UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

**NIGHT BOX**
**FILED**

MAY 1 0 2004

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

| | |
|---|---|
| SIERRA CLUB, et al., | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| ROBERT B. FLOWERS, et al., | ) |
| | ) |
| Defendants. | ) |

Civ. No. 03-23427(WMH)

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

OF COUNSEL:

BRADFORD H. SEWELL
NATURAL RESOURCES DEFENSE COUNCIL
40 West 20th Street
New York, NY 10011

JONATHAN R. LOVVORN
D.C. Bar. No. 461163
ERIC R. GLITZENSTEIN
D.C. Bar No. 358287
MEYER & GLITZENSTEIN
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C. 20009

PAUL J. SCHWIEP
Fl. Bar. No. 823244
ARAGON, BURLINGTON, WEIL,
SCHWIEP, KAPLAN & BLONSKY, P.A.
2699 S. Bayshore Drive
Miami, FL 33133

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.    The Statutory And Regulatory Scheme . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    II.    Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    I.    THE CORPS IS VIOLATING THE NATIONAL ENVIRONMENTAL
        POLICY ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        A.    The Corps Has Not Studied, Developed, And Described
                Alternatives To The Industry's Preferred Rock Mining Plan . . . . . . . . 25

        B.    The Corps' EIS Fails To Analyze All Direct, Indirect, and
                Cumulative Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        C.    The Corps' EIS Unlawfully Deferred Critical Environmental
                Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        D.    The Corps Violated Its Duty To Conduct Supplemental NEPA
                Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    II.    THE CORPS IS VIOLATING THE CLEAN WATER ACT . . . . . . . . . . . . . . 36

        A.    The Corps Violated The Public Participation Requirements Of
                The CWA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

        B.    The Corps Violated Its Duty To Prove That There Are No
                Practicable Alternatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

        C.    The Corps Failed To Provide A Rational Explanation For Its
                Permit Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    III.    THE CORPS AND THE FWS ARE VIOLATING THE ESA . . . . . . . . . . . . 44

        A.    The FWS's "Concurrence" With The Corps' "Not Likely To
                Adversely Affect" Decision Is Arbitrary and Capricious . . . . . . . . . . . 44

i

      B.     The FWS And The Corps Violated Their Duty To Re-Initiate
            Consultation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50

## TABLE OF AUTHORITIES

**FEDERAL CASES**

American Lung Association v. EPA,
134 F.3d 388 (D.C. Cir. 1998) ........................................................................ 44

Baltimore Gas & Electric Co. v. NRDC,
462 U.S. 87 (1983) ........................................................................ 24

Bensman v.USFS,
984 F. Supp. 1242 (W.D.Mo. 1997) ........................................................................ 47

Bersani v. EPA,
850 F.2d 36 (2nd Cir. 1988) ........................................................................ 41

Buttrey v. United States,
690 F.2d 1170 (5th Cir. 1982) ........................................................................ 37,38,42

California v. Block,
690 F.2d 753 (9th Cir. 1982) ........................................................................ 29

Calvert Cliffs v. U.S. Atomic Energy Commission,
449 F.2d 1109 (D.C. Cir. 1971) ........................................................................ 24

Citizens to Preserve Overton Park v. Volpe,
401 U.S. 402 (1971) ........................................................................ 44

Defenders of Wildlife v. Babbitt,
130 F. Supp. 2d 121 (D.D.C. 2001) ........................................................................ 29, 46

Defenders of Wildlife v. Babbitt,
958 F. Supp. 670 (D.D.C. 1997) ........................................................................ 41,42

Dubois v. Department of Agriculture,
102 F.3d 1273 (1st Cir. 1996) ........................................................................ 27

Friends of the Clearwater v. Dombeck,
222 F.3d 552 (9th Cir. 2000) ........................................................................ 35,36

Friends of the Earth v. Corps of Engineers,
109 F. Supp. 2d 30 (D.D.C. 2000) ........................................................................ 28,29

Friends of the Earth v. Hall,
693 F. Supp. 904 (W.D. Wash. 1988) ........................................................................ 39,40,41,42

<u>Friends of the Wild Swan v. USFWS,</u>
945 F. Supp. 1388 (D. Or. 1996) ........................................................................... 26,41

<u>Gerber v. Norton,</u>
294 F.3d 173 (D.C. Cir. 2002) ............................................................................... 34

<u>Greenpeace v. NMFS,</u>
80 F. Supp. 2d 1137 (W.D. Wash. 2000) ............................................................... 47

<u>Half Moon Bay Fishermen's Marketing Association v. Carlucci,</u>
857 F.2d 505 (9th Cir. 1988) ................................................................................. 30

<u>Hough v. Marsh,</u>
557 F. Supp. 74 (D.Mass. 1982) ............................................................... 38,40,41,42

<u>Idaho Sporting Congress v. Thomas,</u>
137 F.3d 1146 (9th Cir. 1998) ............................................................................... 30

<u>Johnston v. Davis,</u>
698 F.2d 1088 (10th Cir. 1983) ............................................................................. 33

<u>Kern v. BLM,</u>
284 F.3d 1062 (9th Cir. 2002) ............................................................................... 32

<u>Korteweg v. Corps of Engineers,</u>
650 F. Supp. 603 (D.Conn. 1986) .......................................................................... 41

<u>Louisiana Wildlife Federation v. York,</u>
761 F.2d 1044 (5th Cir. 1985) ............................................................................... 34

<u>Lujan v. National Wildlife Federation,</u>
497 U.S. 871 (1990) .............................................................................................. 28

<u>Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,</u>
463 U.S. 29 (1983) ............................................................................... 24,35,43,45

<u>Mowery v. Heckler,</u>
771 F.2d 966 (6th Cir. 1985) ................................................................................. 50

<u>NPCA v. Babbitt,</u>
241 F.3d 722 (9th Cir. 2001) ................................................................................. 32,34

<u>NRDC v. Evans,</u>
279 F. Supp. 2d 1129 (N.D.Cal. 2003) ................................................................. 47,48

<u>NRDC v. Hodel,</u>
865 F.2d 288 (D.C. Cir. 1988) .............................................................................. 31

iv

NRDC v. Morton,
388 F. Supp. 829 (D.D.C. 1974) ........................................................................ 30

NWF v. Marsh,
568 F. Supp. 985 (D.D.C. 1983) ........................................................................ 39

NWF v. Marsh,
721 F.2d 767 (11th Cir. 1983) ................................................................. 34,35,36

Neighbors of Cuddy Mountain v. U.S. Forest Service,
137 F.3d 1372 (9th Cir. 1998) ...................................................................... 33,34

Northwest Environmental Advocates v. EPA,
268 F. Supp. 2d 1255 (D.Or. 2003) ............................................................. 48,49,50

Ocean Advocates v. U.S. Army Corps of Engineers,
361 F.3d 1108 (9th Cir. 2004) ..................................................................... 24,31

Pacific Coast Federation of Fishermen's Asss'n v. NMFS,
265 F.3d 1028 (9th Cir. 2001) ........................................................................ 46

Panhandle Eastern Pipe Line Co. v. FERC,
196 F.3d 1273 (D.C. Cir. 1999) ................................................................... 45,48

Protect Key West v. Cheney,
795 F. Supp. 1552 (S.D. Fl. 1992) ................................................................... 24

Public Citizen v. Heckler,
653 F. Supp. 1229 (D.D.C. 1986) ..................................................................... 43

Resources Limited v. Robertson,
35 F.3d 1300 (9th Cir. 1994) ......................................................................... 46

Roberts v.  Methlow Valley Citizens Council,
490 U.S. 332 (1989) ............................................................................... 24,33

Roosevelt Campolbello v. EPA,
684 F.2d 1041 (1st Cir. 1982) ........................................................................ 36

Save Our Sycamore v. MARTA,
576 F.2d 573 (5th Cir. 1978) ......................................................................... 27

Sierra Club v. Marsh,
816 F.2d 1376 (9th Cir. 1987) ........................................................................ 50

Sierra Club v. Sigler,
695 F.2d 957 (5th Cir. 1983) ......................................................................... 36

Sierra Club v. Yeutter,
926 F.2d 429 (5th Cir. 1991) ................................................................. 49,50

Simmons v. Army Corps of Engineers,
120 F.3d 664 (7th Cir. 1997) ............................................................. 27,42,46

Slagle v. U.S.,
809 F. Supp. 704 (D.Minn. 1992) .............................................................. 43

Tennessee Valley Authority v. Hill,
437 U.S. 153 (1978) ............................................................................. 44

Thomas v. Peterson,
753 F.2d 754 (9th Cir. 1985) ................................................................. 49

**FEDERAL STATUTES**

Administrative Procedure Act,

    5 U.S.C. § 706(2) ............................................................................. 24

Clean Water Act,

    33 U.S.C. § 1311 et seq .................................................................... 1

    33 U.S.C. § 1311(a) ....................................................................... 2,37

    33 U.S.C. §1344(a) ........................................................................ 38,39

Endangered Species Act,

    16 U.S.C. § 1531 et seq .................................................................... 1

    16 U.S.C. § 1536(a)(2) .................................................................... 2,44

    16 U.S.C. § 1536(b)(3)(A) ................................................................. 44

National Environmental Policy Act,

    42 U.S.C. § 4321 et seq., ................................................................... 1

    42 U.S.C. § 4332(C) ...................................................................... 2,27,28

    42 U.S.C. § 4332(2)(E) ..................................................................... 25

## FEDERAL REGULATIONS

33 C.F.R. § 320.4(a)(1) ......................................................................................... 43, 44

33 C.F.R. § 320.4(b)(4) ............................................................................................... 3

33 C.F.R. § 325.2(a)(2) .............................................................................................. 39

33 C.F.R. § 325.3(a) ................................................................................................... 39

33 C.F.R. § 325.7(a) ............................................................................................... 44,45

33 C.F.R. § 327.4(a) .............................................................................................. 15,39

33 C.F.R. § 327.4(a-c) ................................................................................................ 41

33 C.F.R. § 327.4(b) ................................................................................................... 41

40 C.F.R. § 230 ............................................................................................................ 3

40 C.F.R. § 230.10 (a)(2) ........................................................................................... 41

40 C.F.R. § 230.10(a)(3) ............................................................................................ 41

40 C.F.R. § 230.10(c) ................................................................................................. 38

40 C.F.R. § 230.1(d) .................................................................................................. 38

40 C.F.R. § 1501.2(b) .................................................................................................. 3

40 C.F.R. § 1502.1 ..................................................................................................... 28

40 C.F.R. § 1502.9(c) ................................................................................................. 35

40 C.F.R. § 1502.14 ................................................................................................... 26

40 C.F.R. § 1502.14(a-c) ........................................................................................... 26

40 C.F.R. § 1502.15 ................................................................................................... 31

40 C.F.R. § 1506.9 ....................................................................................................... 9

50 C.F.R. § 402.02 ..................................................................................................... 49

50 C.F.R. § 402.14(a) .............................................................................................. 3,45

50 C.F.R. § 402.14(g) ................................................................................................. 45

**MISCELLANEOUS**

FWS, Wood Stork Recovery Plan (Jan. 27, 1997) ....................................................... 39

FWS, Consultation Handbook (March 1998) ........................................................... 39

49 Fed. Reg. 7332 (Feb. 28, 1984) ............................................................................... 5

Water Resources Development Act of 1996, Pub. L. No. 104-303,
110 Stat. 3658 (Oct. 12, 1996) ...................................................................................... 5

## INTRODUCTION

In this action, several conservation organizations challenge a decision by the United States Army Corps of Engineers ("Corps") authorizing the first phase of a plan to transform 15,000 acres of irreplaceable Everglades wetlands into hardrock mining pits -- even though the National Park Service ("Park Service") and other federal resource agencies have stated that such mining presents a substantial threat to the continued health and future restoration of the Everglades ecosystem, and despite warnings from Miami-Dade County that mining could contaminate the public drinking water supply. This action also challenges the U.S. Fish and Wildlife Service's ("FWS") decision to "concur" in the Corps' finding that this wholesale destruction of Everglades wetlands will not "adversely affect" any federally endangered species -- a decision that ignores the fact that the wetlands at issue provide core foraging habitat for endangered Wood Storks, see AAR-944 at 1-3,[1] and are also "a key component" in the Park Service's efforts to restore the Everglades, and thus "provid[e] recovery benefits" for Wood Storks and the critically endangered Cape Sable Seaside Sparrow. (SAR-2489).

As discussed below, in authorizing this unprecedented destruction of Everglades wetlands -- including wetlands that are 1,000 feet from Everglades National Park -- the Corps and the FWS violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., the Clean Water Act ("CWA"), 33 U.S.C. § 1311 et seq., and the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq. These violations are compounded by the agencies' failure to prepare a Supplemental Environmental Impact Statement ("SEIS") and reinitiate consultation under the ESA in light of significant new information demonstrating that (1) the wetlands mitigation required by the Corps, and relied upon by the FWS is assessing endangered species impacts, is now infeasible, and has been modified; and (2) the mining at issue presents a far greater threat to the local drinking water supply than originally envisioned by the Corps, Miami-Dade County, or anyone else.

---

[1] All citations herein are to the Corps' Administrative Record for the decision to issue mining permits ("AAR-document number"), the FWS's Administrative Record for the agency's decision to concur with the Corps' ESA finding ("FAR-document number"), and the Corps' Supplemental Administrative Record regarding plaintiffs' February 2004 request for additional environmental review ("SAR-page number"). However, pages 2378 to 2529 of the SAR are materials that are part of the Administrative Record for the decision to issue the permits, but were omitted from the AAR. The only exceptions are plaintiffs' Article III standing declarations (Exhibits 2-6), and the FWS's Recovery Plan for the Wood Stork, which is a public document. (Exhibit 1).

1

## STATUTORY AND FACTUAL BACKGROUND

I.   **The Statutory And Regulatory Scheme**

    A.   **National Environmental Policy Act**

NEPA requires federal agencies to prepare an Environmental Impact Statement regarding "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). NEPA also requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." Id. at § 4332 (2)(E). The regulations implementing NEPA set forth specific factors that agencies must consider "in adequate detail" in preparing an EIS. 40 C.F.R. § 1501.2(b).

    B.   **Clean Water Act**

The CWA prohibits the discharge of pollutants into wetlands. 33 U.S.C. § 1311(a). The Act authorizes the Corps to issue permits for the discharge of "dredged or fill materials," but only after providing "notice and opportunity for public hearings." Id. at § 1344. Under the Corps' regulations, "[n]o permit will be granted which involves the alteration of wetlands" unless the Corps finds that "the benefits of the proposed alteration outweigh the damage to the wetlands resource." 33 C.F.R. § 320.4(b)(4). Under the Environmental Protection Agency's ("EPA") binding "404 Guidelines," 40 C.F.R. § 230, "dredged or fill material should not be discharged into the aquatic ecosystem [wetlands], unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern." Id. at § 230.1(c). The Guidelines also prohibit the issuance of a permit "if there is a practicable alternative . . . which would have less adverse impact on the aquatic ecosystem." Id.

    C.   **Endangered Species Act**

The ESA provides that federal agencies "shall, in consultation with and with the assistance of the Secretary, insure that any action authorized . . . by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). To fulfill this obligations, each federal agency must determine whether its actions "may affect" any listed species. 50 C.F.R. § 402.14(a). If an action "may affect" a species, the agency must engage in "formal consultation" unless the FWS "concurs" that it is not likely to "adversely affect" any listed species. Id.

2

II.     **Facts**

    A.     **The Everglades Ecosystem and the Lakebelt Wetlands.**

The Everglades ecosystem is "an American treasure on par with the Grand Canyon, Yellowstone, and California's ancient redwoods," (AAR-1172 at 1), and is home to a rich diversity of wildlife, including over a dozen federally threatened and endangered species, including the endangered Wood Stork and the endangered Cape Sable Seaside Sparrow. (AAR-104 at 7). However, the Everglades ecosystem has suffered greatly from the effects of human development. In 1948, the federal government undertook the "Central and South Florida Project" to replace the natural hydrology of the Everglades with an elaborate system of canals, levees, and water-control structures. (AAR-1172 at 8-9). Today, over 50% of the original wetland areas in the Everglades ecosystem no longer exist. Id. at 9. The numbers of wading birds have been reduced by 90%. (AAR-1152 at iii); AAR-15 at 7. Entire populations of animals are at risk of disappearing. (AAR-1143 at 4). As explained by Park Service biologists "[t]hese grim indicators warn of a system under assault and in jeopardy of collapse." Id.

Immediately east of Everglades National Park lies a portion of the Everglades ecosystem historically known as the "East Everglades," (AAR-223 at 5), but which, in recent years, has been referred to as the "Lakebelt" because of the series of deep-water pits that have been dug throughout this area by the limestone mining industry. (AAR-574 at 5) (Map). The Lakebelt area consists of 60,000 acres of wetlands that, according to the Park Service, "represent[] the last remnant of the short hydroperiod marshes that are critical to the proper functioning of the Everglades ecosystem." (SAR-2384). Despite their importance, the mining industry has been destroying these wetlands for many years.[2] However, rather than fully mitigating for the loss of wetlands caused by mining, the record shows that, as of February 2002, the industry owed the public at least 388 acres in mitigation that has never been completed. (AAR-964 at 1); AAR-1007 at 1. The FWS has stated that the Lakebelt wetlands are

---

    [2] The rock mining process in the Lakebelt wetlands is a three-part process that completely destroys the affected wetland areas. First, heavy machinery is used to strip all trees, plants, and soil from the wetlands -- an activity which also removes all wildlife and wildlife habitat. (AAR-104 at 5); AAR-123 at 21. Second, dynamite is inserted into the bare limestone and detonated. Id. The blasts are so strong that they frequently cause damage far away from the site. Id. Third, a massive "scoop" is brought in to extract limestone, which is then loaded onto trucks and transported throughout Florida to be used in the building of more roads and development. Id.

necessary for the future restoration of the Everglades and for the recovery of ESA-listed species, and that mining in proximity to Everglades National Park could "hinder our ability to restore the natural hydropatterns of the Everglades" and "hinder our ability to recover listed species." (SAR-2493).[3]

**B.    The Biscayne Aquifer And The Miami-Dade County Wellfield.**

Lying within the East Everglades is the Biscayne Aquifer and the Miami-Dade County Wellfield, which is the primary source of drinking water for millions of people.  (AAR-104 at 5); AAR-623A at 8 (Map).  The aquifer is designated by EPA as a "sole-source" aquifer, which means "that the aquifer is 'particularly vulnerable to contamination' and 'contamination of the sole source aquifer is reasonably likely to occur, unless a program to reduce or prevent such contamination is implemented.'" (AAR-104 at 5); AAR-16 at 16 ("[t]he Biscayne Aquifer is extremely permeable and susceptible to pollution").

According to EPA, "[p]ossibly one of the more devastating impacts to ground water quality is rock mining in South Florida."  (AAR-104 at 5).  This is because the deep water "borrow lakes" left over after mining can "act as a conduit for contamination to reach the aquifer."  (AAR-117 at 3).  Thus, as explained by County water quality experts, mining close to the wellfield can "reduce the potential for the [aquifer] to filter, dilute, or, in the case of pathogens, inactivate contaminants prior to uptake by the wellheads . . . ."  (AAR-242 at 2); AAR-970 at 177.  According to the County, one such pathogen, Cryptospordium, "may survive up to one year in surface water and has been detected in canals in Miami-Dade County."  (AAR-970 at 177).  Because of these risks, the County "has major water quality concerns" about mining, which could "jeopardize drinking water quality."  (AAR-311 at 16).[4]

_____

[3] See AAR-512 at 2 ("the excavation of deep water lakes in close proximity of Everglades National Park could pose a serious threat to the restoration of Shark River Slough"); AAR-512 at 1 ("we believe that mining has serious consequences for restoration efforts in South Florida")

[4] The County has further explained that the risk of contamination is not hypothetical, since "[a] major outbreak of Cryptospordium occurred in Milwaukee in 1993," and that "147 other outbreaks of protozoan waterborne disease were documented in the United States between 1971 and 1994." (AAR-1002 at 391); AAR-970 at 177 ("although the detections within the County have been few, the sampling and laboratory procedures for that organism are known to significantly underrepresent its presence in the environment").  The County has also enacted a "Wellfield Protection Ordinance," which is intended to prohibit mining within the area where a contaminant can travel to the wellfield head within certain time periods.  (SAR-2129); FAR-27 (map).  As discussed below, these restrictions were designed to protect against hazardous chemical spills, and were not specifically designed to address mining and microorganisms. (AAR-605 at 85-90).

4

C.     **The Federally Endangered Wood Stork.**

The Wood Stork is listed as "endangered" -- the highest federal wildlife protection.  See 49 Fed. Reg. 7332 (Feb. 28, 1984).  According to a wildlife study prepared for the Lakebelt plan, "[b]oth adult and juvenile Wood Storks [have been] observed foraging" in the Lakebelt area, and as many as 53 individuals have been observed in the area in a single day.  (FAR-133 at 33).  According to the Administrative Record, one of the largest breeding colonies of Wood Storks is located less than 5 miles from the project.  (AAR-944 at 1); AAR-975 at 7 (Map).  The FWS has stated that "[t]he federally endangered wood stork is dependent on short hydroperiod freshwater marshes, wet prairies and other wetlands including those habitats invaded by melaleuca (*Melaleuca quinquenervia*)[5] for forage habitat." (FAR-50 at 3).  Similarly, the Park Service has stated that the "short hydroperiod marshes" found in the Lakebelt represent the "[b]est wood stork & wading bird habitats." (FAR-26 at 33) (emphasis added).[6]

D.     **The Everglades Restoration Plan.**

To prevent further degradation of the Everglades ecosystem, Congress directed the Corps to develop "a Comprehensive Plan for the purpose of restoring, preserving, and protecting the South Florida ecosystem."  Water Resources Development Act of 1996, Pub. L. No. 104-303, § 528, 110 Stat. 3658 (Oct. 12, 1996).  Pursuant to this directive, the Corps developed the Comprehensive Everglades Restoration Plan ("CERP"), which is intended to provide "a comprehensive plan that provides for the restoration, protection, and preservation of the water resources of central and southern Florida" by removing "internal levees and canals" and other structures that affect natural water flows.  (AAR-1172 at 2).  As part of this "comprehensive" restoration, (AAR-1172 at 6), the CERP proposes to repair the damage wrought upon the Everglades by utilizing areas adjacent to Everglades National Park to help restore the natural hydrology of areas within the Park.  For example, one of the CERP projects -- which

---

[5] Melaleuca is an invasive plant species that occurs throughout the East Everglades.  Although Melaleuca infestation is generally harmful to biodiversity, Wood Storks still forage in wetlands that contain Melaleuca infestation rates as high as 50-75%.  (AAR-205 at 51); FAR-133 at 456.

[6] A comprehensive study prepared by the State of Florida also concluded that "[t]he proximity of wetland habitat within the [Lakebelt] study area to existing foraging and nesting sites for wading birds (especially wood storks) and snail kites in adjacent Water Conservation Areas makes it essential to maintain or even enhance the capacity of remaining wetlands to support these endangered species."  (AAR-17 at 77) (emphasis added).

began implementation in 2001 -- is to use the Lakebelt area as a so-called Water Preserve Area to reduce seepage from the Water Conservation Areas and Everglades National Park, and to act as a flowway to provide additional water to restore the natural hydrology of the Park, and, in turn, recover critically imperilled species such as the Cape Sable Seaside Sparrow. (AAR- 963 at 2-3); AAR-1172 at 11.[7]

### E.   The Lakebelt Mining Plan.

At the same time the Corps was launching an unprecedented program to "*increase* the total spatial extent of natural areas" in the Everglades, the Corps was also developing a plan to authorize the mining industry to *eliminate* over 15,000 acres of Everglades wetlands. In essence, the Lakebelt Plan proposed to authorize widespread mining in the western portion of the Lakebelt wetlands in exchange for the acquisition and restoration of the "Pennsuco wetlands" on the east side of the area. (AAR-623A at 8) (Map). However, nearly half of the Pennsuco wetlands are already publicly owned -- and thus unlikely to be subject to future mining. (AAR-978); FAR-65 (map). Although these same wetlands had already been designated for use as part of the CERP, (AAR-1172 at 11); AAR-605 at 15-22, the environmental review process for the Lakebelt Plan was not integrated with the review process for the CERP.

Although the Lakebelt Plan was originally developed at the State level and touted as a "consensus-based" report that would "provide the best balance of mining, environmental restoration, and regional water management," (AAR-489 at 11-12), the final Issues Advisory Team Report fell far short of achieving either "consensus" or "balance." Thus, after reviewing the Report, the National Park Service and the FWS informed the Corps that these agencies concerns about mining in proximity to Everglades National Park were "completely ignored," and that the Report "erroneously infers that all parties supported [the] amount of mining" proposed in the Report. (AAR-512 at 1); AAR-470 at 3.

Moreover, the Corps' own staff expressed concerns about "the misinformation level," (AAR-532 at 8), and referred to the meetings where the issues were purportedly explored as being "choreographed." (AAR-468 at 1). Indeed, Colonel Terry Rice, then in command of the Corps for that District, lamented that "all we get from the rock miners and the committee is plans skewed towards serving their interests." (AAR-341 at 1). As summarized by one Park Service official, the end result of this process was a

---

[7] Creation of the Water Preserve Area will involve significant re-engineering of the Lakebelt water system, and the creation of "an interconnected series of marshlands, impoundments, stormwater treatment areas, conveyances, and aquifer recharge areas."(AAR- 963 at 2-3).

willingness of [] Team members to concede and compromise on a plan, and heavily pressure those who oppose it, [even] though <u>the plan has irreversible effects, is in a very sensitive area of the former Everglades, may compromise a multi-million dollar restoration project</u>, and to do this so easily without a shred of information to go on.

(AAR-471 at 4) (emphasis added).

F.    **The Corps' Draft EIS.**

In May 1999, the Corps issued a draft EIS ("DEIS") that made no mention of the controversy surrounding the development of the Lakebelt plan, but did acknowledge that the mining plan "will have an irreversible significant negative impact on the environmental resources of the region," including "negative impacts to native vegetation, wildlife, land use, and regional water supply," and may "threaten the quality of the raw drinking water source for the Miami area." (AAR-578 at 71; 82; 84). Despite these frightening predictions -- and notwithstanding the DEIS's stated purpose to "[d]escribe and assess <u>alternatives to</u> the continuation of limestone mining in south Florida wetlands," (AAR-578 at 12) -- the draft did not assess the environmental impacts of a single alternative to the comprehensive mining plan favored by the Corps. Instead, the DEIS dismissed two alternatives -- a "curtail future mining" and a "no action" alternative -- in a half-page of text which did not even attempt to compare the environmental costs and benefits of these alternatives with the Corps' proposed mining plan. (AAR-578 at 67).

The Corps' DEIS was severely criticized by all the major federal resource agencies involved in Everglades restoration. As succinctly explained by the Department of Interior:

> The conversion of the existing short-hydroperiod wetland habitat within the Lakebelt area to deep, open-water lakes removes an extensive area of this critical wetland habitat from the system, replacing it with non-natural habitat of little or no value to the Everglades ecosystem. <u>The size, habitat type, and location of this area make it critical to the ecological integrity of the Everglades ecosystem</u>. The loss of peripheral habitats along the eastern side of the remaining Everglades has been identified as a significant factor in the decline of wading birds, whose populations are adversely affected by the removal of early dry season foraging areas. * * * <u>These ecological characteristics cannot be replaced by simply enhancing existing wetlands through exotic removal, or by elevating the degree of protection provided, as described in the Lakebelt Plan.</u>

(AAR-605 at 18). The Interior Department also identified numerous defects in the DEIS, including (1) an "insufficient" analysis of alternatives; (2) a "deficient" analysis of "proposed compensatory mitigation" and the "effects of the action on the continued sustainability and eventual restoration of the Everglades ecosystem;" (3) the failure to "[p]rovide an alternative to mitigation in the Pennsuco marshes if hydrological instability renders those marshes as inappropriate mitigation;" and (4) the failure to discuss

7

"interrelated and interdependent" components of the CERP, as required "by the National Environmental Policy Act." Id. at 9-28; 15 ("A decision on the appropriateness of mining in this area cannot be made until after it has been determined whether this area is critical for Everglades restoration").[8]

Other federal resource officials were equally blunt in their criticisms. For example, the Superintendent of Everglades National Park and the head of the South Florida Office of the FWS warned the Corps "that excavation of deep water lakes in close proximity of Everglades National Park could pose a serious threat" to Everglades restoration efforts by further "diminishing the land available for constructing a functional buffer between the Everglades and developed land to the east," and by "increas[ing] seepage from Everglades National Park." (SAR-2379) (emphasis added).[9]

The mining plan and EIS were also criticized by the EPA -- the federal agency with primary responsibility for reviewing other agencies' EISs under NEPA. See 40 C.F.R. § 1506.9. EPA expressed concerns about several "significant unknowns" associated with the project, including "important potential water quality complications," "wetland mitigation plan requirements," and the "increasing trend in the seepage losses" associated with mining adjacent to Everglades National Park. (AAR-605 at 41-53). EPA also questioned one of the fundamental premises of the entire Lakebelt Mining Plan -- i.e., whether mining the western Lakebelt in exchange for "protecting" the Pennsuco wetlands was an appropriate ecological trade-off because "acquisition of the Pennsuco parcel will address less than 50% of the total

_____

[8] Several comments also pointed out the DEIS's complete failure to disclose adverse impacts from blasting, truck traffic, and other mining-related activity. See, e.g., AAR-579 at 2 ("increased air pollution (dust) resulting from mining and truck traffic"); AAR-68 at 8 ("dust, heavy truck traffic, and the noise and vibration from quarry blasting"); AAR-19 at 9 (operation of "four cement mills" and "over 300 rail cars a day" for rock deliveries); AAR-617 at 444.

[9] In other communications, the FWS explained that "mining close to the boundary of the remaining Everglades is much like punching a hole in the bucket," and that the increased seepage out of the Everglades caused by this "newly created hole" "will hinder our abilities to restore the natural hydropatterns of the Everglades," and "if we hinder our abilities to restore the greater Everglades ecosystem, we hinder our abilities to recover listed species." (SAR-2493). (emphasis added). The FWS also pointed out that "the area of the proposed rock mine" has already been designated as a "flow-through area" under the CERP, which is "a key component in providing improvements in Cape Sable seaside sparrow and snail kite habitats in [Everglades National Park]," and "is also key in providing recovery benefits . . . for wood storks." (SAR-2489). A Park Service scientist also expressed "concern that the Lakebelt Plan will 'rob' water from the Conservation Areas and that we will lose the very water from the natural system that we are trying so hard to keep as part of the [CERP]." (AAR-1002 at 44).

8

environmental/habitat losses associated with this mining effort." (AAR-605 at 41).

EPA also found the Corps' alternatives analysis flawed because the DEIS refused to explore the alternative of "restrict[ing] mining to areas already permitted" by the Corps -- a total of 15,000 acres. Id. at 42. The Corps refused to develop or explore this alternative because these 15,000 acres would only provide enough limestone for "approximately 15 years," at which time rock would need to be imported. Id. However, as explained by EPA, the DEIS provided "no analysis . . . of acquiring [limestone] materials from domestic sources beyond the study area and/or efforts which could be made to facilitate importation of foreign rock during the [15 year] sunset period." Id. In addition, the EPA informed the Corps that the DEIS may have "overly relied on data supplied by the industry." Id.[10]

Miami-Dade County also objected to the DEIS's failure to assess the critical issue of whether mining could increase the chances of microbial pathogens such as Cryptospordium reaching the Aquifer, and thus contaminating the County's water supply. (AAR-605 at 85-92). As explained by the County, rather than studying and disclosing the actual risk of contamination, the Corps' DEIS chose to rely on the existing wellfield protection ordinance's setbacks. Id. at 86. However, as explained by the County's water quality expert, "[t]he County's current wellfield protection program was established primarily to protect the water supply from septic tanks and hazardous materials spillage and may not adequately address potential impacts from microorganisms associated with surface water bodies." Id. (emphasis added). Thus, rather than rely on the existing setbacks -- which were recognized as inadequate -- the County's expert urged the Corps to study and "determine the extent to which mining in the vicinity of the wellfield will further compromise the natural filtration process that currently exists at the Northwest and West Wellfields." Id. at 88. As summarized by one County water quality expert, the DEIS does "not

---

[10] EPA was also concerned that, rather than completing a detailed analysis before proceeding with the mining plan, the Corps' EIS assumes that issues would be addressed at some later date as part of a "Phase II" planning document. (AAR-605 at 41). EPA explained that, by relying on a "Phase II" study to resolve critical environmental details, the Corps was creating uncertainty as to how "major areas of concern will be resolved," and therefore urged the Corps to conduct "further NEPA documentation and public disclosure" after the Phase II study was completed so that "all commenting parties [are furnished] with a clear understanding of exactly how this action will proceed prior to the final EIS rather than after publication of the Record of Decision." Id. at 44. The Interior Department made the same request. Id. at 11.

fully answer this question, <u>which is essential for the protection of public health</u>." (AAR-605 at 91).[11]

### G.    The Corps' May 2000 Final EIS.

In May 2000, the Corps released a final EIS which failed to remedy any of the serious problems identified during the public comment process, although the document did note that the proposed mining will "result in the direct loss of approximately 15,800 acres of wetlands" over the next 50 years, (AAR-614 at 10), which in turn "will have an irreversible significant impact on the environmental resources of the region," <u>id</u>. at 90, including "significant negative impacts . . . to native vegetation, wildlife, land use, and regional water supply," <u>id</u>. at 89, and potential disruption of the natural hydrology of the Everglades ecosystem from "increased flows of water [out of] the regional Everglades system." <u>Id</u>. at 99.

Like the draft, the final EIS also does not evaluate the environmental impacts of any alternative to the industry's preferred mining plan.  Instead, the Corps merely expanded the draft's one-half page argument for refusing to consider alternatives into a one and one-half page argument for refusing to consider alternatives. (AAR-614 at 71-72).[12]  With regard to the other critical issues, the final EIS simply repeats the Corps' previous assertion that none of the difficult issues associated with mining -- including the development of a concrete mitigation plan and the identification of sufficient mitigation sites, the potential hydrological damage to Everglades National Park and CERP efforts, and the contamination of groundwater supplies -- needed to be resolved in the EIS because they would be fully studied and resolved by the "Lakebelt Committee" in a subsequent "Phase II Plan." (AAR-614 at 10-11; 76; 98-99).[13]  Thus,

---

[11]  The Miccosukee Tribe also explained that "[r]ock mining's adverse consequences directly and negatively impact the Tribe and jeopardize its very existence." (AAR-605 at 33-34).

[12]  In support of its wholesale refusal to consider any alternatives, the Corps inserted into the appendix of the final EIS a hastily prepared "report" by the mining industry's agent, Mr. Paul Larson -- whom the Corps' own officials had previously accused of providing "very biased info" to the agency.  (AAR-270 at 2) ("Paul Larson basically presented his talk as he did last Thursday and Friday.  With that very biased info on the table, I made several comments from the Corps' perspective.").  The Larson report -- which was not circulated for public comment before the final EIS was issued -- predictably concludes that no alternatives other than full-scale mining are economically viable for the mining industry. (AAR-614 at 930).  Nevertheless, despite several agencies' requests for a less biased look at alternatives, the Corps informed these agencies that "the Corps is not interested in funding an independent analysis." (AAR-587 at 1).

[13]  The "Lakebelt Committee" was a reconstituted version of the "Issues Advisory Team" -- the same body that had, according to federal officials, "completely ignored" the Park Service's

rather than determining the actual risk of mining contaminating the water supply, the final EIS candidly admitted that "[a]t this time, it has not been determined what is needed as a safe buffer to protect the water supply." (AAR-614 at 70). The Corps' approach to this critical issue is summarized in an Email message, wherein one Corps official says to the other "I do not think the Corps needs to get into a position of deciding how much protection is warranted for the wellfield." (AAR-602 at 2) (emphasis added).[14]

The final EIS also ignored numerous comments requesting that the Corps fully assess adverse impacts from blasting and other mining-related activities; comprehensively survey and then describe impacts on cultural and historical resources; disclose adverse impacts on Wood Storks and other federally listed species; and explain the cumulative impacts of the proposal. Nor did the final EIS provide any coherent explanation for rejecting the EPA's and the Department of the Interior's requests that a Supplemental EIS be prepared so that "all commenting parties [are furnished] with a clear understanding of exactly how this action will proceed prior to the final EIS rather than after publication of the Record of Decision." (AAR-605 at 44); id. at 11.

The "Phase II plan" subsequently issued by the Lakebelt Committee in December 2000 did not address any of the issues left unresolved by the Corps' EIS. Instead, the Plan merely reiterated previous promises by the Corps to resolve critical details at some point in the future. (AAR-617). Thus, rather than actually developing the "master plan" promised by the EIS, the Committee generated only a preliminary outline of the target dates by which various tasks -- such as development of a detailed mitigation plan -- may be undertaken over several years. (AAR-617 at 12-26). The Phase II Plan also asserted that it did not need to resolve critical environmental details because the Corps would resolve these difficult issues at some point in the future. Id. at 17.

_____

environmental concerns, (AAR-512 at 1), misrepresented the views of the members, (AAR-470 at 3), "heavily pressure[d] those who oppose it," (AAR-471 at 4), and provided "plans skewed towards serving [the mining industry's] interests." (AAR-341 at 1)

[14] With regard to the Interior Department's concern that the EIS did not fully discuss "interrelated and interdependent" components of the CERP, the Final EIS inserted two short paragraphs explaining the "purpose" of the Plan, but which fails to address the Department's core concern -- i.e., that "[a] decision on the appropriateness of mining in this area cannot be made until after it has been determined whether this area is critical for Everglades restoration." (AAR-605 at 15); AAR-602 at 1 (Corps official stating that the agency will "process permit applications as if the CERP is not there") (emphasis added).

11

**H.**     **The Corps' June 2000 Public Notice of Intent to Issue Fifty-Year Mining Permits**.

Shortly after issuing the final EIS, the Corps released a "public notice" under the CWA reflecting the agency's intent to issue fifty-year mining permits authorizing the destruction of over 10,000 acres of Everglades wetlands. (AAR-623A). With regard to mitigation that would allegedly off-set this loss of wetlands, the notice stated that funds "will be used to <u>acquire and restore</u> areas adjacent to the Water Conservation Area <u>and other locations</u>," but did not identify these "other" sites. (AAR-623A at 1; 3) (emphasis added). Like the EIS, the permit proposal was strongly criticized by resource agencies. For example, the Interior Department informed the Corps that "we continue to have serious concerns about rock mining in this area" because, among other reasons, "the excavation of quarry lakes at the scale envisioned by this plan compromises the restoration of the greater Everglades ecosystem by increasing seepage from the Water Conservation Areas and Everglades National Park." (AAR-712). The Department also noted of "a number of deficiencies [with the Corps' mining plan] which may have serious, long-term implications with respect to our trust resources and Everglades restoration in south Florida," including that (1) "the analysis of impacts on the environment, including an assessment of the loss of spatial extent of wetlands, is deficient;" (2) "the hydrological modeling is inadequate;" and (3) "potential effects to wood storks and other federally listed species" were not adequately addressed. <u>Id</u>.

The Department further pointed out that the EIS's conclusion that adverse impacts will be mitigated "is misleading and premature," and that the cumulative impacts discussion -- which totaled two pages -- "failed to establish a detailed baseline of previous mining impacts within the Everglades ecosystem," which "is a fundamental component of any impact analysis." (AAR-712 at 3). Because of these omissions, the Department stated that the EIS and the Public Notice did not provide the information "necessary to provide wetland regulators and decision makers the detailed information they need to make informed decisions based on an understanding of environmental consequences . . . in accordance with the mandate expressed in the National Environmental Policy Act." <u>Id</u>. at 2[15]

---

[15] The Park Service also "recommend[ed] that these permits be denied" based on numerous defects in the Corps' EIS and mining plan, including the fact that "the [Corps' final EIS] is incomplete and was issued prematurely;" "the mitigation plan is incomplete;" the proposed mitigation site "will not provide enough mitigation to meet the needs of the proposed project;" and "the effects of increased seepage caused by the expansion of deep-water lakes has not been adequately addressed." (AAR-669 at 1-2). The Park Service pointed out that, despite the fact that

12

EPA also "recommend[ed] that authorization of this project be denied" because of "the numerous currently unresolved resources issues associated with the proposed limestone mining," including "serious wetland and drinking water related concerns." (AAR-670 at 2-3). In light of these concerns, EPA made the highly unusual finding that "the proposed project may result in substantial and unacceptable impacts to aquatic resources of national importance." Id. (emphasis added). EPA subsequently requested that, prior to issuing permits, the Corps prepare "a supplemental Lakebelt PEIS fully addressing drinking water issues associated with limestone mining in close proximity to the NWF [the wellfield]." (AAR-713 at 3).

The FWS joined in recommending against issuance of the mining permits because of "the potential for this project to adversely affect fish and wildlife resources," and because "the proposed work may affect aquatic resources of national importance." (AAR-671 at 7). The FWS also noted that "the mitigation plan is incomplete," that "the long-term viability of [the mitigation site] is unknown," that "potential conflicts with land use needs of the CERP" had not been addressed, and that the "secondary and cumulative effects of the action have not been adequately addressed" in the Corps' EIS. Id. at 4-6.

The FWS was also concerned about the impacts of the proposed mining on threatened and endangered species, and therefore rejected the Corps' determination that the proposed hardrock mining would have "no effect" on ESA-listed species. Id. at 3. The FWS explained that "[t]he federally endangered wood stork is dependent on short hydroperiod freshwater marshes, wet prairies and other wetlands," and that "wetlands within 19 miles of rookery sites have been described as core forage areas for wood storks." Id. The FWS noted that the Corps' EIS stated that a key rookery site that "support[s] 125 nesting pairs of wood storks" is "known to exist nine miles to the west of the Lake Belt area," and that "as many as 53 adult and juvenile wood storks were observed foraging in the Lake Belt area." Id.[16]

_____

"the land available for mitigation within the Pennsuco is expected to meet approximately 50% of the total mitigation needs of the Lake Belt Plan," neither the EIS or the Corps Public Notice for the project "identify lands outside the Lake Belt area a suitable for mitigation." Id. at 2. The agency also noted that the "lack of detail" in the EIS and Public Notice makes "evaluation of the project's direct, secondary, and cumulative impacts [] impossible." Id. at 3 (emphasis added).

[16] The FWS also informed the Corps that, to even begin the ESA consultation process, the Corps needed to submit (1) a "thorough analysis of potential effects" to listed species "through loss and destruction of habitat, through direct mortality, [and] through disturbance and harassment;" (2) a "description and analysis taken to avoid and minimize impacts to [listed] species, measures to protect the species during and after project implementation, including any

Finally, because of the intense public interest and controversy associated with the Corps' mining proposal, several public agencies and elected officials requested that the Corps hold a public hearing on the proposed mining permits -- as required under the Corps' regulations. See 33 C.F.R. § 327.4(a). As U.S. Congressman Lincoln Diaz-Balart explained, "a public meeting [] to address the applications submitted by several rock-mining companies within the Lake Belt area" is "of great importance [to] the citizens of Miami-Dade County," since "the issue to be addressed is one that greatly concerns them, their homes and their quality of life." (AAR-667 at 1); AAR-654 (County requesting public hearing).

## I.   The Corps' "Revised" Permit Proposal.

In response to this overwhelming opposition, the Corps elected not to issue the fifty-year mining permits as proposed. Instead, on March 1, 2001, the Corps issued a "revised" public notice that proposed to reduce the duration of the permits to ten years, and to decrease the total area covered to approximately 5,000 acres. (AAR-737). However, the Corps did not abandon its plan to authorize the destruction of 15,000 acres of wetlands over the next fifty years, nor did the agency revise or reissue the Lakebelt EIS. (AAR-820 at 1). Instead, the Corps proposed to issue permits to cover the next ten years of mining, and to defer any analysis of the environmental effects of their controversial fifty-year mining plan to some later date. Like the Corps' previous notice, the new notice stated that mitigation "will be provided by acquiring, restoring and managing lands within the Pennsuco and other locations," but did not identify or describe where or what these "other locations" might be. (AAR-737 at 3).

The Corps' proposal was again poorly received by federal and state resources agencies, conservation organizations, and affected citizens. Thus, EPA again concluded that

> [b]ased on the large size of the proposed impact, the location of the resources adjacent to the Everglades, the potential for long-term, regional degradation of water quality and wetlands, and the lack of data for adequate evaluation of proposed compensation measurers, EPA continues to recommend denial of these permits.

(AAR-820 at 5) ("the proposed work will affect aquatic resources of national importance and [] we continue to object to the projects as proposed"); id. at 1 ("EPA maintains its objection").[17]

---

enforcement and monitoring programs;" and (3) an "analysis of cumulative effects." (AAR-671).

[17]   The EPA also noted that the agency had previously informed the Corps that "critical information concerning the relationship of limestone mining proximal to Miami-Dade County's

14

The FWS also reiterated its objections and pointed out that the "acquisition and exotic removal" in the Pennsuco wetlands "are unlikely to compensate for the wildlife habitat function and spatial extent of the historic Everglades that will be lost as a result of mining," and that the "temporal loss of wetlands" during the time between destruction and mitigation had not been addressed. (AAR-824 at 4). The FWS also repeated its objection to the Corps' determination that the project "would have 'no effect' on any federally listed species," and reaffirmed that it could not even consider whether formal consultation was necessary under the ESA unless the Corps provided a Biological Assessment that included the specific information previously requested by the FWS and required by the ESA regulations. Id. at 3. The FWS also advised that "the proposed work will have substantial and unacceptable impacts on aquatic resources of national importance if permitted as specified in the public notice." (AAR-828) (emphasis added).

The Park Service also reiterated its "serious concerns" that mining -- some of which is as close as 1,000 feet from Everglades National Park -- "will directly impact the hydrological conditions in the adjacent marshes of Everglades National Park." (AAR-825 at 2). The County also reiterated its previous "request that [the Corps] deny the applicants request" because, among other reasons, "an adequate program to protect the Northwest Wellfield from water quality impacts, including pathogenic contamination . . . by the excavation of rockmine lakes has not been developed." (AAR-791B at 1).[18]

**J.    The Corps' Lengthy Closed-Door Process For Issuing The Final Mining Permits.**

Rather than hold a "public hearing" or conduct supplemental NEPA review on the numerous unresolved issues concerning the mining plan, the Corps convened a series of closed-door meetings with the mining industry's lawyers to negotiate the terms of the final permits.  (AAR-823); AAR-840; AAR-1028 at 34.  Thus, despite the Corps' admission that the decisions being made presented "extremely

---

Northwest (NW) Well Field, and more specific information associated with the implementation of the Lake Belt wetland mitigation plan, must be developed via the *Lake Belt Phase II Plan* to support the Lake Belt Section 404 permitting," but that the Phase II Plan "does not provide critical information needed to assess proposed mitigation" and other important issues such as Wellfield contamination – as promised in the EIS.  (AAR-820 at 3).

[18] Plaintiffs also noted that the decision to allow mining now -- while trusting the industry to resolve technical issues later -- was flawed in light of documents showing that "mining operators in the Lakebelt routinely fail to actually follow through with promised mitigation by simply 'neglecting' to finish mining permits," and, "in at least one documented case, mining companies are actually mining within areas set aside for mitigation." (AAR-793B at 4); AAR-827.

15

difficult public policy issues," (AAR-778 at 1), the nearly one year of negotiations, project changes, discussions, and analysis that took place between the March 2001 Public Notice and the Corps' April 2002 final decision, was conducted  without any public disclosure or participation.  Indeed, when a representative of the Sierra Club attempted to attend one of these meetings between the Corps and the miner's lawyers, the representative was told that he "was not welcome," that the meeting was "a private gathering," and that he should "take [his] briefcase and get out." (FAR-22 at 1-3).  During this closed-door process, the Corps and the miners discussed several different proposed draft permits, many which appear to have been written and edited by the miners' litigation counsel, Mr. Rafe Peterson. (AAR-817); AAR-847; AAR-848; AAR-852; AAR-1002 at 444 (local official stating "I am wondering why this thing [the draft Corps' permit] is coming from a rockminer attorney and not the CORPS").

### K.   The Fish And Wildlife Service's Post-Election Reversal Of Position, And The Discovery Of New Information Concerning Wood Storks In The Lakebelt.

During the closed-door review process, the Corps also purported to address the FWS's concerns about impacts on threatened and endangered species.  However, rather than preparing the detailed environmental analysis requested by the FWS, the Corps delivered a generic "Biological Assessment" ("BA") for all twelve of the permits, which was written by an "ecologist" hired by the mining industry's lawyers, and that reiterated the Corps' implausible assertion that the loss of 5,000 acres of Everglades wetlands will have "no effect" on Wood Storks that forage in the project area.  (AAR-821B at 6-7).

Following the January 2001 change in Presidential Administrations, the FWS abruptly reversed its scientific position with respect to the effect of the Corps' mining plan on ESA-listed species, and issued a letter concurring in the Corps' conclusion that the elimination of 5,000 acres of Everglades wetlands will not "adversely affect" Wood Storks.  (AAR-838 at 2).  The FWS's concurrence letter did not restate the FWS's previous concerns over impacts to Wood Storks and other listed species.  (AAR-671 at 3).  Rather, FWS's letter reiterated, nearly verbatim, the mining industry's consultant's conclusion that formal consultation was not required because there are a limited number of Wood Stork rookeries near the project area, and because displaced endangered Wood Storks can simply find "other protected wetlands" to use for foraging and feeding.  (AAR-838 at 2).

After the FWS's abrupt reversal, but before the Corps made its final decision, plaintiffs informed the Corps and the FWS in writing of significant new information showing that the Lakebelt project area

16

was squarely within the primary foraging range for 90% of all Wood Storks nesting within the Everglades National Park. (AAR-944 at 4). Plaintiffs further explained that both the mining applicants' BA and the FWS's concurrence letter rely heavily on the assertion that there are no major Wood Stork colonies near the project area, see AAR-821B at 7-9; AAR-838 at 2, and pointed out that this conclusion is impossible to reconcile with new information indicating that the most important Wood Stork colony in Everglades National Park was located just a few miles from the border of the Lakebelt project area. (AAR-944 at 3). Nevertheless, the Corps and the FWS still failed to engage in formal consultation under the ESA.

###### L.    The Corps' Record of Decision To Issue Ten-Year Mining Permits.

In April, 2002, the Corps issued a Record of Decision ("ROD") that announced the agency's decision to issue ten CWA permits. (AAR-1028). Although the ROD relies on new data, charts, analyses, permit conditions, and proposed future studies that were not disclosed or discussed in the EIS, the Corps made no attempt to circulate any of this information and analysis for public comment before making its decision to issue the permits. Id. at 51-73. Nor did the agency hold a public hearing or follow the EPA's recommendation to prepare a SEIS. (AAR-605 at 44); AAR-713 at 3. At the same time, the ROD also makes no attempt to resolve the serious legal and policy concerns raised by federal resources agencies and environmental organizations. Instead, the ROD relies on more promises of future analysis contained in several "permit conditions" that were developed by the Corps' as part of the "permitting process," (AAR-1028 at 73-76) -- i.e., during closed-door meetings with the mining industry's lawyers.

Thus, with regard to alternatives, the ROD reiterated the final EIS's refusal to fully analyze any alternatives to the comprehensive rock mining plan favored by the miners and the Corps, and repeated the agency's assertion that alternatives such as curtailing future mining or limiting mining to the existing mining footprint (which would sustain mining for 15 years without eliminating any additional wetlands) did not have to be considered because it would "result in economic hardship for the industry," and because the mining industry has "an expectation of continued permitting." Id. at 36.

In addition, with respect to impacts on hydrology, including impacts on Everglades National Park and the future success of the CERP, the ROD relied on an entirely new analysis of models and studies -- none of which had ever been circulated for public comment -- and concluded that adverse effects on hydrology "will be minimal" because some as of yet undeveloped "seepage control technology" might

17

mitigate any impacts. Id. at 51-53; 81 (seepage loss control "could be" carried out in coordination with CERP restoration projects, but any "details" can be "identified in later years"). Similarly, with regard to mitigation, the ROD also relied on a new analysis of charts, plans, proposed conditions, and "estimates of how many acres of lands . . . would be needed to offset the impacts of the 10-year permit authorization" -- materials that also were never circulated for public comment -- and concluded that such critical issues as coordination with overlapping CERP projects, the identification of additional mitigation sites beyond the Pennsuco, and a full accounting of how many hundreds of acres in mitigation the mining industry owes the public from previous mining, can all be addressed at some later date. Id. at 60-73.

With regard to drinking water, the ROD flatly conceded that "[t]here is a risk of contamination to the public Wellfield," and that "the current suite of setbacks and restrictions may not be providing the appropriate level of protection to prevent surface water contaminants from reaching the wells," but then proceeded to authorize mining without determining what an appropriate, safe setback would be. Id. at 54-56.[19] Finally, the ROD concluded that mining is in the "public interest" because "this permit action *will not* have a significant impact on the quality of the human environment," id. at 113 (emphasis added) -- even though the Corps' final EIS states that the mining "*will* have an irreversible significant impact on the environmental resources of the region." (AAR-614 at 90) (emphasis added).

**M.    The Final Mining Permits.**

Shortly after issuance of the ROD, the Corps issued mining permits to the applicants. Although the permits are for a ten-year duration, the permits state clearly that "the purpose of this permit is to facilitate the 50-year life of mining activities under the Miami-Dade County Lakebelt Plan" -- i.e., to facilitate the complete 15,000 acre mine out of the Lakebelt area. (AAR-1035 at 3). The permits concede that various "questions pertaining to the cumulative, long-term consequences of mining" were not fully addressed or resolved by the EIS and the ROD. Id. Thus, the permits rely on a series of "special conditions" which the Corps has touted as addressing this lack of complete analysis. (AAR-1028 at 75).

_____

[19] The ROD also reiterated the final EIS's assertion that the Corps need not undertake any analysis of several direct, secondary, and cumulative impacts of the mining proposal -- including the aesthetic and social impacts of increased blasting, truck traffic, and the use of limestone for further development and environmental degradation -- because these issues are somehow "beyond the scope of this permit application." (AAR-1028 at 91; 98-99; 109).

However, many of these conditions merely continue the Corps' pattern of deferring any serious consideration of important environmental and technical issues, while others are rife with speculation, inaccurate statements, and clauses that are extremely favorable to the mining industry.

For example, although the ROD suggested that unresolved issues would be addressed during a subsequent three-year review, the permits do not require any public process for addressing those issues, and contain no standards for modification of the permits. See, e.g., AAR-1035 at 1-19. Similarly, although the ROD stated that the impacts of mining would be partially mitigated by "the transfer of portions of the post-mining landscape to Miami-Dade County in fee-simple," (AAR-1028 at 74), the permits state that the industry need not transfer any land to the public unless the industry eventually gets "full" permission to mine all 15,000 acres regardless of any concerns about Wellfield contamination, endangered species, or hydrological damage to Everglades National Park. (AAR-1090 at 16).

In addition, while the ROD suggested that issues pertaining to drinking water contamination would be addressed by the fact that the permits designate certain areas close to the Wellfield as being off-limits to mining during the first three years ("cross-hatched areas"), the permits themselves show that many of the areas closest to the Wellfield head can be mined any time. See, e.g., AAR-1100 at 28 (Map with mining authorized in years 1-3 adjacent to wellfield head); AAR-1109 at 29 (Map with cross-hatched areas indicating no mining in years 1-3 in areas farthest away from wellfield, but allowing mining in years 1-3 in areas closer to wellfield head); AAR-1090 at 28 (Map showing two side by side areas equidistant from wellfield head, one with mining in years 1-3, and one without).

Moreover, while the ROD suggested that the permits would place "additional restrictions on the footprint and operations of the mining near the wellfield" that would "minimize risk of contamination" until issues about the safety of mining near the wellfield are resolved, (AAR-1028 at 75), the permits state that, unless at the end of the first three year review the Corps produces "compelling data that such mining will pose a risk to public health, this permit will be modified to remove this restriction." See, e.g., AAR-1071 at 20. In other words, the permits place the burden on the Corps to prove that mining presents an actual threat to public heath, and predetermine that mining will be allowed in close proximity to the sole drinking water source for the County starting in 2005 unless the Corps carries its burden.

19

N.     **The Corps' Receipt of Significant New Information.**

By letter dated February 16, 2004, plaintiffs informed the Corps that new information had come to light showing that the Wellfield is far more vulnerable to contamination from mining than originally considered by the Corps, and that the wetland mitigation proposal that formed the basis for issuance of the permits is now infeasible. (SAR-784). With regard to the risk of drinking water contamination, plaintiffs' letter explained that, in issuing the mining permits, the Corps asserted that mining setbacks based on the County's existing Wellfield Ordinance would be sufficient to protect the water supply from mining related contamination. (SAR-784-85). However, plaintiffs explained that, even if the Corps' assumptions were valid in 2002, recent data and analysis demonstrate that the Corps' assumptions are wholly without basis now, and the intended protections in the permits concerning the Wellfield are also wholly inadequate, even during the initial years of mining. (SAR-785-86).

In support of this conclusion, plaintiffs provided the Corps with, among other information, a scientific report prepared by Dr. Stavros Papadopulos – an internationally-recognized expert on wellfield protection -- which provides a detailed analysis of data from Wellfield studies conducted to date, including data that has been made available concerning the most recent tracer dye study in 2003. (SAR-786; 792-801). As explained by Dr. Papadopulos, the results of these recent tests conducted by the United States Geological Survey ("USGS") and other agencies to evaluate pathogen transport in the Biscayne Aquifer in the vicinity of the Wellfield show that potential contaminants travel much faster in the so-called "karstic flowways" west of the wellfield than previously assumed by the Corps. (SAR-786).

Dr. Papadopulos also determined that, if these karstic flowways exists throughout the Wellfield and based on the most recent test results, the distance to the 60-day travel-time boundary -- inside of which mining is restricted by the County -- would extend as much as 5 miles from the wellfield, i.e., throughout large portions of the area where mining has been authorized. Id. Dr. Papadopulos also concluded that, even based on a 1999 test that reported the slowest travel time of the group, the distance to the 60-day travel-time boundary was 1.4 miles, well into areas targeted for mining. Id. Based on these findings, and based on the terms of the current County ordinance, Dr. Papadopulos concluded that mining should be restricted in areas where the recent testing done in that area indicates potential travel times of less than 30 or 60 days. Id.; SAR-824 (Map showing likely 30 and 60 day travel times).

20

With regard to mitigation, plaintiffs' February 2004 letter pointed out that the EIS, the public notices, and the ROD all emphasized that the industry's agreement to "acquire and restore" significant acreage of Pennsuco wetlands was a crucial part of the Corps' determination that the mining industry would adequately mitigate the environmental impacts caused by the widespread conversion of wetlands to open-pit hardrock mining sites. (SAR-787); AAR-614 at 53; AAR-623A at 1. According to the ROD, approximately 6,500 to 7,200 acres of Pennsuco wetlands would need to be purchased and restored – and several hundred acres of littoral wetlands would need to be constructed around the mining pits – to offset mining in the ten year footprint, and allow the Corps to conclude that the permits were in the "public interest." (AAR-1028 at 69; 114).

However, as explained in plaintiffs' letter, new information demonstrates that the mitigation proposal – integral to the Corps' public interest review and the permits themselves, even if criticized by several resource agencies – is not achievable. In particular, rapidly rising land prices have made purchasing the already inadequate amount of Pennsuco wetlands available for mitigation impossible, given the funds available pursuant to the permits. (SAR-788). For example, the mitigation proposal assessed a fee on mining in the Lakebelt to pay for the purchase and restoration of wetlands, which was based on an assumed value for Pennsuco wetlands of $3,071 per acre and provided for a small annual increase. Id. In total, the mitigation fee was designed to provide for acquisition and restoration costs of $6,142 per acre in 2000, $6,339 in 2001, $6,541 in 2002, and $6,751 in 2003. (AAR-1028, Table A).

In reality, Pennsuco land prices are now significantly higher than provided for by the permits and the ROD. (SAR-789). As a result, the private lands that were targeted for acquisition by the Corps' permit scheme, as assumed in the ROD and EIS, are no longer available because of lack of funds. Id. In their letter, plaintiffs provided documentation showing that current values of the targeted mitigation lands in the Pennsuco range from $10,000 to more than $20,000 per acre -- a figure that could reduce total mitigation by 70 to 85%. Id. As explained by plaintiffs, this unanticipated increase in land values makes it clear that the permits' mitigation fee does not provide sufficient funds for the purchase and restoration of the required Pennsuco mitigation acreage. Id.[20]

_____

[20] Based on mining estimates, the mining fee, and according to the permits' Table A, it appears that the Lakebelt Management Trust Fund would contain $33,922,705 at the end of the 10-year permit term in 2011. (SAR-789). At a $10,000 per acre purchase price for the remaining

Moreover, as explained by plaintiffs, if the Corps intends to utilize alternative mitigation sites to make up the difference, this would represent a significant change in the project requiring additional public disclosure and environmental review under NEPA and the CWA. Id. Because of the seriousness of these issues -- and the nature of the threat to the Northwest Wellfield -- plaintiffs requested that the Corps respond to this new information within thirty (30) days, that the agency prepare a supplemental EIS, and also modify and/or rescind the permits as required by the Clean Water Act. (SAR-790).[21]

By letter dated March 30, 2004, the Corps responded to NRDC's letter by noting that "the Corps was very concerned about potential impacts to the County's Northwest Wellfield," and agreeing that "[a] critical component of [the] mitigation is acquiring the Pennsuco [wet]lands." (SAR-1879-80). Despite this statement of concern, the Corps did not to grant plaintiffs' request for a supplemental EIS, nor did it agree to suspend the existing mining permits pending review of these issues. Id. Instead, the Corps, in effect, denied the request for immediate action, and indicated that it will "evaluate" the information concerning the threat to the drinking water supply as part of its "3-year review" of the permits (which need not be completed until May of 2005 under the terms of the permits), and is working towards finding

---

period of the permit and without any increase in costs, the fund could be used to purchase and restore only 2,601.2 acres -- thousands of acres less than stated in the ROD. Id. At a price of $16,000 per acre, which would better account for current valuations, the fund would only allow for the purchase and restoration of 1,781.6 acres. Id. By comparison, to offset the loss of wetland functions caused by mining just through 2011, the Corps previously determined that at least 4,865.56 acres of wetlands must be bought and restored, assuming that 266.2 additional acres of littoral marshes are promptly built around the lake pits in 2012. (AAR-1028 at 129). Thus, even assuming the littoral marshes are constructed and all needed Pennsuco acreage can be purchased for an average cost of $10,000 per acre, the mitigation plan provides for insufficient funds to buy and restore the needed wetland acreage in the Pennsuco. (SAR-789-90).

[21] Plaintiff NRDC subsequently provided the Corps with documents from the County and the U.S. Geological Survey showing, among other things, that these agencies were reaching the same conclusions about the unanticipated drinking water threat discussed in plaintiffs' February 2004 letter to the Corps. (SAR-1040); SAR-1543-44 (County officials noting that the April 2003 test provided "more accurate data on groundwater velocity than had previously been available," and had identified "preferential flow zones" of unknown extent in the Lakebelt area); SAR-1381; 1414; 1444 (U.S. Geological Survey presentation on how the April 2003 dye test identified "highly porous  preferential pathways" for microorganisms such as Cryptosprodium to travel in the Wellfield).

"alternative locations within the Watershed that may serve as appropriate mitigation . . . ." Id.

**O.     The Current Status Of Mitigation In The Lakebelt Wetlands.**

Shortly after plaintiffs delivered their February 2004 letter, the mining industry submitted to the Corps an "Annual Report" on mining that reaffirms many of the concerns expressed in plaintiffs' letter. For example, although the Corps' public documents tell the public that the loss of critical Everglades wetlands will be mitigated because mining fees will be used to "acquire and restore" the Pennsuco wetlands (AAR-623A at 1) (emphasis added), the report suggests that, to date, not a single new acre of wetlands has been purchased. Rather, the report indicates that funds generated from mining have been spent on either (1) "[e]nhancement and long-term management" of lands already owned by the Corps and the South Florida Water Management District; or (2) for "[r]eimbursement" to the Water Management District for lands that the agency had previously purchased. (SAR-947). In other words, rather than "acquire and restore" Pennsuco wetlands, it appears that the funds generated from the destruction of wetlands have been used exclusively to manage lands already protected by public ownership.

The reasons for this unannounced switch from "acquisition and restoration" of wetlands, to "reimbursement" and "enhancement," is clear from the Supplemental Administrative Record. Thus, as early as September, 2002, one member of the Mitigation Committee explained that "I don't think we can even come close to meeting our mitigation acreage obligations given the potential costs for City National [one parcel of non-publically owned land in the Pennsuco wetlands]." (SAR-1139); SAR-1583 (Corps official noting that the "price is going up" in the Pennsuco, and that most owners are only willing to sell at between $10,000 and $25,000 per acre). Accordingly, the official continued, "[t]hat's why I want to explore potential mitigation $$ swap outs for other, previously acquired, cheaper parcels." Id. Under this new "swap out" plan, rather than requiring the industry to pay the high costs of actually doing what the Corps' decision documents say they would -- i.e., "acquire" lands in the Pennsuco -- the industry will "buy" already protected lands from government agencies at below market prices and "count these lands as mitigation." Id.; SAR-1079 (Corps official stating "the priority should be acquiring privately owned lands that face development pressures, rather than restoring things already under public ownership").[22]

---

[22] Although the Annual Report is suppose to provide a description of the total number of acres destroyed by mining operations during 2003, plaintiffs could not locate anything in the record reflecting the total amount of wetlands impacted by the Corps' decision to date.

## ARGUMENT

Under the Administrative Procedure Act, 5 U.S.C. § 706(2), this Court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," as well as agency action that was taken "without observance of procedure required by law." As the Supreme Court has emphasized, agency action is arbitrary or capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view." Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co., 463 U.S. 29, 43 (1983).

## I.     THE CORPS IS VIOLATING THE NATIONAL ENVIRONMENTAL POLICY ACT

NEPA "aims to establish procedural mechanisms that compel agencies, such as the Corps, to take seriously the potential environmental consequences of a proposed action." Ocean Advocates v. U.S. Army Corps of Engineers, 361 F.3d 1108, 1124 (9th Cir. 2004). As this Court has explained, "[p]rior to the passage of NEPA, environmental considerations were systematically underrepresented in the federal agency decisionmaking process . . . [and] the benefits of development were overstated and less environmentally damaging alternatives for meeting program objectives were often given limited consideration." Protect Key West v. Cheney, 795 F. Supp. 1552, 1560 (S.D. Fla. 1992). The Act seeks to remedy this historic imbalance by "plac[ing] upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action," Baltimore Gas & Electric Co. v. NRDC, 462 U.S. 87, 97 (1983), and by requiring "agency decision maker[s] . . . [to] take[] into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance." Calvert Cliffs v. U.S. Atomic Energy Comm'n, 449 F.2d 1109, 1114 (D.C. Cir. 1971). These "action forcing" procedures are designed to "guarantee[]" that "relevant information will be made available to the larger audience." Roberts v. Methlow Valley Citizens Council, 490 U.S. 332, 349 (1989).

In this case, however, the Corps has run roughshod over these principles by preparing an EIS that (1) failed to develop and explore any alternatives to the mining industry's preferred mining plan; (2) failed to disclose significant direct, secondary, and cumulative impacts associated with the mining plan;

and (3) deferred critical environmental analysis concerning mitigation and drinking water risks until <u>after</u> the public review process. Moreover, the Corps has compounded these errors by refusing to prepare and circulate a Supplemental EIS.

**A.    The Corps Has Not Studied, Developed, And Described Alternatives To The <u>Industry's Preferred Rock Mining Plan</u>.**

Perhaps the most glaring legal violation in this case is the Corps' failure to carry out its statutory duty under NEPA to "study, develop, and describe alternatives to the recommended course of action" for "any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). Because the analysis of alternatives is the "heart" of the NEPA process, 40 C.F.R. § 1502.14, the Act requires an EIS to analyze alternatives "to the fullest possible extent." 42 U.S.C. § 4332(C).[23]

However, in this case, nether the Corps' draft or final EIS contains <u>any</u> of the required analysis. Nor do these documents provide any basis for the public to make a choice among "alternative uses of available resources," since they do not study any available options. As several federal resource agencies and other parties pointed out, because the stated purpose of the EIS was to "[d]escribe and assess alternatives to the continuation of limestone mining in south Florida wetlands," (AAR-614 at 12), an appropriate range of alternatives to achieve this "purpose" should include: eliminating all mining, allowing mining only in the existing footprint, mining in a smaller footprint to conserve wetlands, shifting mining away from Everglades National Park, shifting mining away from the Wellfield, importing building materials, and concrete recycling. <u>See</u> SAR-2385; 2408; 2462; 2466.

_____

[23] The CEQ regulations implementing the Act provide detailed standards for an agency's evaluation of alternatives. Thus, an agency must "<u>rigorously explore and objectively evaluate all reasonable alternatives</u>," including alternatives that are "not within the jurisdiction of the [] agency." 40 C.F.R. §§ 1502.14(a-c); <u>id</u>. at § 1500.8(a)(4). An agency "shall state how alternatives . . . will or will not achieve the requirements of section 101 and 102(1) of the Act" -- which requires agencies to "use all practicable means" to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings" and to "preserve important historic, cultural, and natural aspects of natural heritage." <u>Id</u>. at § 1502.2(d). The agency must "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." <u>Id</u>. at § 1502.14.

Nevertheless, the EIS refused to study and develop any alternatives except the "Comprehensive Mining Plan" -- i.e., the Corps' and the mining industry's favored alternative. Instead, the Corps eliminated all alternatives from detailed consideration -- including a "curtail future mining" alternative and a "no action" alternative -- because other, less intensive mining alternatives "do not meet the objectives of this study." (AAR-614 at 71-72). However, because the EIS states that the "objective" of the study is to "describe and assess the alternatives to the continuation of limestone mining," (AAR-614 at 12), the Corps' assertion that any alternatives other than full-scale mining "do not meet the objectives of" the EIS is patently arbitrary and capricious. See Friends of the Wild Swan v. USFWS, 945 F. Supp. 1388, 1397 (D. Or. 1996) (agency decision is "arbitrary and capricious" if it is "internally inconsistent").

This arbitrary refusal to develop any available alternatives was pointed out by the National Park Service, the EPA, environmental organizations, and various state officials during the public review process for this project.[24]   Nevertheless, in its ROD, the Corps essentially ignored all of these warnings, and instead reiterated the agency's assertion that common sense alternatives such as limiting mining to the existing mining footprint or shifting mining away from the wellfield did not even need to be explored in the EIS because actually adopting those alternatives might result in "economic hardship" for the mining industry. (AAR-614 at 71). Obviously, however, the industry's preferences cannot override the agency's evaluation of alternatives under NEPA. Indeed, it is well settled that "[a]n agency cannot restrict its analysis to those 'alternative means by which a particular applicant can reach his goals.'" Simmons v. Army Corps of Engineers, 120 F.3d 664, 669 (7th Cir. 1997) (emphasis in original).  Rather, "the evaluation of alternatives mandated by NEPA is to be an evaluation of alternative means to accomplish

---

[24] Indeed, the record shows that the Corps' own officials were aware of "[s]everal initial alternative plans . . . that provide varying proportions of mining (from 5,000 acres to 26,000 acres)" -- and yet none of these plans were developed in the PEIS. See SAR-2463; AAR-616 at 20 (Corps was aware of "a viable and competitive limerock source . . . for the central and northern Florida markets" not develop in the EIS); SAR-2385 (National Park Service explaining how the PEIS's rejection of alternatives is inconsistent with the "stated objective of the document"); AAR-605 at 42 (the EPA explaining that "no analysis . . . of acquiring [limestone] materials from domestic sources beyond the study area and/or efforts which could be made to facilitate importation of foreign rock during the [15 year] sunset period"); SAR-2462 (Everglades National Park stating that the Corps refused to consider reduced mining alternatives without any justification); SAR-2465-66 ("a viable alternative has not been fully reviewed" because the option of "recycling concrete" to reduce mining was not developed in the EIS).

26

the <u>general goals</u> of an action"). <u>Id</u>. (emphasis added).   Accordingly, defendants' EIS violates NEPA.
See <u>Dubois v. Dep't of Agriculture</u>, 102 F.3d 1273, 1288 (1st Cir. 1996) (because the agency did not
"rigorously explore" all reasonable alternatives its action is unlawful under NEPA).

### B.   <u>The Corps' EIS Fails To Analyze All Direct, Indirect, And Cumulative Impacts.</u>

The EIS prepared by the Corps is also deficient in its discussion of environmental impacts. NEPA
and the CEQ regulations proscribe detailed standards to ensure that agencies provide "a good faith and
objectiv[e] . . . hard look at the environmental consequences of a proposed action." <u>Save Our Sycamore
v. MARTA</u>, 576 F.2d 573, 575 (5th Cir. 1978). Thus, an EIS must describe (1) the "environmental impact
of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the
proposal be implemented," (3) "alternatives to the proposed action," (4) "the relationship between local
short-term uses of man's environment and the maintenance and enhancement of long-term productivity,"
and (5) any "irreversible or irretrievable commitment of resources which would be involved in the
proposed action should it be implemented." 42 U.S.C. § 4332(C). The agency's evaluation of these
factors must be "concise, clear, and to the point," and the agency's conclusions "shall be supported by
evidence." 40 C.F.R. § 1502.1. An agency must also "insure the . . . . scientific integrity of the
discussions and analyses in the environmental impact statement," and "make explicit reference . . . to the
scientific or other sources relied upon for [the agency's] conclusions." <u>Id</u>. at § 1502.24.[25]

In this case, there is overwhelming record evidence demonstrating the inadequacy of the Corps'
EIS. As succinctly explained by the Interior Department, <u>the "lack of detail" makes "evaluation of the
project's direct, secondary [indirect], and cumulative impacts [] impossible."</u>  (AAR-669 at 3).

---

[25] In addition, the CEQ regulations also set forth specific factors that agencies must consider
"in adequate detail," 40 C.F.R. § 1501.2(b), including a "full and fair discussion" of (1) all
"direct," "indirect," and "cumulative" effects of the action, <u>Id</u>. at § 1502.1; 1502.16 (a-b); (2) any
"[p]ossible conflicts between the proposed action and the objectives of Federal . . . policies and
controls for the area concerned," <u>id</u>. at § 1502.16(c); (3) "the environmental effects of
alternatives," <u>id</u>. at § 1502.16(d); (4) "the conservation potential of various alternatives," <u>id</u>. at §
1502.16(e-f); (5) "historic and cultural resources, and the design of the built environment," <u>id</u>. at
§ 1502.16(g); and (6) "means to mitigate adverse environmental impacts." <u>Id</u>. at § 1502.16(h).

1.    **Direct Effects**

Despite the agency's duty to "account for all direct environmental impacts of the proposed action," the comments in this case pointed out that the EIS entirely ignores numerous impacts "caused by the action," Friends of the Earth v. Corps of Engineers, 109 F. Supp. 2d 30, 36 (D.D.C. 2000), quoting 40 C.F.R. § 1508.8(a), including "increased air pollution (dust) resulting from mining and truck traffic," (AAR-579 at 2), "the noise and vibrations from quarry blasting," (AAR-68 at 8), the operation of "four cement mills" and "over 300 rail cars a day" for rock deliveries, (AAR-19 at 9); the "significant impact on delay to community traffic patterns" from hauling rock, (AAR-657 at 1), and "economic losses and reduction of quality of life caused by mining activities including blasting." (AAR-605 at 107-08).

Nor does the EIS provide any meaningful discussion concerning the adverse aesthetic and scenic impacts that will result from the large scale conversion of up to 15,000 acres of Everglades wetlands to hard rock mining pits -- including reduced opportunities for viewing birds and other wildlife, changes in landscape features, and the potential aesthetic impacts on those members of the public who live close enough to see and hear hard rock mining operations.  The EIS is also devoid of any description of the actual loss of wildlife that is likely to result from the destruction of thousands of acres of Everglades wetlands, nor any discussion of what this loss will mean for the overall ecosystem.  The EIS also makes no attempt to address impacts on local Native American Tribes' cultural, economic, and aesthetic interests, even though the Miccosukee Tribe commented that "[r]ock mining's adverse consequences directly and negatively impact the Tribe and jeopardize its very existence." (AAR-605 at 34).

Without any analysis of these direct effects, there is simply no meaningful way for either the public or the agency decisionmaker to estimate the "adverse environmental effects" and "irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented"-- as required by NEPA.  42 U.S.C. §§ 4332(C); 4331(2) (NEPA's entire focus is on the "quality of the human environment," and one of its explicit purposes is to "assure . . . aesthetically and culturally pleasing surroundings."); Lujan v. National Wildlife Federation, 497 U.S. 871, 886 (1990) ("We have no doubt that 'recreational use and aesthetic enjoyment' are among the sorts of interests [NEPA and other environmental statutes] were specifically designed to protect").

### 2.    Indirect Effects

Nor does the EIS make any attempt to fulfil the agency's duty to "consider 'indirect impacts,' which are defined as those impacts that 'are caused by the action and are later in time or farther removed in distance, but still reasonably foreseeable.'" Friends of the Earth, 109 F. Supp. 2d at 40, quoting 40 C.F.R. § 1508.8(b). "Indirect effects may include growth-inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air water and other natural systems, including ecosystems." Id. The record shows that the Corps received comments from expert resource agencies and other parties explaining how that the "secondary [] effects of the action have not been adequately addressed" in the EIS. (AAR-671 at 5-6); AAR-605 at 36.

Nevertheless, despite the fact that the EIS spends considerable time explaining that the purpose of rock mining is to facilitate housing development, the construction of roads, and other economic growth activities that are widely acknowledged as having adverse environmental effects on the State's natural resources, (AAR-614 at 68-69), the EIS makes no effort to "analyze the adverse effects of that growth including loss of wetlands, reduced aquifer supplies, urban sprawl, air pollution, etc." (AAR-605 at 147); see Friends of the Earth, 109 F. Supp. 2d at 40 (Corps cannot "trumpet[] the supporting business development" that will flow from granting a 404 permit and them claim that the "indirect" environmental impacts of this development are too "speculative" to be discussed in the agency's NEPA document); California v. Block, 690 F.2d 753, 764 (9th Cir. 1982) ("While the EIS carefully identifies the economic benefit attributable to development in each area, no effort is made to weigh this benefit against the wilderness loss each area will suffer from development").

### 3.    Cumulative Effects

Similarly, the EIS also entirely fails to discharge the Corps' duty to "consider cumulative impacts in an EIS, which are defined as 'the impacts on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency[] or person undertakes such other actions.'" Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d 121, 136 (D.D.C. 2001).  As discussed above, several resource agencies expressed serious concerns that the EIS's discussion of cumulative impacts -- which totals less than two pages of text -- was deficient in two significant respects. (AAR-712 at 3); AAR-669 at 2-3; AAR-671 at 5-6.

First, the EIS "failed to establish a detailed baseline of previous mining impacts within the Everglades ecosystem," which "is a fundamental component of any impact analysis." (AAR-712 at 3); 40 C.F.R. § 1502.15 ("The environmental impact statement shall succinctly describe the environment of the area(s) to be affected").  Thus, the EIS does not provide any detailed description of past mining at each site, any increased seepage caused by mining, any past mitigation efforts, whether special resources such as threatened and endangered species are present in particular areas, nor any other information about the particular characteristics of each site that are highly relevant to the question of what cumulative environmental impacts are likely to follow from the Corps' decision.  This omission is critical because, "[w]ithout establishing the baseline conditions which exist in the vicinity of [the proposed action] before [the action] begins, there simply is no way to determine what effect the [action] will have on the environment and, consequently, no way to comply with NEPA." Half Moon Bay Fishermen's Marketing Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir. 1988); NRDC v. Morton, 388 F. Supp. 829, 838-40 (D.D.C. 1974) (setting aside NEPA document that "[did] not provide the detailed analysis of local geographic conditions necessary for the decision-maker to determine what course of action is appropriate under the circumstances").[26]

Second, the EIS fails to meaningfully discuss the impacts of mining in relation to "reasonably foreseeable future actions," including the Corps' own actions with regard to the CERP.  As pointed out by the resource agencies, both the Lakebelt EIS and the Corps' CERP EIS propose major landscape changes and uses for the Lakebelt area.  On the one hand, the Lakebelt EIS proposes a series of mining lakes, coupled with the acquisition and restoration of the Pennsuco wetlands. (AAR-614).  At the same time, however, the Corps' CERP EIS proposes to create a so-called Water Preserve Area in the Lakebelt area to reduce seepage from the central Everglades and to serve as a flowway to provide additional to restore the natural hydrology of adjacent Everglades National Park, and, in turn, recover critically imperilled species such as the Cape Sable Seaside Sparrow. (AAR- 963 at 2-3); AAR-1172 at 11.  The

---

[26] The practical effect of this failure to discuss baseline conditions is apparent from the Administrative Record, which shows that the Corps knew, but did not disclose in the EIS, that the mining industry owes the public hundreds of acres of mitigation for past mining in this area. (AAR-793B at 4); AAR-827 at 1-2; AAR-964 at 1; AAR-1007 at 1). See Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1151-52 (9th Cir. 1998) (NEPA document unlawful where it failed to disclose important information).

obvious problem with this arrangement, as repeatedly pointed out by the Interior Department, is that the "interrelated and interdependent" components of the CERP were not discussed in any detail in the Corps' Mining EIS -- including, most importantly, the extent to which these two plans might offer conflicting uses of the same wetlands. (AAR-605 at 24); id. at 22 ("The Department finds that the Restudy [CERP] features are reasonably foreseeable actions subject to review and analysis in the Lakebelt EIS").[27]

Rather than addressing this issue, the record shows that the Corps simply decided that the agency would "process permit applications as if the CERP is not there." (AAR-602 at 1) (emphasis added). This approach -- which amounts to a decision by the agency to stick its head in the sand with regard to the cumulative and synergistic impacts of the Lakebelt and CERP plans for the same geographic area -- plainly violates NEPA. See NRDC v. Hodel, 865 F.2d 288, 288-89 (D.C. Cir. 1988) (remanding EIS that failed to comply with CEQ regulations' mandate to fully discuss cumulative impacts); Ocean Advocates, 361 F.3d 1108 (remanding Corps' NEPA document that did not fully explore cumulative impacts).

### C.   The Corps' EIS Unlawfully Deferred Critical Environmental Analysis.

For those environmental impacts and issues that are acknowledged by the Corps' EIS, there is no "full and fair discussion" of these issues, to say nothing of the required "concise, clear, and to the point" analysis "supported by evidence" with "reference . . . to the scientific or other sources relied upon for the [agency's] conclusions." Id. at §§ 1502.1; 1502.24.   To the contrary, EPA and other federal agency commentors found that the Corps' EIS repeatedly relied on "insufficient," "deficient," "incomplete," "inappropriate," and "misleading" analysis and data.  (AAR-605 at 11; 13); AAR-712 at 3.  Particularly troubling are the EPA's comments stating that the Corps' EIS "overly relied on data supplied by the industry," which may have had an "obvious bias."  (AAR-605 at 51); see Ocean Advocates, 361 F.3d at 1126 (remanding Corps' NEPA document that "relied wholly on [the permit applicant's] claims that the project would reduce oil spills" without conducting any independent analysis).

---

[27] As explained by the Department of the Interior, this omission is more than a technical concern, since "[a] decision on the appropriateness of mining in this area cannot be made until after it has been determined whether this area is critical for Everglades restoration." (AAR-605 at 15); id. at 11 (the EIS failed to explore the "effects of the action on the continued sustainability and eventual restoration of the Everglades ecosystem").

Remarkably, the Corps has essentially conceded that the agency failed to provide the analysis required by NEPA and the CEQ regulations at the time the agency published its draft and final EIS. (AAR-1035 at 3) (final permit conceding that various "questions pertaining to the cumulative, long-term consequences of mining" were not fully addressed by the EIS).  Instead, the final EIS states that the required analysis of these difficult scientific and technical issues would be fully studied and resolved by the "Lakebelt Committee" in a subsequent "Phase II Plan." (AAR-614 at 10; 76; 99).[28]

Thus, as discussed above, rather than addressing the County's repeated requests to conduct the necessary studies and fully disclose "the extent to which mining in the vicinity of the wellfield will further compromise the natural filtration process that currently exists at the Northwest and West Wellfields," and thus increase the chances of microbial pathogens such as Cryptospordium contaminating the County's drinking water supply, (AAR-605 at 85-90), the final EIS candidly explains that "[a]t this time, it has not been determined what is needed as a safe buffer to protect the water supply." (AAR-614 at 70) (emphasis added); AAR-605 at 91 (the EIS does "not fully answer this question, which is essential for the protection of public health.").  Here again, the record suggests that the Corps deliberately choose not to take the required "hard look" at this issue.  See AAR-602 at 2 ("I do not think the Corps needs to get into a position of deciding how much protection is warranted for the wellfield."); see Kern v. BLM, 284 F.3d 1062, 1073 (9th Cir. 2002) (EIS inadequate where it failed to fully analyze environmental risk even though the "environmental problem was readily apparent at the time the EIS was prepared").[29]

_____

[28] Compare NPCA v. Babbitt, 241 F.3d 722, 733 (9th Cir. 2001) ("The [agency] proposes to increase the risk of harm to the environment and then perform its studies . . . .  This approach has the process exactly backwards").

[29] The EIS similarly defers any detailed analysis of other critical environmental issues, including potential hydrological damage to Everglades National Park and interference with CERP caused from "the effects of increased seepage caused by the expansion of deep-water lakes," (AAR-669 at 2), impacts to cultural and historical resources, see AAR-605 at 127, and potential adverse impacts on Wood Storks.  (AAR-605 at 130).  Rather, for each issue, the final EIS merely repeats the same promise that the missing analysis will be provided in the "Phase II Master Plan" or some other post-EIS document.  See AAR-614 at 11 (hydrological damage analysis promised but not included in Phase II Master Plan); id. at 83-84 (endangered species conservation measures promised but not included in Phase II Plan); id. at 86 (future cultural resource surveys that never took place).

The Corps also unlawfully deferred any detailed consideration of the proposed mitigation scheme, which was not disclosed to the public in any detail in either the draft or final EIS. One of the most important aspects of an EIS is "a detailed discussion of possible mitigation measures" to avoid adverse environmental impacts. Methlow Valley, 490 U.S. at 351-52 ("mitigation [must] be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated"); Neighbors of Cuddy Mountain v. U.S. Forest Service, 137 F.3d 1372, 1380 (9th Cir. 1998) ("an EIS 'shall include discussions of . . . means to mitigate adverse environmental impacts'"), quoting 40 C.F.R. § 1502.16(h). In this case, however, all three federal resource agencies that commented on the EIS informed the Corps that the mitigation discussion was "incomplete" and "deficient." See AAR-605 at 41-44 (EPA noting that the EIS does not address "significant unknowns," including "wetland mitigation plan requirements"); AAR-669 at 2 (Park Service explaining that "the mitigation plan is incomplete," and that the proposed mitigation site "will not provide enough mitigation to meet the needs of the proposed project").[30]

Here again, this omission is of critical significance, since the record is replete with controversy, confusion, and disagreement about whether mining the western Lakebelt in exchange for "protecting" the Pennsuco wetlands was an appropriate ecological trade-off, (AAR-605 at 41), whether "lands outside the Lake Belt area are suitable for mitigation," (AAR-669 at 2), and whether "acquisition and exotic removal" in the Pennsuco wetlands will actually "compensate for the wildlife habitat function and spatial extent of the historic Everglades that will be lost as a result of mining," and the "temporal loss of wetlands" during the time between destruction and mitigation. (AAR-824 at 4-5).[31]

_____

[30] Thus, as explained by the EPA, neither the EIS nor the Corps' other public documents circulated before issuance of the ROD provided the public with the "[a]nticipated acreage requirement from the Pennsuco to compensate for expected mining impacts over the 10-year life of the permit," an "[a]ssurance that rock miners will offer their lands in the Pennsuco for sale," a "[d]escription of plans for restoring and maintaining the Pennsuco hydroperiod," an "[a]ssurance that the current per-ton-mitigation fee on limestone will be applied only to acquisition and restoration of wetlands within the Pennsuco," the "[l]ocations and conceptual plans for littoral shelves," or a "[d]escription of techniques to ensure long-term maintenance and protection of littoral shelves." (AAR-820 at 3-4).

[31] Indeed, the Interior Department went so far as to say that the final EIS's conclusion that adverse direct and secondary impacts will be adequately mitigated was "misleading." (AAR-712 at 3); compare Johnston v. Davis, 698 F.2d 1088, 1095 (10th Cir. 1983) (NEPA document that included "unqualified statements [that] are clearly misleading" held unlawful).

Nevertheless, rather than addressing these critical mitigation details sought by expert federal resource agencies, the final EIS states that a "mitigation fee will be used to perform mitigation activities appropriate for the impacts due to mining," that "mitigation measures, if needed, will be recommended in the Phase II Master Plan," and that "[t]he U.S. Army Corps of Engineers will accomplish final implementation of the agreed upon mitigation approach through the issuance of permits." (AAR-614 at 89-91). These cursory remarks -- which essentially side-step federal agency comments and criticisms, and defer consideration of all details concerning where and how mitigation will take place until after publication of the final EIS -- fall far short of carrying out the agency's duty to ensure that "mitigation be discussed in sufficient detail" that "interested groups and individuals can properly evaluate the severity of the adverse impacts." Cuddy Mountain, 137 F.3d at 1381 (EIS "perfunctory description of mitigation measures," which did not "provide an estimate of how effective the mitigation measures would be if adopted" violated NEPA); NPCA, 241 F.3d at 735 ("the question of the impact of the proposed mitigation measures must be studied as part of the preparation of the EIS rather than after the injury has transpired"); Cf. Gerber v. Norton, 294 F.3d 173, 179 (D.C. Cir. 2002) ("given the Service's conclusion that the off-site mitigation area was necessary for approval of the permit, there could not have been a meaningful opportunity to comment on the application without a meaningful opportunity to comment on the site").

**D.     The Corps Violated Its Duty To Conduct Supplemental NEPA Review.**

Even if the Corps could somehow lawfully defer the required "hard look" at environmental issues until after the EIS was issued, when the "Phase II Plan" upon which the Corps relied so heavily in the final EIS did not deliver on any of the promises made by the Corps -- and the agency concedes in the record that it did not, see AAR-977 at 1 -- a Supplemental EIS should have been prepared.

The CEQ regulations provide that agencies "shall prepare supplements . . . if: (i) the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) there are significant new circumstances or information relevant to the environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c); NWF v. Marsh, 721 F.2d 767, 782 (11th Cir. 1983); Louisiana Wildlife Federation v. York, 761 F.2d 1044, 1051 (5th Cir. 1985) (SEIS required where information "raises new concerns of sufficient gravity such that another, formal in-depth look at the environmental consequences of the proposed action is necessary") (quotations omitted).

34

In this case, both EPA and the Department of Interior specifically requested that the Corps' prepare a supplemental NEPA document when the Phase II Plan was completed "to address all of the currently unresolved fundamental environmental issues," see AAR-713 at 1-2; AAR-605 at 11, and repeated this request when it became clear that the information the Corps promised in the Phase II Plan never materialized. (AAR-820 at 3-4). As explained by these agencies, "further NEPA documentation and public disclosure" was needed to ensure that "all commenting parties [are furnished] with a clear understanding of exactly how this action will proceed prior to the final EIS rather than after publication of the Record of Decision." (AAR-605 at 41; 44).[32]

All of these requests fell on deaf ears. Thus, in the ROD, rather than provide a rational explanation for why the Corps decided not to prepare an SEIS, the Corps stated only that "Permit decisions should not be further delayed for further studies," (AAR-1028 at 112) -- an assertion that did not even attempt to address the required questions of whether the agency had made "substantial changes in the proposed action" or whether there was "significant new circumstances or information" within the meaning of the CEQ regulations. See Marsh, 721 F.2d at 782; Friends of the Clearwater v. Dombeck, 222 F.3d 552, 558 (9th Cir. 2000) ("When new information comes to light the agency must consider it, evaluate it, and make a reasoned determination of whether it is of such significance as to require [an SEIS]"); State Farm, 463 U.S. at 52 (agency must "articulate a satisfactory explanation for its actions").[33]

_____

[32] NRDC also requested that the agency prepare a SEIS prior to issuance of the permits in light of significant new information concerning conflicts with the CERP. (AAR-963 at 1-4).

[33] Furthermore, the ROD itself highlights the Corps' legal violation by both altering the nature of the proposed action and the mitigation plan from that disclosed in the EIS, and by relying on page after page of new information -- including significant new data, charts, mitigation plans, analysis, permit conditions, and proposed future environmental studies that were not disclosed or discussed in the agency's EIS nor circulated for public comment -- in support of the agency's conclusion that issuance of the permits is in the "public interest," and "will not have a significant impact on the quality of the human environment." (AAR-1028 at 113-14). Thus, the Corps' position appears to be that all of these project modifications and new information were significant enough to change the Corps' conclusion in the final EIS that the project "will have an irreversible significant impact on the environmental resources of the region," (AAR-614 at 90), to the conclusion in the ROD that the project "will not have a significant impact," (AAR-1028 at 113), but were not significant enough to warrant public disclosure and comment in a SEIS. Compare Marsh, 721 F.2d at 782 (SEIS required where the Corps made several "post-EIS" project changes that are likely to have a "significant" impact on the environment).

35

Finally, totally apart from the Corps' refusal to prepare an SEIS *before* issuing the mining permits, the Corps also violated NEPA and the CEQ regulations by refusing to prepare an SEIS when new information came to light *after* issuance of the permits that confirmed many of the worst fears about drinking water contamination and mitigation shortfalls expressed by federal resource agencies and other parties during the permitting process. As discussed above, the new information provided in plaintiffs' February 2004 letter not only calls into question fundamental assumptions made by the Corps about whether the County's sole drinking water source will be contaminated by mining, (SAR-785-86), but also shows that the Corps has significantly modified the mitigation plan disclosed in the EIS and the Public Notices from one that focused on efforts to "acquire and restore" Pennsuco wetlands, (AAR-623A at 1), to one that is now focused on "reimbursement" and "restoration," (SAR-947), and the use "alternative locations" for mitigation that were never identified to the public in the EIS. (SAR-1880).

By any reasoned analysis, this new information -- which fundamentally changes the nature of the environmental impacts associated with the project, and alters the mitigation that the public is getting in exchange -- constitutes both "substantial changes in the proposed action" and "significant new . . . information . . . bearing on the proposed action or its impacts," 40 C.F.R. § 1502.9(c), that cry out for additional NEPA review in this case. See Marsh, 721 F.2d at 782; Roosevelt Campolbello v. EPA, 684 F.2d 1041, 1055 (1st Cir. 1982) (SEIS required to consider new technical data regarding the risk of an oil spill); Dombeck, 222 F.3d at 559 ("the Forest Service's failure to evaluate in a timely manner the need to supplement the original EIS in light of that new information violated NEPA").

## II.   THE CORPS IS VIOLATING THE CLEAN WATER ACT

Because the Corps' CWA permit decisions were based on a faulty EIS, the Court need look no further than defendants' NEPA violation to dispose of this case. See, e.g., Sierra Club v. Sigler, 695 F.2d 957, 983 (5th Cir. 1983) ("It is apparent to us that the skewed FEIS tainted the Colonel's permit decisionmaking process preventing the '*careful* weighing of *all* relevant factors' necessary in the 'general balancing process required by the Corps' [404] regulations.") (emphasis in original). Nevertheless, the agency has also fallen short of fulfilling its statutory and regulatory obligations under the CWA.

The CWA was enacted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), and prohibits the discharge of any pollutant into the waters

of the United States, including wetlands, without a permit. 33 U.S.C. § 1311(a). Section 404 authorizes the Corps to issue permits for the discharge of "dredged or fill materials," but only after providing "notice and opportunity for public hearings." Id. at § 1344.[34]

Under the Corps' regulations, "the Corps shall begin its analysis of a proposed project with the presumption that the 'unnecessary alteration or destruction of (wetlands) should be discouraged as contrary to the public interest." Buttrey v. United States, 690 F.2d 1170, 1180 (5th Cir. 1982), quoting 33 C.F.R. § 320.4(b)(1). "This presumption is very strong" and the "'guiding principle should be that degradation or destruction of special sites (such as filling operations in wetlands) may represent an irreversible loss of valuable aquatic resources.'" Id., quoting 40 C.F.R. § 230.1(d). To "overcome it, an applicant [for a permit and by extrapolation the Corps] must make three very difficult showings." Id. First, "that 'the benefits of the proposed alteration outweigh the damage(s),' second, that 'the proposed activity is primarily dependent on being located in, or in close proximity to the aquatic environment," and third, that the proposed project cannot be located on any 'feasible alternative sites.'" Id.

EPA's binding Guidelines similarly pronounce a strong, pervasive presumption against permitting any damage to wetlands. They declare that "[f]rom a national perspective, the degradation or destruction of . . . wetlands is considered to be among the most severe environmental impacts." 40 C.F.R. § 230.1(d) (emphasis added). Thus, the guidelines provide that "dredged or fill material should not be discharged into the aquatic ecosystem [wetlands], unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern." Id. § 230.1(c). EPA guidelines further provide that the Corps may not issue a dredge and fill permit "which will cause or contribute to significant degradation of [wetlands]," id. at § 230.10(c), and that effects "contributing to significant degradation considered individually or collectively, include . . . effects on municipal water supply . . . [and] loss of fish and wildlife habitat." Id. at § 230.10(c)(3).

In light of these strict requirements, "it would hardly be putting the case too strongly to say that the Clean Water Act and the applicable regulations do not contemplate that wetlands will be destroyed

---

[34] There are two sets of binding regulations for the issuance of a 404 permit, one promulgated by the Corps, 33 C.F.R. Parts 320-330, and one by the EPA. 40 C.F.R. §§ 230.1-230.80.

simply because it is more convenient than not to do so." See Buttrey, 690 F.2d at 1180; Hough v. Marsh, 557 F. Supp. 74, 82 (D.Mass. 1982) (applicant must "shoulder [a] formidable evidentiary burden"). Nevertheless, in this case, the Corps has issued CWA permits authorizing the destruction of critically important Everglades wetlands *without* requiring the applicant to prove the necessity of this activity, and *without* any cogent analysis of many of the applicable regulatory factors.

A.    **The Corps Violated The Public Participation Requirements Of The CWA.**

Under the CWA and its implementing regulations, when the Corps has received a permit application, it must issue a public notice soliciting comments.  33 U.S.C. § 1344(a); 33 C.F.R. §§ 325.2(a)(2), 325.3.  Because the notice is the "primary method of advising all interested parties of the proposed activity for which a permit is sought and of soliciting comments and information necessary to evaluate the possible impact on the public interest," the notice must include "sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment." 33 C.F.R. § 325.3(a) (emphasis added); id. at § 325.3(a)(13) (notice must provide all "available information which may assist interested parties in evaluating the likely impact of the proposed activity.").  The regulations also provide that "[a] public hearing will be held in connection with the consideration of a [permit] whenever a public hearing is needed for making a decision on" the permit.  Id. at § 327.4(a).

In this case, however, the Corps violated is obligation to provide adequate public notice and comment, as well as its obligation to hold a public hearing.  Thus, with regard to public notice, rather than providing all "available information which may assist interested parties in evaluating the likely impact of the proposed activity," id. at § 325.3(a)(13), the generic notice published by the Corps did not even disclose the most rudimentary information about the projects or the Corps' reasoning on why they qualify for 404 permits under the applicable regulations.  As discussed above, there is no detailed description in the Corps' "Public Notice" of the particular sites involved, no explanation of what environmental effects have already occurred because of past mining, no analysis of whether the site contains special resources such as threatened and endangered species or cultural or historic resources, nor any other information about the particular characteristics of each site that are highly relevant to the question of whether the issuance of a long-term mining permit is consistent with the "public interest."  Id. at § 325.3(a).

Nor did the notice explain the Corps' views on how the issuance of each mining permit, and any mitigation plan, will possibly avoid "significant degradation" of "municipal water supplies," "fish and wildlife habitat," "aquatic ecosystem diversity," and "aesthetic and economic values" -- as is also required under the Guidelines. See 40 C.F.R. § 230.10(c). There is obviously no way for the public to apply the regulatory factors and submit meaningful comments regarding the issuance of each permit if the agency has not even disclosed precisely what effects the activity is likely to have on the specific resources present at each site, and why it is an acceptable activity at a particular location. See NWF v. Marsh, 568 F. Supp. 985, 994 (D.D.C. 1983) (CWA "require[s] that the Army present for public scrutiny the rationale and pivotal data underlying its proposed action before the close of the comment and hearing period").[35]

Furthermore, as discussed above, much of the information upon which the Corps relied in making its permitting decision in the ROD -- including information concerning drinking water contamination, hydrological impacts, and mitigation -- was never made available for comment. Nor did the Corps' provide any opportunity for public comment on several questionable permit conditions drafted by the mining industry's lawyers and agreed to by the Corps after the comment period, including conditions providing that the industry need not transfer any land to the public unless it receives unrestricted permission to mine all 15,000 acres in the future, see AAR-1090 at 16, that many of the areas closest to the Wellfield can be mined any time, see AAR-1100 at 28, that the promised "additional wildlife studies" need not be completed for nine years, see AAR-1071 at 21, and that unrestricted mining close to the wellfield will be allowed in 2005 unless the agency carries the burden of proving that "such mining will pose a risk to public health." (AAR-1071 at 20); see Hall, 693 F. Supp. at 947; Marsh, 568 F. Supp. at 994 (setting aside Corps' permit that did not disclose critical information until after the comment period).

Finally, with regard to the Corps' failure to hold a public hearing on the permits, the plain language of section 404 of the CWA provides that, before issuance of any 404 permit, the public has a statutory right to "notice and opportunity for public hearings." 33 U.S.C. § 1344(a). Despite this

---

[35] Nor did the public notice disclose the highly relevant fact that, at the time of the publication of the notice, the applicants owed the public several hundred acres of overdue mitigation for past destruction of wetlands under Corps-issued permits. (AAR-964 at 1); AAR-1007 at 1; see Friends of the Earth v. Hall, 693 F. Supp. 904, 947 (W.D. Wash. 1988) (setting aside Corps' permit decision because the agency failed to disclose critical data during the comment period).

statutory mandate, and despite the agency's own regulations providing that requests for a public hearing "shall be granted, unless the district determines that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing," 33 C.F.R. § 327.4(b) (emphasis added) -- the Corps flatly refused the public hearing requests of County officials and even a Member of the U.S. House of Representatives. (AAR-1028 at 113). Rather than explain why this denial comports with the CWA and the regulations, and despite the fact that the Corps was then in possession of over a year's worth of new data and information that the public had both a legal right and a compelling interest in seeing, the ROD simply states that no hearing would be held because "a public hearing is not held unless additional information is necessary to make a decision," id. -- an assertion that simply misstates the applicable legal test under the Corps' regulations. See 33 C.F.R. § 327.4(a-c); Hough, 557 F. Supp. at 79-80 ("The Corps' determination that a hearing would serve 'no valid purpose' is not entirely convincing under the circumstances," including the fact that "the project was controversial," and had faced "considerable public opposition," including "two federal agencies recommending rejection of the permit application").

**B.    The Corps Violated Its Duty To Prove That There Are No Practicable Alternatives.**

For the same reasons discussed above in relation to the Corps' failure to fully develop alternatives under NEPA, the Corps has also failed to discharge its obligation under the CWA to prove the absence of feasible alternatives to the destruction of wetlands. Under EPA's Guidelines, there are two separate legal standards the Corps must apply in analyzing alternatives. First, for "water dependent" activities -- i.e., those that cannot be carried out except in wetlands -- the regulations "prohibit the Corps from issuing a dredge and fill permit under section 404 'if there is a practicable alternative . . . which would have less adverse impact on the aquatic ecosystem.'" Hall, 693 F. Supp. at 946, quoting 40 C.F.R. § 230.10(a) (emphasis added).[36]   Second, for those activities that are not "water dependent" -- i.e., do not have to be located in wetlands -- the Corps must apply a higher threshold whereby alternatives that do not involve wetlands "are presumed to be available, unless clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3) (emphasis added); Hough, 557 F. Supp. at 83. Under this second, higher standard, the question is whether

---

[36] An alternative is "practicable" if it is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10 (a)(2).

the "applicant has provided evidence to prove the unavailability of alternative sites which would be subject to less impact than would be the proposed development." Korteweg v. Corps of Engineers, 650 F. Supp. 603, 604 (D.Conn. 1986); Bersani v. EPA, 850 F.2d 36, 39 n. 2 (2ⁿᵈ Cir. 1988).

In this case, however, the Corps simply applied the wrong legal standard to the permit applications. Thus, in making its decision to issue the permits, the Corps concluded that "[t]he activity needs to be located in a special aquatic site [i.e., wetlands] to fulfill its basic purpose." (AAR-1028 at 59). However, this finding is impossible to reconcile with the fact that rock mining takes place all over the world in non-wetland areas, and that the record contains a map of available limestone deposits, which spans a large portion of Southern of Florida.  (AAR-1 at 32).  Nevertheless, the Corps provided no explanation for this finding in the ROD, which is arbitrary and capricious on its face.  See Defenders of Wildlife v. Babbitt, 958 F. Supp. 670, 681 (D.D.C. 1997) ("Because the agency applied the wrong legal standard, in clear violation of the plain wording of the statute . . . its decision . . . must be set aside.").

Because of this error, rather than evaluating alternatives with the "presumption" that such alternatives are available until and unless the applicants "clearly demonstrated otherwise," 40 C.F.R. § 230.10(a)(3); Hough, 557 F. Supp. at 83, the Corps' alternative analysis simply assumes that "other alternative rock sites" are unavailable because, according to a "report" created by the same mining industry representative who the Corps previously accused of providing "very biased info" to the agency, (AAR-270 at 2), "most of these [alternative] locations include quality wetlands or habitats," and "some of these alternative sites also have poor potential for expansion." (AAR-1028 at 38).  The ROD also speculates that mining in these areas "would result in impacts to other ecosystems," and that these impacts would "probably" be greater than the destruction of Everglades wetlands, id. at 84, but fails to provide any evidence or analysis to support these suppositions.  See Friends of the Wild Swan, 945 F.Supp. at 1398 (setting aside agency decision where it "cites to nothing in the record . . . that supports its conclusion"); Hall, 693 F. Supp. at 947 (Corps' analysis of alternatives unlawful because it "assumes" that alternative locations are not practicable and "nothing in the record supports the Corps' assumption").

In short, rather than operating from the required presumption that alternative locations are available for this non-water-dependent activity, and requiring the applicants to "provide[] evidence to prove the unavailability of alternative sites," Korteweg, 650 F. Supp. at 604; Bersani, 850 F.2d at 39 n.

41

2, the Corps simply "assumed" that no other sites were available based on speculation about "most" alternative sites culled from a self-serving report prepared by a mining industry consultant that the Corps knew was not likely to provide quality, unbiased information. Compare AAR-270 at 2 (recounting that Mr. Larson provided the agency with "very biased info") with (AAR-587 at 1) (indicating that "the Corps is not interested in funding an independent analysis"). This course of conduct violates the CWA. See Hall, 693 F. Supp. at 947; Simmons, 120 F.3d at 669 (Corps has a duty to "exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project").

### C.     The Corps Failed To Provide A Rational Explanation For Its Permit Decision.

As discussed above, before issuing any permit, "the Corps is required to conduct a 'public interest' review" that encompasses several different factors, including "conservation, economics, aesthetics, general environmental concerns, historic values, fish and wildlife values, flood damage prevention, land use, navigation, recreation, water supply, water quality, energy needs, safety, food production, and, in general, the needs and welfare of the people." Buttrey, 690 F. Supp. at 1180. In this case, however, rather than providing the "careful," reasoned analysis of the relevant "public interest" factors, and a clear explanation of why "the benefits of the proposed alteration outweigh the damage" of the action, 33 C.F.R. § 320.4(a)(1); (b)(4), the Corps' final permit decision provides only cursory, boiler-plate conclusions for each factor, many of which are arbitrary and capricious on their face.

Thus, with regard to "Conservation," the ROD concludes that the net result will be "beneficial" because the wetlands destroyed in this case are "of poor quality" (AAR-1028 at 77) -- even though the Park Service has stated that these wetlands are "critical to the proper functioning of the Everglades ecosystem." (SAR-2384); FAR-133 at 456; Defenders of Wildlife, 958 F. Supp. at 681 (setting aside agency decision that was "directly contradicted by the undisputed facts in the Administrative Record"). In addition, with regard to "Economics," the ROD concludes that "the mining and processing of crushed limestone is an important source of jobs and economic activity," (AAR-1028 at 77), but fails to discuss any of the adverse economic impacts associated with the loss of Everglades wetlands, drinking water contamination, interference with the CERP, or other effects of mining. See Hough, 557 F. Supp. at 86 (404 permit unlawful where "the Corps did mention the positive anticipated impact of the proposal on

jobs and municipal taxes. But it sidestepped any consideration of adverse economic effects").[37]

Similarly, with regard to impacts to drinking water, the ROD flatly concedes that "[t]here is a risk of contamination to the public Wellfield," and that "the current suite of setbacks and restrictions may not be providing the appropriate level of protection to prevent surface water contaminants from reaching the wells," but proceeds to authorize mining based on virtually the same travel time setbacks promulgated by the County. (AAR-1028 at 54-56); Public Citizen v. Heckler, 653 F.Supp. 1229, 1237 (D.D.C. 1986) ("For an agency to say one thing . . . and do another . . . is the essence of arbitrary action."). Furthermore, the Corps' decision refuses to undertake any analysis of several potential direct, secondary, and cumulative impacts of the Corps' mining proposal -- including the aesthetic and social impacts of increased blasting, truck traffic, and other mining related activity, and the use of limestone for further development and environmental degradation -- because these issues are allegedly "beyond the scope of this permit application," (AAR-1028 at 109) -- even though the Corps' regulations specifically require consideration of the "cumulative impacts of the proposed activity and its intended use on the public interest." 33 C.F.R. § 320.4(a)(1) (emphasis added); Hough, 557 F. Supp. at 86 (setting aside 404 permit that failed to fully consider cumulative impacts).

In short, the Corps' "public interest" analysis contains numerous omissions and errors, any one of which, standing alone, is sufficient to warrant remand of the Corps' 404 permitting decision. See Slagle v. U.S., 809 F. Supp. 704, 711 (D.Minn. 1992) ("In making a determination regarding the approval of a permit . . . . the Corps must address *all* the relevant factors listed in the regulations").[38]

---

[37] Likewise, with regard to "Aesthetics," the ROD offers the absurd conclusion that the conversion of wetlands to mining borrow pits will somehow "enhance the aesthetics" (AAR-1028 at 77) -- even though the Interior Department has stated that "[t]he conversion of the existing short-hydroperiod wetland habitat within the Lakebelt area to deep, open-water lakes removes an extensive area of this critical wetland habitat from the system, replacing it with non-natural habitat of little or no value to the Everglades ecosystem." (AAR-605 at 18); (AAR-614 at 1) (cover of EIS showing "enhanced" aesthetics of open pit mining); State Farm, 463 U.S. at 52; 43 (agency's decision is arbitrary and capricious where it has reached a result which "is so implausible that it [cannot] be ascribed to a difference in view").

[38] The Corps also acted unlawfully when it denied plaintiffs' February 2004 request that the Corps immediately "modify, suspend, or revoke" the mining permits in this case pursuant to 33 C.F.R. § 325.7(a), because the agency's decision failed to explain the Corps' reasoning as to any of the relevant regulatory factors that would plainly apply here, including "whether or not circumstances relating to the authorized activity have changed since the permit was issued or

### III.   THE CORPS AND THE FWS ARE VIOLATING THE ESA

As the Supreme Court has recognized, the ESA's mandate is to "give endangered species <u>priority over the 'primary missions' of federal agencies</u>." <u>Tennessee Valley Authority v. Hill</u>, 437 U.S. 153, 185 (1978) (emphasis added). In this case, the Corps and the FWS have elevated the mining industry's interest in development and rock mining over the need to protect endangered species, and thus violated the requirements of the ESA.

Section 7 of the ESA requires that "in consultation with and with the assistance of the [FWS]," each federal agency shall "insure that <u>any action authorized, funded or carried out by such agency</u> . . . . is not likely to jeopardize the continued existence of any endangered species . . . ." 16 U.S.C. § 1536(a)(2) (emphasis added). To fulfill its obligations under section 7, each federal agency must review its actions to determine whether they "may affect" an endangered or threatened species. 50 C.F.R. § 402.14(a). If an action "may affect" such a species, the agency must engage in "formal consultation" with the FWS unless the FWS "concurs" in writing that the action is "not likely to adversely affect" any threatened or endangered species. <u>Id.</u> Prior to initiation of formal consultation, the agency must provide the FWS a "Biological Assessment" that details the effects of the proposed action on any endangered or threatened species, "including consideration of cumulative effects." <u>Id.</u> at § 402.12(f).[39]

### A.   The FWS's "Concurrence" With The Corps' "Not Likely To Adversely Affect" Decision Is Arbitrary and Capricious.

In implementing the mandates of the ESA, the Corps and the FWS must utilize "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). In addition, under the APA, an agency must consider "the relevant factors," <u>Citizens to Preserve Overton Park v. Volpe</u>, 401 U.S. 402, 416 (1971), "explain the evidence which is available," and provide a rational, non-arbitrary or capricious explanation

---

extended, and the continuing adequacy of or the need for the permit conditions," <u>Id.</u>; <u>see</u> <u>American Lung Ass'n v. EPA</u>, 134 F.3d 388, 392 (D.C. Cir. 1998) (an agency must "cogently explain why [it] has exercised [its] discretion in a given manner").

[39] During the formal consultation process, the FWS must review all relevant information and determine whether the action, taken together with cumulative effects, is "likely to jeopardize the continued existence of listed species. . .." 50 C.F.R. §§ 402.14(g)(1) - (4). At the conclusion of the formal consultation process, the FWS must issue a "Biological Opinion," which "detail[s] how the agency action affects the species," 16 U.S.C. § 1536(b)(3)(A), and sets forth "terms and conditions" for any "take' of listed species authorized by the FWS. 50 C.F.R. §§ 402.14(h)(1-3).

for its actions, including for "changing its course." <u>State Farm</u>, 463 U.S. at 43; <u>Panhandle Eastern Pipe Line Co. v. FERC</u>, 196 F.3d 1273, 1275 (D.C. Cir. 1999). In this case, however, the FWS's abrupt reversal of its position with regard to the impacts of the Lakebelt project on endangered species simply cannot pass muster. Thus, for many years during the development of this project, the FWS -- along with its parent agency the Interior Department, and its sister agency the Park Service -- took the position that this project would not only "adversely affect" endangered Wood Storks, but also that the "short hydroperiod marshes" found in the Lakebelt represent the "[b]est wood stork & wading bird habitats," (FAR-26 at 33), and are "key in providing recovery benefits . . . for wood storks." (SAR-2489).[40]

Because of these concerns, the FWS <u>twice</u> refused to concur in the Corps' finding that mining would have "no effect" on ESA-listed species, and <u>twice</u> demanded that, to comply with the FWS's "regulations governing interagency consultation," the Corps must submit (1) a "thorough analysis of potential effects" to listed species "through loss and destruction of habitat, through direct mortality, [and] through disturbance and harassment;" (2) a "description and analysis taken to avoid and minimize impacts to [listed] species, measures to protect the species during and after project implementation, including any enforcement and monitoring programs;" and (3) an "analysis of cumulative effects." (AAR-671 at 3).

Nevertheless, shortly after the change in Presidential Administrations in 2001, the FWS abruptly reversed its scientific position with respect to the impact of the Corps' mining plan on the Wood Stork, and issued a letter concurring in the Corps' highly implausible conclusion that the elimination of 5,000

---

[40] A discussed above, the record includes these agencies' statements that "[t]he federally endangered <u>wood stork is dependent on short hydroperiod freshwater marshes</u>, wet prairies and other wetlands including those habitats invaded by melaleuca (<i>Melaleuca quinquenervia</i>) for forage habitat," (FAR-50 at 3), that "<u>wetlands within 19 miles of rookery sites have been described as core forage areas for wood storks</u>," <u>id.</u>, that "<u>Storks are especially sensitive to environmental conditions at feeding sites</u>; thus, birds may fly relatively long distances either daily or between regions annually, seeking adequate food resources," (AAR-568 at 4), that as good quality feeding habitat diminishes, "adult storks, hard-pressed to locate food, have been recorded flying up to 80 miles from colonies to feed," (AAR-15 at 77), and that "[t]he inevitable result is fewer feedings and increased rates of nestling mortality." <u>Id.</u> These agencies also stated that "[t]he loss of peripheral habitats along the eastern side of the remaining Everglades has been identified as a significant factor in the decline of wading birds</u>, whose populations are adversely affected by the removal of early dry season foraging areas," (AAR-605 at 18), and that increased "seepage out of the Everglades" caused by mining could "hinder our abilities to restore the greater Everglades ecosystem . . . [and] hinder our abilities to recover listed species." (SAR-2493).

acres of Everglades wetlands will not "adversely affect" Wood Storks. See AAR-838 at 2. In making this decision, the FWS adopted the conclusions contained in a "Biological Assessment" prepared by an "ecologist" hired by the mining industry's lawyers shortly after plaintiffs provided formal notice of their intent to sue the Corps that concluded, predictably, that the mining plan would have "no adverse effect" on Wood Storks. (AAR-821B at 1; 6-7); see Simmons, 120 F.3d at 669 (agency must "exercise a degree of skepticism in dealing with self-serving statements from a prime beneficiary of the project").

Not surprisingly, however, the BA prepared by the mining industry, and uncritically accepted by the FWS, did not contain the specific, detailed environmental analysis for each permit requested by the FWS, and required by the regulations. Instead, the mining industry's consultant delivered a generic, ten-page BA for all twelve of the mining permits which did not provide any "thorough analysis of potential effects" to listed species "through loss and destruction of habitat, through direct mortality, [and] through disturbance and harassment," as requested by FWS and required by the ESA regulations. See Resources Limited v. Robertson, 35 F.3d 1300, 1305 (9th Cir. 1994) (agency violated ESA by relying on FWS's finding of "not likely to adversely affect" where the agency failed "to provide the FWS with all of the data and information required by 50 C.F.R. § 402.14(d)"). Nor did the BA provide an "analysis of cumulative effects," including "the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation process." Defenders of Wildlife v. Babbitt, 130 F. Supp. 2d at 126-27 (setting aside FWS Biological Opinion that did not provide "a complete analysis of the environmental baseline" and "the effects of the action when added to that baseline").

Nor did the BA examine the likely short-term effects on Wood Stork foraging during the time between the destruction of wetlands and the completion of actual mitigation -- a critically important issue in light of the industry's extremely poor track record with regard to following through on promised mitigation. See Pacific Coast Fed'n of Fishermen's Asss'n v. NMFS, 265 F.3d 1028, 1037 (9th Cir. 2001) (affirming decision setting aside agency's ESA analysis because it relied on the "assumption" that long-term restoration would mitigate any adverse impacts, but failed "to evaluate the short term impacts"). In addition, the BA did not given any consideration at all to the project's effects on the Cape Sable

46

Seaside Sparrow -- a critically endangered species whose recovery, as discussed above, is dependent upon CERP actions that may be undermined by the Corps' mining plan. (SAR-2489) ("the area of the proposed rock mine" is "a key component in providing improvements in Cape Sable seaside sparrow and snail kite habitats in [Everglades National Park]"); Greenpeace v. NMFS, 80 F. Supp. 2d 1137, 1148-50 (W.D. Wash. 2000) (agency finding of "no jeopardy" unlawful where it "entirely ignored relevant factors").

Instead, the BA asserted, with virtually no supporting analysis, that "the Lake Belt does not play a significant role as foraging grounds for wood storks" because there are relatively few Wood Storks in and near the Lakebelt project area, and because "Everglades wood stork colonies have shifted locations" away from the Lakebelt project area in recent years. (AAR-821B at 8-10). Based on this biased BA, the FWS determined that the action would have no "adverse effect," and thus no formal consultation would be necessary, because there are a limited number of Wood Stork rookeries near the project area, and because endangered Wood Storks that are displaced and otherwise harmed by this project may be able to find "other protected wetlands" to use for foraging and other habitat dependent activities after Lakebelt wetlands are permanently removed. (AAR-838 at 2).

However, according to the FWS's own Handbook interpreting the ESA regulations, "a finding of 'not likely to adversely affect . . . can be made only if ALL of the reasonably expected effects of the proposed action will be beneficial, insignificant, or discountable.'" NRDC v. Evans, 279 F. Supp. 2d 1129, 1178 (N.D.Cal. 2003) (emphasis added), quoting FWS, Consultation Handbook at 4-1 (March 1998). A "discountable effect" is one that is "extremely unlikely to occur," while an "insignificant effect" is one that a person would not "be able to meaningfully measure, detect, or evaluate." Id. In this case, in the course of blindly adopting the industry's conclusions, the FWS made no mention of its own Handbook, nor the obvious fact that, if Wood Storks have to find "other protected wetlands" to forage in because of the effects of this project, the action unquestionably will have adverse effects that the FWS can "meaningfully measure, detect, or evaluate." Evans, 279 F. Supp. 2d at 1178; Bensman v. USFS, 984 F. Supp. 1242, 1247-49 (W.D.Mo. 1997) (agency's determination that timber sales "were 'not likely to adversely affect' the Indiana bat" was unlawful because the action could cause "disturbance to roosting"

bats in areas "within two to four miles" of the projects).[41]

Moreover, in announcing this stunning about-face, the FWS did not provide any coherent explanation for the agency's sudden change of heart on the issue of Wood Stork impacts, nor did it provide any explanation for why the detailed information twice requested by the FWS was suddenly no longer necessary for the agency to make a rational assessment of the project. See Panhandle Eastern Pipe Line, 196 F.3d at 1275 ("an agency changing its course must supply a reasoned analysis"). Nor did the FWS's decision make any attempt to address the overwhelming record evidence demonstrating that "[b]oth adult and juvenile Wood Storks [were] observed foraging" in the Lakebelt area, that as many as 53 individuals have been observed in the area in a single day, (FAR-133 at 33); AAR-237 at 11, and that "[t]he proximity of wetland habitat within the [Lakebelt] study area to existing foraging and nesting sites for wading birds (especially wood storks) and snail kites in adjacent Water Conservation Areas makes it essential to maintain or even enhance the capacity of remaining wetlands to support these endangered species." (AAR-17 at 77); see Northwest Environmental Advocates v. EPA, 268 F. Supp. 2d 1255, 1272-73 (D.Or. 2003) (agency's finding of "no jeopardy" to a listed species unlawful where "the administrative record is filled with evidence and findings . . . that a no-jeopardy finding is unwarranted").

In short, the record amply demonstrates that the FWS's sudden shift from its pre-election view of mining in the Lakebelt as posing a significant threat to ESA-listed species, to its post-election *laissez faire* attitude that federally endangered wading birds should simply find "other wetlands" to occupy after they are displaced by hard-rock mining, was plainly based on considerations that have nothing to do with the "best available" science or the agency's overriding obligation to protect endangered species and their

_____

[41] Forcing endangered birds to abandon preferred feeding areas also plainly constitutes a "take" through "harm and harassment" under the FWS's regulations. See 50 C.F.R. § 402.02. In turn, any action that rises to the level of a "take" cannot be considered an "insignificant" effect -- and thus requires formal consultation -- under the FWS's own Consultation Handbook. See Evan, 279 F. Supp. 2d at 1178 ("Insignificant effects relate to the size of the impact and should never reach the scale where take occurs"), quoting FWS Consultation Handbook at 3-12; AAR-671 at 3 (FWS explaining that "The ability of wood storks to forage successfully affects their decision to roost at breeding colonies" near the Lakebelt project area). Moreover, the FWS's own Recovery Plan for the Wood Stork states that the species was listed under the ESA because of the "[l]oss of feeding habitat," that "[t]he generally accepted explanation for the decline in the wood stork . . . is the reduction in food base" and that "[t]his reduction is attributed to loss of wetland habitat as well as to changes in hydroperiods" -- i.e., the two key adverse effects of this mining plan. FWS, Wood Stork Recovery Plan at 10 (Jan. 27, 1997) (Exhibit 1)

habitats.  See Northwest Environmental Advocates, 268 F. Supp. 2d at 1273 ("NMFS's clear findings prior to the infusion of political pressures from EPA during the review process indicate that a no-jeopardy finding was unwarranted and unsupported by the evidence").[42]

### B.    The FWS And The Corps Violated Their Duty To Re-Initiate Consultation.

Under the FWS's regulations, where "new information reveals effects of the action that may affect a listed species . . . in a manner or to an extent not previously considered," or if "the action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered," "[r]einitiation of formal consultation is required and shall be requested by the federal agency or the Service . . . ." 50 C.F.R. § 402.16(b); Sierra Club v. Yeutter, 926 F.2d 429, 432 (5th Cir. 1991) ("If new information becomes available pertaining to the harmful effects of previously approved agency action, the consultation process must be repeated with the USFWS.").

In this case, both the mining industry's BA and the FWS's concurrence letter relied heavily on the assertion that there are no major Wood Stork colonies near the project area and, therefore, Lakebelt wetlands are not a "significant" habitat area for Wood Storks.  (AAR-821B at 7-10); AAR-838 at 2. However, according to a report published by the State shortly after the FWS's concurrence, and presented to the agencies before issuance of the permits, nearly 90% of all Wood Storks recorded in Everglades National Park in 2001 were nesting in a single colony that is directly adjacent to the Lakebelt project area. (AAR-944 at 3;14).  As plaintiffs explained in their letter requesting re-initiation of consultation, according to the mining industry's BA, the best available scientific evidence shows that the primary foraging radius for Wood Storks is at least 12 miles from each nesting colony -- which means that the Lakebelt project area was squarely within the primary foraging range for nearly 90% of all Wood Storks nesting within the Everglades National Park. Id.; AAR-821B at 7-9.  Plaintiffs also explained how, in light of this information, there can be no question that the agencies' decision to forgo formal consultation based on the mining industry's claims that there are no major Wood Stork colonies near the project, and that Lakebelt wetlands are not "significant" habitat for Wood Storks, was irrational. (AAR-944 at 1-4).

------

[42] Moreover, the Corps' failure to even make a threshold determination whether the agency's actions "may affect" the Cape Sable Seaside Sparrow, also constitutes a significant violation of the ESA.  See Thomas v. Peterson, 753 F.2d 754, 763-64 (9th Cir. 1985).

By any reasoned analysis, new information confirming that 90% of all Wood Storks in Everglades National Park were located less than five miles from the project, and therefore have primary foraging habitat within the Lakebelt project area, constituted "significant new information" triggering the need for further consultation under section 7 of the ESA before the mining permits were issued in this case. See Mowery v. Heckler, 771 F.2d 966, 972 (6th Cir. 1985) ("Webster's Third New International Dictionary (1976) defines "significant" in pertinent parts: "having or likely to have influence or effect: deserving to be considered."). Because no such consultation took place, the Corps and the FWS violated section 7(a)(2). See Sierra Club v. Marsh, 816 F.2d 1376, 1388 (9th Cir. 1987) ("The COE violated the regulations by failing to re-initiate consultation after learning [] that the destruction and modification of marshland by the project [] could harm the clapper rail and the least tern");Yeutter, 926 F.2d at 432.[43]

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court grant their motion for summary judgment; find that the Corps' EIS, the CWA permits, the FWS's decision to "concur" in the Corps' finding that the destruction of Everglades wetlands will not "adversely affect" any endangered species, and defendants' refusal to conduct supplemental NEPA review and reinitiate ESA consultation, are contrary to the APA, NEPA, the CWA, and the ESA; and retain jurisdiction for purposes of determining what remedy should issue to address these legal violations.

---

[43] Furthermore, the new information presented in plaintiffs' February 2004 letter demonstrating that the proposed mitigation is now infeasible, and has been significantly altered, also triggers the need for reinitiation of consultation. Indeed, in the course of making its decision to "concur" in the Corps' finding of "not likely to adversely effect," the FWS relied specifically on the assumption "the acquisition and enhancement of the 12,113-acre Pennsuco mitigation area" would mitigate for the loss of wetlands caused by mining. (AAR-838 at 2); compare Northwest Environmental Advocates, 268 F. Supp. 2d at 1273 (setting aside NMFS's finding of "no jeopardy" because it relied on "speculative and unenforceable" mitigation commitments from other agencies).  Because significant new information shows that the Corps' promise to "acquire and restore" the Pennsuco wetlands, (AAR-623A at 1), relied upon by the FWS for its "concurrence" has been abandoned in favor of "reimbursement" and "enhancement," (SAR-947), and mitigation of "alternative locations" that the FWS has never evaluated, (SAR-1880), the Corps and the FWS are obligated to re-initiate consultation under the ESA based on this information as well. See Marsh, 816 F.2d at 1388 (re-initiation of consultation required where new information showed that planned public acquisition of wetlands as mitigation had "been delayed and may not take place at all," or may be carried out "in a manner or to an extent not previously considered").



Respectfully submitted:

Jonathan R. Lovvorn
D.C. Bar. No. 461163
Eric R. Glitzenstein
D.C. Bar No. 358287
MEYER & GLITZENSTEIN
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C. 20009
(202) 588-5206

Of Counsel:

Bradford H. Sewell
Natural Resources Defense Council
40 West 20th Street
New York, NY 10011
(212) 727-4507

Paul J. Schwiep
Fl. Bar. No. 823244
ARAGON, BURLINGTON, WEIL,
SCHWIEP, KAPLAN & BLONSKY, P.A.
2699 S. Bayshore Drive
Miami, FL 33133

Date: May 10, 2004                    Attorneys for Plaintiffs

51

Case No. 03-23427 (WMH)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by United

States mail on this on this 10th day of May, 2004 upon:

Mark Arthur Brown, Esq.
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
P.O. Box 7369 - Ben Franklin Station
Washington, D.C. 20044
Phone: (202) 305-0204
Fax: (202) 514-0097
e-mail: mark.brown@usdoj.gov

Lawrence R. Liebsman, Esq.
HOLLAND & KNIGHT, L.L.P.
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006-1816
Phone: (202) 955-3000
Fax: (202) 955-5564
e-mail: rapeters@hklaw.com

Neal McAliley, Esq
WHITE & CASE, L.L.P.
200 So. Biscayne Blvd.
Miami, Florida 33131



By: _____
Paul J. Schwiep

ARAGON · BURLINGTON · WEIL · SCHWIEP · KAPLAN & BLONSKY, P.A.

OFFICE IN THE GROVE   PENTHOUSE   2699 SOUTH BAYSHORE DRIVE   MIAMI, FLORIDA 33133
T: 305.858.2900  F: 305.858.5261
EMAIL: INFO@ABWLAW.COM   WWW.ABWLAW.COM

Exhibit 1

# WOOD STORK RECOVERY PLAN





U.S. Fish and Wildlife Service, Southeast Region

# REVISED
# RECOVERY PLAN FOR THE
# U.S. BREEDING POPULATION
# OF THE WOOD STORK

for

U.S. Fish and Wildlife Service
Southeast Region
Atlanta, Georgia

Original Approved: September 9, 1986

Approved: *[signature: Noreen K. Clough]*

Noreen K. Clough, Regional Director, Southeast Region,
U.S. Fish and Wildlife Service

Date: *[handwritten: January 22, 1997]*

# DISCLAIMER

Recovery plans delineate reasonable actions believed to be required to recover and/or protect listed species. Plans published by the U.S. Fish and Wildlife Service (Service), are sometimes prepared with the assistance of recovery teams, contractors, State agencies, and other affected and interested parties. Recovery teams serve as independent advisors to the Service. Plans are reviewed by the public and submitted to additional peer review before they are adopted by the Service. Objectives of the plan will be attained and any necessary funds made available subject to budgetary and other constraints affecting the parties involved, as well as the need to address other priorities. Recovery plans do not obligate other parties to undertake specific tasks and may not represent the views nor the official positions or approval of any individuals or agencies involved in the plan formulation, other than the Service. They represent the official position of the Service only after they have been signed by the Regional Director as approved. Approved recovery plans are subject to modification as dictated by new findings, changes in species status, and the completion of recovery tasks.

By approving this document, the Regional Director certifies that the data used in its development represents the best scientific and commercial data available at the time it was written. Copies of all documents reviewed in development of the plan are available in the administrative record, located at U.S. Fish and Wildlife Service, 6620 Southpoint Dr., South, Suite 310, Jacksonville, Florida, 32216. (904) 232-2580.

LITERATURE CITATIONS SHOULD READ AS FOLLOWS:

U.S. Fish and Wildlife Service. 1996. Revised recovery plan for the U.S. breeding  population of the wood stork. U.S. Fish and Wildlife Service. Atlanta, Georgia. 41 p.

ADDITIONAL COPIES MAY BE OBTAINED FROM:

Fish and Wildlife Reference Service
5430 Grosvenor Lane, Suite 110
Bethesda, Maryland 20814
301/ 492-6403 or 1-800-582-3421

Fees for plans vary depending upon the number of pages.

The following standard abbreviations for units of measurement are found throughout this document:

| | | | |
|---|---|---|---|
| cm = centimeters | in = inches | m = meters | ft = feet |
| km = kilometers | mi = miles | kg = kilograms | lbs = pounds |
| ppm = parts per million | | | |

i

## ACKNOWLEDGMENTS

The Service gratefully acknowledges the countless hours of research and commitment made by the following individuals to the recovery of the wood stork.  Without their help, this revision would not have been possible.

Larry Bryan
Savannah River Ecology Laboratory

Malcolm Coulter
IWRB/IUCN/BirdLife International
Specialist Group on Storks, Ibises and Spoonbills

John Fowler
Chehaw Wild Animal Park, Zoo Atlanta

Mike Harris
Georgia Department of Natural Resources

Tom Murphy
South Carolina Department of Natural Resources

John Ogden
South Florida Water Management District
(formerly, Everglades National Park)

John Robinette
U.S. Fish and Wildlife Service
Savannah Coastal Refuges

Jim Rodgers
Florida Game and Fresh Water Fish Commission

Becky Shortland
The Georgia Conservancy

ii

## EXECUTIVE SUMMARY

**Current Species Status:** The United States breeding population of the wood stork is listed as an endangered species and is found throughout Florida, Georgia, and coastal South Carolina. Since the 1960's, the wood stork population has shown a substantial decline in southern Florida, and substantial increases in northern Florida, Georgia, and South Carolina. Over the last 12 years, the U.S. population has ranged between 5,500 and 6,500 pairs.

**Habitat Requirements and Limiting Factors:** Wood storks use a variety of freshwater and estuarine wetlands for nesting, feeding, and roosting. Freshwater colony sites must remain inundated throughout the nesting cycle to protect against predation and abandonment. Foraging sites occur in shallow, open water where prey concentrations are high enough to ensure successful feeding. Limiting factors include loss of feeding habitat, water level manipulations affecting drainage, predation and/or nest tree regeneration, and human disturbance.

**Recovery Objective:** The objective of this revised recovery plan is to assure the long-term viability of the U.S. breeding population of the wood stork in the wild, allowing initially for reclassification to threatened status and ultimately removal from the list of threatened and endangered species.

**Recovery Criteria:** Reclassification from endangered to threatened could be accomplished when there are 6,000 nesting pairs and annual regional productivity is greater than 1.5 chicks per nest/year (calculated over a 3-year average). Delisting could be accomplished when there are 10,000 nesting pairs calculated over a 5-year period beginning at the time of reclassification, annual regional productivity greater than 1.5 chicks per nest/year (also calculated over a 5-year average) and a minimum of 500 successful nesting pairs in South Florida.

**Actions needed:** The major actions needed to accomplish the recovery objective are: (1) protect currently occupied habitat; (2) restore and enhance habitat; (3) conduct applied research; and (4) increase public awareness.

**Total Estimated Cost of Recovery:** $1,095,000.00

**Date of Recovery:** Under an ideal set of circumstances, the earliest possible date for complete recovery of this population would be 2005. However, because of the time necessary to complete some of the long term restoration tasks, full recovery may not be possible for an additional 15 or 20 years.

# TABLE OF CONTENTS

                                                                        Page

PART I: INTRODUCTION ...................................................... 1
   Description ............................................................. 1
   Distribution ............................................................ 1
   Habitat Characteristics ................................................. 3
   Life History/Ecology .................................................... 4
   Reasons for Listing .................................................... 10
   Ongoing Conservation Efforts .......................................... 12
   Strategy for Recovery ................................................. 16


PART II: RECOVERY ........................................................ 17
   A. Recovery Objective and Criteria .................................... 17
   B. Narrative Outline .................................................. 18
   C. Literature Cited ................................................... 27


PART III: IMPLEMENTATION SCHEDULE ....................................... 32

List of Reviewers ........................................................ 37


APPENDICES
Appendix A - Colony survey data ....................................... A-1
Appendix B - Management Guidelines .................................... B-1

Case 1:03-cv-23427-WMH   Document 31   Entered on FLSD Docket 05/11/2004   Page 75 of 163

# PART I.  INTRODUCTION

This is the revised recovery plan for the U.S. breeding population of wood storks (*Mycteria americana*).  The U.S. Fish and Wildlife Service (Service) listed the United States breeding population of wood storks as endangered on February 28, 1984, pursuant to the Endangered Species Act of 1973, as amended (U.S. Fish and Wildlife Service 1984).   All populations of wood storks breeding within the United States, and their offspring, are protected by the listing action.  The wood stork is also listed as an endangered species pursuant to Alabama, Florida, Georgia, North Carolina, and South Carolina State laws.  The Service approved this recovery plan in 1986 to identify actions necessary to recover the population.  Since that time, many tasks identified in the original plan have been accomplished and more information is now available on the biology and distribution of storks throughout the Southeast.  This revised recovery plan updates the original information and addresses new threats and needs.

## A.  DESCRIPTION

The following description is derived from Robertson (1989).  The wood stork is a large, long-legged wading bird, with a head to tail length of 85-115 cm (33-45 in) and a wingspread of 150-165 cm (59-65 in).  The plumage is white, except for iridescent black primary and secondary wing feathers and a short black tail.  Storks fly with necks and legs extended.  On adults, the rough scaly skin of the head and neck is unfeathered and blackish in color, the legs are dark, and the feet are dull pink.  The bill color is also blackish.  Immature storks, up to the age of about 3 years, differ from adults in that their bills are yellowish or straw colored and there are varying amounts of dusky feathering on the head and neck.  During courtship and the early nesting season, adults have pale salmon coloring under the wings, fluffy undertail coverts that are longer than the tail, and toes that brighten to a vivid pink.   The wood stork is also known as the wood ibis, ironhead, flinthead, and gannet.

## B.  DISTRIBUTION

The wood stork is one of 17 species of storks (Ciconiidae) occurring worldwide, and is the only stork regularly occurring in the United States (Figure 1).  The breeding range of the species extends from the southeastern United States south through Mexico and Central America, Cuba and Hispaniola, and through South America to western Ecuador, eastern Peru, Bolivia, and northern Argentina (American Ornithologists' Union 1983).

The wood stork may have formerly bred in all the



Figure 1.  Breeding range of the wood stork.

Case 1:03-cv-23427-WMH   Document 31   Entered on FLSD Docket 05/11/2004   Page 76 of 163

coastal Southeastern States from Texas to South Carolina. Currently, wood storks breed throughout Florida, Georgia, and coastal South Carolina (Figures 2, 3 & 4). Post-breeding storks from Florida, Georgia, and South Carolina disperse occasionally as far north as North Carolina and as far west as Mississippi and Alabama. Storks sighted in Arkansas, Louisiana, Texas, and points farther west may have dispersed from colonies in Mexico. The amount of overlap and/or population interchange is unknown.

It is believed that storks nesting in north Florida, Georgia, and South Carolina move south during the winter months. The large number of storks that occur during winter in the freshwater wetlands of south Florida far exceeds the number known to breed in south Florida colonies in the same months. Bancroft et al. (1992) have shown that the number of storks feeding in the three Water Conservation Areas of the central and northern Everglades varied greatly among winters, ranging from a low of 1,233 birds in a high water year to 7,874 birds in a low water year. In most of the study years, 1985-1989, the total number of storks in the Water Conservation Areas increased substantially between December and January, and dropped off sharply after March. In some years, the inland marshes of the Everglades have supported the majority (55%) of the U.S. population of wood storks.

Winter abundance of wood storks in coastal Georgia is much reduced from the fall when storks are commonly seen along the coast feeding in the tidal marshes during low tide. Although some flocks may be seen during mild winters, most sightings during this season are of just a few birds. Georgia's coast does not appear to be a primary wintering area for storks (M. Harris, Georgia Department of Natural Resources (GADNR), pers. comm.).

Wood storks have been seen in South Carolina during every month of the year. However, storks are uncommon from December through mid-March. During a sudden cold snap in 1989, several storks were



Figure 2. Florida wood stork colony locations for 1995.

Figure 3. Georgia wood stork colony locations for 1995.



Figure 4. South Carolina wood stork colony locations for 1995.

2

recovered with their bills frozen shut and a coating of ice on their legs. These storks were alive when found but later died. Most storks seen during the winter are immature. Virtually all storks seen from March through mid-June are adults. Juvenile storks are first seen in June, but are not common until July. The lack of juveniles in the State during the nesting season has unknown consequences on the recruitment to South Carolina colonies (Tom Murphy, South Carolina Department of Natural Resources (SCDNR), pers. comm.).

## C. HABITAT CHARACTERISTICS

Wood storks use a variety of freshwater and estuarine wetlands for nesting, feeding, and roosting sites. Each habitat type has distinct characteristics.

Nesting. Typically, storks select patches of medium to tall trees as nesting sites, which are located either in standing water (swamps) or on islands surrounded by relatively broad expanses of open water (Palmer 1962, Rodgers et al. 1987, Ogden 1991). At freshwater sites, nests are often constructed in cypress (*Taxodium distichum*), black gum (*Nyssa biflora*), and southern willow (*Salix carolina*). Coastal nest sites occur in red mangroves *(Rhizophora mangle)* and occasionally Brazilian pepper (*Schinus terebinthifolius*), prickly pear cactus (*Opuntia stricta*), and Australian pine (*Casuarina equisetifolia*). Coastal nest sites in Georgia occur in black gum, willow, and button bush (*Cephalanthus occidentalis*) (J. Robinette, U.S. Fish and Wildlife Service, pers. comm.). Colony sites located in standing water must remain inundated throughout the nesting cycle to protect against predation and nest abandonment.

Storks tend to use the same colony sites over many years, as long as the sites remain undisturbed, and sufficient feeding habitat remains in the surrounding wetlands. Colony turnover rates (calculated using Erwin 1977) for colonies in South Carolina are very low at 0.17 with a 89% likelihood of remaining active in consecutive years. Traditional wetland sites may be abandoned by storks once local or regional drainage schemes remove surface water from beneath the colony trees. As a result of such drainage, many nesting storks have shifted colony sites to managed or impounded wetlands. Ogden (1991) suggested that recent increases in the number of colonies in north and central Florida have been possible because of the availability of altered or artificial wetlands. The percentage of the total number of storks that nested in either altered wetlands (former natural wetlands with impounded water levels) or artificial wetlands (former upland sites with impounded water) in central and north Florida colonies increased from about 10% in 1960 to between 60-82% between 1976 and 1986.

Foraging. Storks forage in a wide variety of shallow wetlands, wherever prey concentrations reach high enough densities, in water that is shallow and open enough for the birds to be successful in their hunting efforts (Ogden et al. 1978; Browder 1984; Coulter 1987). Good feeding conditions usually occur in relatively calm water, where depths are between 5-40 cm (2-16 in), and where the water column is uncluttered by dense patches of aquatic vegetation (Coulter and Bryan 1993). In southern Florida, a dropping water level is often necessary to concentrate fish to suitable densities (Kahl 1964; Kushlan et al. 1975). In east-central Georgia,

where stork prey is almost twice as large as the prey in southern Florida, the birds usually feed where prey is sparse and foraging storks do not seem to depend on evaporative concentration of prey (Coulter 1992; Coulter and Bryan 1993; Depkin et al. 1992). Typical foraging sites throughout the species' range include freshwater marshes and stock ponds, shallow, seasonally flooded roadside or agricultural ditches, narrow tidal creeks or shallow tidal pools, managed impoundments and depressions in cypress heads and swamp sloughs. Almost any shallow wetland depression where fish become concentrated, either through local reproduction or the consequences of area drying, may be used as feeding habitat.

Differences between seasons and years in rainfall and surface water patterns often cause storks to make changes between years in where and when certain habitats are used for nesting, feeding or roosting. These hydrological changes may cause storks to shift the timing or intensity of feeding at a local wetland, or cause entire regional populations of birds to make large geographical shifts between one year and the next (Bancroft et al. 1992). Because nesting storks generally use foraging sites that are located within about a 50 km (31 mi) flight range of the colony, successful colonies are those that are in regions where birds have options to feed under a variety of rainfall and surface water conditions (Ogden et al. 1978; Coulter 1987). Maintaining this wide range of feeding site options requires that many different wetlands, both large and small and with relatively long and short annual hydroperiods, be available as foraging habitat.

Roosting. Although storks tend to roost at sites that are structurally similar to nesting sites, they also use a wider variety of sites for roosting than for nesting (Coulter 1990; Bryan 1995; J. Ogden, South Florida Water Management District (SFWMD), pers. comm.). Non-breeding storks, for example, may change roosting sites in response to changing feeding locations, and in the process, will roost in patches of trees that would be unacceptable for nesting (i.e. stands of trees over dry ground). Roosts may be used for long periods of time, either seasonally or annually over many years, or may be used for only brief periods, depending on the availability of persistent foraging areas in surrounding wetlands. Roosting sites include cypress heads and swamps, pine or hardwood islands in marshes, mangrove islands, expansive willow thickets or dry marshes, or on the ground on levees.

## D. LIFE HISTORY/ECOLOGY
### Prey items and density

Wood storks feed almost entirely on fish between 2 and 25 cm (1-10 in) in length (Kahl 1964; Ogden et al. 1976; Coulter 1987). In a study on regurgitation samples from a stork colony in east-central Georgia, fish (primarily sunfish - (*Lepomis* spp.), bowfin (*Amia calva*), redfin pickerel (*Esox americanus*) and lake chubsuckers (*Erimyzon sucetta*)) represented 92% of all individual prey items consumed and 93% of the biomass (Depkin et al. 1992). In south Florida, Ogden et al. (1976) found that certain fish species were taken preferentially; mosquito fish (*Gambusia affinis*) were underrepresented in the diet in proportion to availability, whereas, flagfish (*Jordanella floridae*), sailfin mollies (*Poecilia latipinna*), marsh killifish (*Fundulus confluentus*), yellow bullheads (*Ictalurus natalis*), and sunfish were over-represented. In 1994,

4

regurgitation samples from a coastal colony on St. Simons Island, Georgia yielded primarily (93.75%) brackish/saltwater species. The majority of those fish were mummichogs (*F. heteroclitus*) and one juvenile mullet (*Mugil* spp.) (A.L. Bryan, Jr., Savannah River Ecology Laboratory (SREL), pers. comm.). Wood storks also occasionally consume crustaceans, amphibians, reptiles, mammals, birds, and arthropods. Fish densities at stork foraging sites varied from 15.6 individuals/m² in east-central Georgia to 40 individuals/m² in south Florida (Depkin et al. 1992; Ogden et al.1978). The natural hydrological regime in south Florida involves seasonal flooding of extensive areas of the flat, low-lying peninsula, followed by drying so that water is increasingly restricted to ponds and sloughs. Fish populations reach high numbers during the wet season, but become concentrated in increasingly restricted habitats as drying occurs. Consumers such as the wood stork are able to exploit high concentrations of fish in drying pools and sloughs.

Feeding behavior
The specialized feeding behavior of the wood stork involves tactilocation, also called grope feeding. A feeding stork wades through the water with the beak immersed and partially open (7-8 cm (2.5-3.5 in)). Upon contact with a prey item the mandibles are forcibly snapped shut, the head is raised, and the food swallowed (Kahl 1964). Occasionally, storks will stir the water with their feet in an attempt to startle hiding prey (Rand 1956; Kahl 1964; Kushlan 1979). Tactilocation allows storks to feed at night or utilize water that is turbid or densely vegetated. However, for this type of feeding to be effective, prey must be concentrated in relatively high densities (see discussion under prey items and density).

Wood storks are able to use distant feeding sites without major expenditures of energy because of their soaring abilities, which allow them to rise to high altitudes on thermals, then coast many miles without flapping. A recent study suggested that soaring flight by storks can be accomplished at one-tenth the energetic cost of flapping flight (Bryan et al. 1995). Long distances traveled, however, shorten the time available for feeding and the number of return trips to feed nestlings (Kahl 1964). During the breeding season, feeding areas located in close proximity to a colony site may play an important role in chick survival, and provide enhanced opportunities for newly fledged birds (weak fliers) to learn effective feeding skills.

Storks from the Corkscrew Swamp colony in Collier County, Florida, sequentially forage in a variety of drying sites, feeding within approximately a 96-km (60-mi) radius around the colony (Browder 1984). However, Coulter (1986) reported that greater than 80 percent of the feeding sites for the Jenkins County, Georgia wood stork colony were within 20 km (12 mi) of the colony and that 55 percent of the feeding sites were within 10 km (6 mi). Storks in south Florida traditionally travel in large groups from the colony to feed. In contrast, storks in Georgia often travel alone or in small groups to forage (Coulter 1992). In coastal areas, the tidal cycle strongly influences use of saltwater habitats by wood storks. The relatively great tidal amplitudes characteristic of coastal marshes in northeast Florida, Georgia, and South Carolina serve to concentrate prey similarly to the seasonal drawdowns found in freshwater systems. In a study

conducted at the Priest Landing roost site in Chatham County, Georgia, departure times of storks from the site strongly suggested the storks were foraging in estuarine systems at low tide equally both day and night (Bryan 1995).

Breeding

Wood storks are seasonally monogamous, probably forming a new pair bond every season. There is documented first breeding for 3- and 4-year-old birds, but the average age of first breeding is unknown. It is believed that once storks reach sexual maturity they nest on a yearly basis (J. Ogden, SFWMD, pers. comm.). Mating occurs after a period of highly ritualized courtship displays at the nest site.

Nest initiation varies geographically. In Florida, wood storks lay eggs as early as October and as late as June (Rodgers 1990). In general, earlier nesting occurs in the southern portion of the State (<27°N). Storks in Georgia and South Carolina initiate nesting on a seasonal basis regardless of environmental conditions. Wood storks in Georgia and South Carolina lay eggs from March to late May, with fledging occurring in July and August. Storks nesting in Everglades National Park (ENP) and in the Big Cypress, under pre-drainage conditions, formed colonies between November and January (December in most years) regardless of annual rainfall and water level conditions (Ogden 1994). In response to deteriorating habitat conditions in south Florida, wood storks in these two regions have delayed the initiation of nesting to February or March in most years since the 1970's. This shift in the timing of nesting explains the increased frequencies of nest failures and colony abandonment in these regions over the last 20 years. Colonies that start after January in south Florida risk having young in the nests when May-June rains flood marshes and disperse fish.

Nests are constructed as high as 30.5 m (100 ft) in cypress trees but as low as 1m (3 ft) in mangrove colonies. Nests are constructed of sticks, vines, leaves, and Spanish moss, and lined with leaves or cypress foliage. Wood storks have also successfully nested in man-made artificial structures (Robinette et al. 1992).

Females lay a single clutch of eggs per breeding season. A second clutch is sometimes laid if nest failure occurs early in the season (M. Coulter, IWRB/IUCN/BirdLife International, pers. comm.). Two to five (usually three) eggs are laid. Average clutch size may increase during years of favorable water levels and food resources. Incubation requires about 30 days, and begins after the first one or two eggs are laid; the eggs therefore hatch at different times and young nestlings in a single nest vary in size. Younger, smaller chicks are often the first to die during times of food stress. About 9 weeks are required for fledging, but the young return to the nest for an additional 3 to 4 weeks to be fed. Parents feed young by regurgitating whole fish into the bottom of the nest at a rate of 3 to 10 or more feedings per day. Feedings tend to be more frequent when young are small. Ogden reports that only 1 - 2 feedings per day, per nest, have been recorded in south Florida colonies, when adults were forced to fly great distances to locate prey. Kahl (1964) calculated that an average wood stork family requires 201 kg (443 lbs) of fish

Case 1:03-cv-23427-WMH   Document 31   Entered on FLSD Docket 05/11/2004   Page 81 of 163

during a breeding season, and that a colony of 6,000 nests therefore requires 1,206,000 kg (2.6 million lbs) of fish during the breeding season.

Productivity

Actual colony production measurements are difficult to determine because of the prolonged fledging period, during which time the young return daily to the colony to be fed. It appears that colonies experience considerable variation in production among years and locations, apparently in response to differences in food availability. Table 1 represents data from several south and central Florida colonies demonstrating the variation (J. Ogden, SFWMD and J. Rodgers, Florida Game and Fresh Water Fish Commission (FGFC), pers. comm.).

Table 1.  Average number of nestlings per successful nest (N/SN).

| AREA | YEAR | Colony name | AGE | N/SN |
|------|------|-------------|-----|------|
| Central Florida | 1976 | Mulberry | 4-6 wk | 2.0 |
| Central Florida | 1977 | Brewster | 7-9 wk | 1.8 |
| Central Florida | 1977 | Pelican Island | 4-6 wk | 1.8 |
| Central Florida | 1977 | El Clair | 7-9 wk | 1.9 |
| Central Florida | 1977 | Pelican Island | 7-9 wk | 2.0 |
| Central Florida | 1977 | Moore Creek | 7-9 wk | 2.0 |
| Central Florida | 1977 | El Clair | 4-6 wk | 2.2 |
| Central Florida | 1977 | Moore Creek | 7-9 wk | 2.3 |
| Central Florida | 1977 | Moore Creek | 4-6 wk | 2.6 |
| Central Florida | 1979 | El Clair | 4-6 wk | 1.9 |
| South Florida | 1975 | Lane River | 6wk | 2.5 |
| South Florida | 1977 | Lane River | 6wk | 1.7 |
| South Florida | 1979 | Madeira | 6wk | 2.5 |
| South Florida | 1988 | Cuthbert | 7-9 wk | 1.0 |
| South Florida | 1989 | Cuthbert | 7-9 wk | 1.6 |
| South Florida* | 1990 | Cuthbert | 7-9 wk | 1.7 |

(*Heavy rains subsequently resulted in the starvation of all nestlings in Cuthbert in 1990 and all 250 nestlings in nearby Paurotis Pond in 1995. Colony failures such as these have plagued south Florida colonies since the 1970s.)

Maintaining adequate water levels to protect nests from predation is a critical factor affecting production within Georgia colonies (M. Harris, GADNR, pers. comm.). Sufficient fall/winter rainfall can provide enough water within colonies to last through the nesting season. If this is followed by general drying conditions in late spring through mid-summer, most colonies will produce young to flight stage (A.L. Bryan, SREL, pers. comm.). Conditions similar to those described above, persisted in 1991 and 1992 in coastal Georgia. Average production (birds produced per successful nest) during the 1991-1992 nesting season from a coastal colony in McIntosh County (Harris Neck) was 2.40 and 2.44 respectively.

When drought conditions persist during chick rearing, production from inland and coastal colonies may increase due to prey concentration in non-tidal feeding areas, provided colonies are not subject to predation (M. Harris, GADNR, pers. comm.). During drought conditions in the spring and summer of 1993, the Harris Neck colony produced a mean of 2.94 birds per nest. Three additional coastal colonies in McIntosh, Camden and Glynn counties each produced over 2.85 birds and two inland colonies in Jenkins county produced 2.53 and 2.08 birds per successful nest.

Artificial feeding ponds have been used successfully to provide supplemental high quality forage for wood storks and other wading birds (Coulter et al. 1987; Robinette and Davis 1992). Their potential impact on nesting success, production, and survival of newly fledged young is unknown. Preliminary results from a study conducted in 1995, on coastal colonies in Georgia, indicate artificial feeding ponds, located in close proximity to a colony site, may have significant positive impacts on production (L. Bryan, SREL and J. Robinette, USFWS, pers. comm.). Drawdowns during breeding season, and early post-breeding season, (March - September) can cause anoxic conditions and summer kill. Annual fall stocking will ensure that a consistent high quality forage base is provided on an annual basis, and that prey density is optimum for foraging storks.

It appears that above normal rainfall can severely impact production in inland colonies that depend solely on non-tidal fresh water food sources (A.L. Bryan, SREL, pers. comm.). Inland colonies in Jenkins County, Georgia (Big Dukes Pond and Chew Mill Pond) averaged 0.94 and 0.69 birds per active nest respectively in 1994 when heavy rain kept water levels relatively high in traditional feeding areas. Along Georgia's coastal plain, weather conditions varied among coastal colony sites during the 1994 season, but in general, water levels in most non-tidal fresh water feeding areas were higher than normal. One colony received above normal rainfall, and lost chicks during high winds, but still maintained production above 2.0 birds in nests that remained following the storm (Harris Neck 2.21 chicks per nest). Others suffered loss of chicks to predation when falling water levels allowed raccoons to enter the colony (Black Hammock 1.67 chicks per nest and Brailey Swamp 1.64 chicks per nest). The colony on St. Simons Island received above normal rainfall but did not suffer chick loss from predation or high winds (2.47 chicks per nest). The availability of fresh and brackish tidal marshes, combined with high tidal amplitude, may provide a more consistent food supply for coastal colonies in Georgia. Current data indicate coastal colonies may be less affected by above normal water levels than inland colonies.

Productivity in South Carolina colonies is similar to that found in Georgia and north Florida. In the period from 1981 to 1995, South Carolina colonies averaged 2.25 chicks/nest with an annual range of 1.75 to 2.75 (T. Murphy, SCDNR, pers. comm.).

Life span, Survivorship and Mortality

Little information is available on annual adult survivorship or survival of fledglings once they leave the colony. The oldest known age bird in the wild was 11 years 8 months (Hancock et al. 1992, p. 284). The oldest recorded specimen in captivity was a bird that was held at the National Zoological Park for 27 years and 6 days (May 28, 1923 to June 3, 1950) (Brouwer et al. 1992), although Hancock et al. note a 30+ year old bird (1992, p. 284).

Little is known about mortality among storks except in nesting colonies. In most colonies, the greatest mortality in nests occurs due to egg loss during incubation, and among nestlings during the first 2 weeks following hatching (J. Rodgers, FGFC, In press). As a result of delayed nesting in colonies in the southern Everglades, many nestling storks have died of starvation once summer rains dispersed fish concentrations on foraging grounds (Ogden 1994). Coulter and Bryan (1995a) examined factors that affected reproductive success of storks in east-central Georgia. Five factors accounted for the loss of nests: raccoon predation, stress induced by cold weather, intraspecific aggression, storm damage, and other unknown factors. Raccoon predation occurred when the swamp under nesting trees dried up. Alligators appeared to be an effective deterrent to raccoon predation. When sufficient water was under the nest trees, alligators were present. When water levels receded, the alligators left and raccoon predation became a problem.

Population status

Historically, wood storks were reported to have nested in all coastal states between Texas and South Carolina (Bent 1926; Cone and Hall 1970; Dusi and Dusi 1968; Howell 1932; Oberholser 1938; Oberholser and Kincaid 1974; Wayne 1910). There is no evidence, however, that colonies located outside of Florida ever, at any time prior to about 1970, formed on a regular basis or contained large numbers of storks. The largest individual colonies were in southern Florida, and contained from 5,000 to 10,000 nesting pairs in some years during the period from about 1900 through 1968 (6,000 pairs at Corkscrew Swamp in 1961 and 1966).

The estimated total population of nesting storks throughout the southeastern United States declined from 15,000 to 20,000 pairs during the 1930s, to 10,000+ pairs in 1960 to 1961, to a low of between 4,500 and 5,700 pairs in most years from 1977 to 1980 (Ogden et al. 1987). The lowest annual total, 2,500 pairs in 1978, probably reflected the combined influences of a low regional population and poor conditions for nesting in that year - many storks may not have attempted to breed. Surveys for all known colonies in South Carolina, Georgia, and Florida since 1983 have revealed a population ranging from 5,500 to 6,500 pairs. Over 6,000 pairs were estimated in 1983, 1984, 1993, and 1995.

Since the 1960s, the wood stork population has shown a substantial decline in southern Florida, and a substantial increase in northern Florida, Georgia, and South Carolina (Ogden et al. 1987). The number of pairs nesting in the traditional colony sites located in the Everglades and

Case 1:03-cv-23427-WMH   Document 31   Entered on FLSD Docket 05/11/2004   Page 84 of 163

Big Cypress regions of southern Florida declined from 8,500 pairs in 1961 to fewer than 500 pairs (from 1987 through 1995). During the same years, the number nesting in Georgia increased from 4 pairs in 1965 to 1,501 pairs in 1995, and the number nesting in South Carolina increased from 11 pairs in 1981 to 829 pairs in 1995. Appendix A shows recent survey information for storks in the Southeast.

Rodgers et al. (1995) pointed out shortcomings in the aerial surveys used to generate population estimates for storks in Florida, Georgia, and South Carolina. Rodger's study compared ground surveys of wood stork colonies with aerial surveys of the same colonies. The variability of the aerial estimates were very large. For example, an approximate 95% confidence interval for the 1993 Statewide (Florida) nesting population was 3,807 to 12,653 nests. The greatest variability occurred in large colonies with a high proportion of other white-plumage nesting birds.

The Service acknowledges the limitations involved in relying on aerial surveys for developing population estimates. However, storks are a long-lived species that demonstrate considerable variation in population numbers in response to changing hydrological conditions. Over the long-term, aerial surveys are the most cost-effective method for estimating population trends. Ground surveys, while providing greater individual colony accuracy, are more time consuming and expensive on a region-wide basis. Rodgers recommended the following actions to minimize variability in aerial surveys; incorporating ground counts at selected colonies, training observers in presurvey flights, and replicating counts for each colony. Surveys in Georgia and South Carolina, where colonies are not as numerous, often include ground counts. When possible, surveys in Florida will also include ground counts to reduce some of the variability..

E. REASONS FOR LISTING
When the Service listed the wood stork as an endangered species in 1984, several factors were listed as contributing to the decline of the population.

1. Loss of feeding habitat. The generally accepted explanation for the decline of the wood stork as a U.S. breeding species is the reduction in the food base (primarily small fish) necessary to support breeding colonies. This reduction is attributed to loss of wetland habitat as well as to changes in hydroperiods (Ogden and Nesbitt 1979; Ogden and Patty 1981). Wetland drainage and hydroperiod alteration are believed to have lowered the productivity and availability of fish for the wood stork, as well as for other wading bird species utilizing interior wetlands in Florida (Ogden and Nesbitt 1979; Ogden 1983).

2. Water level manipulations. The development of intensive water management in southern Florida has apparently affected wood stork reproductive success in two ways. The primary and most obvious effect is the decrease in areas subject to natural flooding followed by gradual drying; such a regime is essential to wood storks. If suitable concentrations of prey fish are not available, nest abandonment may occur. Kushlan et al. (1975) found that a water level increase as little as 3 cm (1.2 in) in the first 2 months of nesting was correlated with nest desertion in the ENP colonies, and that subsequent re-nesting efforts were usually unsuccessful. They also found that, while successful wood stork nesting was associated with wet years prior to 1962, nesting

became relatively more successful in dry years after that date. This coincided with the restriction of water deliveries through a smaller flow section across the Tamiami Trail, causing higher water levels in some portions of ENP per given rainfall, and at the same time, overdrainage of other areas of the Park.

The history of water management in Florida has been summarized by Blake (1980). Early water management efforts were intended to drain wetlands for agriculture. The drainage schemes sought to alter the natural hydrological regime, which consisted of extensive seasonal (mainly summer-fall) flooding, followed by gradual declines in water levels as the drier seasons (fall, winter, and spring) commenced. The larger watersheds of primary concern to the wood stork in Florida are the Kissimmee - Okeechobee - Everglades system and the St. Johns River Basin. A wide variety of other, mostly smaller, watersheds are important to the wood stork over its breeding range. The initial modifications involved digging headwater canals to drain off water quickly to the ocean. Increased human use of flood-prone areas caused additional demands for further structural flood control measures. Subsequently, the construction of additional canals, levees, gates, water storage areas, and the use of backpumping, brought the hydrological regimes largely under human control. These structural modifications affected vast areas in both south and central Florida, and also made the ENP largely dependent on release of water from the Water Conservation Areas. In 1970, ENP was guaranteed an annual allotment, but in drought years this can be inadequate for optimum wetland health and productivity. Just as important, unseasonably large releases of water can cause wood stork nesting failures. A newer, Experimental Water Delivery program for the Park, initiated in 1985, has not yet resulted in the recovery of sufficiently natural hydrological patterns to have improved habitat conditions for storks in the Everglades basin.

It should be pointed out that the long reproductive lifespan of the wood stork allows it to tolerate reproductive failure in some years, and naturally occurring events (prolonged drought or unseasonal heavy rainfall) have undoubtedly always affected the breeding success of this species, causing some breeding failures. Modified hydrological regimes, however, have caused nesting failures to become chronic, rather than occasional, in the important south Florida wood stork colonies.

3. Predation and/or lack of nest tree regeneration. Drainage of cypress stands will prevent wood storks from nesting, and lowered water levels after nest initiation facilitates raccoon predation. Raccoons may also enter colonies more easily when mats of aquatic vegetation form under cypress swamp colonies (J. Rodgers, Jr., FGFC, pers. comm.). On the other hand, colonies that are perpetually flooded will have no cypress regeneration. In recent years, some wood stork colonies have formed on islands in clay settling ponds formed as a result of phosphate mining operations. These colonies tend to be temporary, because vegetational succession results in the death of the pioneering willows used for nesting and shrubs and dense vines ultimately predominate (Clewell 1981). In some such settling impoundments, all vegetation dies after a few years (J. Ogden, SFWMD, pers. comm.).

4. <u>Human disturbance.</u>  Human disturbance may cause adults to leave nests, exposing the eggs and downy nestlings to predators, sun, and rain.  However, it appears that wood storks may be less sensitive to low levels of human disturbance than other wading birds.  Rodgers and Smith (1995) examined 8 colonies of mixed-species wading birds (including wood storks) for responses to various human disturbances.  They calculated recommended setback distances for each species depending on their sensitivity to disturbance.  Of the 15 species examined, wood storks exhibited the smallest mean flush distance in response to a walking approach (18.4 ± 5.5 m) and an equally small (<20 m) flush distance in response to a motor boat approach.  Rodgers and Smith recommended minimum setback distances for wood storks at 65 meters for any type of walking activity and 63 meters for any type of boating activity.

5. <u>Pesticides and other chemical pollutants.</u>  Pesticide contamination has not generally been considered to adversely affect wood stork reproduction (Ohlendorf *et al.* 1978), but a 1984 study (Fleming *et al.*) suggests that reproduction in north and central Florida colonies may have been adversely affected by DDE.  This compound, a DDT metabolite, was found in higher concentrations in eggs from nests in which not all eggs hatched.  The levels of heavy metals and selenium were examined in the feathers of young wood storks nesting in northeastern Florida (Dee Dot, Duval County) and compared to nesting wood storks on the west coast of Costa Rica (Burger et al. 1993).  Concentrations of mercury, cadmium, and lead were significantly higher in the chicks from Florida compared to those from Costa Rica.  Additionally, feather and liver tissue samples from a road-killed wood stork in Florida were examined for mercury content (Facemire and Chlebowski 1991).  Liver and feathers contained an average of 10.1 and 9.9 mg mercury/kg wet weight, respectively.  This level is below the level of acute toxicity (16.5 ppm wet weight), but is well within the range of residues (5.0 to 40.0 ppm) known to have impaired reproduction in several species of birds (Eisler 1987).

6. <u>Current concerns.</u>  Recent programs designed to begin the ecosystem restoration process for Everglades National Park, including the Minimum Water Deliveries Program of the 1970's, and the Experimental Water Deliveries Program beginning in the mid-1980's, have shown no evidence that they have benefited storks.  Peak numbers of nesting storks in ENP were 1,500 to 2,000 pairs during the 1960's, 1,000 to 1,200 pairs during the 1970's, 500 to 1,000 pairs during the 1980's and fewer than 250 pairs since 1989.  Urban and agricultural expansion in southwestern Florida continue to adversely impact the Corkscrew Swamp and other Big Cypress Basin colonies, resulting in a continuing decline in total nesting effort by storks in that region as well.

F.  ONGOING CONSERVATION EFFORTS

<u>Management Guidelines.</u>  In 1990, the Service developed a set of management guidelines for wood stork nesting, feeding, and roosting habitats (Appendix B).  The Guidelines recommend buffer zones that may be necessary to reduce human disturbance for storks using nesting and roosting habitats.  These efforts have substantially contributed to the protection of stork habitat, particularly where new developments have been proposed in areas where it could be demonstrated that storks were using specific sites.  The buffer zones recommended in the management guidelines are greater than those recommended by Rodgers and Smith (1995) in their analysis.  At the time the guidelines were developed, very little empirical data were

available on the response of wood storks to human activities. Rodgers and Smith analyzed only three types of human activities: walking, canoeing, and a small motorboat with two persons. They did not evaluate responses to other activities such as construction or aircraft. The current guidelines recommend buffer zones to protect colonies from many kinds of activities including human disturbance. J. Rodgers (FGFC, pers. comm.) plans to develop recommended minimum setback distances for loafing and foraging sites in the near future. Upon completion of his report, the management guidelines should be reevaluated to consider the recommendations of Rodgers and Smith.

Guidelines for Forestry Practices. In 1994, the Florida Game and Fresh Water Fish Commission developed draft guidelines to assist professionals conducting forestry practices (when Federal cost-share program funds are used) on lands where wood storks occur. The guidelines are designed to prevent incidental take and provide management options to enhance the species and habitat when consistent with the landowners objectives. When approved, these guidelines will have the concurrence of the U.S. Forest Service and the U.S. Fish and Wildlife Service.

Foraging Habitat Management. Over the last several years, South Carolina and Georgia have been successful in managing man-made diked impoundments for use by wood storks. These impoundments can be made available to storks under a variety of circumstances because of the ability to artificially manipulate water levels and concentrate fish in canals and natural pools.

There are in excess of 70,000 acres of diked marshes in South Carolina. These impounded marsh areas are managed primarily to attract waterfowl. Management generally involves manipulation of salinity and water level through the use of water control structures and tidal flow. Impoundments may be used by storks any time water levels are shallow enough to accommodate foraging storks (<40 cm (16 in)). High density stork use most commonly occurs during periods when water levels are dropped and fish are concentrated. This procedure immitates the natural drought cycle but is artificially accelerated using water control structures and may be timed within season for maximum utility. Storks find impoundments within days of a drawdown and concentrations of >300 storks in a single impoundment are regularly recorded. Impoundment drawdowns provide continuous foraging opportunities unlike the adjacent tidal marsh which is useful only during the periods around low tide. Drawdowns of impoundments for stork use can often be accomplished within the framework of waterfowl water manipulations. Impoundment drawdowns should be conducted on different units over time to provide high quality foraging habitat over a longer period of time. Consideration should be given to conducting drawdowns during periods when other habitats are not as available, such as periods following heavy rains. The need for food is at its highest during the time when chicks are in the nest. However, in most years there appears to be adequate foraging habitat to support high levels of production. A critical need for predictable high quality habitat may well be during the period immediately after the young fledge. The presence of foraging habitat with high prey densities may reduce the high rate of mortality of recently fledged chicks.

An example of a managed impoundment for storks occurs at the Kathwood Lake facility near Jackson, South Carolina. In response to an Endangered Species Act Section 7 consultation between the Service and the U.S. Department of Energy's (DOE) Savannah River Site, the DOE

modified the bottom of the drained Kathwood Lake into four impoundments to be specifically managed as wood stork foraging habitat (Coulter et al. 1987). These impoundments are periodically stocked with known stork prey species (fish) and are managed for fish reproduction in the fall, winter and spring (Coulter and Bryan 1995b). The impoundments are lowered to appropriate depths for stork foraging in the late summer months (July - September) when storks frequent south-central South Carolina. Wood storks have utilized these impoundments every year since they were constructed (1986) with the primary beneficiaries being immature ($\leq$ 3 yrs. old) storks who were consistently present in higher numbers than adult storks on these managed impoundments (Bryan and Coulter 1995). The successful utilization of these impoundments, and future attempts to create or manage foraging habitat, was the result of active management to either produce or stock high densities of prey species and then making the prey available for the storks during a period of peak food demand, such as when parents are feeding nestlings or fledgling storks are dispersing from their colonies.

In 1994, the Service's Charleston Ecological Services field office provided technical assistance and funding to two private landowners for construction of a wood stork foraging area on their property. This Partners for Wildlife project occurred on abandoned farmland thirty miles west of Charleston, South Carolina. The drained and degraded site, currently managed for game species, was once used as a farm pond. The site received occasional stork use. With assistance from numerous cooperators, a low dike was constructed to surround the seven-acre area encompassing the farm pond, a drainage ditch and a field containing hydric soils. Since its construction, the site has been a major foraging site for a nearby (one-quarter mile away) wood stork colony. The site is seasonally ponded from rainfall. It contains emergent vegetation with areas of moist soil, islands, and a water depth ranging from a few inches to three feet. The storks are believed to be feeding on minnows, tadpoles, and crayfish. The site is also used by waterfowl, wading birds, shorebirds and alligators (L. Duncan, USFWS, pers. comm.).

Nesting habitat management. Wood storks have successfully fledged young from artificial nesting structures on Harris Neck National Wildlife Refuge in coastal Georgia since 1993. Production from structures has been similar to that from natural sites. Structures are made from four by four posts, steel re-bar, coated screen, and artificial "silk" foliage. Artificial structures can be used in existing or pre-existing colony sites where natural nesting habitat is lacking and/or degraded (Robinette 1992).

Everglades restoration. An understanding of the relationships between storks and water conditions in the Everglades has provided a basis for restoration planning for the region. The ENP staff has used a 64-year, continuous record of stork nesting in the Everglades basin (1932-1995) for this purpose. Regional plans now being developed for the ecological restoration of the Everglades basin should eventually result in much improved habitat conditions for storks in south Florida. It is currently assumed, as a part of the restoration planning, that the recovery of increased volumes of freshwater flow into the mainland estuaries downstream from the Everglades marshes will increase primary and secondary production in these regions. These broad, mainland estuaries are thought to have been the primary foraging sites for storks during the early dry season months, at the time of the year when nesting colonies were formed in the

pre-drainage system. Loss of early dry season foraging habitat apparently is the reason why storks have delayed the initiation of nesting by 2-3 months each winter, resulting in the increased mortality rates among nestlings and newly fledged birds.

Tri-state surveys.  Regional, aerial surveys of nesting colonies conducted during 1957 through 1961, and again in the mid-1970s, were essential for locating important habitats, and understanding threats to the southeastern population of storks.  These surveys were the first to measure the status of the regional population of storks, and have been used to measure responses by nesting storks to water management practices in the Everglades region.  Over the last 5 years (1991-1995), the Service coordinated a systematic multi-state aerial survey of stork nesting colonies. The results are presented in Appendix A.  [Limitations of these aerial surveys, identified by Rodgers et al. (1995) are discussed in the population status section on page 10.] After a 5-year hiatus where financial efforts will be directed towards research, a new series of surveys will begin again in the year 2001.

Genetics Study.  In 1990, Stangel et al. employed starch gel electrophoretic techniques to examine genetic variation in Florida wood stork populations. This study did not indicate significant allozyme differences within or between populations.  In 1994, a genetics study incorporating DNA microsatellites of breeding storks in Florida and Georgia was initiated to further investigate the geographic and genetic origins of wood stork colonies in the these states. By assessing the degree of genetic interrelatedness among wood stork colonies, vital information can be obtained concerning population movements, allowing managers to determine whether the increase in numbers of storks breeding in the northern portion of their range is the result of high productivity in those colonies, increased immigration from Florida colonies, or both.

Roosting Habitat Study.  A survey of a portion of the coastal zone of Georgia and South Carolina in the fall of 1994 for wood stork roosts documented 110 roost sites (Bryan 1994). The majority (59.1%) of these roosts were located along upland/salt marsh interfaces and were presumed to be temporary "day roosts" used by storks near foraging sites. Only 13 (11.8%) roost sites were classified as either "important" or "moderately important" based on the average number of storks present ($\geq$ 25 storks and 20 to 25 storks, respectively) during repeated surveys. The majority of these roosts were located in man-made or natural, enclosed wetland openings, similar to the habitat storks use as colony sites.

Additional roost sites were discovered in the southern coastal zone of Georgia in the fall of 1995 (A.L. Bryan, Jr., SREL, unpublished data).  Similar trends for habitat types (wetland openings) of "moderately important" and "important" roosts were observed.  Re-visiting a sample of roosts from the 1994 surveys indicated that most, but not all, of the repeatedly used roosts remained important in the second year of surveys.

In a separate study, Bryan (1995) documented that storks frequently departed from a coastal roost nocturnally. The attendance patterns of storks in this roost were linked to the tide cycle, with storks leaving the roost 2 to 3 hours prior to low tide, presumably to take advantage of fish being concentrated in tidal creeks and pools by the dropping tide.

In 1995, the Service's Charleston Ecological Services field office consulted with the Corps of Engineers on a proposed golf course and residential development near Hilton Head Island, Beaufort County, South Carolina. The Service determined that the proposed project adversely affected several foraging sites and small roosts located within the project boundaries. The applicant agreed to include, as part of the project plans, measures to minimize adverse impacts to the storks. These measures included: (1) maintaining forested buffers along onsite lakes, ponds, and the proposed development; (2) managing an onsite pond to benefit foraging storks; (3) placing interpretive signs on the golf course explaining the history of the wading bird roost and providing biological information on the wood stork and its use of the area; (4) implementing a six-year monitoring plan to determine the impacts of the development and associated human activities. (Both day and night observation periods are included in the study area.) Construction of the golf course nearest to the stork areas was completed in spring 1996. Storks continued to use the roosts and foraging areas during the 1996 season. The monitoring continues.

Educational efforts. A Wetlands-Wood Stork Summit was held on October 13-14, 1994, in Georgia. The Georgia Conservancy and Zoo Atlanta convened this summit to initiate a coordinated region-wide effort in wetlands education focusing on the wood stork. The initiative is comprised of both an education and a research component. A grant proposal was submitted in early 1995 requesting support for this effort.

## G. STRATEGY FOR RECOVERY

The fact that wood storks nesting in the southeastern U.S. represent a single, highly mobile population strongly favors the development of a regionally integrated recovery strategy. Storks operate over relatively large spatial scales when foraging, meaning that the timing and location of colonies, and the number of birds initiating nesting, are much more likely to be a reflection of regional rather than local ecological conditions. The long-term survival and recovery of this population requires that the mosaic of nesting, foraging, and roosting habitats necessary to support storks throughout their range during varing climatological and seasonal conditions must be identified and protected. Mere preservation of wetland acreage does not necessarily preserve the processes necessary for the production of a strong prey base for wading birds. Wetlands must be managed to maintain or recover the dynamic wetland processes that create and make available the abundance of food required by nesting birds. Continuous habitat assessment and protection, and population monitoring, will best assure that recovery objectives are met.

A prerequisite for the complete recovery of wood storks in the Southeast will be the restoration of the defining ecological characteristics of the Everglades and Big Cypress systems. These wetlands must, once again, provide at the right locations and times, the food resources that are necessary to support traditional stork wintering and nesting patterns.

16

## PART II. RECOVERY

### A. RECOVERY OBJECTIVE

The objective of this revised recovery plan is to assure the long-term viability of the U.S.
breeding population of the wood stork in the wild, thereby allowing removal of this population
from the Federal List of Endangered and Threatened Wildlife (50 CFR 17.11 and 17.12). In the
original recovery plan, the Service set recovery criteria for delisting at 10,000 pairs provided that
the population was self-sustaining and adequate feeding and nesting areas over the species'
historic range were secured. This number was based on the estimated number of breeding wood
storks in 1960, when good rates of reproduction were occurring at major Florida colonies (Ogden
and Patty 1981). The recovery criteria for reclassification to a threatened species was 6,000
breeding pairs provided that the increase was sufficiently well understood so that the population
level could be maintained or increased. The basis for this number was the estimate of breeding
pairs in 1975 (Ogden and Patty 1981). The original plan acknowledged that past and ongoing
destruction and alteration of wetlands may preclude reaching this objective.

Knowledge of wood stork biology and distribution has increased significantly since the original
recovery plan. Part I of this plan incorporates this new information into a strategy for recovery
encompassing the entire regional distribution of storks.

After a thorough evaluation of current information, the original recovery criteria remain as
reasonable estimates of what is necessary to maintain this population of wood storks into the
future. However, numbers of nesting pairs are not a complete indication of the stability of a
population. Productivity levels exceeding a minimum standard are necessary to ensure continued
viability. Additionally, for complete security of the wood stork population, some improvement
in productivity and population trends must occur in the Everglades and Big Cypress systems.
Habitat in Georgia and South Carolina has not changed substantially in recent years to explain
the increase in nesting pairs occurring in these areas. Rather, these increases may have resulted
from declines in the South Florida colonies - the health of which continue to decline. Without
some restoration of the Everglades and Big Cypress systems, the wood stork cannot ever be
considered fully recovered. Available habitat in north Florida, Georgia, and South Carolina
cannot be expected to support the entire population of wood storks. Further, it should not be
assumed that habitat in the northern range will continue to be protected as well in the future as it
is at present. As a result of these conclusions, the revised recovery criteria are as follows:

DOWNLISTING TO THREATENED STATUS: An average of 6,000 nesting pairs and annual
regional productivity greater than 1.5 chicks per nest per year, calculated over 3 years.

DELISTING: An average of 10,000 nesting pairs (50% of historical population) calculated over
5 years beginning at time of reclassification, annual regional productivity greater than 1.5 chicks
per nest per year (also calculated over a 5-year average). As a subset of the 10,000 pairs, a
minimum of 2,500 successful nesting pairs must occur in the Everglades and Big Cypress
systems.

## B. NARRATIVE OUTLINE

This narrative outline provides a detailed explanation of the recovery tasks and actions believed necessary to recover this species.

1.  Protect currently occupied habitat. At a minimum, for continued survival of the U.S. population, currently occupied nesting, roosting and foraging habitat must be protected from further loss or degradation. Watersheds supporting natural nesting habitat should remain unaltered, or be restored to function as a natural system if previously altered.

    1.1. Locate important habitat. Identifying important nesting and roosting sites for protection is relatively easy as storks tend to use the same sites year after year. Important foraging sites, however, are more difficult to identify. Individual feeding sites vary from day to day and season to season depending on hydrologic changes and availability of food.

    1.1.1. Locate nesting habitat. The health and productivity of colonies must be known to evaluate the status and recovery of the wood stork. Continue periodic aerial surveys to determine the status of nesting storks. Distribute survey information to public and private organizations and interested individuals.

    1.1.2. Locate roosting and foraging habitat. Identifying important foraging and roosting habitat is critical to the recovery of the wood stork. The pattern of wetland use by wood storks is poorly known. Recent studies along the Georgia and South Carolina coast have provided valuable information on roosting and foraging behavior (Bryan 1995); additional work of this sort is needed.

    1.2. Prioritize habitat. Using data gathered from task 1.1., develop a prioritization scheme to focus protection efforts on colonies and feeding sites with the greatest degree of threat. Efforts should be made to identify important foraging and roost sites associated with high priority colonies.

    1.3. Work with private landowners to protect habitat. Conservation agencies need to recognize the significant contributions that private landowners have made to the protection of wood storks.

    1.3.1. Inform landowners of the presence of storks nesting on their property. Property owners having priority foraging and roost sites (as defined in task 1.2.) should also be informed. Encourage compliance with existing regulatory mechanisms (see task 1.6.).

    1.3.2. Provide assistance and support to landowners in managing their property for the benefit of wood storks. Assistance can be in the form of written material explaining best management practices, site visits, local recognition, tax and/or monetary incentives, etc. For example, in 1994, the Service's Partners for Wildlife program funded a wetland restoration project on private land in South Carolina. The project involved providing a cost share to the landowner to restore hydrology to the previously drained wetland. The project resulted in a shallow water feeding site of several acres and is used by many wood storks.

    1.3.3.  <u>Develop management plans for private lands.</u>  Conservation agencies should assist landowners in developing specific management plans for each colony site. These management plans should adequately protect colony sites yet be flexible enough to respond to the changing needs of the landowner. The success or failure of management prescriptions for nesting, roosting and foraging areas should be clearly documented and reported.

1.4.  <u>Acquire land.</u>  Federal and State conservation agencies and private conservation organizations should continue efforts to acquire wood stork habitat as it becomes available. Low turnover rates of established stork nesting colonies (see p. 5) result in a high probability of continued use of colony sites. Site acquisition may be a viable management option. Initial land acquisition efforts should be carefully targeted to sites having the greatest potential for maintaining storks over time. Large, stable colonies that are in immediate threat from disturbance should be of highest priority. Priority should also be given to larger colonies with a history of annual use, sites most in need of management, colony sites where alternate habitat is not available, and sites where water levels can be manipulated with water control structures to provide optimal conditions independent of rainfall patterns.

1.5.  <u>Protect sites from disturbance.</u>  Nesting habitat should be protected from disturbance and human alteration. The Service developed Habitat Management Guidelines for Wood Storks (Appendix B) in an effort to reduce disturbance to colony sites. These management guidelines discuss various types of activities known to disturb nesting wood storks. Additionally, certain types of habitat management activities can adversely impact colony sites. Cypress logging is a potential threat to some colonies. Human disturbance causes adult wood storks to leave nests, exposing eggs to predation and weather elements. Posting or other appropriate protection may provide some benefit.

1.6.  <u>Use existing regulatory mechanisms to protect habitat.</u>

    1.6.1  <u>Review Federal actions for impacts to wood storks.</u>  Wetlands are altered for mining, agriculture, and residential purposes. Permitting authority over such activities is held by agencies in the State of Florida (Department of Environmental Protection, Water Management Districts) and the Federal government (U.S. Army Corps of Engineers, Environmental Protection Agency). Analogous State agencies, and the same Federal agencies, exercise equivalent jurisdiction in Georgia and South Carolina. Important feeding areas should be included as a category of waters for which the Service receives Corps of Engineers predischarge notification pursuant to Section 404 of the Clean Water Act. Section 7 of the Endangered Species Act requires that all Federal agencies ensure that their actions are not likely to jeopardize the continued existence of any listed species or destroy or modify their critical habitat. Federal agencies conducting actions that may affect the continued existence of wood storks must consult with the Service.

1.6.2. Encourage conservation of wood stork habitat in Habitat Conservation Plans. Section 10(a)(1)(B) of the Endangered Species Act provides for incidental take permits that have the potential to contribute to the conservation of listed species. If appropriate, applicants should be encouraged to consider conservation of wood stork habitat when preparing Habitat Conservation Plans.

2. Restore and enhance habitat. A prerequisite for recovery of the wood stork in the southeastern U.S. is the restoration and enhancement of suitable habitat throughout the mosaic of habitat types used by this species.

2.1. Restore the Everglades and Big Cypress system. Recover viable nesting subpopulations in traditional Everglades and Big Cypress colony locations. The water delivery formula and schedules developed by the Experimental Water Deliveries Program, the structural modifications to canals and levees proposed for ecosystem restoration of Everglades National Park, and the regional Everglades restoration planning process (C&SF Review) conducted by the Corps of Engineers, should address the recovery of the ecological processes that made it possible for the pre-drainage Everglades Basin to support such large numbers of storks and other wading birds. These ecological processes were made possible by the large spatial scale of the pre-drainage Everglades, the strong between-year variation in surface water patterns, and the strong flows of surface water into the estuaries.

2.1.1. Analyze and report on existing record of stork colony patterns in the Everglades basin, including the effects of the initial restoration programs on the ecological recovery of ENP. Reports currently being generated by the staff at the South Florida Natural Resources Center, ENP should be completed. These reports present all stork colony data from the Everglades basin, and assess the impacts of past and current restoration programs on wood stork and wading bird colony patterns in the Park. They will form the basis for evaluating restoration efforts to date and improving future restoration programs.

2.1.2. Develop models of wood stork colony dynamics in south Florida wetlands. These models are needed as planning tools for improved ecosystem restoration programs. Potentially the most important of the ecological models for the Everglades is a wood stork population dynamics model, that is a part of the "Across-Trophic-Level System Simulation" (ATLSS) set of models being developed by the South Florida/Caribbean Field Station of the Biological Resources Division ( U.S. Geological Survey).

2.1.3. Provide feedback for adaptive restoration planning. Monitor stork colony patterns during implementation and testing of future efforts to improve hydrological conditions. Use information on the location, timing, size, and success of stork colonies in the Everglades and Big Cypress systems to evaluate ecological responses to the restoration programs, as a basis for designing future iterations in the restoration process.

2.1.4.  <u>Organize systematic censuses of stork foraging habitat in the Big Cypress region, comparable to existing censuses in the Everglades basin.</u>  The fact that declines in nesting effort and delays in timing of colony formation have shown similar trends in the Big Cypress and have been well documented in the Everglades suggests that the Big Cypress colonies are dealing with similar kinds of habitat deterioration on the foraging grounds. The location and relative importance of stork foraging grounds in the Big Cypress are much less known, and should be determined as a basis for developing protection strategies in this region.  It is also suspected that small stork nesting colonies go undetected in the Big Cypress, because of the lack of systematic colony censuses over most of the Big Cypress National Preserve.

2.2.  <u>Enhance nesting and roosting sites throughout the range.</u>
Ideal nesting habitat consists of large nesting trees growing on islands surrounded by water.  Enhancement of nesting habitat should focus on construction of islands, combined with tree planting, to provide for deep water protection, while preventing nest tree damage due to inundation during the growing season.

2.2.1.  <u>Improve colony success/productivity by impounding suitable sites.</u> While above normal rainfall and high water levels negatively impact the foraging success of wood storks, high water levels in colony sites can improve productivity for the following reasons:

a.      Prolonged flooding increases the likelihood of storks using the site for continuous nesting.

b.      High water levels decrease predation by terrestrial predators.

c.      Prolonged flooding reduces understory vegetation that may contribute to "hot" wildfires and damage to nesting trees.

Not all colony sites respond well to continued inundation and care must be taken to select sites that will benefit from this management action.  Over time, prolonged flooding can reduce or eliminate tree recruitment for future years, reduce the growth rate of flood tolerant species and kill flood intolerant trees located within the colony.  Some sites may need to be periodically drained to preserve nest trees.

2.2.1.1.    <u>Determine the structural and vegetative characteristics of impounded sites.</u>  Impounded sites currently used by nesting storks, should be examined for their structural and vegetative characteristics as a basis for understanding the feasibility of enhancing and creating additional colony sites.

2.2.1.2.    <u>Conduct long-term monitoring of impounded colony sites.</u> Health of nesting structures (trees, etc.) should be monitored and supplemental planting of desired species conducted if natural regeneration is no longer an option. Conduct long-term monitoring of impounded sites to

compare nesting histories among these sites and natural colony sites to determine importance of site types in maintaining subregional populations of storks.

2.2.2. Replace lost nesting trees. In the event that nesting trees have been lost and/or regeneration has been hindered, new trees (cypress, black gum, etc.) should be planted to eventually replace the lost nesting structures.

2.2.3. Use artificial nesting structures to attract storks to suitable habitat. Artificial structures can be used to bridge the gap until newly planted trees reach a suitable size for nesting. Artificial structures have been used to successfully raise young in south Georgia (Robinette 1992).

2.3. Enhance foraging habitat by modifying hydrologic regimes in existing artificial impoundments to maximize use by wood storks. In tidal impoundments where water levels can be controlled, there is the potential to enhance use by wood storks. Estuarine fishes are recruited during flooding of the impoundment and maintained over the entire acreage while at flood stage. These fish can then be concentrated into the perimeter canals at high density when water levels are lowered to dry the marsh bed. By staggering the timing of drawdown of different impoundments within a management unit, stork use may be extended for several months. Impoundment management efforts should include, at least, the following:

a. Maintenance of high quality water using a flow-through system, aeration tower, etc.

b. Stocking of preferred prey species (sunfish, bullhead catfish, etc.). State and Federal fish hatcheries are a potential source of fish for stocking efforts.

c. Providing preferred prey size (5-20 cm (2-8 in)) through high density stocking and/or post spawning drawdown.

d. To prolong feeding opportunities, use a slow drawdown to desired water depth, approximately 25 cm (10 in).

2.3.1. Encourage management of existing impoundments on public and private lands. Most of the management required to enhance use of artificial impoundments by storks is within the framework of normal waterfowl management practices for brackish and saline marsh impoundments. Use the combined expertise of wildlife and fisheries biologists to provide optimum habitat. State and Federal agencies should work with private landowners in an effort to incorporate wood stork feeding habitat into current management practices. Coordinated efforts should also be used to seize opportunities to provide enhanced feeding areas through the mitigation process.

2.3.2. Determine optimal drawdown time. The optimal time for drawdown of potential feeding areas is unknown. With limited acreage devoted to providing feeding areas for wood storks, land managers would like to provide additional feeding opportunities when they could have the greatest benefit to the recovery of this species. In some years the best time for

drawdown may be apparent due to degradation of natural feeding areas by flooding or other natural or man-made events. Additional study is needed to determine the more critical times to provide additional food resources. Ideally a coordinated effort over a large geographic area, extending from breeding season through migration to wintering grounds, would provide the greatest benefit to the wood storks.

3.      Conduct applied research necessary to accomplish recovery goals. Recovery efforts for the wood stork would be more effective with a complete understanding of population biology, movement patterns of U.S. and neighboring populations of storks, foraging ecology and behavior, the importance of roost sites, and the possible impacts of contaminants.

   3.1.    Determine movement patterns of U.S. and neighboring populations of storks. Movement patterns of wood storks are poorly known.

      3.1.1   Determine movement patterns for fledglings and other subadult storks. Determining these patterns for fledglings and other sub-adult storks would provide needed information concerning their behavior, habitat utilization, and potential threats to their survival.

      3.1.2.  Determine movement patterns of post breeding adults. Movement patterns of post-breeding adults should also be examined as they will provide information concerning the important habitat characteristics of where these birds winter and their possible condition when they return to breed (Did they winter in an area where heavy rainfall may have limited food availability, resulting in poor breeding condition?).

      3.1.3.  Determine origins of non-breeding populations. Wood storks are regularly seen in the lower Mississippi valley and the southwest region of the U.S. The origins of these non-breeding populations should be determined to clarify if they are storks from Mexico wintering in the U.S. and if so, do they mix with U.S. populations?

   3.2.    Determine population genetics. Studies of the population genetics of the U.S. stork population can provide answers concerning the interrelatedness of stork colonies. Such information will help document regional population movements and shifts, and determine if increases in northern populations are the result of increased productivity in that region, increased immigration from southern populations, or both. Better knowledge of the genetic interrelatedness of the southeastern stork population will assist in answering management questions such as:

      a.      Should coastal colonies be managed differently than inland colonies?

      b.      What are the important source colonies for new colonies?

      c.      What becomes of colonies/populations/storks that fail to breed one year and where do they go when and if they breed?

      d.      What are important (i.e., genetically unique or diverse) colonies for protection/acquisition?

3.3.   Monitor productivity of stork populations. There is a need to systematically determine reproductive success (# fledged young/nest and #fledged young/successful nest) within a majority of the colonies in the same year(s) to better estimate productivity of the breeding population and to determine when (or if) the population meets criteria for downlisting or delisting.

3.4.   Monitor survivorship of stork populations. This parameter is one of the least understood, and research on this topic may provide more new insights into population dynamics than any other effort. We need to determine survivorship of fledged young to adulthood to better gauge what amount of productivity is required to maintain or increase regional population size. This could be accomplished through either a massive, multi-year leg banding (or wing tagging) effort in multiple colonies, radio-instrumenting a certain number of birds, or possibly by surveys during the non-breeding season to determine the adult:sub-adult ratio.

3.5   Determine extent of competition/cooperation between wood storks and other wading birds in mixed nesting colonies. Many storks nest in established wading bird colonies. More information is needed on the benefits/drawbacks of storks nesting in mixed colonies.

3.6.   Determine foraging ecology and behavior. Foraging ecology of wood storks has only been well-studied in the Everglades (in the 1970's) and for the Birdsville Colony in east-central Georgia.

   3.6.1   Reevaluate foraging studies in ENP. Foraging studies on storks in ENP were done in the 1970's. This issue should again be addressed since restoration of this area is vital to the overall recovery of this species,  is important as a wintering area for northern birds, and has recently been documented to have contaminant problems (mercury) (Sundlof et al. 1994).

   3.6.2.   Study foraging ecology along the coast.   Over half of the U.S. population now breeds in the coastal zone of Georgia, South Carolina, and central and northern Florida. The foraging ecology of storks in these areas should be studied.

   3.6.3.   Determine foraging requirements during the non-breeding season. Research concerning the foraging ecology of this species should also examine foraging requirements during the wintering or non-breeding period. In some years, the inland marshes of the Everglades have supported the majority of the U.S. population of wood storks. Bancroft et al. (1992) reported that during non-breeding seasons in 1985-1989, up to 55% of the entire U.S. population may have relied on the Water Conservation Areas, which comprise only a portion of the Everglades system, to meet their foraging requirements. Understanding processes that determine whether storks in the non-breeding season are concentrated on a small area of habitat or dispersed throughout their entire winter range, will provide management flexibility and decrease the likelihood of negative impacts to a large proportion of the population during a single season.

3.6.4. <u>Continue studies on nocturnal foraging activities.</u> Preliminary studies by Bryan (1995) indicate that storks are active night-time feeders. The prevalence of nocturnal foraging activity by this species needs to be studied both seasonally and geographically. This is important in a regulatory sense in that foraging areas may need to be protected from human disturbance "around the clock."

3.6.5. <u>Determine impacts of artificial feeding areas on nest success, production and survival of newly fledged birds.</u> A coordinated effort among wildlife and fisheries biologists is needed to determine optimum stocking densities, species to stock, need for supplemental stocking, time of drawdown, and the impacts to wood stork recovery.

3.7. <u>Determine the importance of roost sites.</u> Recent surveys of the Georgia and South Carolina coasts documented the presence of a large number of stork roost sites, but only a limited number of roosts were inhabited repeatedly by numerous storks. Research concerning the function and use of such sites/habitats, which may be limited or threatened, is needed. These studies could also assess foraging habitats utilized from these sites, thus providing important information during the wintering period.

3.8. <u>Determine the impacts of contaminants on stork populations.</u> Potential impacts from contaminants need to be reconsidered in light of recent findings concerning the amount of mercury present in the Everglades ecosystem and the discovery of severe impacts of DDT/DDE based estrogen-mimicking compounds on wildlife in a large Florida wetland (Guillette et al. 1994, Sundloff et al. 1994).

3.8.1. <u>Conduct mercury studies in South Florida.</u> Studies should be conducted in the South Florida ecosystem to document effects of mercury on wood storks or suitable surrogate species.

3.8.2. <u>Conduct contaminant studies throughout the region.</u> Develop baseline contaminant information from a variety of colony sites throughout the region to determine if further studies are needed.

4. <u>Increase public awareness.</u>

4.1. <u>Increase awareness and appreciation through educational materials.</u> Wood storks utilize a wide variety of wetland habitats. Additionally, they are visually unique and generate interest from the general public. These factors make the wood stork an excellent choice for the subject of environmental education materials and programs.

4.1.1. <u>Develop and distribute educational materials.</u> Currently, there are several brochures, videos, and educational packets available that focus on wood storks. This information needs to be kept up to date. New educational material should be developed to increase the awareness of a larger audience.

4.1.1.1. <u>Develop information for private landowners.</u> As recommended in task 1.3.2., provide material to private landowners that explains wood stork ecology and suggests management practices that would benefit wood stork habitat.

4.1.1.2.  **Develop educational material for schools.** Since wood storks occur in Florida, Georgia, and South Carolina, it would be cost effective to develop educational materials that could be used in schools in all three States.

4.1.1.3.  **Develop material for policy makers and elected officials.** The wood stork should be included as part of a larger effort to inform and educate policymakers and elected officials of the importance of maintaining and protecting wetland habitats.

4.2.  **Provide opportunities for the public to view wood storks in captivity.** Maintaining wood storks in captivity should be for the sole purpose of public education, awareness, and research to enhance survival of the species. Currently, there are nearly two dozen American wood storks in captivity in North American zoos and related facilities.

4.2.1.  **Maintain captive populations for the purpose of education, awareness, and research.** The Service's draft policy on controlled propagation (U.S. Fish and Wildlife Service and National Marine Fisheries Service 1996) sanctions captive propagation of listed species when recommended in an approved recovery plan and supported by an approved genetics management plan. Captive propagation of wood storks is not considered necessary for the purpose of supplementing wild populations through reintroduction programs. Captive breeding and rearing efforts will not be made for this purpose. However, good captive management of wood storks may result in reproduction. The resulting progeny may be used to supplement other captive populations under specific approval of the Service. If available space within captive facilities becomes saturated, further production of offspring should be prevented within the scope of laws governing captive endangered wildlife.

4.2.2.  **Develop policy on rescue, rehabilitation and release of injured wood storks.** The Service, in conjunction with the American Zoological Association, should develop policy for dealing with wood storks that are rescued from the wild. Adult wood storks are not as frequently received by licensed wildlife rehabilitators as other wetland bird species. Opportunities for rescue may most likely occur when field personnel are in the colonies and witness distress. This may be as a result of nest abandonment when food sources become scarce or when chicks fall out of the nest for reasons such as adult bird interactions or wind storms. Where possible, field personnel should return downed chicks to the nest. When replacement is not viable, the usual protocols for triage and rehabilitation should be followed in placement with a licensed wildlife rehabilitator.

## C.  LITERATURE CITED

American Ornithologists' Union.  1983.  Check-list of North American birds, 6th edition.

Bancroft, G.T., W. Hoffman, R.J. Sawicki and J.C. Ogden.  1992.  The importance of the Water
    Conservation Areas in the Everglades to the Endangered Wood Stork (*Mycteria
    americana*).  Conservation Biology 6:392-398.

Bent, A.C.  1926.  Life histories of North American marsh birds.  U.S. Nat. Mus. Bull. 135.
    392p.

Blake, N.M.  1980.  Land into water - water into land.  Univ. Presses of Florida, Tallahassee.
    344p.

Brouwer, K., M.L. Jones, C.E. King and H. Schifter.  1992.  Longevity and breeding records of
    storks.  Int. Zoo Yb. 31:131-139.

Browder, J.S.  1984.  Wood stork feeding areas in southwest Florida.  Florida Field Naturalist
    12:81-96.

Bryan, A.L., Jr.  1994.  Wood Stork roost sites in the coastal zone of Georgia and South Carolina
    in 1994.  Report to the U.S. Fish and Wildlife Service, Savannah Coastal Refuges,
    Savannah, Georgia.  Contract No. 41620-4-0425.

Bryan, A.L. Jr.  1995.  Utilization patterns of the Priest Landing roost by wood storks in 1994.
    Report to the U.S. Fish and Wildlife Service, Savannah Coastal Refuges, Savannah,
    Georgia.

Bryan, A.L. Jr., and M.C. Coulter.  1995.  Wood stork use of the Kathwood foraging ponds:
    1986-1993.  P.53-56 in Proceedings of the Wood Stork Symposium.  The Georgia
    Conservancy, Savannah, Georgia.  95p.

Bryan, A.L. Jr., M.C. Coulter, and C.J. Pennywick.  1995.  Foraging strategies and energetic
    costs of foraging flights by breeding wood storks.  Condor.  97:133-140.

Burger, J., J.A. Rodgers, Jr. and M. Gochfeld.  1993.  Archives of Environmental Contamination
    and Toxicology.  24:417-420.

Clewell, A.F.  1981.  Vegetational restoration techniques on reclaimed phosphate strip mines in
    Florida.  Paper presented at Second Annual Meeting of Society of Wetland Scientists in
    Alexandria, Louisiana.  13p.

Cone, W.C. and J.V. Hall.  1970.  Wood ibis found nesting in Okefenokee Refuge.  Oriole 35:14.

Coulter, M.C.  1986.  Wood storks of the Birdsville Colony and swamps of the Savannah River Plant.  1984 annual report.  Savannah River Ecol. Lab. Rep. SREL-20.  110p.

Coulter, M.C.  1987.  Foraging and breeding ecology of Wood Storks in east-central Georgia. P.21-27 in Odom, R.R., K.A. Riddleberger and J.C. Ozier (eds.),  Proc. Third Southeastern Nongame and Endangered Wildlife Symposium.  Georgia Department of Natural Resources.

Coulter, M.C.  1990.  Wood storks of the Birdsville Colony and swamps of the Savannah River Site.  1989 annual report.  SREL-38/UC-66e.  Savannah River Ecology Laboratory, Aiken, South Carolina.

Coulter, M.C.  1992.  Foraging ecology of American Wood Storks (*Mycteria americana*) in east-central Georgia, USA.  Proc, VIII Pan-Afr.Orn.Congr.  P.411-416.

Coulter, M.C., and A.L. Bryan, Jr.  1993.  Foraging ecology of Wood Storks *(Mycteria americana)* in east-central Georgia.  I.  Characteristics of Foraging Sites.  Colonial Waterbirds 16:59-70.

Coulter, M.C. and A.L. Bryan.  1995a.  Factors Affecting Reproductive Success of Wood Storks (*Mycteria americana*) in East-Central Georgia.  AUK.  112:237-243.

Coulter, M.C., and A.L. Bryan, Jr.  1995b.  The design and management of the Kathwood Ponds: Artificial foraging ponds for Wood Storks in east-central Georgia.  P. 47-52 in Proceedings of the Wood Stork Symposium.  The Georgia Conservancy, Savannah, Georgia.  95p.

Coulter, M.C., W.D. McCort, and A.L. Bryan, Jr.  1987.  Creation of artificial foraging habitat for Wood Storks.  Colonial Waterbirds 10:203-210.

Depkin, F.C., M.C. Coulter, and A.L. Bryan, Jr.  1992.  Food of nestling Wood Storks in east-central Georgia.  Colonial Waterbirds 15:219-225.

Dusi, J.L., and R.T. Dusi.  1968.  Evidence for the breeding of the wood stork in Alabama. Alabama Birds 16:14-16.

Eisler, R.  1987.  Mercury hazards to fish, wildlife, and invertebrates: a synoptic review.  U.S. Fish and Wildlife Service.  Biological Report 85(1.10).  90 p.

Erwin, R.M.  1977.  Population and colony site dynamics in selected Massachusetts Waterbirds. Proc. Colon. Waterbirds 1:19-25.

Facemire, C. F. and L. Chlebowski.  1991.  Mercury Contamination in a Wood Stork (*Mycteria americana*) from West-Central Florida.  U.S. Fish and Wildlife Service, Office of Environmental Contaminants, Vero Beach Field Office, Vero Beach, Florida.  Publication No. VBFO-91-C03.  6 p.

Fleming, W.J., J.A. Rodgers, Jr., and C.J. Stafford.  1984.  Contaminants in wood stork eggs and their effects on reproduction, Florida, 1982.  Colonial Waterbirds 7:88-93.

Guillette, L.J. Jr., T.S. Gross, G.R. Masson, J.M. Matter, H.F. Percival, and A.R. Woodward. 1994.  Developmental abnormalities of the gonad and abnormal sex hormone concentrations in juvenile alligators from contaminated and control lakes in Florida. Environmental Health Perspectives 102:680-688.

Hancock, J.A., J.A. Kushlan and M.P. Kahl.  1992.  Storks, Ibises and Spoonbills of the World. Academic Press, San Diego.

Howell, A.H.  1932.  Florida Bird Life.  Coward-McCann, New York.  579p.

Kahl, M.P., Jr.  1964.  Food ecology of the wood stork (*Mycteria americana*) in Florida.  Ecol. Monogr. 34:97-117.

Kushlan, J.A.  1979.  Prey choice by tactile foraging wading birds.  Proceedings of the Colonial Waterbird Group 3:133-142.

Kushlan, J.A., J.C. Ogden, and A.L. Higer.  1975.  Relation of water level and fish availability to wood stork reproduction in the southern Everglades, Florida.  U.S. Geol. Surv.  Open file Rep. 75-434.  56p.

Oberholser, H.C.  1938.  The bird life of Louisiana.  Louisiana Dept. Conserv. Bull. 28.

Oberholser, H.C. and E.B. Kincaid, Jr.  1974.  The bird life of Texas.  Univ. Texas Press, Austin, Texas.  1069p.

Ogden, J.C.  1983.  The abundant, endangered flinthead.  Audubon 85(1):90-101.

Ogden, J.C.  1991.  Nesting by wood storks in natural, altered, and artificial wetlands in central and northern Florida.  Colonial Waterbirds.  14(1):39-45.

Ogden, J.C.  1994.  A comparison of wading bird nesting colony dynamics (1931-1946 and 1974-1989) as an indication of ecosystem conditions in the southern everglades.  St. Lucie Press CCC 0-9634030-2-8 1/94.  p. 533-570.

Ogden, J.C. and S.A. Nesbitt.  1979.  Recent wood stork population trends in the United States. Wilson Bull.  91(4):512-523.

Ogden, J.C. and B.W. Patty.  1981.  The recent status of the wood stork in Florida and Georgia. P. 97-102 *in* R.Q. Odom and J.W. Guthrie, eds., Proceedings of the nongame and endangered wildlife symposium.  August 13-14, 1981, Athens, Georgia. Georgia Dept. Nat. Res. Game and Fish Div. Tech. Bull. WL5.

Ogden, J.C., J.A. Kushlan, and J.T. Tilmant.  1976.  Prey selectivity by the wood stork.  Condor 78(3):324-330.

Ogden, J.C., J.A. Kushlan, and J.T. Tilmant.  1978.  The food habits and nesting success of wood storks in Everglades National Park in 1974.  Natl. Park Serv. Nat. Resour. Rep. No. 16. 25p.

Ogden, J.C., D.A. McCrimmon, Jr., G.T. Bancroft and B.W. Patty.  1987.  Breeding populations of the wood stork in the southeastern United States.  Condor. 89:752-759.

Ohlendorf, H.M., E.E. Klaas, and T.E. Kaiser.  1978.  Organochlorine residues and eggshell thinning in wood storks and anhingas. Wilson Bull. 90:608-618.

Palmer, R.S.  1962.  Handbook of North American birds, Volume 1, Loons through Flamingos. Yale University Press, New Haven, Connecticut.

Robertson, W.B., Jr.  1989.  Wood Stork.  Unpublished species account, South Florida Natural Resources Center, Everglades National Park, Homestead, Florida.  8p.

Rand, A.L.  1956.  Foot-stirring as a feeding habit of Wood Ibis and other birds.  Am. Midl. Nat. 55:96-100.

Robinette, J.R. and J.P. Davis.  1992.  Management for nesting Wood Storks.  Harris Neck National Wildlife Refuge. P.55-56 in Jennings, D.P. (Compiler), Proceedings of the Coastal Nongame Workshop, Gainesville, Florida.  10-12 Sept., 1991.  186p.

Rodgers, J.L., Jr.  1990.  Breeding chronology and clutch information for the wood stork from museum collections.  Journal of Field Ornithology. 61(1):47-53.

Rodgers, J.A., Jr., and Henry T. Smith.  1995.  Set-Back distances to protect nesting bird colonies from human disturbance in Florida.  Conservation Biology. 9(1):89-99.

Rodgers, J.A., Jr., A.S. Wenner, and S.T. Schwikert.  1987.  Population dynamics of Wood Storks in north and central Florida.  Colonial Waterbirds 10:151-156.

Stangel, P.W., J.A. Rodgers, Jr. and A.L. Bryan.  1990.  Genetic variation and population structure of the Florida Wood Stork.  Auk 107:614-619.

Sundlof, S.F., M.G. Spalding, J.D. Wentworth, and C.K. Steible.  1994.  Mercury in livers of wading birds (Ciconiiformes) in southern Florida.  Arch. Environ. Contam. Toxicol. 27:299-305.

U.S. Fish and Wildlife Service.  1984.  Endangered and threatened wildlife and plants; U.S. breeding population of the wood stork determined to be endangered.  Federal Register 49:7332-7335.

PART III: IMPLEMENTATION SCHEDULE

U.S. Fish and Wildlife Service and National Marine Fisheries Service. 1996. Draft policy regarding controlled propagation of species listed under the endangered species act; request for public comment. Federal Register 61(26):4716-4720.

Wayne, A.T. 1910. Birds of South Carolina. Contr. Charleston Mus. No. 1.

## PART III. IMPLEMENTATION SCHEDULE

The following Implementation Schedule lists and ranks tasks and estimates costs for the recovery program of the U.S. population of wood storks over the next 3 years. This schedule will be reviewed annually until the recovery objective is met, and priorities and tasks will be subject to revision.

Key to Implementation Schedule Column 1
Task priorities are set according to the following standards:

Priority 1 -    An action that must be taken to prevent extinction or to prevent the species from declining irreversibly in the forseeable future.

Priority 2 -    An action that must be taken to prevent a significant decline in species population/habitat quality or some other significant negative impact short of extinction.

Priority 3 -    All other actions necessary to provide for full recovery of the species.

Key to Agency Designations in Column 5

| | |
|---|---|
| USFWS - | U.S. Fish and Wildlife Service |
| ES - | Ecological Services |
| FSH - | Division of Fisheries |
| DEC - | Division of Environmental Contaminants |
| Ref. - | Division of Refuges and Wildlife |
| LA - | Division of Realty (Land Acquisition) |
| LE - | Division of Law Enforcement |
| PA - | Division of Public Affairs |
| FGFC - | Florida Game and Fresh Water Fish Commission |
| GADNR - | Georgia Department of Natural Resources |
| SCDNR - | South Carolina Department of Natural Resources |
| SREL - | Savannah River Ecology Laboratory |
| TNC - | The Nature Conservancy |
| TGC - | The Georgia Conservancy |
| ACOE - | Army Corps of Engineers |
| FDEP - | Florida Department of Environmental Protection |
| EVER - | Everglades National Park, National Park Service |
| BICY - | Big Cypress National Preserve |
| NAS - | National Audubon Society |
| AZA - | American Zoological Association |

## IMPLEMENTATION SCHEDULE

| Recovery Task Priority | Task Number | Task Description | Task Duration | Responsible Party | | Cost (thousands) | | | Comments |
|---|---|---|---|---|---|---|---|---|---|
| | | | | FWS | OTHER | FY1 | FY2 | FY3 | |
| 1 | 1.1.1 | Locate nesting habitat. | 5 YR | ES | FGFC, GADNR, SCDNR, SREL | 15 | 15 | 15 | 5K/state/year. Begin new 5yr cycle in yr 2001. |
| 1 | 1.1.2. | Locate roosting and foraging habitat. | 2-3 YR | ES | " " | 10 | 10 | 10 | See Bryan 1995. |
| 1 | 1.3.1. | Inform landowners. | Continuous | ES | All parties | Staff Time | | | |
| 1 | 1.5. | Protect sites from disturbance. | Continuous | ES | FGFC, GADNR, SCDNR | Staff Time | | | |
| 1 | 1.6. | Use existing regulatory mechanisms to protect habitat. | Continuous | ES | FGFC, GADNR, SCDNR, FDEP, ACOE, | Staff Time | | | |
| 1 | 3.3. | Monitor productivity of stork populations. | Once every 5 YR | ES | " " | 30 | | | 10K per state |
| 2 | 1.2. | Prioritize habitat. | 1 YR | ES | All parties | Staff Time | | | |
| 2 | 1.3.2. | Provide assistance and support to landowners in managing property. | Continuous | ES FSH | FGFC, GADNR, SCDNR, TGC | ? | ? | ? | Cannot determine specific costs at this time. Assistance would be on a site by site basis. |
| 2 | 1.3.3. | Develop management plans for private lands. | Continuous | ES REF FSH | FGFC, GADNR, SCDNR | Staff Time | | | |

33

| Recovery Task Priority | Task Number | Task Description | Task Duration | Responsible Party | | Cost (thousands) | | | Comments |
|---|---|---|---|---|---|---|---|---|---|
| | | | | FWS | OTHER | FY1 | FY2 | FY3 | |
| 2 | 1.4. | Acquire land. | Continuous | LA REF | FGFC, GADNR, SCWMR, TNC | ? | ? | ? | Cannot determine specific costs at this time. Need to complete task 1.2. first. |
| 2 | 2.1.1. | Analize report on S. FL. restoration. | 1 YR | ES | ENP | 10 | 10 | | Initiated |
| 2 | 2.1.2. | Develop models of colony dynamics in S. FL. wetlands. | 1 YR | ES | ENP | 25 | 25 | | On-going. Funding will allow completion and evaluation of model. |
| 2 | 2.1.3. | Provide feedback for adaptive restoration planning. | 1 YR | ES | ENP | | | | Part of the long-term restoration planning |
| 2 | 2.1.4. | Organize systematic census in Big Cypress Region. | 5 YR | ES | NAS BICY | 20 | 20 | 20 | Should occur in all years of statewide census. |
| 2 | 2.2.1. | Improve colony success/productivity by impounding suitable sites. | Continuous | ES | All parties | | | | Costs must be calculated on a site by site basis. |
| 2 | 2.1.1. | Determine structural and vegetative characteristics of impounded sites. | 2 YR | ES | FGFC GADNR SCDNR SREL | 20 | 20 | | |
| 2 | 2.1.2. | Conduct long-term monitoring. | 10 YR | ES | " " | 15 | 15 | 15 | |
| 2 | 2.3.1. | Encourage impoundment management on public and private lands. | Continuous | ES REF FSH | FGFC GADNR SCDNR | | | | Costs incorporated into existing waterfowl impoundment management |
| 2 | 3.1.1. | Determine movement patterns of fledglings and sub-adults. | 4 YR | ES | " " | 35 | 35 | 35 | |
| 2 | 3.1.2. | Determine movement patterns of post-breeding adults. | 4 YR | ES | " " | | | | Combine with task 3.1.1. |

34

| Recovery Task Priority | Task Number | Task Description | Task Duration | Responsible Party | | Cost (thousands) | | | Comments |
|---|---|---|---|---|---|---|---|---|---|
| | | | | FWS | OTHER | FY1 | FY2 | FY3 | |
| 2 | 3.2. | Determine population genetics. | 2 YR | ES | " " | | | | Ongoing |
| 2 | 3.4. | Monitor survivorship. | Once every 5 YR | ES | " " | ? | ? | ? | Costs depend upon method used for study. |
| 2 | 3.5. | Determine extent of competition/cooperation between storks and other wading birds. | 2 YR | ES | FGFC, GADNR, SCDNR, SREL | 15 | 15 | 15 | |
| 2 | 3.6.2. | Study foraging ecology along the coast. | 2 YR | ES | FGFC, GADNR, SCDNR, SREL | 30 | 30 | 30 | |
| 2 | 3.6.4. | Continue studies of nocturnal foraging activities. | 2 YR | ES | " " | 20 | 20 | 20 | Ongoing |
| 2 | 3.7. | Determine importance of roost sites. | 2 YR | ES | " " | | | | Could be combined with several other tasks |
| 2 | 3.8. | Determine impacts of contaminants. | 2 YR | ES, DEC | " " | 100 | | | |
| 3 | 2.2.3 | Use artificial nest structures to attract storks to suitable habitat. | Continuous | ES REF | FGFC, GADNR, SCDNR | | | | Average cost per structure is $500. |
| 3 | 2.3.2. | Determine optimal drawdown time of impoundments. | 3 YR | ES REF FSH | " " | 20 | 20 | 20 | |
| 3 | 3.1.3. | Determine origins of non-breeding populations. | 4 YR | ES | " " | | | | |
| 3 | 3.6.1. | Re-evaluate foraging studies in ENP. | 1 YR | ES | EVER | 75 | 75 | 75 | Ongoing |

35

| Recovery Task Priority | Task Number | Task Description | Task Duration | Responsible Party | | Cost (thousands) | | | Comments |
|---|---|---|---|---|---|---|---|---|---|
| | | | | FWS | OTHER | FY1 | FY2 | FY3 | |
| 3 | 3.6.3. | Determine foraging requirements in non-breeding season. | 2 YR | ES | " | | | | Combine with task 3.5.2. |
| 3 | 3.6.5. | Determine impacts of artificial feeding areas. | 2 YR | ES REF FSH | GADNR SCDNR SREL | 20 | 20 | 20 | |
| 3 | 4.1.1. | Develop and distribute educational materials. | Continuous | ES, PA | FGFC, GADNR, SCDNR, | 10 | 10 | 10 | Complete task 4.1.1.1. in FY1, 4.1.1.2. in FY2 and 4.1.1.3. in FY3 |
| 3 | 4.2. | Provide opportunities for the public to view wood storks in captivity. | Continuous | ES, LE | AZA | | | | |

36

## List of Reviewers

Names in **bold type** denote those agencies/individuals who provided written comments on the draft revision of this plan.

Dr. Robert Baker
Director Natural Science Research
Laboratory
Department of Biological Science
Texas Tech University
Box 43131
Lubbock, TX 79409

Mr. Dan Botts
Florida Fruit and Vegetable Association
P.O. Box 20155
4401 E. Colonial Drive
Orlando, FL 32814

Ms. Sherry Branch
Sea World
7007 Sea World Drive
Orlando, FL

**Dr. I. Lehr Brisbin**
Savannah River Ecology Laboratory
P.O. Drawer E
Aiken, SC 29802

Dr. Joan Browder
National Marine Fisheries Service
75 Virginia Beach Drive
Miami, FL 33149

**Mr. A. Lawrence Bryan**
Savannah River Ecology Lab
Drawer E
Aiken, SC 29802

Mr. Thomas D. Bryce
Fish and Wildlife Branch
DEH. ATTN: AFZP-DEN-W
Ft. Stewart, GA 31314-5000

Mr. Carl Burch
Miami Metrozoo
12400 SW 152 Street
Miami, FL 33177

Mr. Steve Calver
U.S. Army Corps of Engineers
Savannah District
P.O. Box 889
Savannah, GA 31402

Mr. Dan Connelly
National Audubon Society
4542 Silver Bluff Road
Jackson, SC 29831

**Dr. Malcolm Coulter**
SIS
P.O. Box 48
Chocorua, NH 03817

Mr. John Crawford
UGA Marine Extension Service
P.O. Box 13687
Savannah, GA 31406

Mr. Doug Dallas
GA Dept. of Transportation
3993 Aviation Circle
Atlanta, GA 30336

37

APPENDICIES                                                             LIST OF REVIEWERS

Executive Director
The Nature Conservancy
2699 Lee Road, Suite 500
Winter Park, FL 32789

Ms. Lori Duncan
U.S. Fish and Wildlife Service
P.O. Box 12559
Charleston, SC 29412

Mr. Rick Eager
U.S. Fish & Wildlife Service
P.O. Box 69
Wadmalaw Island, SC 29487

Mr. John Fowler
Chehaw Wild Animal Park
105 Chehaw Park Road
Albany, GA 31701

Dr. Marion H. Fuller
Chief, Bureau Of Pesticides
Florida Department of Agriculture and
Consumer Services
Rm. 170, Conner Building
3125 Conner Boulevard
Tallahassee, FL 32399-1650

Dr. Dale E. Gawlik (for Dr. Tom Fontaine)
South Florida Water Management District
P.O. Box 24680
West Palm Beach, FL 33416-24680

Mr. John Godbee
Union Camp Corporation
P.O. Box 1391
Savannah, GA 31402

Mr. Williams Ralph Graham
Sea Island
P.O. Box 30051
Sea Island, GA  31561

Mr. Mike Harris
GA Dept. of Natural Resources
Nongame Species
1 Conservation Way
Brunswick, GA 31523

Ms. Deborah Harris
U.S. Fish and Wildlife Service
Federal Building, Rm. 334
801 Gloucester Street
Brunswick, GA 31520

Mr. Royce Hayes
St. Catherine's Island
Route 1, Box 207-Z
Midway, GA 31320

Refuge Manager
Merritt Island National Wildlife Refuge
U.S. Fish and Wildlife Service
P.O. Box 81
Oak Hill, FL 32759

Mr. Kevin McIntyre
Little St. Simons Island
P.O. Box 1078
St. Simons Island, GA 31522

Ms. Emmy Minor
Rt. 3 Box 3261
Townsend, GA 31331

Mr. Tom Murphy
South Carolina Department of Natural
Resources
Star Route 2, Box 167
Green Pond, SC 29446

38

**Mr. John Ogden**
South Florida Water Management District
Florida International University
Bldg. OE, Room 148,  University Park
Miami, FL 33199

**Mr. Jim Ozier**
Georgia Department of Natural Resources
Non-game Species Program
Route 5, Box 180
Forsyth, GA 31029

Ms. Barbara K. Passmore
900 Pineridge Dr.
Valdosta, GA 31558

Colonel Terry L. Rice
District Engineer
Jacksonville District
U.S. Army Corps of Engineers
P.O. Box 4970
Jacksonville, FL 32232

**Mr. John Robinette**
U.S. Fish and Wildlife Service
Savannah Coastal Refuges
1000 Business Center Drive
Parkway Business Center, Suite 10
Savannah, GA 31405

Mr. Mark Robson
Florida Game and Fresh Water Fish
Commission
551 North Military Trail
West Palm Beach, FL 33415

**Dr. Jim Rodgers**
Florida Game and Fresh Water Fish
Commission
4005 S. Main Street
Gainesville, FL 32601

Dr. Peter Rosendahl
Flo-Sun, Inc.
316 Royal Poinciana Plaza
Palm Beach, FL 33480

Corkscrew Swamp Sanctuary
Route 6, Box 1875-A
Naples, Florida 33964

Mr. Jim Schmidt
Union Camp-Satilla Forest
Route 11 Box 938
Brunswick, GA 31520

Ms. Becky Shortland
The Georgia Conservancy
711 Sandtown Road
Savannah, GA 31410

Florida Audubon Society
The Greater Mall
460 Highway 436, Suite 200
Casselberry, FL 32707

National Audubon Society
Everglades Office
160 N.W. 176th St., #202
Miami, FL 33169

Dr. Beth Stevens
Zoo Atlanta
800 Cherokee Ave. SE
Atlanta, GA 30315

Mr. Jonathan Streich
The Nature Conservancy
1401 Peachtree St., NE
Suite 236
Atlanta, GA 30309

Ms. Lisa Suatoni
Natural Resources Defense Council
40 West 20th Street
New York, NY 10011

Mr. Buck Thackery
Big Cypress National Preserve
Star Route Box 110
Ochopee, FL 33941

**Ms. Jane Tutton**
U.S. Fish and Wildlife Service
South Florida Ecosystem Office
P.O. Box 2676
Vero Beach, FL 32961

Ms. Lisa Westberry
GA Dept. of Transportation
3993 Aviation Circle
Atlanta, GA 30336

Dr. J. Ross Wilcox
Chief Ecologist, Environmental Affairs
Florida Power and Light Corporation
P.O. Box 088801
11770 U.S. Highway 1
North Palm Beach, FL 33408-8801

Mr. Don Wood
Florida Game and Freshwater Fish
Commission
620 South Meridian Street
Tallahassee, FL 32301

Mr. Darian Yawn
Union Camp-Sapelo Forest
Route 2, Box 2056
Townsend, GA 31331

## APPENDIX A
### RESULTS FROM REGIONAL SURVEY
### (1991 - 1995)

| YEAR | STATE | COUNTY | NAME | NUMBER |
|------|-------|--------|------|--------|
| 1991 | FL | ALACHUA | RIVER STYX | 40 |
| 1991 | FL | BREVARD | GRANT FARM ISLAND | 60 |
| 1991 | FL | BREVARD | BLUEBILL | 4 |
| 1991 | FL | BREVARD | HALL ISLAND | 1 |
| 1991 | FL | BREVARD | HAULOVER | 0 |
| 1991 | FL | BREVARD | SW LAKE WASHINGTON | 60 |
| 1991 | FL | BREVARD | US192 | 12 |
| 1991 | FL | CHARLOTTE | MORGANTOWN | 60 |
| 1991 | FL | COLLIER | CORKSCREW SWAMP | 300 |
| 1991 | FL | COLUMBIA | FALLING CREEK | 80 |
| 1991 | FL | COLUMBIA | OLENO | 42 |
| 1991 | FL | DUVAL | CEDAR POINT ROAD | 9 |
| 1991 | FL | DUVAL | DEE DOT RANCH | 250 |
| 1991 | FL | HARDEE | EL CLAIRE RANCH | 400 |
| 1991 | FL | INDIAN RIVER | PELICAN ISLAND | 110 |
| 1991 | FL | LAKE | LAKE YALE | 40 |
| 1991 | FL | LEON | CHAIRES | 225 |
| 1991 | FL | LEON | OCHLOCKNEE RIVER | 160 |
| 1991 | FL | MONROE | CUTHBERT, ENP | 150 |
| 1991 | FL | NASSAU | NASSAUVILLE | 5 |
| 1991 | FL | PALM BEACH | LOXAHATCHEE 1 | 4 |
| 1991 | FL | PALM BEACH | LOXAHATCHEE 2 | 30 |
| 1991 | FL | POLK | LAKE ROSALIE | 20 |

A-1

| YEAR | STATE | COUNTY | NAME | NUMBER |
|------|-------|--------|------|--------|
| 1991 | FL | SARASOTA | NORTH PORT CHARLOTTE | 75 |
| 1991 | FL | ST LUCIE | WESCOTT GROVE RESERVOIR | 40 |
| 1991 | FL | ST LUCIE | CYPRESS CREEK | 150 |
| 1991 | FL | TOTAL NUMBER OF NESTS | | 2467 |
| 1991 | GA | BROOKS | BLACK WATER | 361 |
| 1991 | GA | CAMDEN | BLACK HAMMOCK | 150 |
| 1991 | GA | CAMDEN | CUMBERLAND ISLAND | 40 |
| 1991 | GA | GLYNN | LITTLE ST. SIMONS | 21 |
| 1991 | GA | GLYNN | HERRINGTON POND | 22 |
| 1991 | GA | JENKINS | BIG DUKES POND | 272 |
| 1991 | GA | MCINTOSH | HARRIS NECK | 52 |
| 1991 | GA | MCINTOSH | BLACKBEARD ISLAND | 36 |
| 1991 | GA | TOTAL NUMBER OF NESTS | | 942 |
| 1991 | SC | COLLETON | JACKSONBORO | 242 |
| 1991 | SC | COLLETON | WHITE HALL II | 259 |
| 1991 | SC | HAMPTON | YEMASSEE I | 163 |
| 1991 | SC | TOTAL NUMBER OF NESTS | | 664 |
| 1991 | REGIONAL TOTAL | | | 4073 |
| 1992 | FL | COLLIER | CORKSCREW SWAMP | 1800 |
| 1992 | FL | DADE | L-28 CROSSOVER | 158 |
| 1992 | FL | DADE | TAMIAMI TRAIL WEST | 123 |
| 1992 | FL | DADE | TAMIAMI TRAIL EAST | 130 |
| 1992 | FL | MONROE | ROOKERY BRANCH, ENP | 9 |
| 1992 | FL | MONROE | CUTHBERT, ENP | 275 |

A-2

| YEAR | STATE | COUNTY | NAME | NUMBER |
|---|---|---|---|---|
| 1992 | FL | MONROE | RODGERS RIVER BAY, ENP | 22 |
| 1992 | FL | MONROE | LANE RIVER, ENP | 1 |
| 1992 | FL | *No data collected for central and north Florida | | 2518* |
| 1992 | GA | BROOKS | BARWICK | 55 |
| 1992 | GA | BROOKS | BLACK WATER | 434 |
| 1992 | GA | CAMDEN | BRAILEY SWAMP | 50 |
| 1992 | GA | GLYNN | HERINGTON POND | 18 |
| 1992 | GA | JENKINS | BIG DUKES POND | 245 |
| 1992 | GA | LIBERTY | SUNBURY | 20 |
| 1992 | GA | MCINTOSH | BLACKBEARD ISLAND | 55 |
| 1992 | GA | MCINTOSH | HARRIS NECK | 150 |
| 1992 | GA | THOMAS | HEARD'S POND | 64 |
| 1992 | GA | TOTAL NUMBER OF NESTS | | 1091 |
| 1992 | SC | COLLETON | JACKSONBORO | 37 |
| 1992 | SC | COLLETON | WHITE HALL II | 307 |
| 1992 | SC | HAMPTON | YEMASSEE I | 131 |
| 1992 | SC | TOTAL NUMBER OF NESTS | | 475 |
| 1992 | REGIONAL TOTAL (no data for central & north FL) | | | 4084* |
| 1993 | FL | ALACHUA | RIVER STYX | 55 |
| 1993 | FL | BREVARD | 612127 | 110 |
| 1993 | FL | BREVARD | US192 | 60 |
| 1993 | FL | BREVARD | GRANT FARM ISLAND | 150 |
| 1993 | FL | BREVARD | SW LAKE WASHINGTON | 185 |
| 1993 | FL | COLLIER | CORKSCREW SWAMP | 426 |
| 1993 | FL | COLUMBIA | FALLING CREEK | 150 |

A-3

| YEAR | STATE | COUNTY | NAME | NUMBER |
|---|---|---|---|---|
| 1993 | FL | DADE | PAUROTIS POND, ENP | 25 |
| 1993 | FL | DADE | EAST RIVER, ENP | 15 |
| 1993 | FL | DUVAL | CEDAR POINT ROAD | 85 |
| 1993 | FL | DUVAL | DEE DOT RANCH | 260 |
| 1993 | FL | HARDEE | EL CLAIRE RANCH | 320 |
| 1993 | FL | HERNANDO | WEEKI WACHEE | 12 |
| 1993 | FL | INDIAN RIVER | PELICAN ISLAND | 225 |
| 1993 | FL | LAKE | LAKE YALE | 275 |
| 1993 | FL | LEON | CHAIRES | 230 |
| 1993 | FL | LEON | OCHLOCKNEE RIVER | 115 |
| 1993 | FL | MANATEE | AYERS POINT | 140 |
| 1993 | FL | ORANGE | LAKE MARY JANE | 100 |
| 1993 | FL | PASCO | DEVIL'S CREEK | 120 |
| 1993 | FL | PASCO | LITTLE GATOR CREEK | 60 |
| 1993 | FL | POLK | 616114 | 75 |
| 1993 | FL | POLK | REEDY CREEK | 230 |
| 1993 | FL | POLK | LAKE ROSALIE | 80 |
| 1993 | FL | POLK | 28048122 | 230 |
| 1993 | FL | SARASOTA | NORTH PORT CHARLOTTE | 520 |
| 1993 | FL | ST LUCIE | CYPRESS CREEK | 375 |
| 1993 | FL | ST LUCIE | WESCOTT GROVE RESERVOIR | 25 |
| 1993 | FL | ST JOHNS | 606109 | 170 |
| 1993 | FL | TOTAL NUMBER OF NESTS | | 4262 |
| 1993 | GA | BROOKS | BLACK WATER | 511 |

A-4

| YEAR | STATE | COUNTY | NAME | NUMBER |
|------|-------|--------|------|--------|
| 1993 | GA | CAMDEN | CUMBERLAND ISLAND | 25 |
| 1993 | GA | CAMDEN | BRAILEY SWAMP | 143 |
| 1993 | GA | CAMDEN | BLACK HAMMOCK | 120 |
| 1993 | GA | GLYNN | ST. SIMONS | 103 |
| 1993 | GA | JENKINS | CHEW MILL POND | 44 |
| 1993 | GA | JENKINS | BIG DUKES POND | 330 |
| 1993 | GA | LIBERTY | ST. CATHERINES | 6 |
| 1993 | GA | MCINTOSH | HARRIS NECK | 162 |
| 1993 | GA | MCINTOSH | BLACKBEARD ISLAND | 90 |
| 1993 | GA | THOMAS | HEARD'S POND | 115 |
| 1993 | GA | TOTAL NUMBER OF NESTS | | 1649 |
| 1993 | SC | COLLETON | JACKSONBORO | 229 |
| 1993 | SC | COLLETON | WHITE HALL II | 294 |
| 1993 | SC | HAMPTON | YEMASSEE I | 283 |
| 1993 | SC | TOTAL NUMBER OF NESTS | | 806 |
| 1993 | REGIONAL TOTAL | | | 6729 |
| 1994 | FL | ALACHUA | RIVER STYX | 175 |
| 1994 | FL | BREVARD | 612127 | 140 |
| 1994 | FL | BREVARD | SW LAKE WASHINGTON | 105 |
| 1994 | FL | BREVARD | GRANT FARM ISLAND | 100 |
| 1994 | FL | COLLIER | CORKSCREW SWAMP | 450 |
| 1994 | FL | COLUMBIA | FALLING CREEK | 110 |
| 1994 | FL | DUVAL | CEDAR POINT ROAD | 30 |
| 1994 | FL | DUVAL | DEE DOT RANCH | 300 |
| 1994 | FL | HARDEE | EL CLAIRE RANCH | 240 |

A-5

| YEAR | STATE | COUNTY | NAME | NUMBER |
|------|-------|--------|------|--------|
| 1994 | FL | HERNANDO | WEEKI WACHEE | 16 |
| 1994 | FL | HILLSBOROUGH | 611163 | 8 |
| 1994 | FL | INDIAN RIVER | PELICAN ISLAND | 110 |
| 1994 | FL. | LAKE | LAKE YALE | 90 |
| 1994 | FL | LEON | OCHLOCKNEE RIVER | 95 |
| 1994 | FL | LEON | CHAIRES | 130 |
| 1994 | FL | MONROE | RODGERS RIVER BAY, ENP | 50 |
| 1994 | FL | MONROE | PAUROTIS POND | 110 |
| 1994 | FL | ORANGE | LAKE MARY JANE | 105 |
| 1994 | FL | PASCO | LITTLE GATOR CREEK | 9 |
| 1994 | FL | PASCO | DEVIL'S CREEK | 160 |
| 1994 | FL | POLK | REEDY CREEK | 230 |
| 1994 | FL | POLK | LAKE ROSALIE | 50 |
| 1994 | FL | POLK | 28048122 | 210 |
| 1994 | FL | POLK | 616114 | 130 |
| 1994 | FL | SARASOTA | NORTH PORT CHARLOTTE | 170 |
| 1994 | FL | ST. LUCIE | CYPRESS CREEK | 265 |
| 1994 | FL | TOTAL NUMBER OF NESTS | | 3588 |
| 1994 | GA | BROOKS | BLACKWATER | 375 |
| 1994 | GA | CAMDEN | BRAILEY SWAMP | 92 |
| 1994 | GA | CAMDEN | CUMBERLAND ISLAND | 25 |
| 1994 | GA | CAMDEN | BLACK HAMMOCK | 30 |
| 1994 | GA | CAMDEN | RAYLAND | 25 |
| 1994 | GA | GLYNN | ST. SIMONS | 149 |

A-6

| YEAR | STATE | COUNTY | NAME | NUMBER |
|------|-------|--------|------|--------|
| 1994 | GA | JENKINS | BIG DUKES POND | 230 |
| 1994 | GA | JENKINS | CHEW MILL POND | 65 |
| 1994 | GA | LIBERTY | ST. CATHERINES | 6 |
| 1994 | GA | MCINTOSH | SLIVKA | 30 |
| 1994 | GA | MCINTOSH | BLACKBEARD ISLAND | 76 |
| 1994 | GA | MCINTOSH | HARRIS NECK | 181 |
| 1994 | GA | QUITMAN | BENTLEY | 60 |
| 1994 | GA | THOMAS | HEARD'S POND | 124 |
| 1994 | GA | TOTAL NUMBER OF NESTS | | 1468 |
| 1994 | SC | BAMBERG | LEMON CREEK | 2 |
| 1994 | SC | CHARLESTON | WASHO RESERVE | 78 |
| 1994 | SC | CHARLESTON | TEA FARM | 136 |
| 1994 | SC | COLLETON | WHITE HALL II | 372 |
| 1994 | SC | COLLETON | JACKSONBORO | 64 |
| 1994 | SC | HAMPTON | YEMASSEE I | 57 |
| 1994 | SC | HAMPTON | BUCKFIELD | 3 |
| 1994 | SC | TOTAL NUMBER OF NESTS | | 712 |
| 1994 | REGIONAL TOTAL | | | 5768 |
| 1995 | FL | ALACHUA | RIVER STYX | 250 |
| 1995 | FL | BREVARD | MICCO NORTH | 36 |
| 1995 | FL | BREVARD | US 192 EAST | 25 |
| 1995 | FL | BREVARD | SW LAKE WASHINGTON | 300 |
| 1995 | FL | BREVARD | 612127 | 275 |
| 1995 | FL | BREVARD | US 192 WEST | 50 |
| 1995 | FL | BREVARD | MICCO SOUTH | 12 |

A-7

| YEAR | STATE | COUNTY | NAME | NUMBER |
|------|-------|--------|------|--------|
| 1995 | FL | BREVARD | VALKARIA | 25 |
| 1995 | FL | COLLIER | CORKSCREW | 864 |
| 1995 | FL | COLUMBIA | FALLING ROCK | 110 |
| 1995 | FL | DUVAL | CEDAR POINT ROAD | 120 |
| 1995 | FL | DUVAL | DEE DOT RANCH | 325 |
| 1995 | FL | HARDEE | EL CLAIR | 415 |
| 1995 | FL | HERNANDO | CROOM | 175 |
| 1995 | FL | HILLSBOROUGH | 611163 | 115 |
| 1995 | FL | INDIAN RIVER | PELICAN ISLAND | 230 |
| 1995 | FL | LAKE | LAKE YALE | 65 |
| 1995 | FL | LEON | OCHLOCKONEE | 144 |
| 1995 | FL | LEON | CHAIRES | 179 |
| 1995 | FL | MANATEE | AYERS POINT | 33 |
| 1995 | FL | MARTIN | SEWEL POINT | 65 |
| 1995 | FL | MONROE | PAUROTIS POND | 105 |
| 1995 | FL | ORANGE | LAKE MARY JANE | 175 |
| 1995 | FL | PALM BEACH | SWA CATCHMENT | 27 |
| 1995 | FL | PASCO | DEVIL'S CREEK | 210 |
| 1995 | FL | PASCO | LITTLE GATOR CREEK | 200 |
| 1995 | FL | POLK | 616114 | 110 |
| 1995 | FL | POLK | REEDY CREEK | 190 |
| 1995 | FL | POLK | LAKE ROSALIE | 115 |
| 1995 | FL | SARASOTA | NORTH PORT CHARLOTTE | 500 |
| 1995 | FL | ST. JOHNS | 606109 | 60 |

A-8

| YEAR | STATE | COUNTY | NAME | NUMBER |
|------|-------|--------|------|--------|
| 1995 | FL | ST. LUCIE | WESCOTT GROVE RESERVOIR | 8 |
| 1995 | FL | ST. LUCIE | CYPRESS CREEK | 10 |
| 1995 | FL | TOTAL NUMBER OF NESTS | | 5523 |
| 1995 | GA | BROOKS | BLACKWATER | 310 |
| 1995 | GA | BROOKS | BENTLEY | 82 |
| 1995 | GA | BROOKS | BARWICK | 8 |
| 1995 | GA | CAMDEN | BRAILEY SWAMP | 40 |
| 1995 | GA | CAMDEN | BLACK HAMMOCK | 119 |
| 1995 | GA | CHARLTON | LITTLE BUFFALO CREEK | 1 |
| 1995 | GA | GLYNN | ST. SIMONS | 165 |
| 1995 | GA | JENKINS | BIG DUKES POND | 245 |
| 1995 | GA | LIBERTY | ST. CATHERINES | 8 |
| 1995 | GA | LONG | MALCOLMS ROOKERY | 21 |
| 1995 | GA | MCINTOSH | HARRIS NECK | 126 |
| 1995 | GA | MCINTOSH | SLIVKA | 50 |
| 1995 | GA | MCINTOSH | BLACKBEARD ISLAND | 60 |
| 1995 | GA | SCREVEN | JACOBSONS LANDING | 25 |
| 1995 | GA | THOMAS | HEARD'S POND | 146 |
| 1995 | GA | TOTAL NUMBER OF NESTS | | 1501 |
| 1995 | SC | CHARLESTON | WASHO RESERVE | 101 |
| 1995 | SC | CHARLESTON | TEA FARM | 8 |
| 1995 | SC | COLLETON | JACKSONBORO | 120 |
| 1995 | SC | COLLETON | WHITE HALL II | 415 |
| 1995 | SC | HAMPTON | YEMASSEE I | 116 |
| 1995 | SC | HAMPTON | BUCKFIELD | 69 |

A-9

| YEAR | STATE | COUNTY | NAME | NUMBER |
|------|-------|--------|------|--------|
| 1995 | SC | TOTAL NUMBER OF NESTS | | 829 |
| 1995 | REGIONAL TOTAL | | | 7853 |

# HABITAT MANAGEMENT GUIDELINES FOR THE WOOD STORK IN THE SOUTHEAST REGION






# HABITAT MANAGEMENT GUIDELINES
## FOR THE WOOD STORK IN THE
## SOUTHEAST REGION

Prepared by

**John C. Ogden**
Acting Program Manager
Wildlife Research
Everglades National Park

for the

Southeast Region
U.S. Fish and Wildlife Service

January 1990

Cover design by
Florida Power & Light Company
Miami, Florida

# HABITAT MANAGEMENT GUIDELINES FOR THE WOOD STORK
# IN THE SOUTHEAST REGION

## Introduction

A number of Federal and state laws and/or regulations prohibit, cumulatively, such acts as harrassing, disturbing, harming, molesting, pursuing, etc., wood storks, or destroying their nests (see Section VIII). Although advisory in nature, these guidelines represent a biological interpretation of what would constitute violations of one or more of such prohibited acts. Their purpose is to maintain and/or improve the environmental conditions that are required for the survival and well-being of wood storks in the southeastern United States, and are designed essentially for application in wood stork/human activity conflicts (principally land development and human intrusion into stork use sites). The emphasis is to avoid or minimize detrimental human-related impacts on wood storks. These guidelines were prepared in consultations with state wildlife agencies and wood stork experts in the four southeastern states where the wood stork is listed as Endangered (Alabama, Florida, Georgia, South Carolina).

## General

The wood stork is a gregarious species, which nests in colonies (rookeries), and roosts and feeds in flocks, often in association with other species of long-legged water birds. Storks that nest in the southeastern United States appear to represent a distinct population, separate from the nearest breeding population in Mexico. Storks in the southeastern U.S. population have recently (since 1980) nested in colonies scattered throughout Florida, and at several central-southern Georgia and coastal South Carolina sites. Banded and color-marked storks from central and southern Florida colonies have dispersed during non-breeding seasons as far north as southern Georgia, and the coastal counties in South Carolina and southeastern North Carolina, and as far west as central Alabama and northeastern Mississippi. Storks from a colony in south-central Georgia have wintered between southern Georgia and southern Florida. This U.S. nesting population of wood storks was listed as endangered by the U.S. Fish and Wildlife Service on February 28, 1984 (*Federal Register* 49(4):7332-7335).

Wood storks use freshwater and estuarine wetlands as feeding, nesting, and roosting sites. Although storks are not habitat specialists, their needs are exacting enough, and available habitat is limited enough, so that nesting success and the size of regional populations are closely regulated by year-to-year differences in the quality and quantity of suitable habitat. Storks are especially sensitive to environmental conditions at feeding sites; thus, birds may fly relatively long distances either daily or between regions annually, seeking adequate food resources.

All available evidence suggests that regional declines in wood stork numbers have been largely due to the loss or degradation of essential wetland habitat. An understanding of the qualities of good stork habitat should help to focus protection efforts on those sites

B-3

that are seasonally important to regional populations of wood storks. Characteristics of feeding, nesting, and roosting habitat, and management guidelines for each, are presented here by habitat type.

**I.     Feeding habitat.**

A major reason for the wood stork decline has been the loss and degradation of feeding habitat. Storks are especially sensitive to any manipulation of a wetland site that results in either reduced amounts or changes in the timing of food availability.

Storks feed primarily (often almost exclusively) on small fish between 1 and 8 inches in length. Successful foraging sites are those where the water is between 2 and 15 inches deep. Good feeding conditions usually occur where water is relatively calm and uncluttered by dense thickets of aquatic vegetation. Often a dropping water level is necessary to concentrate fish at suitable densities. Conversely, a rise in water, especially when it occurs abruptly, disperses fish and reduces the value of a site as feeding habitat.

The types of wetland sites that provide good feeding conditions for storks include: drying marshes or stock ponds, shallow roadside or agricultural ditches, narrow tidal creeks or shallow tidal pools, and depressions in cypress heads or swamp sloughs. In fact, almost any shallow wetland depression where fish tend to become concentrated, either through local reproduction or the consequences of area drying, may be used by storks.

Nesting wood storks do most of their feeding in wetlands between 5 and 40 miles from the colony, and occasionally at distances as great as 75 miles. Within this colony foraging range and for the 110-150 day life of the colony, and depending on the size of the colony and the nature of the surrounding wetlands, anywhere from 50 to 200 different feeding sites may be used during the breeding season.

Non-breeding storks are free to travel much greater distances and remain in a region only for as long as sufficient food is available. Whether used by breeders or non-breeders, any single feeding site may at one time have small or large numbers of storks (1 to 100+), and be used for one to many days, depending on the quality and quantity of available food. Obviously, feeding sites used by relatively large numbers of storks, and/or frequently used areas, potentially are the more important sites necessary for the maintenance of a regional population of birds.

Differences between years in the seasonal distribution and amount of rainfall usually mean that storks will differ between years in where and when they feed. Successful nesting colonies are those that have a large number of feeding site options, including sites that may be suitable only in years of rainfall extremes. To maintain the wide range of feeding site options requires that many different wetlands, with both relatively short and long annual hydroperiods, be preserved. For example, protecting only the larger wetlands, or those with longer annual hydroperiods, will result in the eventual loss of smaller, seemingly less important wetlands. However, these small scale wetlands are crucial as the only available feeding sites during the wetter periods when the larger habitats are too deeply flooded to be used by storks.

B-4

II.    **Nesting habitat.**

Wood storks nest in colonies, and will return to the same colony site for many years so long as that site and surrounding feeding habitat continue to supply the needs of the birds.  Storks require between 110 and 150 days for the annual nesting cycle, from the period of courtship until the nestlings become independent.  Nesting activity may begin as early as December or as late as March in southern Florida colonies, and between late February and April in colonies located between central Florida and South Carolina.  Thus, full term colonies may be active until June-July in south Florida, and as late as July-August at more northern sites.  Colony sites may also be used for roosting by storks during other times of the year.

Almost all recent nesting colonies in the southeastern U.S. have been located either in woody vegetation over standing water, or on islands surrounded by broad expanses of open water.  The most dominant vegetation in swamp colonies has been cypress, although storks also nest in swamp hardwoods and willows.  Nests in island colonies may be in more diverse vegetation, including mangroves (coastal), exotic species such as Australian pine (*Casuarina*) and Brazilian Pepper (*Schinus*), or in low thickets of cactus (*Opuntia*).  Nests are usually located 15-75 feet above ground, but may be much lower, especially on island sites when vegetation is low.

Since at least the early 1970's, many colonies in the southeastern U.S. have been located in swamps where water has been impounded due to the construction of levees or roadways.  Storks have also nested in dead and dying trees in flooded phosphate surface mines, or in low, woody vegetation on mounded, dredge islands.  The use of these altered wetlands or completely "artificial" sites suggests that in some regions or years storks are unable to locate natural nesting habitat that is adequately flooded during the normal breeding season.  The readiness with which storks will utilize water impoundments for nesting also suggests that colony sites could be intentionally created and maintained through long-term site management plans.  Almost all impoundment sites used by storks become suitable for nesting only fortuitously, and therefore, these sites often do not remain available to storks for many years.

In addition to the irreversible impacts of drainage and destruction of nesting habitat, the greatest threats to colony sites are from human disturbance and predation.  Nesting storks show some variation in the levels of human activity they will tolerate near a colony.  In general, nesting storks are more tolerant of low levels of human activity near a colony when nests are high in trees than when they are low, and when nests contain partially or completely feathered young than during the period between nest construction and the early nestling period (adults still brooding).  When adult storks are forced to leave their nests, eggs or downy young may die quickly (<20 minutes) when exposed to direct sun or rain.

Colonies located in flooded environments must remain flooded if they are to be successful.  Often water is between 3 and 5 feet deep in successful colonies during the nesting season.  Storks rarely form colonies, even in traditional nesting sites, when they are dry, and may abandon nests if sites become dry during the nesting period.  Flooding in colonies may be most important as a defense against mammalian predators.  Studies of stork colonies in Georgia and

Florida have shown high rates of raccoon predation when sites dried during the nesting period. A reasonably high water level in an active colony is also a deterrent against both human and domestic animal intrusions.

Although nesting wood storks usually do most feeding away from the colony site (>5 miles), considerable stork activity does occur close to the colony during two periods in the nesting cycle. Adult storks collect almost all nesting material in and near the colony, usually within 2500 feet. Newly fledged storks, near the end of the nesting cycle, spend from 1-4 weeks during the fledging process flying locally in the colony area, and perched in nearby trees or marshy spots on the ground. These birds return daily to their nests to be fed. It is essential that these fledging birds have little or no disturbance as far our as one-half mile within at least one or two quadrants from the colony. Both the adults, while collecting nesting material, and the inexperienced fledglings, do much low, flapping flight within this radius of the colony. At these times, storks potentially are much more likely to strike nearby towers or utility lines.

Colony sites are not necessarily used annually. Regional populations of storks shift nesting locations between years, in response to year-to-year differences in food resources. Thus, regional populations require a range of options for nesting sites, in order to successfully respond to food availability. Protection of colony sites should continue, therefore, for sites that are not used in a given year.

III.   **Roosting habitat.**

Although wood storks tend to roost at sites that are similar to those used for nesting, they also use a wider range of site types for roosting than for nesting. Non-breeding storks, for example, may frequently change roosting sites in response to changing feeding locations, and in the process, are inclined to accept a broad range of relatively temporary roosting sites. Included in the list of frequently used roosting locations are cypress "heads" or swamps (not necessarily flooded if trees are tall), mangrove islands, expansive willow thickets or small, isolated willow "islands" in broad marshes, and on the ground either on levees or in open marshes.

Daily activity patterns at a roost vary depending on the status of the storks using the site. Non-breeding adults or immature birds may remain in roosts during major portions of some days. When storks are feeding close to a roost, they may remain on the feeding grounds until almost dark before making the short flight. Nesting storks traveling long distances (>40 miles) to feeding sites may roost at or near the latter, and return to the colony the next morning. Storks leaving roosts, especially when going long distances, tend to wait for mid-morning thermals to develop before departing.

IV.   **Management zones and guidelines for feeding sites.**

To the maximum extent possible, feeding sites should be protected by adherence to the following protection zones and guidelines:

A.   There should be no human intrusion into feeding sites when storks are present. Depending upon the amount of screening vegetation, human activity should be no closer than between 300 feet (where solid vegetation screens exist) and 750 feet (no vegetation screen).

B-6

B.  Feeding sites should not be subjected to water management practices that alter traditional water levels or the seasonally normal drying patterns and rates. Sharp rises in water levels are especially disruptive to feeding storks.

C.  The introduction of contaminants, fertilizers, or herbicides into wetlands that contain stork feeding sites should be avoided, especially those compounds that could adversely alter the diversity and numbers of native fishes, or that could substantially change the characteristics of aquatic vegetation. Increase in the density and height of emergent vegetation can degrade or destroy sites as feeding habitat.

D.  Construction of tall towers (especially with guy wires) within three miles, or high power lines (especially across long stretches of open country) within one mile of major feeding sites should be avoided.

V.  **Management zones and guidelines for nesting colonies.**

A.  Primary zone: This is the most critical area, and must be managed according to recommended guidelines to insure that a colony site survives.

1.  Size: The primary zone must extend between 1000 and 1500 feet in all directions from the actual colony boundaries when there are no visual or broad aquatic barriers, and never less than 500 feet even when there are strong visual or aquatic barriers. The exact width of the primary zone in each direction from the colony can vary within this range, depending on the amount of visual screen (tall trees) surrounding the colony, the amount of relatively deep, open water between the colony and the nearest human activity, and the nature of the nearest human activity. In general, storks forming new colonies are more tolerant of existing human activity, than they will be of new human activity that begins after the colony has formed.

2.  Recommended Restrictions:

a.  Any of the following activities within the primary zone, at any time of the year, are likely to be detrimental to the colony:

(1)  Any lumbering or other removal of vegetation, and

(2)  Any activity that reduces the area, depth, or length of flooding in wetlands under and surrounding the colony, except where periodic (less than annual) water control may be required to maintain the health of the aquatic, woody vegetation, and

(3)  The construction of any building, roadway, tower, power line, canal, etc.

b.  The following activities within the primary zone are likely to be detrimental to a colony if they occur when the colony is active:

(1)  Any unauthorized human entry closer than 300 feet of the colony, and

B-7



B-8

(2) Any increase or irregular pattern in human activity anywhere in the primary zone, and

(3) Any increase or irregular pattern in activity by animals, including livestock or pets, in the colony, and

(4) Any aircraft operation closer than 500 feet of the colony.

B. Secondary Zone: Restrictions in this zone are needed to minimize disturbances that might impact the primary zone, and to protect essential areas outside of the primary zone. The secondary zone may be used by storks for collecting nesting material, for roosting, loafing, and feeding (especially important to newly fledged young), and may be important as a screen between the colony and areas of relatively intense human activities.

1. Size: The secondary zone should range outward from the primary zone 1000-2000 feet, or to a radius of 2500 feet of the outer edge of the colony.

2. Recommended Restrictions:

a. Activities in the secondary zone which may be detrimental to nesting wood storks include:

(1) Any increase in human activities above the level that existed in the year when the colony first formed, especially when visual screens are lacking, and

(2) Any alteration in the area's hydrology that might cause changes in the primary zone, and

(3) Any substantial (>20 percent) decrease in the area of wetlands and woods of potential value to storks for roosting and feeding.

b. In addition, the probability that low flying storks, or inexperienced, newly-fledged young will strike tall obstructions, requires that high-tension power lines be no closer than one mile (especially across open country or in wetlands) and tall trans-mission towers no closer than 3 miles from active colonies. Other activities, including busy highways and commercial and residential buildings may be present in limited portions of the secondary zone at the time that a new colony first forms. Although storks may tolerate existing levels of human activities, it is important that these human activities not expand substantially.

VI. Roosting site guidelines.

The general characteristics and temporary use-patterns of many stork roosting sites limit the number of specific management recommendations that are possible:

A. Avoid human activities within 500-1000 feet of roost sites during seasons of the year and times of the day when storks may be present. Nocturnal activities in active roosts may be especially disruptive.

B-9

B.  Protect the vegetative and hydrological characteristics of the more important roosting sites—those used annually and/or used by flocks of 25 or more storks. Potentially, roosting sites may, some day, become nesting sites.

## VII.  Legal Considerations.

### A.  Federal Statutes

The U.S. breeding population of the wood stork is protected by the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 et seq.)(Act). The population was listed as endangered on February 28, 1984 (49 *Federal Register* 7332); wood storks breeding in Alabama, Florida, Georgia, and South Carolina are protected by the Act.

Section 9 of the Endangered Species Act of 1973, as amended, states that it is unlawful for any person subject to the jurisdiction of the United States to take (defined as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.") any listed species anywhere within the United States.

The wood stork is also federally protected by its listing (50 CFR 10.13) under the Migratory Bird Treaty Act (167 U.S.C. 703-711), which prohibits the taking, killing or possession of migratory birds except as permitted.

### B.  State Statutes

#### 1.  State of Alabama

Section 9-11-232 of Alabama's Fish, Game, and Wildlife regulations curtails the possession, sale, and purchase of wild birds. "Any person, firm, association, or corporation who takes, catches, kills or has in possession at any time, living or dead, any protected wild bird not a game bird or who sells or offers for sale, buys, purchases or offers to buy or purchase any such bird or exchange same for anything of value or who shall sell or expose for sale or buy any part of the plumage, skin, or body of any bird protected by the laws of this state or who shall take or willfully destroy the nests of any wild bird or who shall have such nests or eggs of such birds in his possession, except as otherwise provided by law, shall be guilty of a misdemeanor...

Section 1 of the Alabama Nongame Species Regulation (Regulation 87-GF-7) includes the wood stork in the list of nongame species covered by paragraph (4). " It shall be unlawful to take, capture, kill, possess, sell, trade for anything of monetary value, or offer to sell or trade for anything of monetary value, the following nongame wildlife species (or any parts or reproductive products of such species) without a scientific collection permit and written permission from the Commissioner, Department of Conservation and Natural Resources,..."

#### 2.  State of Florida

Rule 39-4.001 of the Florida Wildlife Code prohibits "taking, attempting to take; pursuing, hunting, molesting, capturing, or killing (collectively defined as "taking"), transporting, storing, serving, buying, selling,

B-10

possessing, or wantonly or willingly wasting any wildlife or freshwater fish or their nests, eggs, young, homes, or dens except as specifically provided for in other rules of Chapter 39, Florida Administrative Code.

Rule 39-27.011 of the Florida Wildlife Code prohibits "killing, attempting to kill, or wounding any endangered species." The "Official Lists of Endangered and Potentially Endangered Fauna and Flora in Florida" dated 1 July 1988, includes the wood stork, listed as "endangered" by the Florida Game and Fresh Water Fish Commission.

3. State of Georgia

Section 27-1-28 of the Conservation and Natural Resources Code states that "Except as otherwise provided by law, rule, or regulation, it shall be unlawful to hunt, trap, fish, take, possess, or transport any nongame species of wildlife..."

Section 27-1-30 states that, "Except as otherwise provided by law or regulation, it shall be unlawful to disturb, mutilate, or destroy the dens, holes, or homes of any wildlife; "

Section 27-3-22 states, in part, "It shall be unlawful for any person to hunt, trap, take, possess, sell, purchase, ship, or transport any hawk, eagle, owl, or any other bird or any part, nest, or egg thereof...".

The wood stork is listed as endangered pursuant to the Endangered Wildlife Act of 1973 (Section 27-3-130 of the Code). Section 391-4-13-.06 of the Rules and Regulations of the Georgia Department of Natural Resources prohibits harassment, capture, sale, killing, or other actions which directly cause the death of animal species protected under the Endangered Wildlife Act. The destruction of habitat of protected species on public lands is also prohibited.

4. State of South Carolina

Section 50-15-40 of the South Carolina Nongame and Endangered Species Conservation Act states, "Except as otherwise provided in this chapter, it shall be unlawful for any person to take, possess, transport, export, process, sell, or offer of sale or ship, and for any common or contract carrier knowingly to transport or receive for shipment any species or subspecies of wildlife appearing on any of the following lists: (1) the list of wildlife indigenous to the State, determined to be endangered within the State...(2) the United States' List of Endangered Native Fish and Wildlife... (3) the United States' List of Endangered Foreign Fish and Wildlife ..."

Exhibit 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

|  |  |
|---|---|
| SIERRA CLUB, *et al.*, | ) |
| Plaintiffs, | ) Civ. No. 03-23427(WMH) |
| v. | ) |
| ROBERT B. FLOWERS, *et al.*, | ) |
| Defendants. | ) |

**DECLARATION OF BARBARA LANGE**

1.      My name is Barbara Lange.  I make this declaration on personal knowledge and pursuant to the provisions of 28 U.S.C. § 1746.

2.      I have lived in Florida since August 1970.  I currently am a resident of Miami-Dade County, Florida.

3.      I am a member of both the Sierra Club and the Natural Resources Defense Council ("NRDC").  I have been a member of Sierra Club, Inc. ("Sierra Club") since 1990.  I have been a member of the Natural Resources Defense Council ("NRDC") since approximately 1997.

4.      The Sierra Club has over 30,000 members in Florida.  The Club's mission is to explore, enjoy and protect the wild places of earth and to educated and enlist individuals in the effort to protect and restore the quality of the natural and human environment.  In Florida, the Club works through its members to protect and restore species and their habitat, and to improve and protect, water quality, air quality, and environmental justice. The Sierra Club has been actively involved in efforts to preserve, protect and restore the Everglades' ecosystem, including

1

wetlands. I personally have devoted my time and energy to Everglades' wetlands protection issues.

5.      I currently serve as a member of the Everglades Committee for the Florida Chapter of the Sierra Club. I have been very active on Everglades protection and restoration issues and have served as both chair and co-chair of the Everglades Committee.

6.      I also am familiar with the problems associated with mining and drinking water. My initial introduction to the threat posed by mining activities to Miami-Dade County's drinking water supply occurred when Anthony Clemente, then-Director of Miami-Dade County's Water & Sewer Department (known at the time as the Water and Sewer Authority, or "WASA"), took me on a tour of the Northwest Well Field in order to show me how close the mining pits are to the well heads in the Northwest Well Field. I believe this was in the spring of 1994. He expressed to me his concern regarding the threats to the drinking water supply posed by this mining activity.

7.      I served on Miami-Dade County's Lake Belt Plan Implementation Committee (the "Rock Mining Committee") from December of 1996 through 1998 and then again in 2000. I objected to the euphemism "Lake Belt" because what actually was being discussed was how to allow the rock mining industry to continuing rock mining regardless of the impact on the environment generally and to wetlands in particular.

8.      The Rock Mining Committee was dominated by rock miners, their supporters, and state employees focused on maximizing the recovery of limestone. The committee consisted of a total of twenty one individuals. Three token seats were given to environmentalists; one to the Sierra Club, one to the Friends of the Everglades, and one to the Florida Audubon Society. The Sierra Club's views and concerns were ignored as the Committee zeroed in on adopting a

plan to destroy wetlands to allow more mining.  The Rock Mining Committee devoted little energy on the protection the environment.

9.      The Rock Mining Committee produced a document entitled "Phase II Plan."  I requested in writing that Sierra Club's comments and objections be included in this document as part of the report so that readers of the document would understand Sierra Club's opposition. The meeting at which the Sierra Club's comments were to be discussed was re-scheduled to a time that I could not attend.  Roderick Jude, who currently serves as chair the Sierra Club, Miami Group, attended that meeting on Sierra Club's behalf.  He reiterated the request that the final report include Sierra Club's concerns and objections.  This never happened.  Instead, the final document failed to reflect Sierra Club's environmental concerns. The Rock Mining Committee's refusal to include these comments was misleading because the members of the committee and the organizations they represented are printed of the very first page.  Sierra Club's "no" vote was hidden away at the back of the document.  The majority members of the Rock Mining Committee clearly wanted to sanitize the document so as to downplay and minimize the environmental problems with their rock mining plan.

10.     The mitigation requirement set forth in the plan was Byzantine.  The plan called for the mitigation of as much as 21,000 acres of wetlands at impossibly paltry rate of 5 cents a ton.  This mitigation requirement was written into the plan without its ever being voted on.

11.     As a member of the Rock Mining Committee, I was invited on a helicopter ride to view the area from the air.  It was a sinking feeling to see how much of the Everglades' wetlands were and would be turned into rock mining pits under the plan.

12.     My volunteer work with the Sierra Club concerning the Lake Belt has allowed me to visit the area on many occasions with the expert guidance from George Dalrymple Ph.D of

Everglades Research Group, Inc.  Dr. Dalrymple prepared a report for the Rock Mining Committee dated April 1, 1996 and entitled "Wildlife Study – Final Report."  His intimate knowledge of the wildlife and vegetation of the area only made loss of these wetland so much more painful.  The mining of this area is eroding precious habitat for a wide range of wildlife.

13.     During tours of the area with Dr. Dalrymple, we entered and exited the Lake Belt area through a gate off of Krome Avenue next to Thompson Park.  This area is private property, which is behind a padlocked chain link fence.  The keys to unlock the gate were supplied by Jean Evoy of Miami-Dade County's Department of Environmental Resource Management ("DERM").  We followed the well field canal, the Florida Power & Light right of way, the Dade-Broward Levee and took the Pensueco canal to a big opening where the Dade-Broward Levee and the Pensueco Canal meet to form a large opening of water.  This area was heavily vegetated and I saw many American alligators and frogs.  Dr. Dalrymple pointed out the Squirrel treefrog and the Southern toad.  We also heard the pig frog.  There were also Florida box turtles and the Florida redbelly turtle. We saw a tricolor heron, and numerous egrets and white ibis.  The most exciting find was a wood stork along the Florida Power & Light right of way.

14.     Driving along the well field canal, we saw several tricolor heron, little blue herons and white herons.  Turkey vultures were present along the canals. We also saw great blue herons along the well field canal near the Dade-Broward levee.  As one enters the well field canal area, there are several man-made osprey perches.  Most of these were unoccupied, however, we saw many osprey in Melaleuca trees nearby.

15.     In the canals there are many fish, for example, Florida gar, golden top minnow, mosquito and large mouth bass.

16.     We saw some bobcat scat along the Pensueco Canal.  River otters were in the well field canal and the Dade Broward levee.  We saw snowy egret in the littoral zone of one of the mining pits.

17.     On May 28, 1999, I submitted comments on to the Army Corps of Engineers regarding the Draft Programatic Environmental Impact Statement for Rock Mining.  I have prepared and served requests for documents under the Freedom of Information Act on Everglades National Park, US Fish and Wildlife Service, and Miami-Dade County DERM.  I spoke with biologists, hydrologists, and administrators that conveyed to me the irreversible damage that was taking place in the area slated for further mining to the wildlife and the hydrology of the Everglades. A biologist at the US Fish and Wildlife Service was particularly concerned over the destruction of the wood stork forging habitat.

18.     I regularly visit Everglades National Park where I drive, walk the trails, and canoe. I have taken airboat rides in Water Conservation Area 3A and 3B and seen the wood stork rookery on the L28 south.  Like other Sierra Club and NRDC members, I hike, birdwatch, recreate and otherwise enjoy the wildlife and natural beauty in the Everglades' ecosystem.  I have toured Florida Bay by boat and seen crocodiles and the many fish and wading birds that require freshwater flows from the north to survive, including the Cape Sable Seaside sparrow.

19.     My enjoyment of these activities and ability to engage in them in the future is injured in fact by the rock mining activities at issue in this case because the rock mining will destroy wetlands, reduce wildlife and wildlife habitat, destroy birds, nests and eggs, and create an unacceptable risk of the contamination of drinking water, which will directly threaten Sierra Club and NRDC members (like me) that live in South Florida.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge.

Executed on this _____ day of _____, 2004.

_____
Barbara Lange

6

Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

| | | |
|---|---|---|
| SIERRA CLUB, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. No. 03-23427(WMH) |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT B. FLOWERS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

DECLARATION OF LLOYD MILLER

1.    My name is Lloyd Miller.  I make this declaration on personal knowledge and pursuant to the provisions of 28 U.S.C. § 1746.

2.    I have lived in Florida since 1945 and in Miami-Dade County since 1945.

3.    I am a member of the Natural Resources Defense Council ("NRDC").  I have been a member of NRDC since 1987.

4.    NRDC is a non-profit membership corporation with approximately 500,000 members, including approximately 25,000 members in Florida.  NRDC is dedicated to the preservation, protection and defense of the environment, public health, and natural resources.  NRDC and its members are actively involved in efforts to protect and restore South Florida's ecosystem, including the Everglades, and to ensure compliance with State and federal mandates for protection and restoration of these areas.  NRDC and its members are also actively involved in efforts to protect the quantity, quality and safety of drinking water and groundwater throughout the nation, including in Florida.

5.    NRDC members, including me, hike, fish, birdwatch and otherwise enjoy the wildlife

1

and natural beauty in the Everglades' ecosystem. NRDC members are injured by the rock mining activities at issue in this case because the rock mining will destroy wetlands, reduce wildlife and wildlife habitat, destroy birds, nests and eggs, and create an unacceptable risk of the contamination of drinking water, which will directly threaten NRDC members (like me) that live in South Florida.

6.     I have been a dedicated advocate for the protection of Everglades National Park and the nearby natural areas of South Florida for over fifty years. In addition to being a member of NRDC, I am a member and leader of the Izaak Walton League, Mangrove Chapter and a Trustee of the South Florida National Parks Trust, which raises funds and foster relationships to help Everglades and Biscayne National Parks.

7.     Before dedicating much of my time and energies to environmental issues, I was an active fisherman. Firsthand, I saw the tropical country of south Florida and the Everglades at a different time, not untouched, but far more bountiful and vibrant than it is today. I have witnessed the changes that have destroyed huge swathes of the Everglades and disrupted its marvelous supply of freshwater.

8.     Decades ago, I was among a handful of Miami Dade residents who fended off several harmful development projects, including an oil port and refinery, that would have transformed Miami Dade County. In the wake of these successful battles, I helped establish what is now called Biscayne National Park, in southern Miami Dade County.

9.     Over the years, I have continued to fight environmentally-harmful industrial activities and mega-development projects, which have almost invariably been allowed to proceed by refusal to collect and analyze the necessary environmental information on the part of government regulators. The Lakebelt mining project will result in the loss of tens of thousands of Everglades

wetlands, cause significant and widespread impacts on the hydrology and ecology of the

Everglades National Park and our county and put our drinking and agricultural water supply at

risk. The enormity of that risk is unacceptable.

10.     I am specifically concerned with the problems associated with mining and drinking

water.  As a resident of Miami Dade County and a consumer of the  water supply, I am worried

that the rockmining pits will harbor and propagate disease-causing organisms and that these

organisms may enter our drinking water supply.  I do not believe that the responsible government

officials have adequately investigated the risks from the approved levels of rockmining

operations, or the various alternatives.

11.     I have toured various parts of the Everglades, including the water conservation areas,

by airboat and on foot.  I regularly visit Everglades National Park where I drive, walk the trails,

and canoe.  I have taken airboat rides in Water Conservation Area 3A and 3B.  I have

specifically visited and passed through areas of the Everglades immediately adjacent to the

where the rockmning pits are.  I have toured Florida Bay by boat, and seen the ecosystem that

require freshwater flows from the north to survive.

12.     In my visits to the Everglades, I have seen and enjoyed the animals that make the

Everglades unique.  These include endangered wood storks and numerous other species of

wading birds, including herons, egrets, and ibis, as well as a variety of the reptiles and amphibian

species, including American alligators and the North American Crocodile.

13.     I have also viewed the "Lakebelt" mining area from the air, and am highly concerned

about the extent of rockmining already underway.  I believe that it is critical to further

investigate, with full public involvement, the possible harm from the mining.  I am highly

3

concerned about the present and future impacts of the mining on the Everglades and on Miami Dade County resources, such as its groundwater, that I both enjoy and depend upon.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 4th day of May, 2004.

Lloyd Miller

4

Exhibit 4

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### MIAMI DIVISION

|  |  |  |
|---|---|---|
| SIERRA CLUB, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. No. 03-23427(WMH) |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT B. FLOWERS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### <u>DECLARATION OF RODERICK J. JUDE</u>

1. My name is Roderick J Jude.  I make this declaration on personal knowledge and pursuant to the provisions of 28 U.S.C. § 1746.

2. I have lived in Florida since August 1964.  I live and work in Miami-Dade County, Florida.

3. I am a member of the Sierra Club, Inc. ("Sierra Club") and currently serve as chair of the Sierra Club Miami Group.  I have been a member of Sierra Club since 1984.  The Sierra Club has over 30,000 members in Florida.  In Miami-Dade County, the Sierra Club has close to 3,000 members.  The Club's mission is to explore, enjoy and protect the wild places of earth and to educated and enlist individuals in the effort to protect and restore the quality of the natural and human environment.  In Florida, the Club works through its members to protect and restore species and their habitat, and to improve and protect, water quality, air quality, and environmental justice. The Sierra Club has been actively involved in efforts to preserve, protect and restore the Everglades' ecosystem, including

1

wetlands.  I personally have devoted time and energy to Everglades' wetlands protection issues.

4.  I have been very active on Everglades' protection and restoration issues since the mid-1980s.  I served on the Sierra Club Miami Group's executive committee from about 1994 to 1996.  During this time (and up to the present), the executive committee considered and adopted numerous resolutions furthering the goals of the Sierra Club to preserve and protect the Everglades.

5.  I served on Miami-Dade County's Lake Belt Plan Implementation Committee (the "Rock Mining Committee") from 1992 through 1998.  I also attended one Rock Mining Committee meeting in 2000 on behalf of fellow Sierra Club member Barbara Lange.

6.  The Rock Mining Committee was charged, among other things, with finding ways to maximize the recovery of limestone.  It was apparent to me that the Committee's focus was to endorse extensive rock mining activities while paying mere lip service to environmental issues.  From the start, the Rock Mining Committee was committed to authorizing extensive mining -- that was always a given and, indeed, the very charge of the committee.  Environmental concerns were treated as either an afterthought or an obstacle to be overcome.

7.  At the 2000 Rock Mining Committee meeting I attended on Ms. Lange's behalf, I brought a prepared statement from the Sierra Club objecting to the Committee's draft final report.  I requested that the statement be included in the Committee's final report.  The Committee did not agree to include the statement.  As a result, the Rock Mining

2

Committee's final report, entitled "Phase II Plan," failed to reflect the environmental concerns raised by the Sierra Club.

8. As a member of the Rock Mining Committee, I was invited on a helicopter ride to view the area from the air. From the air, I could see the extent to which rock mining had turned historic Everglades' wetlands into open wounds on the landscape. The Rock Mining Committee's purpose was to continue creating mining pits and further the destruction of wetlands. The Committee's final report sanctioned this activity while giving short shrift to environmental issues.

9. In addition to viewing the area from the air, I have toured the Lake Belt area by van and on foot and have seen the area that is proposed for further mining in the future. I have seen in the Lake Belt area fully functional wetlands. I have seen wildlife in the area including birds and fish.

10. I regularly visit Everglades National Park, where I drive, walk the trails, and kayak. I have taken airboat rides and fished in the Water Conservation Areas. I am familiar with the Everglades' ecosystem near the Lake Belts area. My ability to use, enjoy and recreate in this area will be adversely effected by the mining activities at issue in this case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 29 day of April, 2004.

Roderick J. Jude

3

Exhibit 5

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### MIAMI DIVISION

|  |  |  |
|---|---|---|
| SIERRA CLUB, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. No. 03-23427(WMH) |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT B. FLOWERS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### DECLARATION OF JOHN ADORNATO

1.     My name is John Adornato. I make this declaration on personal knowledge and pursuant to the provisions of 28 U.S.C. § 1746.

2.     I have lived in Florida since 2002. I have been a member of the National Parks Conservation Association ("NPCA") since February 2002. I currently serve as Regional Representative for NPCA's Sun Coast Regional Office.

3.     NPCA has approximately 19,000 members in Florida. NPCA is a non-profit organization that is dedicated to protecting, preserving and enhancing the National Park System. NPCA's mission is to protect specific parks against threats and damaging projects, and to oppose policies on a national level that imperil the park system generally. NPCA is dedicated to ensuring that safeguards are in place to protect our national parks for all present and future generations.

4.     NPCA has been extremely active and committed to protecting and restoring South Florida's national parks, including Everglades National Park. This effort extends to the preservation, protection and restoration of the Everglades' ecosystem. Specifically, NPCA

1

undertakes efforts to protect, preserve and restore the natural beauty and wildlife of the Everglades' ecosystem, including wetlands and wildlife, which will be destroyed and displaced by the mining activities at issue in this case.

5.      NPCA members, including me, hike, fish, birdwatch and otherwise enjoy the wildlife and natural beauty in the Everglades' ecosystem.  NPCA members are injured by the rock mining activities at issue in this case because the rock mining will destroy wetlands, reduce wildlife and wildlife habitat, destroy birds, nests and eggs, and create an unacceptable risk of the contamination of drinking water, which will directly threaten NPCA members (like me) that live in South Florida.

6.      As a NPCA member and as a Regional Representative for NPCA, I personally have devoted my time and energy to Everglades' wetlands protection issues.

7.      I have been active on Everglades protection and restoration issues and serve as team leader for the Southern Everglades issue team (including issues related to Lake Belt Mining) of the Everglades Coalition.  The Everglades Coalition is an umbrella organization of 45 local, state and national conservation organizations that advocate for the protection and restoration of America's Everglades.

8.      I also am familiar with the problems associated with mining and drinking water.  I have talked about drinking water issues with representatives, including Jean Evoy and James Ferro, both formally of Miami-Dade County's Department of Environmental Resource Management.

9.      I regularly participate in meetings of the Lake Belt Mitigation Committee (the "Mitigation Committee") since 2002.  These meetings typically convene every quarter.

2

10.     The Mitigation Committee is composed of representatives of the local, state and federal agencies as well as the rock mining companies; there are no environmentalists that sit on the Mitigation Committee.  Members of the Mitigation Committee include representatives from the Florida Department of Environmental Protection, Miami-Dade County Department of Environmental Resources Management, Florida Fish and Wildlife Conservation Commission, South Florida Water Management District, U.S. Army Corps of Engineers, U.S. Environmental Protection Agency, U.S. Fish and Wildlife Service, Rock Mining Coalition.

11.     The Mitigation Committee produces an annual report outlining how they have and/or will spend the mitigation fees collected for implementing the mitigation plan, including the purchase of lands and the restoration of those lands.

12.     The mitigation plan calls for the mitigation of as much as 21,000 acres of wetlands a paltry rate of 5 cents per  ton.

13.     I have a Masters Degree in Wetland Plant Ecology.  My educational experience, professional background, and personal interests, make it difficult for me to even imagine the loss of such a significant amount of Everglades wetlands.

14.     I have seen a significant number of wading birds, including egrets, ibis and the endangered wood stork, in the Lake Belt area of the Pennsuco wetlands.  I have seen both open sawgrass marshes as well as the degraded wetlands consumed by the exotic, invasive Melaleuca trees.  The canals contain numerous fish, both native and non-native.

15.     I have addressed with a significant number of federal, state and local agency staff the permanent damage that rock mining will inflict upon the wildlife habitat within the area of the Everglades that is slated for mining and at issue in this case.  I have talked at great length

3

with Jim Jackson, Jr. about the history of mining and the agreements that were forged over the years for the Lake Belt mining area.

16.     At least every other month, I visit Everglades National Park to enjoy the Everglades ecosystem. I have driven the road to Flamingo, stayed overnight both at the Flamingo lodge and camped along Florida Bay. I have toured the Bay by boat and seen crocodiles and the many fish and wading birds that require freshwater flows from the north to survive. I've walked the trails and stopped along the roadside to see the American alligator, wood storks, herons, and other wildlife of the Everglades.

17.     I have toured Water Conservation Areas 3A and 3B via airboat during the day and at night to view wildlife and enjoy the Everglades.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on this 30 day of APRIL, 2004.

John Adornato

4

Exhibit 6

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

|  |  |  |
|---|---|---|
| SIERRA CLUB, *et al.*, | ) | |
| Plaintiffs, | ) | Civ. No. 03-23427(WMH) |
| v. | ) | |
| ROBERT B. FLOWERS, *et al.*, | ) | |
| Defendants. | ) | |

**DECLARATION OF JUANITA GREENE**

1.      My name is Juanita Greene.  I make this declaration on personal knowledge and pursuant to the provisions of 28 U.S.C. § 1746.

2.      I have lived in Florida since 1945 after graduating from Louisiana State University with a degree in journalism.  Thereafter, I worked as a journalist in Florida with the *Tama Times, Daytona Beach Journal* and, commencing in about 1956, the *Miami Herald.*  I was honored while at the *Herald* to receive the Polk Award for a series I did regarding the regulation of various utilities.  I was also nominated for a Pulitzer prize for reporting on the Cuban revolution and exile situation in Florida.

3.      I have been active in Everglades restoration issues for many years, including writing numerous articles about the Everglades.  I have been a member of the Sierra Club since 2000.  In 2001, I was awarded the Everglades Coalition's Grass Roots Award for my work in helping to further Everglades restoration issues

4.      Like other Sierra Club members, I hike, fish, birdwatch, recreate and otherwise enjoy the wildlife and natural beauty in the Everglades' ecosystem.  I have traversed the

1

Wilderness Waterway three times. I have camped and boated in Everglades National Park. I have driven the road to Flamingo. I have stayed overnight in Flamingo and camped along Florida Bay. I have toured the Bay by boat and seen crocodiles and the many fish and wading birds that require freshwater flows from the north to survive. I've walked the trails and stopped along the roadside to see the American alligator, wood storks, herons, and other wildlife of the Everglades.

5.     My enjoyment of these activities and ability to engage in them in the future is injured in fact by the rock mining activities at issue in this case because the rock mining will destroy wetlands, reduce wildlife and wildlife habitat, destroy birds, nests and eggs, and create an unacceptable risk of the contamination of drinking water, which will directly threaten Sierra Club members (like me) that live in South Florida.

6.     I served on Miami-Dade County's Lake Belt Plan Implementation Committee (the "Rock Mining Committee") from 1999 to 2000. I joined the committee in the hopes of stopping the continued destruction of Everglades wetlands from rock mining activities and also to attempt to compel the rock mining conglomerates to pay fair mitigation in order to enhance wetlands. I also was (and remain) deeply worried about the threat to Miami-Dade County's Northwest Wellfield that continued rock mining near the well field posed. This seems to me a catastrophe waiting to happen and I hoped through my work on the Committee to do all that I could to ensure the well field was protected.

7.     Unfortunately, the Rock Mining Committee was dominated by rock miners, their supporters, and state employees focused on maximizing the recovery of limestone. The Committee viewed as its goal the adoption of a plan, any plan, to sanction the maximum amount of mining. Environmental issues were raised only considered in terms of how to minimize or

2

overcome them.  Never did the Committee pause to consider the wisdom of ceasing mining

activities in the area under consideration.  That was not its agenda or concern.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge.  Executed on this _10_ day of _May_, 2004.

Juanita Greene

3