UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 03-23427–CIV-HOEVELER

SIERRA CLUB, NATURAL RESOURCES DEFENSE COUNCIL,
and NATIONAL PARKS CONSERVATION ASSOCIATION,

*Plaintiffs*,

v.

ROBERT B. FLOWERS, Chief of Engineers, United States Army Corps of Engineers,
STEVE WILLIAMS, Director, United States Fish and Wildlife Service, MIAMI-DADE
LIMESTONE PRODUCTS ASSOCIATION, INC., VECELLIO & GROGAN, INC.,
TARMAC AMERICA LLC, FLORIDA ROCK INDUSTRIES, INC., SAWGRASS ROCK
QUARRY, INC., APAC-FLORIDA, INC., RINKER MATERIALS OF FLORIDA, INC.,
and KENDALL PROPERTIES AND INVESTMENTS,

*Defendants/Intervenors*.

DEFENDANT INTERVENORS' POST-HEARING BRIEF

Michael Nachwalter
Elizabeth B. Honkonen
Kenny Nachwalter, P.A.
201 South Biscayne Boulevard
1100 Miami Center
Miami, FL 33131
Tel:  (305) 373-1000
Fax: (305) 372-1861
E-mail: mnachwalter@kennynachwalter.com
*Counsel for Miami-Dade Limestone Products
Association, Inc.*

Franklin G. Burt
Richard J. Ovelmen
Jorden Burt LLP
777 Brickell Avenue, Suite 500
Miami, FL 33131
Tel:  (305) 371-2600
Fax: (305) 372-9928
E-mail:  fgb@jordenusa.com
E-mail:  rjo@jordenusa.com
*Counsel for Tarmac America LLC*

Douglas M. Halsey
T. Neal McAliley
White & Case LLP
Wachovia Financial Center, Suite 4900
200 South Biscayne Boulevard
Miami, FL 33131-2352
Tel:  (305) 371-2700
Fax:  (305) 358-5744
E-mail: dhalsey@whitecase.com
E-mail: nmcaliley@whitecase.com
*Counsel for Miami-Dade Limestone
Products Association, Inc., et al.*

Lawrence R. Liebesman
Holland & Knight, LLP
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, D.C. 20006-1816
Tel:  (202) 955-3000
Fax: (202) 955-5564
E-mail:  lawrence.liesbesman@hklaw.com
*Counsel for Rinker Materials of Florida, Inc*

Martin J. Alexander
Holland & Knight LLP
222 Lakeview Drive, Suite 1000
West Palm Beach, FL 33401
Tel: (561) 833-2000
Fax: (561) 650-8399
E-mail: marty.alexander@hklaw.com
*Counsel for Rinker Materials of Florida, Inc.*

Gabriel H. Nieto
Berger Singerman
200 S. Biscayne Blvd., Suite 1000
Miami, FL 33131
Tel: (305) 755-9500
Fax: (305) 714-4340
E-mail: gnieto@bergersingerman.com
*Counsel for Kendall Properties and
Investments*

Daniel H. Thompson
Berger Singerman
315 South Calhoun Street, Suite 712
Tallahassee, FL 32301
Tel: (850) 561-3010
Fax: (850) 561-3013
E-mail: dthompson@bergersingerman.com
*Counsel for Kendall Properties and
Investments*

*(Counsel continued on next page)*
John A. DeVault, III
Bedell, Dittmar, DeVault, Pillans & Coxe, P.A.
The Bedell Building
101 East Adams Street
Jacksonville, FL 32202
Tel: (904) 353-0211
Fax: (904) 353-9307
E-mail: jad@bedell.firm.com
*Counsel for Florida Rock Industries, Inc.*

Marlene K. Silverman
Kerri Barsh
Elliot H. Scherker
Edward G. Guedes
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, FL 33131
Tel: (305) 579-0500
Fax: (305) 579-0717
E-mail: silvermanm@gtlaw.com
E-mail: barshk@gtlaw.com
E-mail: scherkere@gtlaw.com
E-mail: guedese@gtlaw.com
*Counsel for Vecellio & Grogan, Inc.,d/b/a
White Rock Quarries and Sawgrass Rock
Quarry, Inc.*

## TABLE OF CONTENTS

**Page**

TABLE OF CITATIONS ................................................................................ vi

I.      INTRODUCTION. ..........................................................................1

II.     STATEMENT OF THE CASE AND FACTS. .....................................3

    A.      Statement of the Case.................................................................8

    B.      Evidence Presented at the Remedies Hearing Regarding the
Effect of Continued Mining During the Remand Period on
the Biscayne Aquifer.................................................................9

        1.      Cryptosporidium and Giardia. ......................................9

            a.      Evidence regarding hydrogeology does not
establish that continued mining threatens the
Northwest Wellfield with cryptosporidium
or giardia contamination. ...................................10

            b.      Evidence regarding the presence of
cryptosporidium or giardia in the Lake Belt
mining areas does not establish that
continued mining threatens the Northwest
Wellfield. ..........................................................12

            c.      Evidence regarding the risk of
cryptosporidium and giardia contamination
does not establish that continued mining
threatens the Northwest Wellfield. .....................14

        2.      Benzene.....................................................................18

            a.      Plaintiffs' theories that mining activity has
caused benzene contamination in the
Northwest Wellfield are inconsistent with
the evidence presented at the hearing. ...............19

            b.      Regardless of its source, benzene
contamination in the Northwest Wellfield
poses no threat to public health..........................32

i

# TABLE OF CONTENTS
(Continued)

**Page**

C.  Evidence Presented at the Hearing Regarding the Effects of
Continued Mining During the Remand Period on Seepage
From Everglades National Park. ................................................................33

D.  Evidence Presented at the Hearing Regarding the Effects of
Continued Mining During the Remand Period on Wetlands. ...................41

E.  Evidence Presented at the Hearing Regarding the Effects of
Continued Mining During the Remand Period on the Wood
Stork. ........................................................................................................47

F.  The Evidence Presented Regarding Environmental and
Economic Disruption. ..............................................................................56

  1.  Vacatur or injunction would cause enormous
  economic disruption. ...................................................................64

    a.  The evidence demonstrates that Florida
    needs limestone. ..............................................................65

    b.  The evidence demonstrates that the
    limestone mined from the Lake Belt is
    essential to South and Central Florida. ...........................66

    c.  The evidence demonstrates that there are no
    available alternative sources to Lake Belt
    limestone during the remand period. ...............................68

    d.  The evidence demonstrates that even if there
    were alternative sources of limestone, it
    would not matter because the transportation
    infrastructure is at capacity. ...........................................71

      i.  Rail capacity is inadequate. ..................................72

        (a)  CSX Transportation. ......................72

        (b)  FEC Railroad. ................................74

      ii.  Trucking is impracticable. ....................................75

      iii.  Ports and ships are at capacity. ............................76

## TABLE OF CONTENTS
(Continued)

**Page**

e.    The evidence demonstrates that halting Lake Belt mining would cause severe and irreparable harm to Florida's economy and Defendant Intervenors........................................80

        i.    The irreparable harm to Florida's economy..........................................................80

        ii.    The irreparable harm to Defendant Intervenors. .........................................83

2.    The evidence demonstrates that vacatur would disrupt crucial public infrastructure and environmental projects.................................................88

    a.    Public works projects would halt.......................................89

    b.    Environmental projects will be stopped and eco-system service values will be impaired.......................91

3.    Plaintiffs utterly failed to rebut Defendant Intervenors' economic evidence. .....................................93

    a.    At the direction of Plaintiffs, Weisskoff initially failed to model the anticipated effect of the curtailment of Lake Belt mining while conceding his access to Dr. Tanner's model......................................................94

    b.    Weisskoff assumed without any expertise or factual basis, the availability of aggregate to replace the 50 million tons currently produced in the Lake Belt. .................................94

        i.    His lack of information as to other sources in Florida....................................94

        ii.    His lack of knowledge with respect to transportation to bring aggregate from outside into Florida. .......................96

**TABLE OF CONTENTS**
(Continued)

**Page**

iii.   Weisskoff's attempt to value ecosystem services lost to mining ignored resulting benefits from mining and manipulated values to arrive at an answer to serve Plaintiffs' conclusions ............................................97

iv.   Weisskoff's rebuttal attempt to suggest alternative sources likewise fails ........................................................98

v.   Weisskoff's flawed REMI Model ignores constraints on availability and transportation, and replaces aggregate with products not suitable for construction purposes .......................................98

vi.   Even under Weisskoff's model, the curtailment of mining in the Lake Belt will result in Miami-Dade County suffering a severe recession. .................101

III.   THE COURT SHOULD NEITHER ENJOIN CONTINUED MINING UNDER THE DEFENDANT INTERVENORS' EXISTING PERMITS NOR VACATE THOSE PERMITS PENDING THE REMAND ..............................................................................101

A.   Plaintiffs Have Failed to Meet the Standard for Injunctive Relief ..........................................................................................102

1.   The general requirements for injunctive relief ............................102

2.   Injunctive relief in environmental cases. ......................................103

a.   Injunctive relief under the Clean Water Act and the National Environmental Policy Act. ..................104

b.   The Endangered Species Act. ..........................................104

3.   Plaintiffs have failed to establish that continued mining during the remand period would result in irreparable harm ..........................................................................107

iv

# TABLE OF CONTENTS
(Continued)

**Page**

4.    Plaintiffs have failed to establish that the balance of harms favors injunction or that the public interest would be served by enjoining mining during the remand period. ...........................................................................110

B.    Plaintiffs Have Failed to Meet the Standard for Vacatur.........................113

1.    There is no right to "automatic" or "near automatic" vacatur.....................................................................................114

2.    The test for determining whether to vacate agency action.......................................................................................119

3.    There is no question that the Corps can substantiate its decision to issue the permits. ...................................................124

4.    The evidence demonstrates that vacating the permits would be incredibly disruptive and would not be in the public interest. ......................................................................126

IV.    THE COURT SHOULD REJECT PLAINTIFFS' PROPOSED FINDINGS.............................................................................................127

A.    The Form of Plaintiffs' Findings Is Inappropriate....................................127

B.    Plaintiffs' Findings Violate the Summary Judgment Standard. .................................................................................................129

C.    Plaintiffs Fail to Individuate Their Challenges to Each Defendant Intervenors' Permit..................................................................130

V.    IF THE COURT DECIDES TO ENJOIN CONTINUED MINING UNDER THE DEFENDANT INTERVENORS' EXISTING PERMITS OR VACATE THOSE PERMITS, IT SHOULD DO SO IN A WAY THAT AVOIDS ECONOMIC AND ENVIRONMENTAL DISRUPTION. ..................................................................132

CONCLUSION..................................................................................................................133

CERTIFICATE OF SERVICE .........................................................................................135

v

# TABLE OF CITATIONS

**Page**

## Cases

*A.L. Pharma, Inc. v. Shalala*
   62 F.3d 1484 (D.C. Cir. 1995) ................................................................... 115, 124

*Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*
   429 F.3d 1136 (D.C. Cir. 2005) .................................................................. 114, 119

*Ala. v. U.S. Army Corps of Eng'rs*
   424 F. 3d 1117 (11th Cir. 2005),
   *cert. denied*, --- U.S. ---, 126 S. Ct. 2862 (2006) ................................. 18, 23, 103

*Ala. v. U.S. Army Corps of Eng'rs*
   441 F. Supp. 2d 1123 (N.D. Ala. 2006) ...................................................... 106, 107

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*
   988 F.2d 146 (D.C. Cir. 1993) ................................................................... passim

*Am. Rivers v. U.S. Army Corps of Eng'rs*
   271 F. Supp. 2d 230 (D.D.C.),
   *app. dismissed*, 2003 WL 22890061 (D.C. Cir. Dec. 4, 2003) ....................................... 107

*Am. Water Works Ass'n v. Envtl. Prot. Agency*
   40 F.3d 1266 (D.C. Cir. 1994) ...................................................................... 115

*American Bioscience, Inc. v. Thompson*
   269 F.3d 1077 (D.C. Cir. 2001) ..................................................................... 115

*American Water Works Association v. EPA*
   40 F.3d 1266 (D.C. Cir. 1994) ...................................................................... 124

*Anderson v. City of Bessemer City, North Carolina*
   470 U.S. 464 (1985) ................................................................................ 127

*Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*
   462 U.S. 87 (1983) .................................................................................. 20

*Barclays-Am./Bus. Credit, Inc. v. Radio WBHP, Inc.*
   871 F.2d 1023 (11th Cir. 1989) ..................................................................... 128

*Bright v. Westmoreland County*
   380 F.3d 729 (3d Cir. 2004) ..................................................................... 128, 129

## TABLE OF CITATIONS
### (Continued)

**Page**

*Brooks v. Ga. State Bd. of Elections*
    59 F.3d. 1114 (11th Cir. 1995) ................................................................... 105

*C. & C. Products, Inc. v. Messick*
    700 F.2d. 635 (11th Cir. 1983). ................................................................. 105

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986) .................................................................................... 130

*Cent. & S.W. Servs., Inc. v. U.S. Envtl. Prot. Agency*
    220 F.3d 683 (5th Cir. 2000),
    *cert. denied*, 532 U.S. 1065 (2001) .......................................................... 115

*Cent. Me. Power Co. v. Fed. Energy Reg. Comm'n*
    252 F.3d 34 (1st Cir. 2001) .................................................................. passim

*Chamber of Commerce of U.S. v. S.E.C.*
    443 F.3d 890 (D.C. Cir. 2006) .................................................. 117, 119, 120

*Checkosky v. S.E.C.*
    23 F.3d 452 (D.C. Cir. 1994) .................................................... 114, 115, 119

*Citizens to Preserve Overton Park, Inc. v. Volpe*
    401 U.S. 402 (1971) .................................................................................... 123

*City of Brookings Mun. Tel. Co. v. Fed. Commc'ns Comm'n*
    822 F.2d 1153 (D.C. Cir. 1987) ................................................................ 115

*Consolidation Coal Co. v. Disabled Miners of S. W.Va.*
    442 F.2d 1261 (4th Cir. 1971) .................................................................. 130

*Cooper Indus., Inc. v. Aviall Servs., Inc.*
    543 U.S. 157 (2004) .................................................................................... 116

*CropLife Am. v. Envtl. Prot. Agency*
    329 F.3d 876 (D.C. Cir. 2003) .................................................................. 118

*Cuthbertson v. Biggers Bros., Inc.*
    702 F.2d 454 (4th Cir. 1983) .................................................................... 128

*DaimlerChrysler Corp. v. Cuno*
    126 S. Ct. 1854 (2006) ................................................................................. 33

# TABLE OF CITATIONS
## (Continued)

**Page**

*Davis County Solid Waste Mgmt. v. EPA*
   108 F.3d 1454 (D.C. Cir. 1997) ................................................................ 131

*Dehart v. Horn*
   227 F.3d 47 (3d Cir. 2000) ..................................................................... 105

*Endangered Species Comm. of Bldg. Indus. Ass'n of S. Cal. v. Babbitt*
   852 F. Supp. 32 (D.D.C. 1994) ........................................................ 121, 123

*F.T.C. v. Direct Mktg. Concepts, Inc.*
   2006 WL 149039 (D. Mass. 2006) ............................................................ 18

*FCC v. NextWave Personal Communications*
   537 U.S. 293 (2003) ............................................................................ 117

*Fla. Keys Citizens Coalition, Inc. v. U.S. Army Corps of Eng'rs*
   374 F. Supp. 2d 1116 (S.D. Fla. 2005) ..................................... 103, 104, 131

*Fla. Wildlife Fed. v. Goldschmidt*
   506 F. Supp. 350 (S.D. Fla. 1981) ........................................... 103, 104

*Florida Wildlife Federation v. U.S. Army Corps of Eng'rs*
   404 F. Supp. 2d 1352 (S.D. Fla. 2005) ................................................. 118

*Fox Television Stations, Inc. v. F.C.C.*
   280 F.3d 1027 (D.C. Cir. 2002) ............................................................ 119

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*
   528 U.S. 167 (2000) ...................................................................... 33, 118

*Fund for Animals v. Norton*
   294 F. Supp. 2d 104-15 (D.D.C. 2003) ................................................. 118

*Gibson v. Firestone*
   741 F.2d 1268 (11th Cir. 1984) ............................................................ 130

*Hecht Co. v. Bowles*
   321 U.S. 321 (1944) ............................................................................ 116

*Humane Soc'y v. Dep't of Commerce*
   433 F. Supp. 2d 4 (D.D.C. 2006) .......................................................... 118

## TABLE OF CITATIONS
### (Continued)

**<u>Page</u>**

*Idaho Farm Bureau Fed. v. Babbitt*
58 F.3d 1392 (9th Cir. 1995) .................................................................... 115

*In re Colony Square Co.*
819 F.2d 272 (11th Cir. 1987) ........................................................... 127, 128

*Int'l Union United Mine Workers of Am. v. Fed. Mine Safety and Health Admin.*
920 F.2d 960 (D.C. Cir. 1990) .................................................................. 115

*Johnson v. Horn*
150 F.3d 276 (3d Cir. 1998)..................................................................... 105

*Keener v. Convergys Corp.*
342 F.3d 1264 (11th Cir. 2003) ................................................ 103, 130, 132

*Klay v. United Healthgroup, Inc.*
376 F. 3d 1092 (11th Cir. 2004) ........................................... 5, 103, 130, 132

*Kleppe v. Sierra Club*
427 U.S. 390 (1976)................................................................................... 19

*Louisiana ex. rel. Guste v. Lee*
635 F. Supp. 1107 (E.D. La. 1986) ........................................................... 103

*Marsh v. Oregon Natural Resources Council, et al.*
490 U.S. 360 (1989)................................................................................... 19

*Mazurek v. Armstrong*
520 U.S. 968 (1997)................................................................................. 102

*Md. Native Plant Soc'y v. U.S. Army Corps of Eng'rs*
332 F. Supp. 2d 845 (D. Md. 2004)................................................... passim

*Miccosukee Tribe of Indians v. South Fla. Water Mgmt. Dist.*
280 F.3d 1364 (11th Cir. 2002),
*vacated on other grounds,* 541 U.S. 95 (2004)....................................... 104

*Milk Train, Inc. v. Veneman*
310 F.3d 747 (D.C. Cir. 2002) ......................................................... 114, 120

*Nat'l Ass'n of Home Builders v. Norton*
2004 WL 3740765 (D. Ariz. June 28, 2004) ........................................... 116

## TABLE OF CITATIONS
### (Continued)

**Page**

*Nat'l Audubon Soc'y v. Dep't of the Navy*
422 F.3d 174 (4th Cir. 2005) ........................................................................ 104

*Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*
260 F.3d 1365 (Fed. Cir. 2001) ..................................................................... 115

*Natural Resources Defense Council v. U.S. Dep't of Interior*
275 F. Supp. 2d 1136 (C.D. Cal. 2002) ........................................... 116, 121, 123

*Nevada v. Dep't of Energy*
457 F.3d 78 (D.C. Cir. 2006) ......................................................................... 118

*Pa. Envtl. Defense Found. (P.E.D.F.) v. Canon-McMillan School Dist.*
152 F.3d 228 (3d Cir. 1998) ........................................................................... 128

*Quiksilver, Inc. v. Kymsta Corp.*
466 F.3d 749 (9th Cir. 2006) ........................................................................... 18

*Radio-Television News Directors Ass'n v. Fed. Commc'ns Comm'n*
184 F.3d 872 (D.C. Cir. 1999) ....................................................................... 114

*Rodway v. U.S. Dep't of Agric.*
514 F.2d 809 (D.C. Cir. 1975) ....................................................................... 115

*S.E.C v. Chenery Corp.*
318 U.S. 80 (1943) .......................................................................................... 114

*Sannon v. United States*
631 F.2d 1247 (5th Cir. 1980) ....................................................................... 105

*Sierra Club v. Flowers*
423 F. Supp. 2d 1273 (S.D. Fla. 2006) .................................................. passim

*Sierra Club v. Martin*
168 F.3d 1 (11th Cir. 1999) ........................................................................... 118

*Sierra Club v. U.S. Army Corps of Eng'rs*
935 F. Supp. 1556 (S.D. Ala. 1996) .............................................................. 103

*Soc'y for Good Will to Retarded Children, Inc. v. Cuomo*
737 F.2d 1239 (2d Cir. 1984) ................................................................ 130, 133

## TABLE OF CITATIONS
(Continued)

**Page**

*Sugar Cane Growers Co-op. of Fla. v. Veneman*
289 F.3d 89 (D.C. Cir. 2002) ............................................................ 114, 119, 120

*TRW Inc. v. Andrews*
534 U.S. 19 (2001) ............................................................................. 117

*TVA v. Hill*
437 U.S. 153 (1978) ............................................................ 104, 105, 106

*U.S. v. Frazier*
387 F.3d 1244 (11th Cir. 2004) ......................................................... 13

*U.S. v. Oakland Cannabis Buyers' Co-op.*
532 U.S. 483 (2001) .......................................................................... 116

*United Distrib. Comm'n. v. Fed. Energy Reg. Comm'n*
88 F.3d 1105 (D.C. Cir. 1996) .......................................................... 115

*United Mine Workers v. Fed. Mine Safety & Health Admin.*
920 F.2d 960 (D.C. Cir. 1990) ........................................................ 5, 120

*United States v. Lambert*
695 F.2d 536 (11th Cir. 1983) .................................................. 103, 107, 110

*Vermont Yankee Nuclear Power Corp. v. NRDC*
435 U.S. 519 (1978) ..................................................................... 18, 123

*Water Keeper Alliance v. POD*
271 F.3d 21 (1st Cir. 2001) ............................................................... 106

*Weinberger v. Romero-Barcelo*
456 U.S. 305 (1982) ................................................................... 102, 106

## Federal Statutes

5 U.S.C. § 501 ............................................................................................... 9

5 U.S.C. § 702 ............................................................................................. 116

5 U.S.C. § 705 ............................................................................................. 116

5 U.S.C. § 706(2)(A) .................................................................................... 117

16 U.S.C. § 1531 ........................................................................................... 9

## TABLE OF CITATIONS
### (Continued)

**Page**

33 U.S.C. §§ 1251-1387 ................................................................................ 9

42 U.S.C. §§ 4321-4370f ............................................................................... 9

## Statutes

1992 Fla. Laws ch. 92-132, § 21 ................................................................... 8

50 C.F.R. § 402.02 ...................................................................................... 106

50 C.F.R. § 402.14(*l*)(1) ...................................................................... 106, 125

50 C.F.R. § 402.15(a) ................................................................................. 106

## Rules

Fed. R. Civ. P. 56(c) ................................................................................... 130

Fed. R. Evid. 702 ......................................................................................... 59

## Other Authorities

3 RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE, § 7.13 (4th ed. 2002) ................... 116

Ronald M. Levin, *"Vacation" At Sea: Judicial Remedies & Equitable Discretion in Administrative Law,* 53 DUKE L.J. 291, 313 (2003) ............................................. passim

## I.    INTRODUCTION.

At the core of Plaintiffs' case is the *impossible proposition* that this Court could eliminate half of Florida's annual production of high-quality construction-grade limestone without serious economic consequence, and that continued mining of 1,200 acres of degraded wetlands over the next eleven months would produce irreparable harm to the public interest, even though the area to be mined is less than .000375 (three hundred seventy-five millionths) of the more than 3.2 million acres of publicly owned and protected wetlands in South Florida.

*First*, Plaintiffs urge the Court to vacate the permits or enjoin the Lake Belt mining because the Miami-Dade Wellfield is supposedly threatened by cryptosporidium and giardia, even though none has ever been detected in the Defendant Intervenors' lakes, in the County's production wells, or in its water supply.  Plaintiffs urge the Court nonetheless to believe these pathogens would be a threat if they were found in the mining lakes, despite the fact that the aquifer and existing treatment system already achieve a "9.5 log," (approximately 99.9999999%) removal of any such pathogens from the water supply, far in excess of EPA requirements.

*Second*, Plaintiffs urge the Court to find that the public health risks posed by potential benzene contamination of the water supply mandates a halt to mining, even though no evidence exists that mining is the cause of benzene detected in the County's production wells, there was overwhelming evidence that detonation of blasting emulsion did not produce the benzene, the amount of benzene detected was far in excess of what could be potentially derived from the emulsion as used, and the levels of benzene detected could be completely removed by the County's existing water treatment facilities.

*Third*, Plaintiffs would have this Court believe that seepage concerns, wetland values, and the wood stork's well-being, justify vacating the Lake Belt permits or enjoining all mining. Yet, the evidence was overwhelming that Lake Belt seepage is minimal, reversible, and that some amount of seepage is in fact highly desirable.  The evidence was also unrebutted that only about 1,200 acres of degraded wetland would be mined during the remand period, that any

1

wetlands loss will be fully compensated for under the existing permits, and that there are millions of acres of higher value public wetlands in South Florida.  Indeed, the more than 11,000 pairs of wood storks that nested across the southeastern United States would obviously use this vast wetland area to forage, amongst others, and not the degraded melaleuca-infested acreage to be mined during the remand, where they have scarcely ever been observed.  Plaintiffs' attempt to characterize the hypothetical and mitigatable loss of 1.8 fledglings per year as a serious concern is inconsistent with both common sense, and all of the testimony by the wood stork experts, none of whom opined that mining the Lake Belt would adversely affect the species.

On the other hand, Plaintiffs would have this Court dismiss with an unbelievable callousness the devastating economic impacts that will flow from vacation of the permits or an enjoining of mining.  Plaintiffs invite this Court to conclude that 59 million tons of Lake Belt limestone will be replaced immediately – despite the overwhelming and unrebutted testimony that there would be massive shortages because other limestone sources are already producing at capacity, transportation conduits have extremely limited additional capacity, increasing capacity would take far longer than the remand period and transportation costs would be prohibitively high for the inadequate amounts of limestone available.

Even though limestone is essential to making cement, concrete, concrete blocks, asphalt, road base, and high grade construction aggregate, Plaintiffs ask this Court to indulge their credulous contention that shortages would not occur, and the inevitable price escalation for limestone product would have little effect on Florida's economy, employment, public projects, and construction generally.  But even their own expert opined that thousands of jobs would be lost in Miami-Dade County alone if Lake Belt mining halted.  Based on detailed and focused modeling of the vast impacts associated with the likely limestone shortage, Dr. David testified that there would be a recession throughout South Florida.

Having failed to provide credible evidence supporting any of their evidentiary points, Plaintiffs would now have this Court believe it was a mistake, and waste of time, to have held any evidentiary hearing, let alone the 32 days of testimony presented here.  Plaintiffs claim that

2

although their complaint asks for an injunction, none is actually needed.  Instead, Plaintiffs suggest that a remand order should automatically entail a vacatur of all permits, knowing full well that without valid permits from the Corps, all mining must stop during the remainder of the remand period.

The overwhelming weight of authority, however, holds that in circumstances such as these, when the agency may successfully substantiate the ultimate issuance of permits, and vacating them during the remand period would be highly disruptive and contrary to the public interest, the Court has full authority to remand without vacatur, or stay vacatur, or withhold the mandate of vacatur, until the remand period is concluded, and new permits are in place. Regardless of whether Plaintiffs' request for relief is viewed as a prayer for injunctive relief, or for vacatur, the applicable legal standards essentially require that this Court weigh the harm caused by a halt of mining, including negative impacts on Everglades restoration projects, against any irreparable injury that would be produced by allowing it to continue during the brief remand period.  In short, the Court must balance the equities in light of the public interest.

It is no wonder that Plaintiffs would have this Court believe it need not conduct such a calculus, or that the "nuanced remedy" promised by Plaintiffs is now abandoned.  The record evidence set forth below, when considered in light of the legal standards which are thoroughly explored as well, establishes firmly that the Lake Belt mining should continue during the remand period.

## II.    STATEMENT OF THE CASE AND FACTS.

As the Court strongly implied by convening a remedies hearing, a decision on the proper nature of the remedy in this case is not predetermined by the Court's decision on the merits. Rather, this Court must determine, as a matter of equitable balancing, whether it will simply remand to the United States Army Corps of Engineers ("Corps") to "engage in the meaningful analysis required by the APA, NEPA, CWA, and ESA," *Sierra Club v. Flowers*, 423 F. Supp. 2d 1273, 1280 (S.D. Fla. 2006), and issue a new Record of Decision ("ROD"), or require a partial or

3

complete shutdown in mining or site preparation authorized under the 2002 permits. Moreover, contrary to the contention in Plaintiffs' "Proposed Findings," whether the Court treats the request for remedy as a petition to vacate the 2002 permits or to issue an injunction to halt mining, the Court would have to balance the equities.[1]

If the Court treats Plaintiffs' request for a remedy as a motion to vacate the permits, it should follow the precedent of every circuit that has addressed the issue and balance "the seriousness of the ... deficiencies (and thus the extent of doubt whether the agency chose correctly)" against "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C.

---

[1]  Plaintiffs repeatedly have attempted to soft-peddle their relief request to this Court, refusing to admit that the remedy they seek would result in the shutdown of mining in the Lake Belt. Plaintiffs draw a disingenuous distinction between vacatur and injunction by asserting that "a broad injunction against any mining in the Lake Belt would indefinitely preclude the Corps from issuing *any* permits to these or other companies with regard to any areas in the Lake Belt.  On the other hand, setting aside the specific ROD and permits before the Court while the Corps is reconsidering whether, and on what terms, to readopt the overall 'Lake Belt' 'plan' that undergirds these particular agency actions would in no way preclude the Corps from determining expeditiously, on a case-by-case basis, whether *other* permits should be issued in the meantime." Plf. Findings at 8-9, n.5.  But the overbroad, indefinite injunction Plaintiffs describe now is not what they asked this Court to issue.  They asked for an injunction prohibiting mining under the existing permits until the Corps issued its SEIS.  That injunction is entirely indistinguishable from the "vacatur" that Plaintiffs now are requesting.  Both would halt mining under the existing permits.  Both would leave open issuance of other permits by the Corps during the remand – although, as the evidence at the hearing demonstrated, Corps permitting typically requires much longer than the eleven months left in the remand period.  (Tr. 4090-91).

In fact, Plaintiffs' request for total vacatur of the existing permits effects a broader and far more disruptive remedy than an appropriately tailored injunction.  While the Court could craft an injunction that would avoid any broad shutdown of mining while ensuring that operations during the remand have no negative impacts on the environment (*e.g.* an order requiring monitoring for cryptosporidium and giardia, or sampling for benzene, or posting a mitigation bond for any wetlands loss during the remand period), vacatur would prevent any mining whatsoever under the existing permits.  The mechanism that Plaintiffs describe, having the Court vacate the existing permits and then requiring the mining companies to secure from the Corps on an expedited basis new interim permits that the Court may or may not consider environmentally protective, is not just unlikely and inefficient but will result in the massive disruption of a shutdown coupled with questionable environmental protection.  Even if the Corps was able to issue such permits, Plaintiffs would undoubtedly be back before this Court arguing – as they did regarding the 2002 permits and then again regarding the Fish & Wildlife Service's Biological Opinion – that the agencies "rushed to judgment."  Notably, Plaintiffs refused to forego such a challenge, saying only that they "probably wouldn't do that" for "commonsensical" reasons.  (Tr. 7140).

Cir. 1993) (quoting *United Mine Workers v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990)).  In striking this balance, the Court should consider that remanding without vacating has been the traditional remedy in cases, such as this one, where the court found procedural violations of federal statutes that are likely to be addressed on remand.  Moreover, the Court should take into account that vacatur of the permits will be tremendously disruptive to the Defendant Intervenors and to the Florida economy.

If the Court follows its suggestion in its March 22 Order and decides that the issue before it is what "injunction, if any, which would issue," *Flowers*, 423 F. Supp. 2d at 1380, Plaintiffs will have to prove that they prevail on all four of the traditional injunction factors – including demonstrating that they will suffer irreparable harm without an injunction and that granting the injunction will not disserve the public interest.  *See Klay v. United Healthgroup, Inc.*, 376 F. 3d 1092, 1097 (11th Cir. 2004).  As Supreme Court and Eleventh Circuit precedent demonstrates, the burden on Plaintiffs will not be lowered simply because this case involves violations of environmental statutes.  More specifically, Plaintiffs' burden to demonstrate that an injunction is required under all four of the traditional injunction factors will not be excused simply because the Court's March 22 Order found a violation of the Endangered Species Act ("ESA").  Not only have Plaintiffs failed to make a relevant request for relief under the ESA, but any precedent that lowers the burden of proof for ESA violations applies only to cases where the Court has found a substantive violation of the ESA that threatens the very survival of the protected species.

In order to apply the test for either injunction or vacatur, the Court must critically evaluate the evidence presented at the remedies hearing.  As noted below, the presentation of evidence regarding the economic impacts of vacatur or injunction and the environmental issues surrounding mining was exhaustive.  During that presentation, it became abundantly clear that many of the witnesses for Plaintiffs were not testifying about environmental impacts that would occur if mining continued during the brief remand period, but rather were testifying about "potential" or "possible" impacts of mining over a much longer, unspecified period of time.  Similarly, Plaintiffs' economic witness did not testify about the immediate impacts of vacatur or

5

injunction during the remand period, but rather discussed general theories regarding long-term market reactions. Plaintiffs' witnesses also failed to focus their testimony on the areas that are to be mined during remand. This lack of focus leaves much of the evidence presented by Plaintiffs irrelevant to the issue before the Court – determining the effects of shutting down mining under the existing permits versus continuing mining during the remand period.

At the same time, the evidence presented at the remedies hearing overwhelmingly demonstrates that halting or limiting mining would be incredibly harmful to the Florida economy, to thousands of workers that rely on the Lake Belt mining operations, and to the mining companies themselves. It is uncontroverted that a curtailment of mining during the remand period would eliminate thousands of mining jobs. Furthermore, as the effects of a shutdown of mining cascade through the economy, thousands of workers that either use the Lake Belt limestone, supply others who use such limestone, or supply the mining companies themselves, would also lose their jobs.

A shutdown of Lake Belt mining during the remand period would also significantly disrupt Florida's supply of construction materials, undermining the ability of government agencies and private companies to complete public works projects – including projects that are part of the Comprehensive Everglades Restoration Plan ("CERP"). These agencies and firms would be left scrambling to find a replacement for more than 50 million tons of high grade limestone annually mined in the Lake Belt, half of the construction aggregate used in Florida. Yet, these entities and companies would be unable to find significant quantities of replacement aggregate because mines within a reasonable transport distance of South Florida are already working at capacity, and developing new sources takes far longer than the remand period. Moreover, the limited limestone that could be found outside of South Florida would face insurmountable transportation problems, due to limitations on the availability of ships, ports, railroad track capacity, railroad equipment and trucks. Finally, even if transportation was available, the immense costs associated with that transportation would make even the limited

amount of aggregate that could be found and delivered to South Florida during the remand period far more expensive than Lake Belt rock.

A halt to mining would also cause severe harm to the mining companies operating under the existing permits, companies that have operated in the Lake Belt for decades and made extraordinary capital investments in reliance on their mining permits. These companies would not only lose the use of their investments during the remand period, as well as substantial revenue, but they would also be unable to meet contractual commitments, or make new ones, undermining customer relationships that have taken years to develop.

In contrast to the massive economic and environmental harm that will result from a shutdown or curtailment of mining in the Lake Belt, Plaintiffs failed to show that continuing mining during the remand period would result in any concrete environmental impact. The evidence Plaintiffs presented regarding mining's alleged impacts on the Northwest Wellfield, seepage, wetlands and the wood stork was entirely unfocused, addressing at most "potential" future harm from mining generally but not any harm from mining under any of the permits during the short remand period.

Regardless of whether the Court applies an injunction standard or a vacatur standard, the evidence plainly demonstrates that the equities favor leaving the existing permits in place during the brief remand period. There is simply no evidence that continued mining under any permit *during the remand period* would cause any unmitigated environmental harm, and the evidence presented at the hearing demonstrated the immediate, substantial economic and environmental impacts of curtailing mining. Under these circumstances, where the harmful impacts of vacating or enjoining mining under the existing permits are so significant, the environmental impacts of continued mining under the permits are so doubtful, and the remand period is so brief, the Court should leave the permits in place while the Corps completes the reevaluation the Court mandated in its March 22 Order.

7

A.      Statement of the Case.

This case involves a challenge to nine "dredge and fill" mining permits issued in April 2002 by the Corps pursuant to Section 404 of the Clean Water Act.  The permits allow mining at existing limestone quarries in an area of South Florida known as the Lake Belt, on the western edge of urban development in Miami-Dade County.

The challenged permitting process began in 1992, when the Florida Legislature created a committee composed of governmental agencies, environmental organizations, and mining companies to develop a comprehensive strategy for the Lake Belt.  1992 Fla. Laws ch. 92-132, § 21.  Over the next decade, state, federal and local government agencies, with input from representatives of environmental organizations and mining companies, created a comprehensive mining plan called the Miami-Dade County Freshwater Lake Belt Plan.  After considering this plan, the Corps, working with various federal, state and local agencies, issued 10-year mining permits to ten companies in 2002.

Although this Court ultimately determined that this permitting process was flawed in certain respects, the Corps did engage in extensive consultation with state and local agencies, scientists, environmentalists and mining companies.  This decade-long permitting process created a voluminous administrative record.  *See Flowers*, 423 F. Supp. at 1282 ("The record consists of thousands of pages of reports, correspondence, maps, studies, tables, handwritten notes, and electronic mail messages, spanning the time period of 1980 – 2004. In addition, the Administrative Record of the U.S. Fish & Wildlife Service ("FWS") consists of eight large binders, and includes additional materials on computer disk. The decision documents themselves total more than 1,000 pages.").

On August 20, 2002, Plaintiffs filed a complaint in the United States District Court for the District of Columbia, challenging the Corps' issuance of the 2002 permits.  The case was transferred on August 4, 2003 and assigned to this Court on December 30, 2003.  *Flowers*, 423 F. Supp. 2d at 1280.  This Court then granted various mining companies' motions to intervene as Defendants and allowed Plaintiffs to amend their complaint based on new information submitted

to the Corps.  Plaintiffs filed their amended complaint on April 6, 2004.  *Id*. at 1281-82.  Various pleadings and motions followed.

On March 22, 2006, this Court entered its order ("March 22 Order") on Plaintiffs' motion for summary judgment, remanding to the Corps its decision for further review under the Clean Water Act, 33 U.S.C. §§ 1251-1387 ("CWA"), the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370f ("NEPA"), the ESA, 16 U.S.C. § 1531, and the Administrative Procedure Act, 5 U.S.C. §§ 501 *et seq.* ("APA").   The Court also stated that it had not "yet determined an appropriate remedy in this case," requested briefing on "the nature of the injunction, if any, which would issue," and explained that it would "hold a hearing on the question of remedies after review of the parties' briefs."  *Flowers*, 423 F. Supp. 2d at 1380.

The Court presided over an extensive remedies hearing that went well beyond the already-voluminous record that the Corps compiled when issuing the permits.  In total, the Court heard remedies testimony that lasted for 32 days scattered over 7 months, with 31 live witnesses and more than 7,300 pages of transcript.  The Court also admitted into evidence roughly 500 exhibits and a number of depositions.  While the remedies hearing was ongoing, the Corps has proceeded with its reevaluation of the issues identified in the March 22 Order, and on August 31, 2006, FWS completed its Biological Opinion in compliance with the March 22 Order.

**B.      Evidence Presented at the Remedies Hearing Regarding the Effect of Continued Mining During the Remand Period on the Biscayne Aquifer.**

**1.      Cryptosporidium and Giardia.**

The evidence presented at the hearing establishes that mining during the remand period would not cause any significant risk of cryptosporidium or giardia contamination in the Northwest Wellfield.  The current level of risk to the Northwest Wellfield is infinitesimally low, no witness could quantify any increase in risk attributable to mining, and none of the witnesses even suggested that a halt to mining would abate the theoretical risk.

> a.   **Evidence regarding hydrogeology does not establish that continued mining threatens the Northwest Wellfield with cryptosporidium or giardia contamination.**

The basis for Plaintiffs' contention that the Northwest Wellfield is at risk for cryptosporidium and giardia contamination is the assertion that the existing permits allow mining too close to the wellfield. (Plf. Findings at 16-17). Plaintiffs contend that, as a result, the "travel time" from a mining lake to the Northwest Wellfield could be shorter than 60 days. (*Id*. at 20).[2] At the hearing, Plaintiffs relied on the testimony of Dr. Stavros Papadopulos, a hydrogeologist, to provide his opinion regarding groundwater movement and travel times. Dr. Papadopulos testified that, based on an "analytical model" he ran, he believed that the 60-day travel time line for the Northwest Wellfield was greater than the current 2500-foot mining setback. (Tr. 222-23).[3]

The Defendant Intervenors presented the testimony of hydrogeologist James Rumbaugh by deposition. Mr. Rumbaugh reviewed Dr. Papadopulos' work. Mr. Rumbaugh testified that the South Florida Water Management District and the Corps have spent decades developing and

---

[2]   Although Plaintiffs spend an inordinate amount of time discussing the correct location of the regulatory 60-day setback, there is nothing inherently important about 60 days of travel time in the groundwater when discussing the risk of pathogen contamination. The evidence demonstrated that cryptosporidium die off according to a continuous curve based on time and the temperature of the water. (Tr. 4405-06; Def. Int. Ex. 98). As explained in the County's Northwest Wellfield Watershed Protection Plan, "[t]he majority of pathogenic bacteria die off within an average of 10-30 days." (Plf. Ex. 4 at 6). Further, as discussed below, die off is only one of the factors (along with filtration, dilution, removal in lakes and lime treatment) that reduces the risk of contamination of drinking water by cryptosporidium.

[3]   On cross examination, Dr. Papadopulos conceded that a number of the mining areas at issue in this case are entirely outside the Northwest Wellfield's "limit of capture," meaning that the groundwater from those mining areas does not flow to the Northwest Wellfield. (Tr. 196; *see* Plf. Ex. 7, figure 3a, 3b (assuming an unrealistically high 150 million gallon per day actual pumping rate for the Northwest Wellfield, mining lakes located outside the red line on the exhibit are outside the limit of capture for the wellfield)). Dr. Papadopulos testified that water from lakes located north of Okeechobee Road (White Rock Main and Sawgrass quarries), just south of Okeechobee Road (Rinker Materials FEC quarry), and south of the prison in the Lake Belt (Rinker Materials SCL quarry, Kendall-Krome quarry) are outside the Northwest Wellfield's capture zone. (Tr. 196-97, 198-99). Thus, even if mining were associated with any form of water contamination, which it is not, these mining lakes simply could not impact the wellfield. Moreover, Dr. Papadopulos conceded on cross examination that the pumping rate for the Northwest Wellfield he used was more than twice the actual pumping rate, and if he used the actual pumping rate his "limit of capture" would be closer to the wellfield. (Tr. 197).

continually refining numerical groundwater models to accurately simulate groundwater levels in the Lake Belt area, and that these models, which exist and are generally available, are far more accurate than Dr. Papadopulos' rough-cut analytical model.  (*See* Def. Int. Ex. 162 at 104-06). Mr. Rumbaugh further testified that the analytical model Dr. Papadopulos utilized was simplistic, had a limited number of parameters, and was not calibrated to reflect actual conditions in the field.  (*Id.*).

The evidence demonstrated that Dr. Papadopulos' estimate of groundwater travel time is unreliable in several respects.  Most importantly, Dr. Papadopulos admitted that he does not have any expertise concerning the capacity of the rock to remove cryptosporidium and giardia, (Tr. 101), and that he did not model the travel times for cryptosporidium.  (Tr. 105).  On cross examination, Dr. Papadopulos admitted that the "tracer dye" tests he primarily relied upon in forming his opinion do not allow for analysis of how far a particular pathogen, like cryptosporidium, might travel in the aquifer in a particular period of time.  (Tr. 151).  The evidence also is undisputed that cryptosporidium and giardia are strained out of the groundwater by the limestone.  (Tr. 173 (Papadopulos), Tr. 4412-22 (Cotruvo)).

Further, Dr. Papadopulos' analytical model did not take into account the effect of surface water in the area of the Northwest Wellfield, which means that it did not show the effect of aquifer recharge from canals, wetlands, lakes or rain.  (Tr. 178).  By failing to include surface water recharge in his model, Dr. Papadopulos overestimated the size of the capture zone and the rate of groundwater flow.  (Def. Int. Ex. 162 at 106-07).  As Mr. Rumbaugh noted, the importance of surface water to hydrology in the Lake Belt is so prominent that surface water is a significant component of almost every model that has been developed for use in South Florida. (*Id.* at 108).

In addition to these errors, Dr. Papadopulos also (1) used incorrect regional groundwater flow values, (*Id.* at Ex. C, 12 at 3); (2) assumed in his model that the aquifer around the Northwest Wellfield is homogenous with regard to transmissivity (even though he conceded on cross examination that the aquifer is not in fact homogenous), (Tr. 184-85); (3) adopted an

unrealistically high rate of transmissivity, (Def. Int. Ex. 162 at 110); (4) assumed an artificially high hydraulic gradient that inaccurately increased groundwater velocity, (*Id.* at 112); (5) analyzed only a single aquifer layer (the alleged preferential flow zone), despite the fact that the layer analyzed accounts for only 15% of the water received in the Northwest Wellfield, (Tr. 183; Def. Int. Ex. 132); and (6) used an unrealistically high 150 to 225 million gallon per day rate of pumping in the Northwest Wellfield, when the current average pumping rate is between 64 million and 72 million gallons per day.  (Tr. 189-91).  Each of these assumptions by Dr. Papadopulos served to overestimate the size of the wellfield capture zone, the rate at which groundwater moves, and thus, travel time distances in the area of the Northwest Wellfield.  (*See, e.g.*, Def. Int. Ex. 162 at 112 (transmissivity); Def. Int. Ex. 162 at 112 (hydraulic gradient); Def. Int. Ex. 162 at B, 111-12 (single layer aquifer)).  In fact, based on just one of those faulty assumptions, the inaccurate pumping rates, Dr. Papadopulos conceded that none of his findings accurately reflect travel times in the Northwest Wellfield today.  (Tr. 193).[4]

> ### b.   Evidence regarding the presence of cryptosporidium or giardia in the Lake Belt mining areas does not establish that continued mining threatens the Northwest Wellfield.

The uncontroverted evidence demonstrates that despite hundreds of samples, cryptosporidium has **never** been found in mining lakes, monitoring wells, or drinking water wells in the Lake Belt.  (Tr. 4363-64 (Cotruvo) (no positive detection of cryptosporidium in hundreds

---

[4]   In their Proposed Findings, Plaintiffs suggest that another of their witnesses, Dr. Susan Markley, concluded that travel time distances in the area around the Northwest Wellfield also were longer than previously believed.  Plf. Findings at 18.  Dr. Markley's testimony in this regard was primarily a conduit for hearsay regarding the uncompleted modeling work of a Dr. Hillol Guha.  (Tr. 397-413).  Dr. Markley is not a hydrogeologist or groundwater modeler, and had no ability to evaluate the validity of Dr. Guha's modeling work.  (Tr. 283, 482).  In fact, Mr. Rumbaugh, who wrote the model that Dr. Guha used, and reviewed the data filed and equations used by Dr. Guha, testified that Dr. Guha miscalibrated the model (*i.e.*, did not properly correlate the modeling results to the actual real-world data).  (Def. Int. Ex. 162 at B, 56-57).  When the model was properly calibrated, it showed slower travel times and smaller capture zones than on draft documents proffered by Plaintiffs.  (Def. Int. Ex. 162 at B, 57). Even Plaintiffs' own witness, Dr. Papadopulos, testified that he did not know if Dr. Guha's conclusions were technically sound.  (Tr. 166).

of samples taken by the State, the County, and the mining companies from lakes, shoreline, groundwater, and production wells); Tr. 332 (Huffman) (no samples detecting cryptosporidium in drinking water wells); Tr. 334 (Huffman) (no samples detecting cryptosporidium in mining lakes); *see also* Tr. 487 (Markley); Tr. 2534-35 (Studt); Tr. 5104 (Espinosa); Plf. Ex. 16 at 3; Fed. Def. Ex. 4; Def. Int. Ex. 37 at 8).   The chances of all of these samples being "false negatives" is essentially zero.  (Tr. 4365).[5]

Similarly, despite hundreds of samples, giardia has been found only once – in one sample in December of 2005 in a mining lake owned by the Lowell Dunn Company, and that result has never been replicated.  (Tr. 331 (Huffman); Tr. 487 (Markley); Tr. 4373 (Cotruvo); Tr. 5104, 5239 (Espinosa); Plf. Ex. 16 at 3; Plf. Ex. 19).[6]

The absence of any detection of these pathogens in water production wells despite decades of mining, or detection in the mining lakes at issue, demonstrates that any "threat" of cryptosporidium or giardia contamination of the wellfield from mining during the remand period is entirely theoretical.  Even if one assumed that the pathogens are present in the mining areas, which they are not, the evidence does not establish that any risk of wellfield contamination from cryptosporidium or giardia is exacerbated by, or even associated with, mining.

---

[5]   Despite these hundreds of negative sampling results, Plaintiffs' witness, Dr. Debra Huffman, nonetheless testified that she believed that cryptosporidium was in fact present in mining lakes in the Lake Belt, a conclusion that Plaintiffs would have this Court adopt.  (Plf. Findings at 22). That Dr. Huffman is willing to simply ignore all of the sampling data and state a contrary conclusion undermines the scientific credibility of her testimony; the essence of science is reaching conclusions based on data rather than faith.  *U.S. v. Frazier*, 387 F.3d 1244, 1295-96 (11th Cir. 2004) (expert testimony must be "authenticated by more than subjective belief or unsupported speculation. ... The trial court's gatekeeping function requires more than simply taking the expert's word for it." (citations and quotations omitted)).   Further, on cross examination, Dr. Huffman was unwilling to stand by her statement that cryptosporidium was actually present in the mining lakes, and she conceded that she did not know if it was present at all.  (Tr. 335 ("Q:  Okay. So I am correct that you don't know whether there's cryptosporidium in the lakes?  A. That's correct.")).

[6]   It should be noted that the Lowell Dunn Company is not part of this litigation, although its permit was issued on the basis of the same ROD challenged by Plaintiffs.  (Tr. 2476-77).   That Plaintiffs would choose not to challenge the permit for the only lake where giardia ever has been found, yet assert that the threat of giardia justifies equitable relief against the Defendant Intervenors in this case, is puzzling at best.

c.    **Evidence regarding the risk of cryptosporidium and giardia contamination does not establish that continued mining threatens the Northwest Wellfield.**

Testimony about the risk posed to the Northwest Wellfield of cryptosporidium and giardia contamination on behalf of Plaintiffs was given primarily by Dr. Debra Huffman.  She described the effects of cryptosporidiosis graphically, but testified only in the vaguest of terms about the risks that she considered could be associated with mining in the vicinity of the Northwest Wellfield.  She described the existing mining lakes near the Northwest Wellfield as creating "a risk of contamination from protozoan pathogens" (Tr. 265), and "future development of lake mining pits within proximity to the Northwest Wellfield" as creating some "potential increased risk."  (*Id.*).

Dr. Huffman initially expressed a theory that the presence of mining lakes increased the risk of cryptosporidium contamination by increasing the amount of surface water and shoreline. (Tr. 268-88).[7]  Plaintiffs repeat this assertion in their Proposed Findings.  (Plf. Findings at 23). Plaintiffs neglect to mention, however, that Dr. Huffman abandoned that theory on cross examination; she testified that cryptosporidium contamination could originate from the  wetlands or the canals that surround the Northwest Wellfield, and that the existence of mining lakes as a pathway for contamination was not central to her theory of risk.  (Tr. 307-08).  In fact, Dr. Huffman testified that she believed cryptosporidium *was present* in the wetlands and the canals that surround the wellfield, (Tr. 317-18, 320), and that cryptosporidium could survive more readily in wetlands than in a lake.  (Tr. 318).

Dr. Huffman never quantified any risk associated with any particular mining lake in the Lake Belt, (Tr. 345), and did not conduct a risk assessment for the Northwest Wellfield. (Tr. 340).  Dr. Huffman was unwilling to quantify the increase in risk, if any, that she thought would

_____

[7]  Dr. Huffman also speculated that blasting could somehow change the character of the aquifer and make it more susceptible to protozoan contamination.  (Tr. 305).  On cross examination, however, she conceded that she had no first-hand knowledge or expertise that led her to that conclusion, and no independent basis for her speculation about the effect of blasting on hydrology. (Tr. 305-06).

be associated with mining during the remand period, and thus had no opinion to offer on the central issue before the Court. (Tr. 349-50). Dr. Susan Markley, the chief of the Ecosystem Restoration and Planning Division of the Miami-Dade County's Department of Environmental Resources Management ("DERM"), who was called by Plaintiffs not as a representative of DERM or the County but rather in her personal capacity, testified that she also could not say whether continued mining within the permitted areas in the Lake Belt presents any kind of immediate threat to public health from cryptosporidium or giardia. (Tr. 498).[8]

In contrast, officials from Miami-Dade County testifying on behalf of their agencies all stated that there is no imminent risk associated with continued mining in the Lake Belt during the remand period. (Tr. 5104-05 (Mr. Carlos Espinosa testifying on behalf of DERM); Tr. 4239 (Mr. Douglas Yoder testifying on behalf of Miami-Dade County's Water and Sewer Department ("WASD")).[9] The fact that there is no imminent risk associated with continued mining was supported by the testimony of Dr. Joseph Cotruvo, the former head of EPA's Office of Drinking Water Standards and one of the foremost experts in the United States on drinking water risk assessment, who testified that the risk to consumers of water from the Northwest Wellfield is: "Very, very low. Negligible." (Tr. 4429).[10]

---

[8]  Neither Dr. Huffman nor Dr. Markley explained how the existing mining setback, the "double-cross hatch areas" in the existing permits, (Tr. 2528-29), affected their assessment of risk.

[9]  All witnesses agreed that the Northwest Wellfield is not under the direct influence of surface waters. (Tr. 4327 (Cotruvo), Tr. 286 (Huffman), Tr. 286 (Markley), Tr. 4243 (Yoder), Tr. 5129 (Espinosa)). This means that the risk is less than 1 in 10,000 that a person could get sick from microbial pathogens from the Northwest Wellfield – even assuming that such pathogens are present and there are no mechanisms for removing those pathogens before they reach the production wells. (Tr. 4329 (Cotruvo), Tr. 336-37 (Huffman)(acknowledging 1/10,000)). The results of several independent studies indicate that there is no trend toward the Northwest Wellfield becoming under the direct influence of surface water, despite the long-term mining that has occurred in the area. (Tr. 4341-50, 4358-63; Int. Def. Ex. 96). No witness testified that the continued mining during the remand period will cause the Northwest Wellfield to come under the direct influence of surface water. (Tr. 339-40 (Huffman), Tr. 4363 (Cotruvo), Tr. 5134 (Espinosa)).

[10]  Plaintiff's characterization of Dr. Cotruvo as a mere "chemist formerly with the U.S. Environmental Protection Agency," Plf. Findings at 25, is almost laughable. Dr. Cotruvo has a Ph.D in physical chemistry and has worked in the field of drinking water safety for more than 30 years. (Tr. 4296, 4298). He spent 14 years as director of the EPA office that sets all drinking water standards in the United States, (Tr. 4298- 99), a position that required him to supervise

(continued . . .)

Dr. Cotruvo testified that given the rate of die-off of cryptosporidium in the mining lakes, filtering in the groundwater, dilution, and the lime softening process already employed at the Miami-Dade water treatment plants, there is currently a "9.5 log" removal of cryptosporidium between any mining lake surface water and any public water consumer.  (Tr. 4429).  That 9.5 log removal equates to a reduction in the presence of cryptosporidium of approximately 99.99999999 percent before any water reaches a consumer.  (Tr. 4434).[11]  The reduction in

---

(. . . continued)
teams of experts in different disciplines in assessing risks to drinking water supplies.  (Tr. 4300-03).  Dr. Cotruvo now helps the World Health Organization set international drinking water guidelines, (Tr. 4310-12), and he has been hired by other countries to establish their drinking water standards, (Tr. 4312-13).  Moreover, every technical aspect of Dr. Cotruvo's testimony was backed up by the work of independent third parties (e.g., EPA studies on reduction of cryptosporidium in lakes, EPA guidance on the effectiveness of lime softening in the removal of cryptosporidium, USGS on the ability of the limestone to strain out cryptosporidium from groundwater, etc.).  Dr. Cotruvo clearly was the most qualified witness to testify on the overall risk to drinking water associated with cryptosporidium and giardia.

[11]  Plaintiffs take issue with certain of the factors that Dr. Cotruvo used to calculate the 9.5 log removal, suggesting that the removal efficiency could be lower if more conservative assumptions about water temperature, travel time, and filtration were used.  (Plf's Findings at 26-27).  The factual bases for Dr. Cotruvo's calculations, however, remain unrebutted.  For example, Dr. Cotruvo calculated a 4 log reduction of cryptosporidium in mining lakes.  The precipitation of calcium carbonate from the lake water – a process described by EPA in its water quality study of the Lake Belt, Def. Int. Ex. 20 – would cause cryptosporidium to be dropped into sediment at the bottom of the lakes.  (Tr. 4399-4402).  Moreover, given that water stays in the lakes for 80-170 days on average, (Tr. 3738), and third-party studies have shown that the average water temperature in the lakes is higher than in the groundwater, any cryptosporidium that theoretically exist would die-off in significant numbers while in the lakes.  (Tr. 4381-83, 4397-98).  Plaintiffs identify no evidence that undercuts any of these conclusions, implying instead that the failure of the U.S. Geological Survey ("USGS") and CH2MHill to evaluate in-lake removal mechanisms means that those mechanisms do not exist.  (Plf. Findings, at 27 n.29).  Plaintiffs' implication is specious.  The record shows that the in-lake removal mechanisms were simply outside of the scope of work of USGS and CH2MHill, both of which were hired by Miami-Dade County to conduct very specific investigations.  (Tr. 4341-43).  Dr. Cotruvo's assessment of filtration is supported by research from USGS that estimates removal of cryptosporidium from groundwater travel through the limestone aquifer, (Def. Int. Ex. 93; Tr. 4412-14), and CH2MHill in its risk assessment for the Northwest Wellfield.  (Tr. 4415-17).  And Plaintiffs' challenge to the positive effects of filtration also ignores that the farther away from the wellfield, the greater filtration provided by the aquifer.  (*See* Plf. Ex. 29).  Plaintiffs' expert, Dr. Huffman, agrees with Dr. Cotruvo that the current lime softening treatment used at the Hialeah Water Treatment Plant is credited with 3-log removal of cryptosporidium, (Tr. 344), and travel in the aquifer reduces cryptosporidium, (Tr. 343).

Even if, contrary to the evidence, the Court were to credit Plaintiffs' argument that different assumptions about the removal of cryptosporidium should be used, it would make no practical difference.  As Dr. Cotruvo testified regarding the difference between a 6-log or 7-log

(continued . . .)

giardia would be similar, if not greater, due to giardia's larger size.  (Tr. 4429).  And, when Dr. Cotruvo was asked whether the risk posed to consumers from cryptosporidium or giardia would go up as a result of the excavation of between 500 and 1,200 acres of mining lakes during the remand period, his response was that the additional mining during remand would have a "negligible effect."  (Tr. 4433-34 (Cotruvo); *see also* Tr. 2582-83 (Studt) (adequate protections for the wellfield from cryptosporidium and giardia are in place during the remand period)).  Mr. Carlos Espinosa, the Acting Director of DERM, who testified in his official capacity on behalf of DERM, noted that the County did not believe that the existing mining permits need to be revoked to protect public health.  (Tr. 5104-05).[12]

Moreover, there is no evidence to suggest that, even if cryptosporidium or giardia reached the Northwest Wellfield, the pathogens would not be removed by the existing water treatment system.  Indeed, the evidence demonstrates that the existing water treatment system would remove any cryptosporidium or giardia.  As Dr. Cotruvo testified, and Dr. Huffman conceded, lime softening systems like the one in use at the Hialeah-Preston water treatment plant are an EPA-approved method to treat cryptosporidium and giardia.  (Tr. 4426 (Cotruvo); Tr. 344 (Huffman); *see also* Def. Int. Ex. 92 at 691 (EPA drinking water standards for cryptosporidium and giardia)).  The systems employed to treat the Northwest Wellfield alone provide a 3-log, or 99.9% removal efficiency for cryptosporidium and giardia.  (Tr. 4427-28; Def. Int. Ex. 92, at 691).

---

(. . . continued)
removal and a 9.5-log removal, "whether the reduction is 99.99999 or 99.999999 is of no consequence in reality."  (Tr. 4516; *see also* Tr. 4502-03).

[12]  In fact, Mr. Espinosa testified that DERM issued County permits for mining within the Lake Belt in the exact locations that Plaintiffs claim threaten the County's water supply.  Such permits had conditions designed to address long-term wellfield protection that were coordinated among the Corps, the EPA, the County, Florida Department of Environmental Protection ("DEP") and other relevant state and federal agencies. (Tr. 5091-92).  Espinosa testified that the County obtained all permit conditions related to water quality that it requested be included in the Corps permits.  (Tr. 5165).

2.        Benzene.

The evidence presented at the hearing did not establish that mining has caused benzene contamination or that continued mining during the remand period would increase the risk of benzene contamination.  Plaintiffs have not identified a single site anywhere in the world at which benzene contamination was shown to have been caused by blasting. In fact, they have not identified a single site anywhere in the world (with the exception of their allegations here) where benzene contamination was even alleged to have been caused by blasting. Similarly, Plaintiffs have not identified a single study, article, paper or other document indicating that the *detonation* of an ammonium nitrate blasting emulsion creates or releases benzene.  Moreover, the evidence established that benzene contamination poses no threat to drinking water consumers.[13]

---

[13]  There is a threshold question of whether the Court has jurisdiction to issue equitable relief of any sort based on benzene. The issue of benzene was not and is not part of Plaintiffs' amended complaint, and was not considered as part of the Court's March 22 Order.  The Eleventh Circuit has stated that equitable relief must "relate in some fashion to relief requested in the complaint." *See Ala. v. U.S. Army Corps of Eng'rs*, 424 F. 3d 1117, 1134 (11th Cir. 2005) ("Granting a preliminary injunction based on a showing that Plaintiffs were likely to succeed on establishing a violation of an ancillary court order, rather than a showing that they were likely to succeed on the merits of any of their claims, was a misapplication of the legal standard for likelihood of success on the merits, and thus an abuse of discretion"), *cert. denied*, --- U.S. ---, 126 S. Ct. 2862 (2006); *see also Amoco Prod. Co. v. Village of Gambrell*, 480 U.S. 531, 536 n. 12 (permanent injunction requires "actual success" on the merits); *Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, n.4 (9th Cir. 2006) ("[W]e note that the inclusion of the 'knock-offs' prohibition in the injunction goes beyond the claims asserted in the complaint and the evidence presented at trial, in contravention of well-settled Ninth Circuit authority holding that 'a court may not, without the consent of all persons affected, enter a judgment which goes beyond the claim asserted in the pleadings.'"); *see also F.T.C. v. Direct Mktg. Concepts, Inc.*, 2006 WL 149039, *3 (D. Mass. 2006) ("Simply because the preliminary injunction is an equitable remedy does not mean it is a springboard to enjoin any other allegedly similar conduct by the defendants without any allegation that such conduct violates the law.").  Benzene contamination was not specifically analyzed by the Corps as part of the NEPA process underlying the present lawsuit, because no contamination was found prior to December of 2005, well after the NEPA process was concluded.  For the Court to issue an injunction or vacate permits based on benzene contamination, it would be pre-judging the results of the SEIS process, a result in direct contravention of long-established principles of administrative law.  *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 555 (1978) (a reviewing court "is not empowered to substitute its judgment for that of the agency.").

> **a.** **Plaintiffs' theories that mining activity has caused benzene contamination in the Northwest Wellfield are inconsistent with the evidence presented at the hearing.**

Despite an investigation described as the most aggressive assessment investigation ever conducted by DERM, neither County agency overseeing the Northwest Wellfield has determined that mining activity caused the benzene contamination detected in the wellfield.  (Tr. 5154-55 (Espinosa) (DERM has not established the source of the benzene contamination); Tr. 1327 (Pitt) (WASD has not concluded that mining companies were the source of the benzene contamination); Tr. 4626, 4714 (Mayorga) (Northwest Wellfield assessment was the most aggressive assessment conducted by DERM, but DERM and WASD still have not determined the source of the contamination)).  In fact, the County Attorney's office evaluated whether there was enough evidence to pursue a claim against mining companies for the costs of assessing the cause of the benzene contamination in the wellfield, and determined that the evidence was insufficient for such a claim.  (Tr. 2379-80).[14]

Plaintiffs would have the Court ignore the conclusions of these expert agencies, however, and instead reach its own factual conclusion that mining is the source of benzene contamination. (Plf. Findings at 30, 34).  Not only would the substitution of the Court's judgment for that of two different expert agencies on a matter as technical as the identification of an intermittent benzene source in groundwater be improper as a matter of law, *Marsh v. Oregon Natural Resources Council, et al.*, 490 U.S. 360, 377 (1989) (where the "analysis" "requires a high level of technical expertise,' we must defer to the 'informed discretion of the responsible federal agencies,'" and "'[w]hen examining this kind of scientific determination .... a reviewing court must generally be at its most deferential.'" (*quoting Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976) and *Baltimore*

---

[14]   Plaintiffs assert that "the County has not implemented and apparently does not intend to implement any additional investigation of the source or extent of the benzene contamination." Plf. Findings at 34-35.  That claim is contradicted by the testimony of Carlos Espinosa, the Acting Director of DERM, (Tr. 5154-55), and Wilbur Mayorga, the person at DERM in charge of the benzene investigation. (Tr. 4695).

*Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 103 (1983)), it also is simply unsupported by the evidence presented at the hearing.

The first theory presented by Plaintiffs at the hearing, that the benzene is from incomplete blasting, *i.e.* that it is from undetonated fuel oil blasting emulsion escaping the mining areas, was advanced by three former or current WASD employees – Ana Caveda, William Pitt and William Brant.  These individuals (providing evidence in their individual capacities and not on behalf of the County) speculated that mining or blasting must have been the source of the benzene because the highest benzene concentrations were found at depth.  (Tr. 1223-24 (Pitt); Tr. 2340, 2343-44, 2366 (Caveda)).  The evidence was clear, however, that the presence of benzene at depth in the Northwest Wellfield does not mean that the source materials containing the benzene must have been introduced at depth.  (Tr. 4684-85 (Mayorga); Tr. 5370-71 (Feenstra)).  The benzene found in the Northwest Wellfield was in a dissolved phase, *i.e.* it was part of the groundwater.  (Tr. 4680).  Unlike a free phase of benzene or petroleum, once in a dissolved phase, benzene does not float and instead moves with the groundwater, so benzene would not have to be introduced to the groundwater at depth in order to be found at depth.  (Tr. 4680-81 (Mayorga), 5368-69 (Feenstra); Def. Int. Ex. 125).[15]

Ms. Caveda, Mr. Pitt and Mr. Brant also testified that they believed the benzene was caused by mining or blasting based on the mass balance calculations prepared by Ms. Caveda, which supposedly indicated that it would not take a large volume of undetonated blasting materials to generate the amount of benzene found in the Northwest Wellfield.  (Tr. 1291-93 (Pitt); Tr. 1469 (Brant); Tr. 2327-30 (Caveda)).  Ms. Caveda – the person who prepared those mass balance calculations – herself characterized them as "worst case, what if, really wacko calculations."  (Tr. 2427).  Ms. Caveda admitted on cross-examination that her calculations did not accurately reflect how much fuel oil would be needed to create the levels of benzene found in

---

[15]   Dr. Feenstra testified that the conditions in the Northwest Wellfield are very conducive to plume diving, *i.e.*, the downward migration of a dissolved contaminant plume.  (Tr. 5368-69). Plaintiffs' witness, Remy Hennet, did not rebut or otherwise contradict this testimony.

the area around the Northwest Wellfield, (Tr. 2426), or how much undetonated fuel oil based blasting emulsion would have to be in the ground in order to get the concentrations of benzene found in the Northwest Wellfield. (Tr. 2426).[16]

In contrast to the unsupported speculation of Ms. Caveda, Mr. Pitt, and Mr. Brant, the evidence collected by the agency investigating the contamination and presented at the hearing demonstrated conclusively that benzene in the Northwest Wellfield could not be caused by incomplete blasting. Wilbur Mayorga testified that DERM did not find the type of chemicals and concentrations that one would expect to be associated with a failed blasting bore. (Tr. 4680).[17] An ammonium nitrate blasting emulsion contains about 94% ammonium nitrate, yet ammonium and nitrate only were detected at background levels in the Northwest Wellfield. (Tr. 2407-08 (Caveda); 4670-71, 4752 (Mayorga); 5315 (Feenstra); Def. Int. Ex. 12). If the benzene contamination had been caused by undetonated explosive material, one should see in the groundwater a ratio of ammonia to benzene of about 500,000 to one. (Tr. 5316). At such a ratio, given a concentration of benzene of 60 ppb, the ammonia concentration should be around 30 to

---

[16] Plaintiffs also would have this Court rely on the assertion that Ms. Caveda conducted "before" and "after" sampling that demonstrated that benzene concentrations in a monitoring well (well MW-109) increased after blasting. (Plf. Findings at 30 n. 32). This claim ignores the evidence actually presented at the hearing by Plaintiffs' own witnesses. First, the characterization of the sampling at MW-109 as "before" and "after" monitoring is inaccurate because Ms. Caveda testified that she was there for a sampling event on April 28, 2005 and that mining was already going on at that time. (Tr. 2353-54) It is not clear what sampling event Plaintiffs claim was the "before" sampling, as they offered no evidence as to when blasting activities began in that area. Second, Plaintiffs' contention that the elevation in benzene levels at MW-109 was due to recent blasting activities is inconsistent with the WASD groundwater modeling runs offered into evidence by Plaintiffs. Ms. Caveda made it clear in her testimony, and in Plaintiffs' Exhibit 142, that the blasting activities that she was referring to were conducted by White Rock at the lake to the east of MW-109. (Plf. Ex. 142; Tr. 2348-52). The WASD modeling runs prepared by Virginia Walsh and introduced by Plaintiffs as Plaintiffs' Exhibit 84 indicate that any particles from the White Rock South lake would travel to the east/northeast, *i.e.*, **away from MW-109** (which is to the west of the White Rock lake), under all production well pumping scenarios. (Plf. Ex. 84). In other words, blasting at the White Rock South lake would not impact MW-109. The assertion that Ms. Caveda's sampling of MW-109 demonstrates an increase in benzene after blasting at the White Rock South lake is wholly without merit and disingenuously misleading.

[17] Mr. Mayorga testified that the County fully delineated the plume of benzene. The array of wells in the direction of the various mining operations did not indicate any impact from those operations. (Tr. 4666-69).

32 *million* ppb.  (Tr. 5316).   In the Northwest Wellfield, however, where the benzene concentration was 60 ppb, the ammonia concentration was only about 300-900 ppb.  (*Id.*)[18]  Even Plaintiffs' witness Dr. Remy Hennet agreed that, due to the absence of high levels of ammonia in the groundwater in the vicinity, the benzene in the Northwest Wellfield could not have resulted from a release of undetonated blasting emulsion in the vicinity of the wellfield. (Tr. 6583-84).

The evidence also demonstrated that one would expect to see several hundred parts per billion of toluene and xylene in the wellfield if the benzene contamination was from fuel oil used in blasting emulsion, but such concentrations were not found in the Northwest Wellfield.  (Tr. 5319, 5321).  Wilbur Mayorga testified that the amounts of toluene, ethylbenzene, and xylene were not found at levels that the County would have expected to see if a diesel discharge were the cause of the benzene contamination.  (Tr. 4678-79).[19]

Finally, Plaintiffs concede that the mining companies have switched from a fuel oil based blasting emulsion to an emulsion based on mineral oil, so there is no risk of undetonated mineral

---

[18]  These ammonia concentrations are considered background levels. (Tr. 2407-08 (Caveda); Tr. 4670-71, 4752 (Mayorga); Tr. 5315 (Feenstra); Def. Int. Ex. 12).

[19]  Moreover, the evidence demonstrated that it would require an extraordinarily large amount of undetonated blasting emulsion – approximately 9.7 million liters (or 2.5 million gallons) – to account for even the benzene found within an 800 foot radius of Production Well 1 in the Northwest Wellfield. (Tr. 5337-38, 5338-39). While Plaintiffs claim that Dr. Feenstra relied on an extremely low value of benzene in fuel oil to reach this conclusion, Plf. Findings at 31, the benzene concentration in No. 2 fuel oil that Dr. Feenstra used in his calculations was based on an EPA guidance document. (Tr. 5325-26, 5328-29).  It was, in fact, the highest value of three reputable sources that Dr. Feenstra consulted.  (Tr. 5297-99).  The other documents, from the TPH Working Group and ATSDR, did not report *any* detectable concentrations of benzene in No. 2 fuel oil. (Tr. 5297-99 (Feenstra); 6366, 6585-86 (Hennet)).

Plaintiffs' witness Remy Hennet, who criticized Dr. Feenstra's calculations, acknowledged that the benzene concentration Dr. Feenstra used was within the range of reported benzene concentrations in the literature. (Tr. 6586).  Dr. Hennet similarly testified that "the reference materials that Dr. Feenstra uses [are] the same type of reference material that I use." (Tr. 6361).  Dr. Hennet's criticism was based on his own selection of a much higher percentage of benzene in fuel oil, 0.1%, which he admitted was at the very highest end of the range of benzene concentrations. (Tr. 6586).  That 0.1% figure was criticized by the United Nations Environment Programme ("UNEP") and the World Health Organization ("WHO") as being "unusually high." (Tr. 6611).  The UNEP and WHO also criticized the source of this value, which is the same source Dr. Hennet relied on, based on the lack of description or explanation for the analytical method used to obtain this value.  (Tr. 6611).

oil-based blasting emulsion causing benzene contamination in the groundwater. Each of the witnesses who testified at the hearing agreed that undetonated mineral oil based emulsions pose *no threat* of benzene contamination to the Northwest Wellfield. (Tr. 5377 (Feenstra); Tr. 6578 (Hennet); Tr. 4828 (Mayorga); Tr. 2402 (Caveda); Tr. 1534-35 (Brant); Tr. 1336 (Pitt)).[20]

Perhaps recognizing the substantial evidentiary gaps in their theory of incomplete detonation, Plaintiffs abandoned that theory on rebuttal for a new theory advanced by Dr. Remy Hennet, namely, that the combustion of any hydrocarbon during blasting – including mineral oil – results in the formation of benzene. (Tr. 6406).[21] Curiously, given the subject of his testimony, Dr. Hennet has no experience whatsoever in blasting chemistry, the blasting process, or the potential for blasting to cause groundwater contamination. (Tr. 6268-70). He has never previously been asked to determine what, if any, pollutants are released from the use of an ammonium nitrate blasting emulsion. (Tr. 6268). He has never written an article on the contamination alleged to have been caused by ammonium nitrate blasting materials, (Tr. 6269), and in fact, has no publications in the field of detonation chemistry. (Tr. 6268-69).

Dr. Hennet also has never conducted any tests or experiments with ammonium nitrate blasting emulsions. (Tr. 6269). He has never seen the blasting materials that are being used in the Lake Belt, (Tr. 6270), and he has never seen how ammonium nitrate blasting emulsions are prepared, used and detonated (*Id.*). He admitted that he is not an expert in blasting with ammonium nitrate explosives. (*Id.*). And he never has previously been accepted by a court as an

---

[20] Thus, even if there were evidence beyond mere speculation that the benzene in the Northwest Wellfield was from the past incomplete combustion of fuel oil emulsion, that evidence could not form the basis of equitable relief. It is black letter law that equitable relief is prospective in nature, and cannot be used to address past acts. *Ala. v. U.S. Army Corps of Eng'rs,* 424 F.3d 1117, 1133 (11th Cir. 2005). Because the mining companies have switched to mineral oil emulsions, any equitable relief geared toward addressing benzene from incomplete combustion of fuel oil emulsion would be improperly retrospective.

[21] Dr. Hennet's testimony was in direct conflict with the testimony of Plaintiffs' witness William Pitt. Mr. Pitt testified that one would only expect to find benzene contamination if blasting was partial or incomplete, not if blasting was complete. (Tr. 1333). In their Proposed Findings, Plaintiffs inaccurately suggest that Dr. Hennet's theory was supported by Mr. Pitt's testimony. (Plf. Findings at 32).

expert on the subject of contamination allegedly caused by ammonium nitrate blasting materials. (*Id.*).

Dr. Hennet also was very careful not to say that blasting was the ***likely*** cause of the benzene in the Northwest Wellfield. (Tr. 6581-82). All Dr. Hennet was willing to say was that it is "possible." (Tr. 6579, 6581-82). At the same time, he admitted that he does not know "whether and to what extent" the conditions exist that are necessary to create benzene in the Lake Belt. (Tr. 6579).[22]

Dr. Hennet acknowledged that the temperature at which a hydrocarbon is combusted affects the amount of benzene that is produced – if the temperature is too high, little or no benzene will be formed. (Tr. 6535-36). According to Dr. Hennet, if the temperature gets higher than 2000 degrees Kelvin "it's less and less likely" that you would have conditions that will

---

[22] Part of Dr. Hennet's testimony relied on what he called a "fingerprint" of BTEX (benzene, tolulene, ethylbenzene, and xylene) production from combustion, (Plf. Ex. 237) that he attempted to match to the sampling results in the Northwest Wellfield. The fingerprint in the Northwest Wellfield is inconsistent with more reliable sources regarding the relative amounts of BTEX compounds formed during the combustion of fuel oil. Defendant Intervenor's Ex. 177 was an excerpt from EPA's AP-42, a compilation of air pollutant emission factors. According to this EPA resource, the combustion of fuel oil releases 28 times as much toluene as benzene. (Def. Int. Ex. 177 at Table 1.3-9; Tr. 6604-05). This is completely at odds with the purported "fingerprint" on Plaintiffs' Ex. 237, which shows higher levels of benzene than toluene. It also is at odds with Defendant Intervenor's Ex. 176, Table 9, a book titled "Groundwater Chemicals Desk Reference" by Montgomery, that Dr. Hennet produced to Defendant Intervenor's. (Tr. 6559-6560). According to Def. Int. Ex. 176, the emissions of toluene from a diesel engine are 42% higher than the emissions of benzene (3980 v. 2740), (Tr. 6562), which is inconsistent with the "fingerprint" on Plaintiffs' Ex. 237. Although Dr. Hennet intimates that the results discussed in Int. Def. Ex. 176 is different from the relative concentrations found in the Northwest Wellfield because the truck engine analyzed in that exhibit had a catalytic converter, he provides no explanation as to why a catalytic converter would selectively eliminate benzene as compared to toluene.

Moreover, Dr. Hennet appears to have misled the Court when he testified that there was a "remarkable" and "very strong correlation" between the concentration of ammonia and the concentration of benzene in the Northwest Wellfield. (Tr. 6341-42; Plf. Ex. 227). On cross-examination, he was forced to acknowledge that when you include all of the data from MW-109, as opposed to just select portions of the data, there is no correlation at all between the benzene and ammonia levels found in the Northwest Wellfield. (Tr. 6503-04; Def. Int. Exs. 172 and 173). The absence of any correlation between benzene levels and ammonia levels becomes even clearer when you include the data from wells other than MW-109. As indicated on Defendant Intevenors' Exhibit 173, the ammonia concentrations in MW-112 and MW-113 were considerably higher than those in MW-109, but no benzene was detected at all in most of those samples. (Def. Int. Ex. 173; Plf. Ex. 135).

produce benzene.[23]  (Tr. 6579-80).  But Dr. Hennet admitted that he does not know the average temperature in a detonation of an ammonium nitrate-based blasting emulsion. (Tr. 6538-41).  He similarly admitted that he does not know how much of a detonation event takes place at a temperature below 2000 degrees Kelvin.  (Tr. 6567).  Dr. Hennet did acknowledge, however, that it may be less than 10%.  (Tr. 6567-68).[24]

In fact, the evidence demonstrates that the average temperature during detonation of ammonium nitrate blasting emulsion of the type used in the Lake Belt is approximately 2273 degrees Kelvin (2000 centigrade), (Tr. 6974-75), which is hundreds of degrees higher than the temperature at which it becomes, according to Dr. Hennet, "less and less likely" that benzene would be created.  (Tr. 6974-75).  The unrebutted evidence also establishes that there is no significant variation in temperature throughout the bore hole during detonation.  (Tr. 7037).

Dr. Hennett also claimed not to know how much benzene was generated from combustion of blasting emulsion, despite the fact that he performed "certain mass balance calculations that [he] ultimately chose not to utilize in the opinion he expressed to the Court." (Tr. 6581, 6583; Plf. Findings at 32, n.34).  The reason Dr. Hennet chose not to share his mass balance calculations with the Court became clear on cross examination, when he was asked to perform calculations based on standard EPA emissions factors for the combustion of fuel oil. Table 1.3-9 of EPA's AP-42, titled "Emission Factors for Speciated Organic Compounds from Fuel Oil Combustion" provides emissions factors from which one can calculate how much fuel

---

[23]  Plaintiffs' Exhibit 236 shows that benzene is not produced at all during combustion at temperatures above 1900 degrees Kelvin (1627 degrees C).  (Plf. Ex. 236, Fig. 28).

[24]  The papers that Dr. Hennet relied on do not support the position that benzene is produced in significant quantities during low temperature combustion.  Dr. Hennet's testimony that benzene is one of the "major, major" soot precursors represented in Plaintiffs' Exhibit 235 is patently false. (Tr. 6405-06).  Benzene is not even mentioned in Plaintiffs' Exhibit 235.  That paper specifically deals with five soot precursors, none of which is benzene. (Plf.' Ex. 235 at Table 1; Tr. 6564).  Plaintiffs' Exhibit 202 indicates that benzene was not formed or detected from the combustion of diesel fuel. (Plf. Ex. 202 at Fig. 2; Tr. 6485 (Hennet); 5451-52 (Feenstra)). Plaintiffs' Exhibit 201 deals with diesel engines at temperatures of 850-1000 degrees Celsius. (Plf. Ex. 201 at Fig. 5-6)  The temperatures associated with the detonation of an ammonium nitrate blasting emulsion are more than 1000 degrees higher. (Tr. 7036-37).

oil would have to be combusted to emit 3.89 liters of benzene, the amount estimated to be in the area around Production Well 1 at the Northwest Wellfield. (Def. Int. Ex. 177 at Table 1.3-9). On cross-examination, Dr. Hennet admitted that, according to this EPA reference, one would have to combust more than 133 million liters of fuel oil to generate 3.89 liters of benzene. (Tr. 6603). As Dr. Hennet explained, "Basically what this says is that you need a motherload of fuel oil to generate the amount of benzene that is reported in those tables for gas emissions." (Tr. 6604).

Because fuel oil comprises only about 6% of the blasting emulsion formerly used in the Lake Belt, this "motherload of fuel oil" significantly understates the amount of blasting emulsion that would be required to generate 3.89 liters of benzene. When he accounted for the fact that the fuel oil is only 6% of the emulsion, Dr. Hennet conceded that it would require more than 2.22 **billion** (2,220,000,000) liters of blasting emulsion to create 3.89 liters of benzene. (Tr. 6603-04).[25]

To respond to Dr. Hennet's ungrounded assertions about the "possibility" that combustion of blasting emulsion in the Lake Belt could generate benzene, Defendant Intervenors called Dr. Oldrich Machacek to testify. Dr. Machacek holds a doctorate in blasting chemistry and has 40 years of experience in explosives and detonation chemistry. (Tr. 6962-63).

Dr. Machacek explained that the basic chemical reaction involved in detonation is quite different than the reaction involved in combustion described by Dr. Hennet. (Tr. 6970 ("There are substantial differences between – generally between combustion and detonation processes.")). Dr. Machacek testified that detonation involves pressures that are thousands of

---

[25] Even the 2.22 billion liters of blasting emulsion that Dr. Hennet testified to on cross-examination significantly underestimates how much blasting emulsion would have to be combusted to create the 3.89 liters of benzene currently in the groundwater around Production Well 1. That calculation assumes that **all** of the benzene generated in combustion is immediately dissolved in the groundwater. Dr. Hennet acknowledged that some of any benzene created during combustion would escape to the atmosphere, as opposed to being dissolved in the groundwater. (Tr. 6532). Dr. Machacek explained that the high pressure gases generated from the detonation of blasting emulsion break the rock and escape to the atmosphere; they do not become dissolved in the groundwater. (Tr. 6975-76, 7011- 13).

times higher than in combustion.  (*Compare* Tr. 6971 ("[C]ombustion is principally oxidation by oxygen from the air under conditions most of the time that is atmospheric or very low pressure, atmospheric pressure.") *with* Tr. 6972 ("Depending on specific formulation, the explosive emulsions, the pressure which they generate, is somewhere between 15 and 50 kilobars.  It means between 15 and 50,000 – 15,000 and 50,000 atmospheres, which is much, much higher than even any testing I review[ed] in Dr. Hennet testimony.")).  Dr. Machacek also explained that the oxygen in combustion comes from the air, while the oxygen in detonation comes from the ammonium nitrate in the emulsion, producing far more complete oxidation of any fuel and preventing the formation of benzene.  (Tr. 6975-77 (explaining that during **combustion**, formation of carbon monoxide and water vapor prevent the fuel from having access to oxygen in the air, meaning that the fuel is exposed to high temperatures and can result in "pyrolysis byproducts" like benzene, but during **detonation**, oxygen is provided by the ammonium nitrate oxidizer, and there is no opportunity for the fuel to undergo pyrolysis)).  Dr. Machacek testified that the type of pyrolysis reactions in combustion that can form benzene simply cannot occur during detonation.  (Tr. 6977 ("There is no space for like a pyrolysis for [detonation], especially in this particular location in Florida with emulsions.")).[26]

Dr. Machacek testified that benzene contamination is not, and has never been, considered a risk of the blasting or mining industries.  (Tr. 6978)  Moreover, EPA's sector notebooks for

---

[26]  Plaintiffs disparaged Dr. Machacek's testimony, asserting that he relied only on basic chemistry and his 40 years of experience with the chemical reactions involved in detonation, rather than technical studies or data, to dispute Dr. Hennet's testimony.  (Plf. Findings at 36).  But Plaintiffs complaints are misguided.  Dr. Machacek explained not only how the detonation and combustion reactions are different, but also why those differences prevent detonation of blasting emulsions from generating benzene.  (Tr. 6970-6977).  Unlike Dr. Hennet, Dr. Machacek testified based on his experience with the specific materials used and conditions found during blasting.  So, contrary to Plaintiffs' assertion that Dr. Machacek failed to explain why it is "impossible or even improbable that benzene will be produced" during detonation, (Plf. Findings at 36), Dr. Machacek did exactly that.

metal mining and non-metal mining do not indicate any concern by EPA with regard to groundwater contamination by benzene from blasting operations.  (Tr. 5340-41).[27]

Plaintiffs' assertion that "upon cross-examination, Dr. Machacek conceded that, even if benzene specifically has apparently not been monitored for or detected, blasting of ammonium nitrate-based agents was known to result in the formation of a variety of other hydrocarbons," (Plf. Findings at 36), is a complete misstatement of Dr. Machacek's testimony.  Nowhere does Dr. Machacek concede that any hydrocarbon other than methane is produced, let alone a "variety of other hydrocarbons."  (Tr. 7009).  And Dr. Machacek explained that while methane may be produced during detonation, higher order compounds, like naphthalene and benzene, cannot be produced during detonation.  (Tr. 7010-11).[28]  Dr. Machacek testified that tests had been performed over the years for the presence of organics like benzene after detonations, and none ever had been found.  (Tr. 7014-15).

Recognizing that this "combustion produces benzene" theory advanced by Dr. Hennet may in fact be irrelevant to detonation of blasting emulsions in the Lake Belt, Plaintiffs ask the Court to assume that the mining companies are the source of the benzene because "there is no viable alternative theory" for the source.  (Plf. Findings at 33).  In essence, Plaintiffs would have the Court reach a conclusion — based upon a few days of testimony — that none of the expert agencies have reached after many months of intense investigation.  Not only does this request

---

[27]  Sector notebooks are prepared by EPA and describe a particular industrial sector and identify the various types of wastes that are generated and the types of pollution problems that might originate from those types of operations.  (Tr. 5340-41).

[28]  As Dr. Machacek explained, data indicating that *methane* is produced from blasting emulsions is irrelevant to the question of whether *benzene* is produced.  Methane from detonation is produced in a very different way than methane from combustion.  (Tr. 7010-11).  Methane from *combustion* is produced in a pyrolysis reaction, which creates the possibility that higher order hydrocarbon compounds (like benzene) can be created.  (*Id.*)  Methane during *detonation* is produced by a chemical reaction under pressure, which is very different than pyrolysis, and cannot lead to higher order hydrocarbon formation.  (*Id.*)  Indeed, Plaintiffs' Exhibit 245, an EPA document identifying emission factors for compounds created during detonation of ammonium nitrate fuel oil explosives, confirms Dr. Machacek's explanation that methane is the only species of hydrocarbon produced during detonation, specifically stating that "[t]he factors apply to the chemical species, methane.  They do not represent volatile organic compounds (VOC) expressed as methane."  (Plf. Ex. 245 at Table 13.3-1 n. b).

28

turn the burden of proof on its head, it lacks any basis in the evidence.[29]  While it certainly is not Defendant Intervenors' burden to prove that mining is not the source of the benzene contamination in the Northwest Wellfield, the evidence demonstrates a number of alternative theories for the presence of benzene.

Dr. Stanley Feenstra, an expert in environmental chemistry, hydrogeology and groundwater contaminant fate and transport, testified that, if he were to go looking for the source, he would look for a distant gasoline spill to the southwest of PW-1.  (Tr. 5346).  Dr. Feenstra believes that the concentrations of benzene compared to the low concentrations of other contaminants found in the Northwest Wellfield suggests that the gasoline source is far enough away to allow the other components, which degrade at faster rates than benzene, to degrade more by the time they reach the Northwest Wellfield.  (Tr. 5346-48).[30]

Plaintiffs attacked Dr. Feenstra's suggestion that a distant gasoline spill could have resulted in the benzene found in the wellfield, with Dr. Hennet testifying that the presence of styrene is "remarkable as [an] indicator of combustion" and that styrene ruled out gasoline as a source because styrene is not a component of gasoline.  (Tr. 6492).  On cross examination, however, when presented with documentation indicating styrene in gasoline at concentrations up to 1% (10 times as high as the highest concentration of benzene in fuel oil that Dr. Hennet was able to find), Dr. Hennet was forced to acknowledge that styrene is also found in significant concentrations in gasoline.  (Def. Int. Exs. 174, 175; Tr. 6518, 6520).[31]  Dr. Hennet also testified,

---

[29]  In fact, Plaintiffs' argument ignores the conclusions of their own Dr. Papadopulos, whose testimony affirmatively rules out any mining area beyond the Northwest Wellfield's "limit of capture" as a source of benzene in the wellfield.  *See supra*, n.3.

[30]  Interestingly, Dr. Hennet testified that he does not believe a distant gasoline spill is the likely cause of the benzene, but he acknowledged that it is "possible."  This is exactly the same level of certainty he ascribed to his theory that benzene could be caused by blasting.  (Tr. 6627).

[31]  Plaintiffs make a similar assertion that the absence of MTBE (methyl tertiary butyl ether), a gasoline additive, in the Northwest Wellfield indicates that the benzene did not come from a gasoline spill.  (Plf. Findings at 33).  Plaintiffs ignore that MTBE has been found in the Northwest Wellfield.  MW-102D, which is 100 feet from Northwest Wellfield Production Well 1, had a benzene concentration at 19.7 ppb along with 14.8 ppb of MTBE and 233 ppb of acetone in February of 2005.  (Def. Int. Ex. 32; Tr. 2405-06).  Neither acetone nor MTBE is a constituent of diesel fuel or blasting emulsion.  (Tr. 2404-05 (Caveda)).  Ms. Caveda testified

(continued . . .)

and Plaintiffs asserted in their findings, that it would take a spill of 41,000 gallons of fuel to result in the 3.89 liters of benzene found in the Northwest Wellfield at concentrations of 28 parts per billion.  (Plf. Findings at 33).  Dr. Hennet's testimony, however, inexplicably took into account only the effects of biodegradation, and completely ignored the effects of other attenuation mechanisms that are critical to the evaluation of the fate and transport of contaminants in groundwater, such as dilution, adsorption, retardation, volatilization and dispersion.  (Plf. Ex. 224; Tr. 1346-47 (Pitt); Tr. 5291-93 (Feenstra)).  Because Dr. Hennet relied solely on biodegradation to reduce the concentration of benzene from a suspected spill, and ignored equally important processes such as dilution, dispersion and retardation that reduce concentrations without reducing the quantity of the contaminant in the aquifer, (Tr. 5292), he overestimated the size of the fuel spill required by 1,000 times.  In fact, taking into account *all* of the factors that go into calculation of fate and transport of contaminants, it would take only 41 gallons, not 41,000 gallons, of fuel spilled to result in the benzene found in the Northwest Wellfield.  (Tr. 5338-39).

In addition to the possibility that an undetected spill of as little as 41 gallons of gasoline could result in the benzene in the wellfield, there are numerous other potential sources of the benzene in the Northwest Wellfield.  According to DERM's 2000 "Northwest Wellfield Watershed Protection Plan" prepared for the South Florida Water Management District ("SFWMD"), unpermitted use of solvents and other chemicals "is probably the greatest potential threat to the Northwest Wellfield."  (Plf. Ex. 4 at 19).  The businesses clustered along NW 58th Street and NW 122nd Avenue "are especially problematic because of proximity."  (*Id.*).  In the Northwest Wellfield, "[t]here is ... a large tallow rendering plant that is grandfathered and permitted by DERM for fuel storage and truck fleet maintenance."  (*Id.*).  The correctional

---

(. . . continued)

that something other than diesel fuel had to have caused the benzene contamination at that time. (Def. Int. Ex. 32; Tr. 2405-06).  Plaintiffs also ignore that the absence of MTBE does not rule out gasoline as a source.  (Tr. 5374-75 (Feenstra); 6326 (Hennet)).

facility to the southwest of the wellfield has aboveground fuel storage tanks that have not been investigated as a possible source.  (Tr. 5354).

DERM's Watershed Protection Plan also explains that "illegal dumping of solid waste in remote areas is a constant problem throughout the county." (Plf. Ex. 4 at 20).  The Watershed Protection Plan documents numerous illegal waste dumping incidents in the Northwest Wellfield.  (*Id.* at 18, Fig. 8).  "The dumping cases plotted on Figure 8 under-represent the magnitude of illegal dumping in the area, because in many cases it is impossible to trace the piles of waste to the perpetrators." (*Id.* at 20).  Between 1990 and 2000, there were about 13 incidents (3.5% of the 370 incidents) of roadside dumping, which typically involved 55-gallon drums containing unknown materials, within the Northwest Wellfield study area. (*Id.* at 21).  White Rock's Jim Hurley testified that "there's a lot of illegal dumping that occurs … in those areas as well as "ATV traffic" and contractor's "access[ing] in and out of the FP&L right-of-way." (Tr. 5508).

DERM has tried to restrict uses inside the Northwest Wellfield, but preventing the establishment of illegal operations, identifying and stopping prohibited activities at existing operations, and closing down illegal operations has been an ongoing management problem.  (Plf. Ex. 4 at 44).  The entrance road to the Northwest Wellfield has a guarded gate, but the public can access the Northwest Wellfield to the north by ATVs or on foot since there are no roads and no gates to prevent access.  (Tr. 2373).[32]  Miami-Dade County has not ruled out unpermitted or unauthorized activities in and around the Northwest Wellfield as a potential source of the benzene contamination.  (*See* Tr. 2374-75).

---

[32]   Ana Caveda, one of Plaintiffs' witnesses, testified that she has seen people riding ATVs around the Northwest Wellfield.  (Tr. 2373).

> **b.      Regardless of its source, benzene contamination in the**
> **Northwest Wellfield poses no threat to public health.**

Benzene in the Northwest Wellfield does not now pose and never has posed a public health threat to the residents of Miami-Dade County. At all times, the water being delivered to the residents of Miami-Dade County has been safe to drink and has met all water quality standards. (Tr. 1326 (Pitt); Tr. 4710 (Mayorga); Plf.' Ex. 100; Def. Int. Ex. 13). To start with, the raw water ***coming into*** the Hialeah and Preston Water Treatment Plants has always been below the maximum contaminant levels for benzene in drinking water. (Tr. 1325 (Pitt); Tr. 2318 (Caveda); Tr. 4238 (Yoder); Tr. 4709-10 (Mayorga)). Moreover, before the raw water pumped from the Northwest Wellfield goes to residents of Miami-Dade County, it is treated. (Tr. 1525). Even if the water going into the treatment plants was not already below detection limits for benzene, the treatment plants are equipped with air stripping towers that can effectively treat levels of benzene many times higher than the highest levels ever detected in the Northwest Wellfield. (Def. Int. Ex. 14; Tr. 1528 (Brant); Tr. 4661 (Mayorga); Tr. 5235 (Espinosa)). Benzene has never been detected in the finished water going to the residents of Miami-Dade County.[33] (Tr. 1325-26 (Pitt); 1533 (Brant); 4710 (Mayorga); 5236 (Espinosa)).

Plaintiffs have failed to identify how they, or anyone else, has been harmed by the benzene in the Northwest Wellfield. They have not identified a single person who has been exposed to benzene contaminated water from the Northwest Wellfield nor have they shown that

---

[33]   Plaintiffs' claim that "witnesses" have testified there are private wells in the area that draw their water from the Northwest Wellfield is simply not supported by the evidence. (Plf. Findings at 35 ¶ 36). First, Bill Brant was the only witness to testify about this for Plaintiffs, and he merely said that it was "possible" there are private wells. When directly asked whether there are "other wells that would draw water from the Northwest Wellfield that wouldn't have the water treated by the Hialeah plant," Mr. Brant answered "no." (Tr. 1455-56). When then asked whether there were private wells in the vicinity, Mr. Brant answered that that he did not know. (Tr. 1456). On cross-examination, Mr. Brant also admitted that he did not know of any private drinking water wells in the Northwest Wellfield or in the vicinity of any areas where there have been detections of benzene. (Tr. 1520). Carlos Espinosa, the Acting Director of DERM, testified that, due to the wellfield protection program, residential areas have been kept out of the Northwest Wellfield area and there is not a problem associated with private drinking water wells. (Tr. 5136- 37).

there is any likelihood that anyone will be exposed to benzene contaminated water from the Northwest Wellfield at any time in the future.  This failure is significant: absent some allegation of harm to Plaintiffs or to their members from the threat of benzene contamination, the Court cannot grant equitable relief addressing it.[34]

### C.   Evidence Presented at the Hearing Regarding the Effects of Continued Mining During the Remand Period on Seepage From Everglades National Park.

The evidence presented at the hearing established that mining during the remand period would have a negligible impact on seepage.[35]  Moreover, the evidence demonstrated that any seepage from mining easily could be mitigated.

Testimony regarding seepage at the remedies hearing was provided by three witnesses. Testimony for Plaintiffs was provided by Mr. Kevin Kotun, a hydrologist at Everglades National Park.  (Tr. 1049).  Mr. Kotun was not testifying on behalf of Everglades National Park or the National Park Service, but rather was testifying about his "personal opinions as a private

---

[34]  Plaintiffs' generalized allegations of contamination or environmental harm are not sufficient to establish their standing to pursue equitable relief intended to prevent the potential threat of benzene contamination in the underground aquifer.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) ("[A] plaintiff must demonstrate standing separately for each form of relief sought."); *DaimlerChrysler Corp. v. Cuno*, 126 S. Ct. 1854, 1867 (2006) (same).  There is no evidence that benzene contamination in the groundwater under the Northwest Wellfield could possibly impact Plaintiffs or their members.  Benzene contamination in the groundwater does not implicate any aesthetic or recreational values (unlike the allegations that sufficed to establish standing in *Friends of the Earth*, where the challenged discharges "directly affected those affiants' recreational, aesthetic, and economic interests" and would plausibly "cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms," 528 U.S. at 184).  Benzene-contaminated water is not being pumped from the aquifer to consumers, all of the water from the Northwest Wellfield is treated at the Hialeah-Preston water treatment plant, which has equipment in place to treat the water and remove any benzene from it before pumping it to the residents of Miami-Dade County.  (Def. Int. Ex. 14; Tr. 1528 (Brant); Tr. 4661 (Mayorga); Tr. 5235 (Espinosa)).  Because benzene contamination would not result in concrete, non-speculative injury to Plaintiffs, they have not established standing to seek equitable relief to address it.

[35]  Groundwater seepage is a natural phenomenon that refers to groundwater moving downhill— *i.e.*, from an area of higher groundwater elevation towards an area of lower groundwater elevation.  (Tr. 4844-45).  Seepage from Everglades National Park toward the east and South Florida's urbanized coastline would occur with or without mining in the Lake Belt.  (Tr. 1113-14).

citizen." (Tr. 1143). Mr. Kotun is not a licensed professional engineer or professional geologist, and holds neither a masters degree nor a doctorate degree. (Tr. 1057).

Col. Terry Rice, Ph.D. (ret.) and Dr. Richard Punnett provided testimony regarding seepage on behalf of the Defendant Intervenors. Col. Rice has been intimately familiar with the water management systems of South Florida since 1994, when he was appointed Commander of the Jacksonville District of the Army Corps of Engineers and thereby became responsible for operation of the Central and South Florida Project for Flood Control and Other Purposes ("CNSF Project"). (Tr. 4841-42; Def. Int. Ex. 109). He has a Ph.D. in water resource engineering and hydraulics, (Tr. 4835), and is a professional engineer. (Tr. 4836). Col. Rice has received a number of awards for his leadership in Everglades restoration and received the Jim Webb Service Award from the Everglades Coalition. (*Id.*).

Dr. Richard Punnett has a doctorate in the soil and water specialty of agricultural engineering, (Tr. 3657-58), and worked for 24 years as a specialist in water quality modeling, water routing, hydrology and hydraulics for the Corps. (Tr. 3658-59). For ten years, from 1993-2003, Dr. Punnett developed the hydrogeologic models used to understand the water-related restoration options for the CERP. (Tr. 3659). For the past seven years, Dr. Punnett has been the lead modeler on the Interim Structural and Operation Plan, the Interim Operation Plan, and the Combined Structural and Operation Plan ("CSOP"), all of which are water management plans for Miami-Dade County. (Tr. 3667-69). Each of those critical CERP components address water levels in the water conservation areas and Everglades National Park and the effect of seepage on the Everglades. (Tr. 3668).

At the hearing, Mr. Kotun testified that he participated in drafting and submitting comments to a letter from the Everglades National Park to the Corps in 2001 that was critical of the Corps' plan to issue a permit to Kendall Properties to mine land within 2000 feet of the L-31N canal – a canal that lies between Everglades National Park and the Kendall Properties lake excavation south of Tamiami Trail. (Tr. 1061-62, 1063-64; Plf. Ex. 71). Mr. Kotun, however, had not even seen the permit that was issued in 2002, and was not aware that the Corps had

addressed the Park's concerns by inclusion of permit conditions in the 2002 permits regarding hydrologic modeling, mitigation, and review.   (Tr. 1111-13; Plf. Ex. 72 at 8-10 (Kendall Properties permit, Special Condition 3); Def. Int. Ex. 53K).[36]  Mr. Kotun also conceded on cross examination that, after the Corps included the special conditions in the Kendall Properties permit regarding seepage, Everglades National Park did not object to the issuance of the permits for any of the Lake Belt mining sites.   (Tr. 1113).   Further, Mr. Kotun said that even his personal concerns about seepage caused by the Kendall Properties permit (to the extent those are even relevant) would be alleviated if the mitigation in the 2002 permit made up for any seepage loss. (Tr. 1141-42).[37]

Despite the fact that Mr. Kotun had not seen the permits issued in 2002, he testified that he believed the Corps modified the Kendall Properties permit in 2006 to allow for more mining and for mining closer to the L-31N canal.  (Tr. 1071).  Apparently relying on that testimony in their Proposed Findings, Plaintiffs argued that the Kendall Properties permit originally contained a restriction on mining within 2000 feet of the L-31N canal, but that restriction was removed "without explanation" by the Federal Defendants in 2006.  (Plf. Findings at 40).  In fact, Mr. Kotun's testimony directly contradicts the argument made by Plaintiffs; he confirmed on cross examination that the original permits issued by the Corps in 2002 authorized mining within 2000 feet of the L-31N canal.  (Tr. 1064-66; *see also* Plf. Ex. 72 at 10 (permitting mining within 2000

---

[36]   The Corps addressed the comments from the Park in its ROD.  *See* Def. Int. Ex. 53K, AR #1028, which specifically references, at page 24, an "undated letter received [from the ENP] on 8 May 2001," the same letter about which Mr. Kotun testified.  The ROD confirms that the Park's concerns were addressed: "The effects of the mining on ENP and the relationship to the CERP have been coordinated with the Department of Interior and are discussed within  [the ROD] in 8.b.(1)."  (Int. Def. Ex. 53K at 102).

[37]   Plaintiffs assert in their Proposed Findings that "at least 13,000 acre feet of water from the regional system would be needed to make up the seepage loss from simply the mining that is authorized adjacent to the Park, south of Tamiami Trail, pursuant to the permit issued to Kendall Properties."  (Plf. Findings at 39).  The testimony adduced at the hearing, however, demonstrated that this estimate, which was part of the original Environmental Impact Statement, addressed scenarios involving proposed seepage mitigation structures upstream on the L-31N canal that have not been built, and is not intended to reflect the current or anticipated impact of mining under the Kendall Properties permit.  (Tr. 4883).

feet of the L-31N canal during the 10-year permit period)).  On cross examination, Dr. Kotun conceded that it is "probably the case" that the modification did not change the permitted mining area.  (Tr. at 1118-20).[38]

Mr. Kotun testified generally that, based on his review of seepage modeling efforts undertaken as part of the Environmental Impact Statement, seepage from mining could be a problem in the Lake Belt.  (Tr. 1088-89).[39]  But on cross examination, Mr. Kotun admitted that he did not know how much mining would take place under any of the permits during the remand period, (Tr. 1107), and conceded that none of the modeling results that he reviewed simulated the amount of mining expected during the remand.  (Tr. 1109).  He agreed that if mining during the remand period only impacted 500-1,200 acres in the Lake Belt instead of the 7,349 acres modeled in the Environmental Impact Statement ("EIS"), the modeling results in the EIS that he relied on would have to be extrapolated downward.  (Tr. 1107-09).  Mr. Kotun testified that, under that scenario, the expected seepage impacts from mining would be from less than one-tenth to one-sixth of the impacts modeled in the EIS and which he used in his testimony.  (Tr. 1109).

Mr. Kotun made no effort to independently model the seepage impacts associated with continued mining during the remand period.  (*Id.*).  He could not testify about any increase in volume or rate of seepage associated with continued mining during the remand period.  (Tr. 1114).  And in the end, he agreed that any increase in seepage north of the Tamiami Trail would be "modest" and would "not imperil any vital resource," and he conceded that "seepage

[38]  The "permit modification" that Plaintiffs are referring to in 2006 had to do with protection of archaeological resources and the consistency of the drawings used across the Lake Belt permits, and did not expand the area allowed to be mined.  (Plf. Ex. 73 at 1).  The 2006 modification for Kendall Properties expressly states that "the overall permitted acreage for fill has not expanded beyond that originally authorized."  (*Id.*).

[39]  Mr. Kotun confirmed that the modeling undertaken in the EIS was appropriate to evaluate seepage associated with mining in the Lake Belt.  (Tr. 1106-07).  He testified that the models were used appropriately, and constitute a reasonable estimate of the conditions simulated.  (*Id.*) Mr. Kotun only took issue with the decision made by the Corps based on that modeling.  As noted above, where the Corps has engaged in an appropriate analysis of an issue, the substantive decisionmaking of the agency should not be disturbed.

management is not expected to be an issue until the mining proceeds outside the ten-year footprint when impacts move closer to the Everglades." (Tr. 1115).  Regarding seepage south of Tamiami Trail, Mr. Kotun conceded that he had made no effort to quantify the impacts of seepage on Everglades National Park, (Tr. 1140), nor could he identify any specific area of the Park that had been adversely affected by seepage from rock mining.  (Tr. 1140-41).

Col. Rice focused his testimony on the area south of the Tamiami Trail, where Kendall Properties is located.  He testified that significant seepage impacts to the Everglades National Park south of the Tamiami Trail have been caused by construction of the L-31 North Levee and Canal adjacent to what is now the eastern border of the Park.  (Tr. 4848-49).  The levee caused groundwater elevation in the Park to increase, which in turn caused seepage into the adjacent canal.  (Tr. 4848-49, 4878).[40]  Approximately 135 cubic feet per second of seepage comes from Everglades National Park; the primary sources of that seepage are operation of the levee and canal and wellfields.  (Tr. 4851, 4878).  In contrast, as shown by the groundwater modeling performed specifically for the Kendall Properties site in the EIS, the results of which are contained in Appendix A to the EIS, and also are shown in Plaintiffs Exhibit 74 starting at page 230, **all** of the mining operations at the Kendall quarry to date have resulted in no more than four cubic feet per second of seepage from the Park.  (Tr. 4865-68).  Col. Rice testified that the amount of seepage from operations on the Kendall Properties site are "de minimis."  (Tr. 4850-51; 4866-67; *see also* Def. Int. Ex. 53K ("the effect [of mining south of the Tamiami Trail] on hydropattern within the ENP is minimal")).

The same modeling also shows that mining during the remand period would add approximately 1.6 cubic feet per second of seepage during the wet season—less than one percent of the seepage from the L-31N levee and canal.  (Tr. 4867-68).  Col. Rice concluded that the

---

[40]   As Col. Rice also explained, seepage is not necessarily harmful.  For example, seepage protects aquifers from salt water intrusion and moves fresh water into Biscayne Bay, and the movement of the water through limestone has a cleansing effect, particularly as to phosphorus reduction.  (Tr. 4846).  Thus, the goal is to manage seepage, not eliminate it.  (Tr. 4847).

modeling demonstrates that any seepage impact from the Kendall Properties site as a result of continued mining during the remand period would be "background noise," (Tr. 4868), "de mimimis," (*id.*), or "miniscule." (Tr. 4885).[41]  As far as impact on the ground in the Everglades, Col. Rice testified that the amount of seepage expected from continued mining at the Kendall Properties site would be imperceptible in the Park – measured, if at all, in "fractions of inches" in water elevation. (Tr. 4871).[42]

Dr. Punnett testified about seepage both north and south of Tamiami Trail, reviewing the most recent South Florida Water Management Model and the USGS MODFLOW model to determine the amount of seepage that could be attributable to mining in the Lake Belt during the

---

[41]  Col. Rice did not base his testimony simply on the EIS modeling. He also testified that since the modeling undertaken in the EIS, the eastern boundary of the Everglades National Park has "probably been modeled more than any area in the entire system." (Tr. 4869-70). Dr. Rice testified that the EIS modeling demonstrating *de minimis* seepage from mining at the Kendall Properties site is consistent with the 1998 modeling runs performed for the Cape Sable Seaside Sparrow, the 2000 modeling done for the eight and one half square mile area, and the recent CSOP modeling testified about by Dr. Punnett. (*Id.*) Plaintiffs' suggestion that seepage has been insufficiently addressed is simply wrong.

[42]  Notwithstanding the de minimis nature of seepage from the Kendall Properties site, the Corps imposed as a permit condition applicable only to Kendall a fee per ton on all limerock mined from certain locations on Kendall's property. (Plfs. Ex. 72, pp.9-10; Tr. 4873-75). The fee is being used to establish a mitigation trust fund to compensate for all seepage associated with Kendall's mining operations. (*Id.*) The amount of the trust fund was calculated so that it would be sufficient to pay for a water control structure that would keep more water in Everglades National Park than would be lost by seepage associated with Kendall's mining operations. (Tr. 4872- 73). With the realignment of the L-31 North Canal and Levee as planned under the CERP, it would no longer be necessary or even appropriate to construct such a seepage control structure, and so the fund instead will ultimately be used to help pay for the CERP project. (Tr. 4873-75). Plaintiffs criticize the mitigation fee, not because it would have been insufficient to build the seepage mitigation structure required to compensate for any seepage caused by mining at the Kendall Properties site, but because that fund may not be sufficient to pay for seepage control measures in the CERP that address region-wide seepage (rather than seepage resulting from the Kendall Properties site). (Plf. Findings at 40, n.38). Plaintiffs suggest that it would be "perverse for the federal government to be authorizing activities that will harm water flows in the Everglades at all, and which will cost unknown sums to correct, when it is spending immense sums to restore this national treasure." (*Id.*) Plaintiffs completely ignore that seepage mitigation would be a necessary part of the CERP even absent mining. Plaintiffs' own witnesses testified that seepage from the Everglades would occur even in the absence of any mining in the Lake Belt, (Tr. 1113-14), and that the restoration of water levels in the Park under the CERP would *increase* seepage from Everglades National Park, rather than decrease seepage, regardless of whether mining was permitted in the Lake Belt. (Tr. 1114, 1144-45; *see also* Tr. 3849-50, 4868, 4925). The evidence demonstrated that continued mining in the Lake Belt during the remand period is "not at all" inconsistent with the CERP. (Tr. 3733).

remand period.  (Tr. 3692-93).[43]  Regarding the area north of the Tamiami Trail, he testified that the current rate of seepage to the Lake Belt from Water Conservation Area 3[44] is approximately 532,000 acre feet per year.  (Tr. 3687-88).  In contrast, he calculated that mining in the Lake Belt would result in a potential increase in seepage of 600 acre feet per year.  (Tr. 3696-97; *see also* Def. Int. Ex. 53).  Dr. Punnett described the potential impact of an additional 600 acre feet of seepage north of the Tamiami Trail on the hydroperiods in Water Conservation Area 3 as "negligible," (Tr. 3703), and calculated that it would affect water levels in the Pennsuco by no more than 1/100th of a foot.  (Tr. 3709-10).  Moreover, Dr. Punnett testified that mining north of the Tamiami Trail has ***no impact whatsoever*** on seepage from Everglades National Park.  (Tr. 3724).[45]

Regarding the area at issue south of the Tamiami Trail, Dr. Punnett testified that the current rate of seepage is 193,000 acre feet per year.  (Tr. 3688).  An additional 219,000 acre-feet of water per year flow out of the portion of the L-31N canal located (as noted above) adjacent to the mining area south of the Tamiami Trail.  (Tr. 3721-22; *see also* Def. Int. Exs. 57, 58).  Based on his calculations, Dr. Punnett concluded that mining during the remand period south of Tamiami Trail would result in a potential increase in seepage of 1,400 acre feet per year.  (Tr. 3715; *see also* Def. Int. Ex. 57).[46]

Dr. Punnett testified about the relative insignificance of this seepage expected from mining south of the Tamiami Trail during the remand period:

---

[43]  All of the witnesses at the hearing recognized those models as appropriate to use to develop estimates of seepage from mining in the Lake Belt. (Tr. 1106 (Kotun), 3691-93 (Punnett), 4868 (Rice)).

[44]  Water Conservation Areas, or WCAs, are areas of the historic Everglades set aside to manage water flows into Everglades National Park.  WCA 3A and WCA 3B are located immediately to the west of the Lake Belt and Pennsuco.

[45]  All of the permits at issue in this litigation involve mining areas north of the Tamiami Trail with the exception of the Kendall Properties permit.

[46]  In his testimony, Col. Rice noted that Dr. Punnett's calculations of seepage for the area south of the Tamiami Trail using the most recent models of Everglades hydrology reinforced his conclusions and the modeling done in the EIS.  (Tr. 4869-70; 4885).

> Q:  Okay.  Why is it relevant to show the remand period incremental seepage compared to the structural inflows and outflows in the canal?

> A:  There's a lot of water going into the canal, coming out of the canal, and all those affect seepage rates.  And what it shows you here is that there's a lot of water being moved in and out of that canal.  An additional 1400 acre feet a year is just background noise to the amount of water that's actually moving in and out and the seepage and the numbers of things going on in that area.

(Tr. 3723; *see also* Def. Int. Ex. 54 ("[O]perations of the L-31N canal have the dominant impact on seepage from Everglades National Park, additional mining east of the canal had a small, but measurable, effect."); Plf. Ex. 74A, Hydrologic Analysis of Limestone Mining South of Tamiami Trail Between Krome Avenue and the L-31N Canal at 2 ("Based on the model results, increasing the size of the existing quarries in sections 24 and 25 within the areas analyzed for this report ***would have virtually no impact on seepage*** from the west under most conditions and only minimal effect (less than 2.0%) during very dry conditions." (emphasis added)).[47]

As noted above, the evidence demonstrates that the effects of seepage on Everglades National Park from continued mining in the Lake Belt during the remand period would be infinitesimally small.[48]   While Mr. Kotun testified that it was his belief that losing any water from the system could be "significant" as a water supply matter, (Tr. 1145-46; *see also* Plf. Findings at 39), Col. Rice noted that even a loss of 13,000 acre feet to seepage easily could be

---

[47]   Plaintiffs take issue with Dr. Punnett's comparison of the amount of incremental seepage caused by mining to the amount of total seepage, asserting that it is "simplistic" and "misleading."  (Plf. Findings at 41-42).  Plaintiffs claim that, because not all seepage is a problem, the amount of seepage caused by mining should only be compared to the increment of seepage that is problematic.  Such a comparison, Plaintiffs contend, would show that mining-induced seepage is a significantly larger fraction of "problematic" seepage.  (*Id.*)  Not only does Plaintiffs' argument conflict with the testimony of their own witness, Mr. Kotun, who asserted that he believed all seepage was bad, (Tr. 1140), but no witness testified that "beneficial" and "problematic" seepage could be distinguished, and no witness testified about what percentage of the total seepage is problematic.  Plaintiffs' criticism is itself over simplistic, and ignores the fact that the modeling shows that seepage resulting from increased mining lake acreage is in fact beneficial to water supply deliveries to the Northwest Wellfield.  (Tr. 3707- 09).  Additional mining lake acreage reduces the amount of water required to be taken from the Water Conservation Areas through surface water deliveries, a result confirmed by modeling in the EIS. (*Id.*).

[48]   Mining in the areas north of Tamiami Trail would have ***no*** impact on Everglades National Park.  (Tr. 3724).

replaced: "a lot of the modeling that we've looked at already shows that we are throwing out to tide, getting rid of 675,000-acre feet a year of water....  So there's a lot of water in the system that we could utilize."  (Tr. 4883-84).  Similarly, while Mr. Kotun asserted without support that any seepage from Everglades National Park has a negative impact, (Tr. 1140), Col. Rice testified that "you would not be able to see any impact," and that he has "seen no evidence from anybody else that's looked at that that would indicate that there would be any issue" with the "fractions of inches" of impacts on hydrology like those expected from mining during the remand period.  (Tr. 4871).[49]

Finally, all witnesses agreed that any seepage from continued mining could be managed and mitigated.  (Tr. 3738-39 (Punnett) (there are several alternatives that can be used to manage seepage); Tr. 1116-17 (Kotun) (mitigation measures such as backpumping to offset any incremental increase in seepage are feasible); Plf. Ex. 162 at 33-62 ("Seepage Management," Report by Technical Advisory Committee, September 1997, identifying potential seepage control measures)).

### D. Evidence Presented at the Hearing Regarding the Effects of Continued Mining During the Remand Period on Wetlands.

The evidence presented at the hearing established that mining in the Lake Belt avoids the most valuable wetlands in the area, the Pennsuco wetlands, in favor of lower quality wetlands. The evidence demonstrated that the functions and values of any wetlands that would be lost to continued mining during the remand period will be compensated for by the mitigation plan currently in place.  Each of the witnesses at the hearing testified that mitigation can compensate for any wetlands lost in the Lake Belt due to continued mining during the remand period.  And

---

[49]  Mr. Kotun's bare assertion that any seepage is harmful was not supported by any analysis:  he could not quantify any adverse impact, he knows of no studies that describe any such impact, and he cannot identify any area in the Everglades that has been adversely affected by rock mining. (Tr. 1140-41).

each of the witnesses who testified regarding wetland impacts testified that areas that have been cleared and demucked can be restored.

Two witnesses testified at the hearing about the value of wetlands in the Lake Belt: Nancy O'Hare and Dr. Thomas Lodge.  Ms. O'Hare's testimony was largely based on her participation in a study in 1996 that collected data concerning wildlife and plant cover types in the Lake Belt area.  (*See* Plf. Ex. 46; Tr. 565-566).  As set forth below, Ms. O'Hare testified that the recommendations she made as a result of that study were largely incorporated into the Lake Belt Plan.

Ms. O'Hare offered no opinion about the functions and values of wetlands in the areas to be mined during the remand period, or about the ecological impacts of mining in those specific wetlands.  (Tr. 733, 739).  Ms. O'Hare testified that she did not perform a functional assessment of the wetlands on the permit sites using any of the methodologies approved by any of the state or federal wetland regulatory agencies.   (Tr. 747-48).   Further, Ms. O'Hare was not "comfortable" offering an opinion on the effects of mining during the remand because she did not know where the mining was taking place.  (Tr. 739).

Instead of testifying about the specific functions and values of the areas to be mined, Ms. O'Hare testified *generally* regarding wildlife use of different cover types in the Lake Belt, such as melaleuca.[50]   Ms. O'Hare agreed that different wetlands have different functional values – some very high and some very low.  (Tr. 704-05).  She further agreed that dense melaleuca areas have very low wetland values.  (Tr. 711).  Indeed, in her 1995 Wildlife Study, Ms. O'Hare and her partner gave dense melaleuca the lowest value scores.   (*Id.*).   Consistent with the

---

[50]  Plaintiffs' reference to Ms. O'Hare's testimony that melaleuca-infested areas have "very high levels of species diversity," Plaintiffs' Findings, at 52, ignores the fact that much of that diversity comes from the presence of upland species (such as raccoons and feral dogs).  (Tr. 592-93; Tr. 3967-69, 4133-34). The presence of upland species does not indicate that melaleuca-infested wetlands have high wetland value.  Ms. O'Hare also admitted that the replacement of native vegetation by melaleuca is undesirable, (Tr. 697-98), that with a high melaleuca density, species abundance decreases, (Tr. 699), and that it is preferable to mine areas where there is dense melaleuca.  (Tr. 715).

recommendations in her study, Ms. O'Hare agreed during cross-examination that mining should occur in regions with dense melaleuca, such as the bulk of the areas to be mined during remand, rather than in regions with lower concentrations of melaleuca.  (Tr. 715).[51]  She further agreed that, consistent with the recommendations in her study, future mining would occur primarily in areas with poor wetland values, such as pasture in the northern area of the Lake Belt, (Tr. 738), and dense melaleuca in the central Lake Belt, (Tr. 738).

Ms. O'Hare testified that her study recommended no mining in the Pennsuco.  (Tr. 716). She also testified that most of the areas within the Lake Belt that were less than 10% melaleuca were located in the Pennsuco.  (Tr. 584).  Ms. O'Hare further testified that, consistent with the current mitigation plan, melaleuca should be removed from the Pennsuco in order to prevent habitat degradation.  (Tr. 716).  And that is precisely what is occurring under the existing mitigation plan.  While Ms. O'Hare did not engage in the analysis necessary to compare wetland impacts to mitigation, she accepted mitigation as a valid and necessary regulatory tool for replacement of habitat values that are lost when land is developed.  (Tr. 702).

Dr. Thomas Lodge is a Ph.D. biologist who has published a textbook on the ecology of the Everglades.  (Tr. 3932, 3940-41; Def. Int. Ex. 60 (textbook)).  Dr. Lodge has substantial expertise in the evaluation and restoration of wetland values and functions, (Tr. 3931, 3936-39), and has served on governmental technical committees concerning the value of melaleuca-infested wetlands.  (Tr. 3962-63).[52]  He testified that most of urbanized Miami-Dade and Broward Counties originally were part of the Everglades, but were separated by flood control levees decades ago.  (Tr. 3952-58).  Dr. Lodge explained how the flood control activities have reduced the hydroperiods in the Lake Belt area, (Tr. 3960-61), which has changed the soils, (Tr.

---

[51]   In fact, the O'Hare report to which Plaintiffs refer made specific recommendations on where mining should take place, basically recommending that it occur first in areas with highest melaleuca density and otherwise be "compartmentalized into certain areas."  (Tr. 715-716).

[52]   Plaintiffs' characterization of Dr. Lodge as simply "a paid consultant for various extractive industries," (Plf. Findings at 58), ignores the fact that Dr. Lodge has worked with a wide variety of interests, including government agencies and environmental groups.  (Tr. 3943-44).

3960-61), and diminished the number and size of fish that would be available as prey for bird species, (Tr. 3996-98). Dr. Lodge further testified that the spread of melaleuca in the Lake Belt has degraded remaining wetlands, obstructed foraging by wading birds, (Tr. 3962), and impeded the growth of periphyton algae. (Tr. 3967). Given that most of the mining areas in the current permits are covered with dense melaleuca, (Tr. 4027, 4051-52), Dr. Lodge testified that mining during the remand period would not destroy any unique or irreplaceable wetlands, (Tr. 4102-03, 4111), and that ongoing mitigation in the Pennsuco will offset any loss in wetland functions and values, (Tr. 4103).[53]

There also was testimony from two government officials concerning ongoing wetland mitigation efforts in the Lake Belt. John Studt, the Corps official in charge of the limestone mining permits, described how wetland mitigation is being accomplished in the Lake Belt. In particular, Mr. Studt testified that wetland impacts are mitigated on the basis of their functions and value. (Tr. 2794-95).[54] He also testified that the State of Florida uses funds generated from

_____

[53] Dr. Lodge's conclusions about the quality of the wetlands that were within the area expected to be mined during the remand period were confirmed by other evidence presented at the hearing. (*See, e.g.,* Tr. 4960 (areas that remain to be mined under the Tarmac permit are either already prepared for mining or are dense melaleuca); Tr. 5771 (vegetation around the Rinker Materials FEC quarry is dense melaleuca); Tr. 5774 (dense melaleuca observed at the Rinker Materials SCL quarry); Tr. 5499-5500 (area around White Rock Main is not wetlands, but rather has been pastureland since the 1960s); Def. Int. Ex. 159 at 18-19 (area remaining to be mined at Sawgrass quarry already is cleared and/or demucked)).

[54] Plaintiffs devote a significant portion of their findings to asserting that the mitigation plan and mitigation fee schedule currently contained in the Lake Belt permits is insufficient to compensate for wetlands impacted by mining. (Plf. Findings at 45-50). Not only is the sufficiency of the mitigation irrelevant for the purposes of determining equitable relief (after all, the mitigation plan can easily be modified if necessary to address any shortfall in mitigation due to mining during the remand period), but Plaintiffs have also entirely mischaracterized the nature of the mitigation requirement in the existing permits. The Corps permits employ the concept of ecological lift, rather than a strict mitigation ratio, to mitigate for wetlands impacts from mining. (*See, e.g.*, Int. Def. Ex. 97 at 4-8; Tr. 2493-94 (Mr. Studt describing the mitigation requirements)). If, during the life of the permit, the Corps determines that the ecological lift provided by mitigation will be less than the ecological loss associated with mining, the permittees are required to implement a modified mitigation plan to make up for any shortfall. (Int. Def. Ex. 97 at 7 (Special Condition 2.d.) ("If this office determines at the periodic review date that, based on these reports, the sum projected cumulative units of ecological lift will be less than the sum projected units of loss at the expiration of the Lake Belt mining permits (or extensions), then Permittees will implement a plan acceptable to this office for the appropriate modification to the Lake Belt permits.")). And, although Plaintiffs assert that the mining
(continued . . .)

44

a mitigation fee on limestone to acquire, restore, and maintain wetlands in the Pennsuco.[55]  (Tr. 2523-25).  Mr. Studt, who sits on the Lake Belt Mitigation Committee, (Tr. 2523), testified that the mining permittees currently are ahead of schedule on mitigation, (Tr. 2526-27), that the Florida Legislature significantly increased the mitigation fees in 2006,[56] (Tr. 2811), and that there will be sufficient mitigation during the remand period.  (Tr. 2811-12).  Despite the adequacy of mitigation, Mr. Studt testified that the Corps would continue to review and adjust the mitigation in order to improve mitigation success.  (Tr. 2524).

Also testifying on the mitigation process was Janet Llewellyn, a DEP official.  Ms. Llewellyn, who has spent decades in the field of environmental regulation and wetland impacts, testified that she participated in the planning processes that resulted in the Lake Belt Plan.  (Tr.

---

(. . . continued)
companies are not required to sell their lands in the Pennsuco for mitigation even at fair market value, (Plf. Findings at 49), the Corps permits specifically provide that any refusal to sell land in the Pennsuco for fair market value by any mining company triggers a review of the entire mitigation plan and potential modification of the permits.  (Int. Def. Ex. 97 at 8 (Special Condition 2.e.) ("The Permittee acknowledges that if any Permittee with lands in the Pennsuco are for any reason unwilling to reach an agreement to sell its land when made an offer by the SFWMD, other than a disagreement as to whether the offer represents fair market value, that this refusal would trigger a review of the Mitigation Plan by this office, with comments from the U.S. EPA and the U.S.  FWS for the purpose of determining whether a modification to the permit is required.")).  Plaintiffs' arguments that the sufficiency of the 2.5:1 mitigation ratio and the absence of any requirement to sell Pennsuco land are deficiencies in the permits are just flatly inaccurate.  (Tr. 2526-27).  The existing permits already have special conditions that address mitigation sufficiency and the refusal to sell Pennsuco property, and Plaintiffs' repeated assertions to the contrary are misleading.

[55] The record shows that 3,375 acres of publicly-owned wetlands in the Pennsuco were restored using Lake Belt mitigation fees.  (Plf. Ex. 16, at 2, 6).  Although Plaintiffs assert that the Corps assumed when it issued the permits that mitigation would only be accomplished through the purchase of new wetlands, (Plf. Findings at 46), that assertion is simply incorrect.  The Record of Decision specifically indicates that mitigation can be accomplished through restoring wetlands already in government ownership (referred to as "expedited mitigation"), A.R. 1028, at 61-62, Table F7, Pfs. Ex. 153 at 5-7 (LB Mitig. Committee 2003 Annual Report), Plf's. Ex. 152 at 7 (LB Mitig. Committee 2005 Annual Report), as well as through new acquisition of privately-owned wetlands.  Plaintiffs' assertion that restoration of existing publicly-owned lands was approved only "following the approval of the ROD and permits at issue in this case," (Plf Findings at 47), flies in the face of the evidence.

[56] The record shows that the fee will be increased significantly as a result of the new legislation, from approximately $0.07/ton in 2006 to $0.12/ton in 2007, $0.18/ton in 2008, and $0.24/ton in 2009.  (Def. Int. Ex. 21 (Notice of Legislative Development)).

3207-09, 3211-12).  Through that planning process, mining activities were directed away from the Pennsuco wetlands which have higher ecological value and into melaleuca-infested wetlands further to the east that have lower ecological value.[57]  (Tr.  3214, 3219).  Ms. Llewellyn further testified that government agencies were able to acquire valuable wetlands in the Pennsuco as a result of the Lake Belt Plan, (Tr.  3248-49), that initial stages of mining have been in areas with low wetland values and functions, (Tr. 3216-17), and that there has been more wetland mitigation than impacts to date in the Lake Belt, (Tr. 3249-50).  Contrary to Plaintiffs' unfounded assertions, this planning process accomplished exactly the goals of the Corps' permitting process by engaging in minimization, avoidance, and mitigation on a regional scale where there would be maximum environmental benefits.

Finally, the evidence overwhelmingly establishes that any impacts to wetland functions and values will be adequately mitigated.  Dr. Lodge, Mr. Studt, and Ms. Llewellyn agreed that the loss of wetland functions and values in the Lake Belt can be mitigated, and Ms. O'Hare did not disagree.  (Tr. 4053-54 (Lodge); Tr. 2582, 2585 (Studt); Tr. 3221-22 (Llewellyn); *see also* Tr. 612).  And all witnesses testified that restoration of wetlands that have been devegetated and demucked in preparation for mining was possible.  (Tr. 612 (O'Hare); Tr. 3972-74, 4100 (Lodge); Tr. 2634, 2860-63 (Studt)).[58]  The only two witnesses who testified about the sufficiency of mitigation, Mr. Studt and Ms. Llewellyn, agreed that mitigation is ahead of schedule.  (Tr. 2526-27, 2581, 2796 (Studt); Tr. 3249-50 (Llewellyn)).[59]  Those same witnesses

---

[57] Most of Plaintiffs' Proposed Findings on wetlands consist of arguments about the nature of the permitting process that will be readdressed by the Corps during the course of the remand. Plaintiffs' assertion that the Corps did nothing to avoid and minimize wetland impacts in the Lake Belt is refuted by the testimony of Ms. Llewellyn, who explained that the Lake Belt Plan avoided impacts to the best wetlands in the area – the Pennsuco – by permitting mining only in lower value wetlands and using the mining activities to fund acquisition and restoration of high quality wetlands.  (Tr.  3216-17, 1319).

[58]  Even where a mining lake has been excavated to a depth of 60 feet, it is possible to restore that lake to wetlands.  (Tr. 2634).  Plaintiffs themselves acknowledge that wetlands can be restored in their proposed findings.  (Plf. Findings at 43).

[59]  Plaintiffs claim that only 48 acres in the Pennsuco were acquired in a way that qualifies as mitigation.  Plaintiffs' Findings, at 46.  The evidence, however, indicates that 936 acres of mitigation were acquired through 2005.  Fed. Def. Ex. 4, at 8.  The assertion that most of those

(continued . . .)

further testified that there will be sufficient mitigation of wetland values and functions to offset any adverse wetland impacts during remand.  (Tr. 2811-12 (Studt); Tr. 3221-22 (Llewellyn)).[60]

   E.   **Evidence Presented at the Hearing Regarding the Effects of Continued Mining During the Remand Period on the Wood Stork.**

       The evidence at the hearing demonstrated that no areas in the Lake Belt where mining will take place during the remand are valuable foraging habitat for the wood stork.  The evidence further demonstrated that the Lake Belt wetlands in the mining areas are melaleuca-infested and isolated from longer hydroperiod wetlands, making them unsuitable for wood stork foraging.

       Testimony relating to wood storks was provided by six witnesses.  Testimony on behalf of Plaintiffs was provided by Nancy O'Hare and Dr. Dale Gawlik.  Testimony on behalf of the Federal Defendants was provided by Mr. Paul Souza and Mr. John Studt.  Testimony on behalf of the Defendant Intervenors related to wood storks was provided by Mr. John Ogden and Dr. Thomas Lodge.

       The crux of Plaintiffs' wood stork testimony was provided by Dr. Gawlik.[61]  He testified that wood storks are selective feeders and require open vegetative cover and certain threshold prey size and density to successfully forage.  (Tr. 850-51)  He also testified that adequate prey size and density can be found in different areas of the wood storks' foraging range at different times of year when those areas begin to dry out.  (*Id.*).  He analogized this phenomenon to a

---

(. . . continued)
acres should not count as mitigation because they were acquired by land exchange is a fabrication of Plaintiffs' counsel, and has no support in the evidence.  Property is still "acquired" through a land exchange; it provides a vehicle for government agencies to acquire land in the Pennsuco owned by the mining companies, and mining companies cannot mine land acquired from the state without additional permits that have not yet been issued.  (Tr. 2788).  Moreover, the Florida Legislature significantly increased the mitigation fee in 2006, undercutting Plaintiffs' complaints that mitigation funding will be insufficient.  (Tr. 2527, 3235).

[60] Plaintiffs assert that in order to mitigate for wetland impacts of mining, 13,522 acres would have to be restored.  Plf. Findings at 46.  In making this calculation, Plaintiffs ignore the evidence that different wetlands have different values, (*see, e.g.,* Tr. 704-05), and that the Corps determines mitigation amounts based on functional values.  (Tr. 2794-95; A.R. 1028, Tables C, D).  Once again, Plaintiffs' assertion runs counter to the evidentiary record.

[61] Gawlik is an assistant professor in the Department of Biological Sciences at Florida Atlantic University.  (Tr. 803).

checkerboard, and testified that at any given time, the wood storks may be relying on only a few of the spaces on the board for foraging. (*Id.*) His view is that "each [space] on the checkerboard is equally valuable, if only for a different time." (Tr. 892).

Dr. Gawlik then attempted to testify about whether any area in the Lake Belt is a "space" on the "checkerboard." But Dr. Gawlik could not state definitively whether there was any area in the Lake Belt that provided all of the characteristics necessary to be considered valuable wood stork foraging habitat. (Tr. 837). Rather, based on his review of an aerial photo cobbled together from the internet, he could only identify areas in the Lake Belt that have open canopy vegetation. (*Id.*) Dr. Gawlik then noted that *if* those areas have sufficient water and sufficient prey, he would "suspect that these would be good areas to forage in." (*Id.*) Dr. Gawlik was perfectly clear about the limitations of his testimony:

> So that doesn't mean that the area that I identify, if we were all to walk out there now, would necessarily be good foraging habitat, or tomorrow or the next day. It just means that these are the places that have the potential, given these other two ingredients I talked about, water and prey. When those are right, these are the areas.

(*Id.*). Dr. Gawlik went on to identify three areas in the Lake Belt that he would "suspect" might "have the potential" to be good wood stork foraging habitat. (Tr. 841-42).[62] Dr. Gawlik did not testify that any of the three areas he identified as potential wood stork habitat were within areas to be mined under existing permits. In fact, he has never been to the mining areas in the Lake Belt, (Tr. 1001), did not recently fly over the areas he labeled as potential habitat, (Tr. 968), and did not know what land in the Lake Belt was covered by the existing permits. (Tr. 940-41, 955-56).[63]

---

[62]   Dr. Gawlik identified these areas by hand-drawing them on an aerial photograph of the Lake Belt. (Plf. Ex. 66). Dr. Gawlik testified that he could have identified with much more precision the areas that he believed had the potential to be good wood stork habitat. (Tr. 842). It is telling that Plaintiffs never asked him to do so.

[63]   Plaintiffs stated that they were calling Dr. Gawlik for the "narrow" purpose "to determine whether, in fact, there is foraging habitat within the Lake Belt area" and that "he is not being called as an expert on where the mining operations may or may not take place in the next 36

(continued . . .)

On cross examination, Dr. Gawlik conceded that he had no opinion about the effect on the wood stork, if any, there might be from mining in the permitted areas. (Tr. 1001). He offered no opinion on whether mining in the permitted areas might result in death or injury to any individual wood stork, (Tr. 1001), or whether mining during the remand period would result in death or injury to any individual wood stork. (Tr. 1001-02). Dr. Gawlik conceded that he had no evidence that mining activity in the Lake Belt would result in the take of any wood stork or jeopardy to the species. (Tr. 996-97). He also conceded that the most recent data demonstrates that the wood stork is currently on a path to recovery. (Tr. 999; Def. Int. Ex. 10).

Nancy O'Hare was the other witness testifying for Plaintiffs who discussed the wood stork, although she conceded that she was not a wood stork expert. (Tr. 590). As noted above, she conceded that her wildlife study determined that the number of native *wetlands-dependent* species declined dramatically with increasing melaleuca density. (Tr. 698-99; *see also* Tr. 3067-70).[64] Specifically, she conceded that dense melaleuca does not provide significant habitat value for wood storks, and that wading birds do not forage in such closed canopy habitat. (Tr. 700-01). Ms. O'Hare conducted two site visits in the Lake Belt in 2006, but she did not determine the density of melaleuca coverage remaining at each of the mining sites, nor did she measure fish density at the sites. (Tr. 733-34). On cross examination, Ms. O'Hare admitted that she had no opinion about whether mining during the remand period in the areas she viewed would result in the death or injury of any wood stork. (Tr. 749).

---

(. . . continued)

months." (Tr. 824-25). This is a fundamental deficiency in Plaintiffs' evidence regarding wood storks which was not remedied by any other witness. It is not enough for Plaintiffs to assert that wood stork foraging habitat potentially exists in the Lake Belt – at a minimum they must present evidence that mining under the existing permits during the remand period would impact that habitat. No witness testified, and no evidence was presented to establish, that mining under any of the permits at issue is taking place in *any* of the areas identified by Dr. Gawlik. Absent that evidence, Plaintiffs' assertion that the evidence shows that "mining operations are, in fact, destroying significant amounts of wood stork foraging habitat," (Plf. Findings at 53), borders on the frivolous.

[64]   Indeed, Ms. O'Hare testified that removal of melaleuca from areas with more than 75 percent coverage leads to a greater abundance of wetland-dependent species. (Tr. 698).

Paul Souza, the acting Field Supervisor for the FWS's South Florida Ecological Services Office, (Tr. 3024), testified on behalf of the Federal Defendants.  The branch of FWS that Mr. Souza's heads is part of the multi-agency partnership that is leading the Everglades restoration effort.  (Tr. 3426-27).   Mr. Souza is responsible for overseeing all Section 7 consultations in his office (over 450 consultations to date), (Tr. 3027), and preparation of the recently issued August 31, 2006 Biological Opinion.  (Tr. 3028-29).[65]

Mr. Souza testified that the FWS conducted a site-by-site on-the-ground survey of the mining areas in the Lake Belt in May of 2006 in order to prepare its Biological Opinion, and concluded based on that site-by-site review that the areas to be mined under each of the permits during the remand period were either already impacted by mining preparation activities or were infested with dense melaleuca.  (Tr. 3070-78).   Based on that site-by-site review and the condition of the land to be mined, Mr. Souza testified that continued mining during the remand period would not result in the "take" of a wood stork, affect wood stork nesting success, or affect wood stork foraging behavior.  (*Id.*)[66]

---

[65]   Plaintiffs would have this Court disregard Mr. Souza's testimony because he is not a recognized wood stork expert.  (Plf. Findings at 60, n. 50).  But Mr. Souza's testimony cannot be so cavalierly dismissed.  Mr. Souza heads the office that handled the wood stork Section 7 consultation for the FWS, he testified that he is familiar with the state of the science regarding the wood stork, and he oversees a staff at FWS with a tremendous amount of wood stork expertise.  (Tr. 3057–62).  Mr. Souza is more than qualified to provide testimony about his and his staff's conclusions regarding the impact of mining in the Lake Belt on the wood stork.

[66]   Plaintiffs imply in their findings that Mr. Souza was less than truthful with the Court in his testimony that mining during the remand period would not result in a "take," given that the August 31, 2006 Biological Opinion, issued ten days after Mr. Souza testified, found that a projected take could be estimated based on calculations of acreage mined over the life of the ten-year permits.  (Plf. Findings at 60, n.50).  This disparagement of Mr. Souza's testimony is patently misleading.  Plaintiffs ignore the fact that the August 31, 2006 Biological Opinion bases its conclusions on the calculated impact on potential wood stork habitat over the entire life of the permits (4,521 acres mined), while Mr. Souza's testimony was based on a site by site investigation undertaken to determine the impact of mining during the remand period.  *Compare* August 31, 2006 Biological Opinion at 57 *with* Tr. 3070-78 (Souza).  That mining during remand would not result in a "take" because the areas to be mined during the remand period were already impacted by mining preparation activities or were infested with melaleuca is in no way inconsistent with the calculation in the August 31, 2006 Biological Opinion that there may be a "take" from mining over the ten year life of the permits.

John F. Studt, the Chief of the South Permits Branch for the Corps, (Tr. 2461), also testified for the Federal Defendants regarding the wood stork.  Mr. Studt oversaw preparation of the Corps' Lake Belt Biological Assessment and implementation of new permit terms and conditions based on the August 31, 2006 Biological Opinion.  (Tr. 2481, 2511, 2577; Def. Notice of Filing Permit Modification (Nov. 22, 2006)).  Formerly the National Program Manager of the Corps of Engineers Regulatory Program, Mr. Studt oversaw all policy and regulation development at the Corps including Endangered Species Act consultation on a national basis. (Tr. 2465).

Mr. Studt testified about the process involved in consultation between the Corps and the FWS regarding the wood stork. (Tr. 2571-77).  He testified that, based on the fact that the areas to be mined are infested with melaleuca and the mitigation associated with mining would remove melaleuca in the Pennsuco, the Corps concluded that mining during the remand period would not cause jeopardy to the wood stork.  (Tr. 2574-75, 2584- 85).

Dr. Thomas Lodge and Mr. John Ogden provided testimony on behalf of the Defendant Intervenors regarding the wood stork.  Dr. Thomas Lodge is a highly respected Everglades scientist.  (Tr. 3930-45; Def. Int. Ex. 59).  He has extensive field experience in ecosystem restoration (including wood stork habitat) and is author of the Everglades Handbook.  (Tr. 3940-41; Def. Int. Ex 60).  Dr. Lodge was recognized as an expert in the fields of Everglades wildlife and ecology, including threatened and endangered species habitat in the South Florida ecosystem; state and federal wetlands permitting, including mitigation; assessment of the functions and values of wetlands; and the habitat of wetland-dependent species in South Florida, including wading birds.  (Tr. 3952).  Dr. Lodge visited each of the mining sites, (Tr. 3971), and became familiar with the conditions at each location.  (Tr. 3978-79).

Dr. Lodge testified that most of the mining areas are covered with dense melaleuca. (Tr. 3991-92).[67] He also testified that even if there were some open-canopy areas in the Lake Belt, those areas would not provide suitable wood stork foraging habitat because the isolation of the wetlands in the Lake Belt results in prey density that is too low for wood storks. (Tr. 3999-4000).[68] Dr. Lodge concluded that mining during the remand period would not result in the loss of any critical wading bird foraging habitat: "I believe that those wetlands have little or nothing to do with survival of any of the wading birds in the Everglades ecosystem." (Tr. 4092). Similarly, Dr. Lodge concluded that continued mining in the Lake Belt during the remand period would have no impact on the breeding or nesting behavior of wood storks, and would not cause "jeopardy" to any threatened or endangered species. (Id.).

Mr. John Ogden also testified about the wood stork on behalf of the Defendant Intervenors. Mr. Ogden is the premier wood stork scientist in the nation, having spent his entire professional life (more than 40 years) studying the wood stork and working on recovery efforts, including work at the National Audubon Society and the National Park Service. (Tr. 3463-74; Def. Int. Ex. 41). He is author of some of the leading literature on the wood stork, including the Recovery Plan (which has served as the road map to the successful recovery of the species). (Tr. 3470-73; Plf. Ex. 62; Def. Int. Ex. 42; Tr. 928). Mr. Ogden continues to actively work on wood stork recovery efforts, (Tr. 3473-74), and to peer-review articles concerning wood stork biology on a regular basis. (Tr. 3470). Currently, Mr. Ogden is Chief Environmental Scientist for the SFWMD and the Program Director for the RECOVER Division in the CERP Planning

---

[67]   Plaintiffs contention that Ms. O'Hare's study of species diversity in melaleuca-infested wetlands is somehow relevant to the areas to be mined during the remand period, (Plf. Findings at 51-53), is further undercut by the unrebutted testimony of Dr. Lodge and other witnesses that most of the mining areas are infested with dense melaleuca. Even Ms. O'Hare concedes that the type of dense melaleuca observed at the mining sites provides no significant habitat value for wood storks. (Tr. 700-01).

[68]   Dr. Lodge has particular knowledge of fish in the Everglades that form the prey base for wading birds. (Tr. 3997). He developed a protocol in the Wetlands Quality Index for sampling fish in marsh communities and has done extensive fish trap sampling in various Everglades marsh communities. (Id.). Dr. Lodge is very familiar with the kinds of fish population levels found in various wetlands. (Id.).

Department, a multi-agency technical team consisting of membership from six federal agencies, four state agencies and two tribal governments that is charged with Everglades ecosystem restoration.  (Tr. 3459-60, 3462).[69]   RECOVER's mission is to integrate all of the pertinent scientific and hydrological modeling and planning information into formats that support CERP and assess whether the program is working.  (Tr. 3462). Mr. Ogden was qualified as an expert in the field of wood stork population, habitat and foraging requirements and recovery trends both nationally and in South Florida.  (Tr. 3478).

In order to render an opinion in this case, Mr. Ogden conducted a helicopter overflight to evaluate the mining areas:  "we flew quite low, maybe 200 feet, and slow and circled these sites, and based on experience of 30-plus years of looking at these kind of sites, I was looking for sort of several different parameters or characteristics of the sites."  (Tr. 3499).  On the overflight, Mr. Ogden examined the areas to be mined during the remand to determine the spatial extent and topography of the areas, (*id.*), vegetation and the condition of the marl prairie, (*id.*), and how well the sites were hydrologically connected to adjacent wetlands.  (Tr. 3499-3500).

Based on his expertise, experience, and evaluation of the specific locations to be mined, Mr. Ogden testified that the areas to be mined during the remand period "are not good wood stork habitat … they are degraded – at best, degraded marl prairie, that they lack the longer hydroperiods to allow for internal production of large numbers of fishes and survival of those fishes over multiple years, and that they lack connectivity, any kind of meaningful connectivity with long hydroperiod systems nearby."  (Tr. 3554-55).  The lack of connectivity with long hydroperiod wetlands is significant, Mr. Ogden explained, because areas like the Lake Belt

---

[69]   Plaintiffs imply that because Mr. Ogden works with the Corps in his current position with the SFWMD, he is somehow beholden to the Corps, and that he is somehow biased because he agreed to testify before taking a helicopter overflight to evaluate the specific mining sites.  (Plf. Findings at 59).  The implication that Mr. Ogden would provide inaccurate testimony because he coordinates his role at SFWMD with the Corps is unconscionably insulting to a scientist that has spent his entire career working to help the wood stork recover, and confirms that Plaintiffs would rather sling mud than address Mr. Ogden's incontrovertible testimony that mining in the Lake Belt will not harm the wood stork.

mining areas that dry out every year cannot themselves generate fish of sufficient size and density to attract the wood stork. (Tr. 3503). For these wetlands to provide sufficient prey, fish would have to migrate from longer hydroperiod areas. (Tr. 3492-93). The areas to be mined in the Lake Belt do not have connectivity with the longer hydroperiod areas required to establish an adequate prey base for wood storks. (Tr. 3501).

Mr. Ogden also addressed Dr. Gawlik's "checkerboard theory," and Dr. Gawlik's assertion that every wetland will at some point in time be valuable for wood stork foraging. While Mr. Ogden did not disagree with the general concept that wood storks will use different parts of their foraging range at different times, he did disagree with the premise that all wetlands are part of the "checkerboard" for the wood stork:

> The only concern I have about the checkerboard idea is that somehow it implies that the entire wetland system is part of this checkerboard pattern. That all – it almost says that all areas are of equal value, and the difference is that they're used at different times by wood storks. And, in fact, there are portions of the wetlands out there that are in my view of no value to storks. So not all squares on the checkerboard should be viewed as potential stork foraging habitat.

(Tr. 3515-16). Moreover, as Mr. Ogden pointed out, that concept simply does not apply where, as here, the wood stork has hundreds of thousands of other acres of short and long hydroperiod wetlands to use for foraging. (Tr. 3510-12, 3517-18 (wood storks "under any sort of hydrological condition have a lot better options within their foraging range" than Lake Belt wetlands); Tr. 3514 ("And so they got this immense area that's sort of at their doorstep to work over, and they're going to go to the places that are the best – better suited for them. They're going to pass over low quality areas."); *see also* August 31, 2006 Biological Opinion at 38-39, Table 11 (744,493 acres of suitable foraging habitat are within the "core foraging areas" of the three wood stork colonies within range of the Lake Belt); Def. Int. Ex. 47).[70]

---

[70] Mr. Ogden also disputed that the areas Dr. Gawlik marked on Plaintiffs' Exhibit 66 as suspected potential habitat could be valuable wood stork habitat. First, he testified that Dr. Gawlik could not simply extrapolate data from a single water depth reading and ignore hydroperiod and connectivity to reach conclusions about wood stork habitat. (Tr. 3552-53).

(continued . . .)

Based on the information he gathered about the individual mining sites and his decades of experience with the wood stork, Mr. Ogden concluded that continued mining during the remand will have no effect whatsoever on wood storks in South Florida and will not in any way undermine the wood stork recovery.  (Tr. 3528-29).  As Mr. Ogden concluded: "This is such a degraded area.  It's so isolated. The area in the 36 month footprint is so spatially small and scattered…these areas will not create the size and densities of prey that would attract nesting wood storks." (Tr. 3501).[71]

Finally,  all of the witnesses concurred that melaleuca eradication in the Pennsuco being undertaken as part of the permit mitigation process is a viable method to mitigate any harm to the

---

(. . . continued)

Second, he noted that the areas identified by Dr. Gawlik were degraded marl prairie with insufficient hydroperiod to generate prey internally and had insufficient connectivity to longer hydroperiod areas.  (Tr. 3554-55).

[71]   Plaintiffs' discussion in their findings of FWS's August 31, 2006 Biological Opinion and its conclusions regarding the wood stork is misleading.  First, Plaintiffs fail to note that the Biological Opinion addresses the entire 10 year permitting period, rather then the more limited remand period.  August 31, 2006 Biological Opinion at 10 ("In this biological opinion, our evaluation centers on the mining activities from 2002 through 2012.").  Any conclusions reached in the Biological Opinion with regard to the entire 10-year period are of limited application to the shorter remand period (for example, land to be mined during the remand period may be infested with melaleuca, or already impacted by mining preparation, where other land in the ten year footprint may not be, and thus continued mining during the remand would not contribute to the effects estimated over the ten year term of the permits).  Plaintiffs also assert that the Biological Opinion "specifically finds" that 1,281 acres of land to be mined in the Lake Belt is suitable wood stork foraging habitat.  Plf. Findings at 56.  This assertion is patently false.  The Biological Opinion uses the 1,281 acre number as an estimate "to err on the side of caution."  (August 31, 2006 Biological Opinion at 37.)  The Biological Opinion itself notes that "a portion of the 1,281 acres was demucked prior to the start of the 2002 permits…. As a result, the actual area of foraging habitat available for wood storks at the beginning of the 2002 permits may be closer to 900 acres." *Id.*  The Biological Opinion also notes that "the 1,281 acres were derived from aerial photos taken from 1992-1994, which do not account for habitat loss that has occurred from mining under previous permits after that period."  *Id.*  Finally, although the acreage estimates were derived from aerial photos in 1992-1994, the Biological Opinion notes that "melaleuca expansion into native habitats and density increases in previously invaded habitat have increased substantially from 1995 through 2002 and from 2002 to 2006."  *Id.* at 34.  Accordingly, the Biological Opinion concludes: "Given the increase in melaleuca over time, and the habitat loss from previous permits, the Service believes the quality of foraging habitat is lower today than observed from 1992-1994."  *Id.* at 37.  In sum, the Biological Opinion itself indicates that its conservative estimates are based on data that does not reflect the current conditions in the Lake Belt.  *Id.*  Accordingly, the Biological Opinion does not constitute reliable evidence that any suitable wood stork habitat currently exists in the areas to be mined during the remand.

wood stork. (Tr. 4053-55 (testifying that he would "overwhelmingly select mitigation in the Pennsuco" over preservation of isolated areas of wetland in the Lake Belt mining area); Tr. 704, 716 (stating that "removal of Melaleuca is overall a good thing" and agreeing that "Melaleuca should be removed from the Pennsuco in order to prevent habitat degradation")). And the evidence demonstrates that, overall, the mitigation being undertaken would more than compensate for the wood stork habitat value of any loss of wetlands in the Lake Belt. (Tr. 4091 (testifying that losses of wetlands from mining under existing permits "can be easily mitigated, and I think that the losses are insignificant compared to the benefits of the mitigation that can be supplied."); Tr. 2585 (the "mitigation, among other things, provides improved wood stork habitat and feeding areas")).

### F.       The Evidence Presented Regarding Environmental and Economic Disruption.

The evidence presented at the remedies hearing demonstrated that vacatur of the existing Lake Belt permits or an injunction against mining in the Lake Belt would result in a severe shortage of construction materials essential to the Florida economy. That shortage could not be compensated for by increasing production in other quarries outside the Lake Belt, or importing rock from other states or countries. An injunction or vacatur would result in immediate job losses at the Lake Belt quarries themselves, and, as the effects of the curtailment of mining rippled through the construction products, equipment and transportation industries built around Lake Belt operations, thousands of additional jobs would be lost. Those losses would then be compounded by the effects of price increases and material shortages on the construction industry itself, where thousands more Florida construction and transportation workers no longer would be needed. The evidence shows that if unable to secure sufficient aggregate from the Lake Belt quarries, agencies like the Florida DOT would have to postpone or cancel public works projects and road improvements. The Defendant Intervenors themselves would suffer hundreds of millions of dollars in damage from an injunction or vacatur, losing decades of capital investment

in land, equipment, and infrastructure, and losing the revenues associated with the Lake Belt quarries and the products manufactured with them.[72]

The economic evidence presented was a study in contrasts.  During their case in chief, Plaintiffs presented only the testimony of Dr. Richard Weisskoff, an economics professor at the University of Miami.  He testified that he did not "attempt to predict any future responses through econometric modeling at this stage" and that "[he] was asked [by Plaintiffs] not to do it." (Tr. 1644-45; *see also* Tr. 1958) (indicating that "the attorneys who employed [Weisskoff] asked [him] not to have an econometric model").  He wanted to do a model, but Plaintiffs' counsel would not let him.  (Tr. 1958, 1959).  As a result, Weisskoff was "unable to give a [precise,] quantitative estimate of the actual impact on the curtail [sic] of mining in the Lake Belt district" as part of Plaintiffs' case-in-chief.  (Tr. 1959).  The lack of modeling also left him unable, at the hearing, to make other estimates, such as the number of tons of limestone that could come into the state to replace the tonnage lost by vacatur or injunction by rail, barge, and ocean-going ships or the tonnage that could come through Florida's deep-water ports.  (Tr. 2109, 2117).

Dr. Weisskoff acknowledged that "without the basic building materials [produced in the Lake Belt], you cannot . . . build a building."  (Tr. 1721-22).  He acknowledged further that closing down the mines would put significant numbers of men and women out of work, not just those working in the mines, but others whose work depends on the limestone products produced by the Lake Belt mines.  However, because he determined these to be "modeling questions," and

---

[72]  Plaintiffs repeat in their Proposed Findings, almost *ad nauseum*, the contention that the evidence concerning these harms is somehow irrelevant because Plaintiffs are only asking for vacatur rather than injunction.  *See*, *e.g.*, Plf. Findings at 74, 75, 78, and 80.  As noted above, this distinction Plaintiffs repeatedly draw makes no difference.  Vacatur prevents mining under the existing permits.  Without permits to mine, the quarries in the Lake Belt cannot operate.  There is no basis for any assumption that the Corps would be able to issue some type of replacement permit for some or all of the existing permits on a timeline that would prevent disruption.  In fact, the only evidence adduced at the hearing on this issue was that Corps permits typically take a minimum of 18 months to secure, which is longer than the expected remand period.  (Tr. 4090-91).

he was not permitted to prepare models prior to his testimony, he was unable to estimate the number of workers that would be affected. (Tr. 1723-24).[73]

In response to Dr. Weisskoff's unenlightening testimony, Defendant Intervenors presented a number of witnesses, both in court and by designation. Those witnesses included: Mr. Stuart Limb, a Chartered Mineral Surveyor with more than 40 years of experience specializing in the aggregate industry, who testified about the lack of alternative sources of aggregate available outside the Lake Belt; Mr. Michael Darragh, the Director of Sales and Marketing – Mined Minerals for CSX Transportation, who testified about the limited capacity of the CSX railroad to ship additional aggregate into Florida to replace production from the Lake Belt; Mr. Charles Lynch, Vice-President of Transportation for the Florida East Coast ("FEC") Railway, who did the same regarding the FEC railroad; Mr. Charles Towsley, former Director of both the Port of Miami and Tampa Port Authority and Chairman of the Florida Seaport Transportation Economic Development Council, who testified about the inability of Florida ports to significantly increase the import of aggregate to make up for any lost production in the Lake Belt; and Mr. Edward DeRoche, Senior Vice President of Canada Steamship Lines International, who testified about the constraints on shipping capacity for aggregate transportation. Witnesses from each of the Defendant Intervenors' companies also testified about the damage that would be caused to their businesses and employees if Lake Belt mining was halted or curtailed. Defendant Intervenors also presented the expert economic testimony of Dr. Jesse David, a vice president of National Economic Research Associates (NERA),[74] who testified about the market impact of vacatur or injunction, and, using the information provided by the above experts in each of their

---

[73] Dr. Weisskoff did not reveal that Plaintiffs had bought a license to use Dr. Tanner's model, but that he decided not to use it. (Tanner Dep. at 21-22).

[74] Dr. Jesse David's two areas of specialty are environmental economics and valuation of businesses and assets. (Tr. 5927). He has a Bachelor of Science in economics from Brandeis University and a Ph.D. in economics from Stanford University. (Tr. 5927). He has done extensive work in the field of environmental economics, including analysis of impact and other issues involving: air pollution regulation, site contamination, nuclear and hydroelectric power, and municipal solid waste. (Tr. 5928-30). Currently, he is assessing the economic impact of environmental restrictions on the logging and mining industry in West Virginia. (Tr. 5930).

respective fields in the aggregate and transportation industries, developed and testified about detailed economic modeling simulating vacatur or injunction curtailing Lake Belt mining.[75]

The evidence provided by the company witnesses demonstrated the extraordinary harm to the Defendant Intervenors' businesses and employees that would result if the Court were to vacate the existing permits or enjoin mining.  The evidence provided by the expert witnesses demonstrated that existing quarries outside the Lake Belt do not have the capacity to replace the aggregate production lost from a shutdown or significant curtailment of mining in the Lake Belt.  Even if the aggregate was available, which the evidence demonstrates it is not, these experts described the significant constraints on rail, ship, and port capacity that would prevent the import of more than a small amount of the aggregate that would be lost from vacatur or injunction.  Finally, taking into account these limitations on availability and transportation, Dr. David described the severe economic impacts on Florida of vacatur or injunction, including the loss of thousands upon thousands of jobs and billions of dollars in economic output from the mining industry and the "upstream" and "downstream" companies that rely on the Lake Belt quarries.

On rebuttal, Plaintiffs once again presented only Dr. Weisskoff.  This time, however, he testified regarding the results of computer runs that he had executed using a basic version of

---

[75] Plaintiffs disparage Dr. David's modeling of induced and other downstream affects as a "home grown" model relying upon biased sources.  This is typical of the approach they employ throughout their Proposed Findings.  Dr. David modeled his "upstream" effects using IMPLAN, a standard model routinely used for such effects.  Dr. Weisskoff simultaneously accused Dr. David of also using IMPLAN for "downstream" effects and employing "unprofessional" techniques.  But Dr. David carefully explained that his downstream modeling used only certain inputs from the IMPLAN modeling, nor did he use unprofessional techniques.  Instead he relied upon the actual expert and fact testimony and evidence regarding the data on the capacity of Florida's transportation network and other mines to replace the Lake Belt limestone to calculate price effects, outputs, and total loss of employment.  The inputs for his downstream modeling specifically included the facts relating to how many millions of tons of limestone could be replaced from Florida mines, what tonnage could be transported from outside Florida, the cost of this substitution, and then he applied standard economic techniques to estimate the shortage and price effects on the South Florida economy.  Plaintiffs' expert ignores the actual evidence to rely on a "couple of personal telephone calls" and a model that could not distinguish limestone from phosphate.  Dr. David's analysis complies with the Federal Rules of Evidence; Dr. Weisskoff's does not.  *See* Fed. R. Evid. 702 (requiring expert witnesses' testimony to be "based upon sufficient facts or data" and their methodologies to applied "reliably to the facts of the case").

something known as the REMI model that cost $3,000 to license and five hours to program.  He ran 15 scenarios through the model, but presented none of them to this Court.  The omission is hardly surprising; the several computer runs in which Dr. Weisskoff considered the increased costs of transporting limestone produced job losses of almost 50,000 employees in Miami-Dade County alone.[76]

On cross-examination, Dr. Weisskoff admitted that his model considered effects only in Miami-Dade County, even though the Lake Belt limestone is sold and used throughout South and Central Florida.  More fundamentally, Dr. Weisskoff was forced to admit that his model could not distinguish limestone from any other mined product, and that it assumed unlimited transportation capacity. His model therefore replaced Lake Belt limestone from other mines regardless of whether they extract phosphate, kaolin, or anything else.  Of course, those other products cannot be used in construction.  In other words, Dr. Weisskoff did not just ignore the actual evidence on how much limestone could be replaced, and at what increased cost, he chose to use a model that assumed away all of the "downstream" effects of a halt on mining by replacing lost limestone with phosphate, kaolin, and natural gas.  He did this even though he could have customized his model to incorporate the evidence, as he did in part in the few computer runs that adjusted transportation cost (and consequently reflected very large job losses).  Despite his major modeling error, which he was forced to admit during cross-examination, Weisskoff concluded that the "upstream" effects alone would cost Miami-Dade County some 4,000 to 20,000 jobs.

Thus, the economists testifying for both Plaintiffs and the Defendant Intervenors opined that if limestone mining is halted in the Lake Belt during the remand period thousands of jobs will be lost in Miami-Dade County.  The record evidence also establishes that billions of dollars

---

[76]  Weiskoff's modeling run showed that with just a 50% shutdown of Lake Belt mining there would be a loss of almost 19,000 jobs in Miami-Dade County in 2007 and a loss of almost 24,000 jobs in 2008.  (Tr. 6818).  With a 100% shut down, the loss of jobs would be 34,000 for 2007 and 48,000 for 2008.  (Tr. 6821).

of output and income will be lost.  Public construction projects like roads, schools, hospitals, jails, and bridges will fail or falter.  The mining companies and those businesses dependent upon them or their products will be shut down.  The CERP will be compromised.  South Florida will fall into a recession.

The overwhelming testimony adduced at the remedies hearing supports the conclusions reached by Dr. Jesse David, testifying on behalf of Defendant Intervenors, and explains why these severe consequences will follow inevitably from a halt in mining.  Limestone has been mined in the Lake Belt for more than 50 years.  Lake Belt rock possesses special qualities required for government-regulated road and construction uses.  It is located close to the population centers of South Florida.  Limestone is an essential ingredient of cement, concrete, asphalt, concrete block, road base, and other construction aggregates.  In fact, the Lake Belt mines provides nearly half of the high grade limestone products needed and utilized in the entire State of Florida.  If Lake Belt mining were halted, only a small portion of Florida's limestone demand could be replaced during the remand period from other sources.  The consequent shortages and price increases would seriously and adversely affect the entire economy of South Florida, and other parts of the state that utilize and depend on Lake Belt limestone.

Replacement of the Lake Belt limestone during the remand period would be minimal for several important reasons.  The unrebutted testimony reveals that other Florida mines are already operating at full capacity or lack quality stone, and new sources, if any existed, would take years to develop to the point of production, as would new foreign sources.  Existing mines in other states or countries cannot replace Lake Belt limestone because they too are operating at or near capacity, conduits for moving stone are also at capacity, and the cost of transportation – even if available – would be prohibitively high.  So even if an unlimited supply of limestone from areas outside the Lake Belt were available, and the price of transportation was not prohibitive, the railroads, trucks, and ports taken together have the capacity to accommodate transporting no

more than 13 million more tons of limestone, leaving a 46 million ton shortfall throughout the remand period.[77]

This extraordinary shortage, accompanied by hugely inflated prices for the limestone that remains available, will thwart the completion of public projects, cost thousands of Floridians their jobs, shut down the Lake Belt mining companies, and ironically do significant injury to the environment. The funding source for mitigation fees needed to restore the Pennsuco, and to augment the Miami-Dade County water treatment plant will be lost. The massive amounts of construction grade limestone needed for CERP projects will be unavailable or far too expensive to timely complete these projects.[78] Mining at alternate quarries with yields per acre less than the quarries in the Lake Belt will also result in greater surface impacts at those quarries than in the Lake Belt, because more acreage will have to be disturbed to produce the same volume of aggregate mined in the Lake Belt.[79]

To contravert all of this evidence, Plaintiffs present only speculation, groundless aspersions regarding Defendant Intervnors' witnesses, and an academic economist who used a model that assumed away entirely the problem of replacing the Lake Belt limestone. Since

---

[77] Defendant Intervenors' economist, Dr. Jesse David, testified that 50 million tons of aggregate currently are produced by Lake Belt quarries, and that this amount will grow during the remand period to an output of 59 million tons. Accordingly, if available transportation modes during the remand period will allow for replacement of 13 million tons of Lake Belt aggregate, there will be 46 million tons not replaced. (Tr. 5960; 5975-5976).

[78] As discussed below, Scott Burch, Chief of the Cost engineering Branch of the Corps testified that key components of CERP are reliant on limestone from the Lake Belt area. (Tr. 2913). A shutdown of mining, "would significantly impact Everglades restoration." (Tr. 2947).

[79] The limestone deposits at the FEC, SCL and Krome quarries, and at other quarries in the Lake Belt, are considered the highest quality deposits in Florida. In comparison to other locations in Florida, the aggregate deposits in the Lake Belt are uniform and the aggregate is very hard. (Tr. 5761). Due to the hardness of the rock, the production process produces a much higher quality finished product, and a higher yield of aggregate per acre. The Lake Belt quarries produce an 85% yield after crushing, while only 50% of the softer rock from the quarries outside the Lake Belt is useable as construction aggregate – the remainder is waste. (Tr. 5762-63). Thus, Lake Belt quarries are much more efficient than other quarries located outside the Lake Belt. For example, Mr. Will Glusac testified that Rinker Materials' FEC quarry in the Lake Belt yields 135,000 to 145,000 tons of aggregate per acre mined, whereas Rinker Materials' two coarse aggregate quarries outside the Lake Belt yield 20,000 to 35,000 tons per acre. (Tr. 5761-62).

Plaintiffs could offer no rebuttal witnesses during the evidentiary hearing to dispute the limited capacity of the ports, railroads, trucking, and other mines, they now make the *ad hominen* argument that the companies operating these facilities are "business partners" with the Defendant Intervenors, inferring that the witnesses would be willing to perjure themselves to maintain their business relationships. But there is no evidence to substantiate Plaintiffs' baseless assertions of bias. Plaintiffs offered no testimony, for example, to rebut the testimony that the only two north and south railroads in Florida, CSX Railroad and FEC Railroad, are single-track and operating at near capacity.[80] Moreover, if Plaintiffs are correct that there are plenty of alternative sources of limestone, these transportation witnesses would have no incentive to lie for Defendant Intervenors inasmuch as they could readily replace their Lake Belt business with these other sources, and presumably make even greater profits because the transport distances from quarries in Alabama, Georgia, or even Northern Florida would be far greater than those between the quarries in the Lake Belt. The overwhelming evidence reinforces the logistical reality that at least during the remand period, alternate sources will be unable to ramp up to replace lost Lake Belt production, and the modes of transport will be able to move only a small fraction of the aggregate that would be desperately needed.

---

[80] Mike Darragh, Director of Sales and Marketing – Mined Minerals for CSX, testified that CSX rail lines leading to and within Florieda are single track lines, which means that trains cannot pass each other unless one of the trains pulls off onto a passing siding to allow the other train to go by (Darragh Dep. 36; 115). He explained that the rail lines leading into Florida from Alabama and Georgia are near full capacity, (Darragh Aff. ¶11), and that there are widespread delays along the CSX lines leading into Florida from Alabama and Georgia. (Darragh Dep. 119). Charles Lynch is Vice-President of transportation for FEC railway. (Def. Int. Defs.' Ex. 1 to Lynch Dep.). Mr. Lynch testified that FEC is a single-track railroad that runs along the east coast of Florida from Jacksonville to Miami. (Lynch Dep. 146, Plf. Ex. 1). He testified that the rail lines leading into Florida are congested and lack the rail capacity and infrastructure necessary to substantially increase current shipments of aggregate to the FEC line. (Lynch Dep. 27:3-28:11; 32:15-33:8). Moreover, the quarries in Alabama and Georgia served by CSX are running at or near their capacity to transport aggregate by rail. (Darragh Dep. 17, 23, 25-26). Notably, in order to increase capacity from the north, CSX would need to obtain a substantial number of additional rail cars and locomotives to deal with the longer turn times (Darragh Dep. 95-96; 149-51; Darragh Aff. ¶ 10). Rail cars and locomotives are difficult to obtain, however, because of high demand, the long lead times to obtain such cars, and competition with coal for any available cars. (Darragh Dep. 24).

1.      **Vacatur or injunction would cause enormous economic disruption.**

Unlike Plaintiffs' economics witnesses[81] – who refused to ground their modeling or opinions in the actual evidence adduced in this case – the testimony of Defendant Intervenors' expert economist, Dr. Jesse David, presented in depth below, is based squarely upon, and supported fully by, both the fact witnesses and the other experts who testified.  In particular, the Defendant Intervenors' economic position carefully accounts for:  (1) the impact that geographic and demographic features of Florida have on limestone demand and consumption, *i.e.* the southern end of Florida's long peninsula has high concentrations of population that are far removed from substantial sources of aggregate other than those located in the Lake Belt; (2) the size and growth rate of limestone-dependent industries, *i.e.,* Florida's construction industry, which uses virtually all of the limestone aggregate, is Florida's single largest non-service sector, and it has grown substantially with the continual increase of population entering the state; (3) the economic ramifications of limestone's low value-to-weight ratio, *i.e.* the vast majority of limestone is utilized near the source because it is very bulky and heavy, such that it is very expensive to transport, and thus South Florida logically depends on the local source of aggregate in the Lake Belt; (4) the high capital costs, and other barriers to entry associated with limestone mining, *i.e.,* the costly, time-consuming difficulty and unlikelihood of locating reasonably accessible alternative sources of high-quality limestone, acquiring the source, and obtaining the necessary array of government permits to mine; and (5) the constrained capacity, and substantial

---

[81]  Plaintiffs presented only Dr. Richard Weisskoff at the evidentiary hearing, but also submitted for the record the deposition transcript of a Dr. Tanner, who presented an untested theoretical model he developed called REDYN.  Defendant Intervenors moved to exclude Dr. Tanner's deposition from the record.  (D.E. 326).  Plaintiffs twice represented to this Court that having oral argument on the motion was premature until they filed their response.  (*See, e.g.,* Tr. 6204) ("What we would like to do is simply file a resonse to the motion to exclude Dr. Tanner").  Plaintiffs never responded, and the time to respond has long since passed.  In that Plaintiffs have themselves abandoned any attempt to rely on Tanner's testimony by failing to make any reference to him either in closing argument or in Plaintiffs' Proposed Findings, Defendant Intervenors ask that Dr. Tanner's deposition be excluded on the grounds presented by the written motion.

costs, of the various practicable modes of transporting limestone from alternative sources *i.e.,* transport by truck is too costly for long distances, railroads have limited capacity and equipment to transport substantial volumes, and transport by ocean vessels through Florida ports will be even more limited due to a lack of ships and terminal space.[82]   This evidence demonstrates conclusively that Lake Belt limestone simply cannot be replaced during the remand period, and as a result, the curtailment of mining in the Lake Belt would cause the loss of an extraordinary number of Florida jobs and billions of dollars in economic output, jeopardize a multitude of essential public works projects, and ineluctably bring about what could only be described as a serious recession in South Florida.

### a. The evidence demonstrates that Florida needs limestone.

Over the last thirty years, Florida's economy has grown from *eleventh* among the States to *fourth.*  If Florida were an independent country, its economy would rank among the top twenty in the world.  (Tr. 5935-36).  This economic growth reflects Florida's increasing population, which is expected to continue to increase at the rate of two percent per year for the remainder of the decade, at about twice the national average.  (Tr. 5936).  Florida's economic expansion has fueled a growth in jobs in Florida that has easily kept pace with population.  Indeed, this employment expansion is more than four to five times the national average.  (Tr. 5936).

The explosion in Florida's population and jobs has had a corresponding effect on Florida's construction industry, which is growing at more than sixteen times the national average, reaching $36 billion in output for 2004.  The Florida construction industry represents the largest non-services sector in the State.  (Tr. 5936-37).  Its expansion has been most prominent in transportation and utility infrastructure, residential housing, and commercial/industrial projects.  For example, the Florida Department of Transportation spent

---

[82] Trucking, rail and marine transportation represent the three primary modes for moving crushed limestone in Florida.  (Tr. 5944).

approximately $3.6 billion on highway construction in 2004, and by 2006 Florida highway expenditures were expected to reach $5 billion per year; which is multiple times the growth in transportation expenditures elsewhere in the United States.  (Tr. 5937-38).

The boom in the Florida construction industry has resulted in a sustained increase in the demand for all types of construction materials in Florida.  (Tr. 5938-39).  For example, the demand for and production of cement in Florida has increased at the rate of approximately 16%, or about three times the rate of growth elsewhere within the United States.  (Tr. 5938-39).  Similarly, over the last five years, the demand for crushed stone in Florida has grown at a rate of approximately 7% a year, which is several times the rate of growth for crushed stone consumption elsewhere within the United States.  (Tr. 5939).  Indeed, if a substantial portion of the crushed stone on the market is removed by substantially curtailing or halting Lake Belt production, the impact will be immediate and devastating to the Florida economy.[83]

> **b.    The evidence demonstrates that the limestone mined from the Lake Belt is essential to South and Central Florida.**

The Lake Belt mines at issue in this proceeding produce nearly fifty percent (50%) of Florida's production of crushed stone, (Tr. 5940), which amounted to 50.6 million tons of limestone in 2005, and by 2008 will approximate 59 million tons per annum.  (Tr. 5940-41).  Lake Belt limestone is a very hard limestone, which allows it to meet rigorous government

---

[83]  Plaintiffs refer in their Proposed Findings to a report by CMC, Inc. that has not been admitted into evidence, for the proposition that because aggregate production and prices have increased in Florida recently, mining and transportation companies could replace aggregate lost due to a Lake Belt mining shutdown.  (D.E. 347 at 68).  In fact, that report shows that all the mining companies in Florida are working at full capacity to try to meet the State's needs, are expanding production, and still are not able to meet the demands of Florida's economy.  The report reflects:  (1) construction growth in 2005 was 7% higher than in 2004; (2) projections through 2009 for the United States indicate a 7 to 8% per year increase in total construction; (3) cement shortage and rationing have been widespread across the United States since the end of 2003 mainly due to huge increases in demand for cement within the United States; (4) cement demand in the United States is projected by the Portland cement Association to increase by 12.5% through 2009; and (5) there is projected to be a 20% increase in non-residential construction in Florida. (D.E.. 285 at 1-4).

standards for essential transportation and other heavy construction use (*e.g.*, the Lake Belt is one of the few source areas certified for use in "Superpave" road surface).  (Tr. 5941-42).  Lake Belt limestone meets the highest quality criteria for the construction of transportation infrastructure, road base, cement, construction aggregates, concrete, asphalt, and other concrete products.

Moreover, because limestone has a low "value to weight ratio," and is expensive to transport because it is so heavy and bulky, transportation costs add dramatically to the price of limestone ultimately paid by the consumer.  (Tr. 5943).  Limestone is therefore mined from sources as close to its ultimate users as is feasible.  Accordingly, because the Lake Belt quarries are geographically close to large and growing population areas in South Florida, they can uniquely provide a low cost, high quality source of essential building materials.

The Lake Belt mines also provide employment to Florida's residents.  Approximately 1,000 persons are directly employed in mining operations.  (Tr. 5945).  The quarries are connected to a web of industries, both "upstream" and "downstream" from the mines themselves, that are dependant upon their continued production.  Affected upstream industries are those that supply inputs to the mining companies, including but not limited to, independent trucking contractors,[84] railroads[85], power generation and major machinery manufacturers.  Affected downstream industries include companies purchasing limestone aggregate or products in which limestone is a substantial component, such as the manufacturers of cement, ready mix concrete, concrete blocks, and asphalt.  (Tr. 5946-47).  Critical downstream industries within the six South Florida counties which rely heavily on Lake Belt limestone, including the construction industry, employ about 175,000 people.[86]  More broadly, critical downstream industries across Florida that rely heavily on Lake Belt limestone employ 619,000 workers.  (Tr. 5949-50).

---

[84] Rinker Materials alone provides work to over 1000 local independent truckers.  (Tr. 5784).

[85] *See, e.g.,* Amicus Curie Brief of United Transportation Union.  (D.E. 319).

[86] Approximately 6 million people live within six South Florida counties – Miami-Dade, Monroe, Broward, Palm Beach, Collier, Martin – that are in close proximately to the Lake Belt. (Tr. 5939-40).

c. **The evidence demonstrates that there are no available alternative sources to Lake Belt limestone during the remand period.**

Plaintiffs suggest that this Court find that there are other sources of limestone in Florida outside the Lake Belt that could increase production to compensate for losses in production from the Lake Belt area. (Plf. Findings at 72-73). But the evidence demonstrates that over the next 18 to 36 months, there are no practicable alternative sources of limestone to the Lake Belt quarries. Crushed stone mines in northern or central Florida, Georgia, and Alabama do not have available capacity to replace the Lake Belt production of limestone.[87] In fact, approximately thirty percent (30%) of Lake Belt production is presently transported at significant expense to northern and central Florida markets from the Lake Belt quarries. If the mines in northern and central Florida had the capacity to supply those markets, there would be no need for Lake Belt limestone to be shipped to them at significant additional expense. The largest supplier of crushed stone outside of the Lake Belt (Martin Marietta Materials) stated in 2006 that it has no additional capacity in the Southeastern United States and is "sold out." (Tr. 5953-55).[88]

Testimony and exhibits establish that Defendant Intervenors' witness, Mr. Stuart Limb, is an exceptionally qualified expert in limestone resources worldwide.[89] He has extensive

---

[87] Florida mines outside the Lake Belt produce less than 75 million tons of crushed stone annually. The mines in Georgia and Alabama produce approximately 140 million tons annually (largely granite rather than limestone). Replacing the Lake Belt limestone would require a twenty-five (25%) percent increase in production from those mines. Since the annual growth in production from the northern or central Florida, Georgia and Alabama mines has consistently been only four percent (4%) per annum, it is unrealistic to expect that they could replace the 50 to 59 million annual tons of Lake Belt limestone production over the next 18 to 36 months. (Tr. 5953-5955).

[88] Michael Darragh of FEC noted that while there are quarries in Alabama and Georgia (including those owned by Martin Marietta and Vulcan), these quarries are running at or near their capacity to transport aggregate by rail. (Darragh Dep. 17:5-7; 23:13-17; 25:18-26:9).

[89] Mr. Limb has over 42 years of training and experience in the aggregate industry in the United States and throughout the world. (Int. Defs.' Ex. 161, Limb Tr. at 4-5, 9). He is a British-trained and Chartered mineral surveyor specializing in the aggregate industry. (*See* Int. Defs.' Ex. 161C). Mr. Limb has the equivalency of a master's degree from Nottingham University in England in mineral and real estate management, (Int. Defs.' Ex. 161, Limb Tr. at 5), and his specialized education, training and testing resulted in his attaining and maintaining the designation of a Chartered Mineral Surveyor from the Royal Institute of Great Britain. (Int. Defs.' Ex. 161, Limb Tr. at 9-11). Mr. Limb testified that the profession of Charter Mineral

(continued . . .)

experience in Florida and offered opinions on Lake Belt production and the availability of potential alternative aggregate sources, both domestic and foreign.  (Int. Defs.' Ex. 161, Limb Tr. at 12-13, 15-16).  Based on his experience, knowledge and analysis, he testified that there would be no available or practical alternative supplies to replace Lake Belt production if production were stopped or significantly curtailed within the next 18 to 36 months.  (Int. Defs.' Ex. 161, Limb Tr. at 33-34).  He also confirmed that the transportation infrastructure is not in place to permit transportation of crushed stone from other locations to replace the Lake Belt production in Florida for the foreseeable future, even if limestone were to become available from another source.  (Int. Defs.' Ex. 161, Limb Tr. at 33-34, 40-41).

The company witnesses confirmed Mr. Limb's assessment.  For example, Mr. Albert Townsend, the Tarmac America LLC company representative, testified that Tarmac has no practical alternative to Lake Belt limestone.  (Tr. 4973-74).  Even if there were other suitable sources of limestone in quarries in the Florida Panhandle, Alabama, and/or Georgia, those quarries are operating at or near capacity, and are located at least 500 to 700 miles away, (Tr. 4974), thus making them too far away to be a practical alternate source of aggregate.

Mr. Jim Hurley, White Rock's President, likewise testified that his company cannot obtain limestone from another source because his company has been unable to identify other reserves in Florida that have the same quality stone as quarried in the Lake Belt.  That limestone meets all of the FDOT specifications and the ASTM specifications that govern commercial building, and is superior to all other deposits located within Florida.  (Tr. 5516-17).  Since the March 22 Order in this case, White Rock has investigated various areas within Florida for an

---

(. . . continued)

Surveyor requires a mix of engineering and real estate in that one is trained to identify, quantify, value and manage mineral real estate properties.  (Int. Defs.' Ex. 161, Limb Tr. at 8-9).  He has been an aggregate consultant for over 42 years and has provided opinions that are relied upon on a regular basis by the mineral industry, banks, financial institutions, investment firms and courts.  (Int. Defs.' Ex. 161, Limb Tr. at 9, 12).  He has been recognized and qualified as an expert in aggregate related matters in many courts throughout the United States.  (Int. Defs.' Ex. 161, Limb Tr. at 9-10).

alternative source to the mining activities located in the Lake Belt area, and found no deposits with quality that approaches or equals that in the Lake Belt.[90]

Mr. Will Glusac of Rinker Materials testified that the company's quarries in Fort Myers and Brooksville would also be unable to replace the limestone now produced by its FEC, SCL and Krome quarries in the Lake Belt. Rinker Materials' Fort Myers and Brooksville mines are currently operating at full capacity. (Tr. 5793). Equally important, the limestone from those quarries is soft, and yields per acre are far less than in the Lake Belt; consequently, more acreage must be disturbed to produce an amount of aggregate equivalent to that mined in the Lake Belt. (Tr. 5761-5762). In addition, there is no transportation infrastructure available to transport limestone from Fort Myers and Brooksville to the locations from which Rinker Materials currently supplies its numerous concrete manufacturing facilities and block plants throughout Florida. (Tr. 5793). Rinker Materials has been unsuccessful in finding limestone reserves anywhere in Florida that could even come close to replacing the reserves within the Lake Belt. (Tr. 5793-94).[91]

More fundamentally, it is an extraordinarily long-term process to find possible reserves, test them, negotiate arrangements, purchase the rights to quarry stone, obtain the necessary permits and construct the needed infrastructure, and Rinker Materials will not be able to do so within the remand period. (Tr. 5793-94). It generally takes at least five years from conception to

---

[90] White Rock investigated potential deposits in and around Fort Myers, Fort Pierce, Vero Beach and north and northwest of Orlando, but the rock was not comparable to that being mined in the Lake Belt, and would not meet FDOT specifications for "Superpave" asphalt, for friction course asphalt, and for the high-strength products that are required for commercial building construction. (Tr. 5526-27).

[91] Rinker Materials' nearest quarries outside of Florida are located in Georgia. The stone mined at Rinker Materials' quarries in Georgia is granite, which is not as desirable an aggregate as limestone for making cement or concrete. Those mines are also currently operating at full capacity. (Tr. 5795). Rinker Materials' next closest quarries would be in Tennessee, 650-700 miles from the State, and transportation costs from those locations would be prohibitively high. (Tr. 5796). Rinker Materials has no sources of aggregate outside of the United States that could be practicably transported for use in Florida, and Rinker Materials will be unable to establish any such foreign source of aggregate within the remand period. (Tr. 5796-97). In sum, there are no practical alternate sources to replace the aggregate now produced at the quarries in the Lake Belt.

commencement of production mining for quarries in Florida.[92]  (Tr. 5955-56).  It can take even longer to establish foreign sources of aggregate.  For example, Mr. Glusac was previously employed by Vulcan Materials, another major supplier of building materials, when it started up its quarry in Mexico.  (Tr. 5751; 5797).  It took over 10 years for Vulcan Materials' geologists to find a site with suitable limestone.  (Tr. 5797).  Vulcan then had to negotiate a deal with the owner and find a Mexican partner (as is often required by a foreign government), invest capital, obtain permits (dealing with foreign governmental entities is far different than applying for permits from domestic governmental agencies), and construct the mining and shipping infrastructure associated with Vulcan's Yucatan mines.  (Tr. 5798).  The process took over 15 years before production at the quarry began. (Tr. 5797-98).

In sum, even if alternative limestone reserves were available in Florida or elsewhere, development of those new sources would be impracticable over the remand period.

### d. The evidence demonstrates that even if there were alternative sources of limestone, it would not matter because the transportation infrastructure is at capacity.

Assuming alternative sources of crushed stone could be found which have the capacity to produce 50 to 59 million tons each year, existing transportation constraints would preclude moving more than 13 million tons of crushed stone into Florida over the remand period.  (Tr. 5957-58).  Accordingly, even assuming alternative sources of high quality limestone existed, which they do not, transportation constraints would nevertheless result in a limestone shortage in Florida of approximately 46 million tons per year.  (Tr. 5975-80).

---

[92] The time it takes to build a new quarry is affected by various factor such as environmental permitting, obtaining the machinery, preparing the site, etc.  (Tr. 5955).  Also, companies would be hesitant to open a new quarry simply to replace the output of the Lake Belt, given that it is a significant capital investment.  (Tr. 5955-56).  The investors would consider the risk that the Lake Belt mines may be brought back on-stream highly material.  (Tr. 5956).

### i.     Rail capacity is inadequate.

Following an extensive review of publicly-available sources, Dr. Jesse David testified that there are no more than 5 million tons of available rail capacity to transport replacement crushed stone from sources in northern Florida, Georgia or Alabama into central and southern Florida.[93]  Construction of additional rail capacity would take five or more years.  (Tr. 5957-59). In addition to the testimony of Dr. David, two expert railroad witnesses provided unrebutted testimony regarding the capacity for transporting aggregate into or within Florida by rail:  Mike Darragh of CSX Railroad and Charles Lynch of the FEC (Florida East Coast) railroad – the two main rail lines that operate in Florida.

### (a)     CSX Transportation.

Mr. Michael Darragh is the Director of Sales and Marketing – Mined Minerals for CSX Transportation, and his responsibilities at CSX include marketing CSX's freight rail services to all of CSX's rail customers that ship granite and limestone via rail.  (Darragh Aff. ¶ 1).[94]  The

---

[93]  Transporting limestone by rail adds between 2¢ and 5¢ cents per ton mile to its cost, consequently, at between two-hundred and three-hundred miles, the price doubles.  (Tr. 5945).

[94]  Mr. Darragh based his testimony on:  his educational foundation, including an MBA from Stanford University; his 10 years of working in the Operations Department of CSX (*i.e.,* analyzing how to better and more reliably run the operations of the railroad); his experience with cost economic analysis (*i.e.,* working with the finance group of CSX in analyzing whether an infrastructure cost such as a rail passing siding makes economic sense); and his experience in marketing and sales (*i.e.,* knowing what a market price is, how the customer relationship with CSX works, understanding CSX's rail capacity, and the challenges inherent in obtaining additional rail capacity on CSX's lines to meet customer needs).  (Darragh Dep. 145:11 - 147:16).  Although Plaintiffs have attempted to challenge the foundation for Mr. Darragh's testimony, Mr. Darragh testified that he was also part of a CSX team that analyzed capacity problems with the CSX rail line in Georgia in 2005, when it was forced to advise customers that the railroad could not handle any more business along those routes.  (Darragh Dep. 165:2 - 25; 173:4-25).  As a routine duty, he conducts on-site meetings with CSX's crushed stone customer-suppliers concerning their ability to produce and ship materials, (Darragh Dep. 78:4 - 79:11), he monitors the status of rail capacity on CSX's rail lines, and secures rail capacity for his aggregate customers.  (Darragh Dep. 10:12-18; 165:18-25; 166:13-167:11).  Mr. Darragh revealed that for the past two-and-half years he has been exploring ways to increase rail shipment of crushed stone from quarries in Florida, Georgia, and Alabama, (Darragh Dep. 20:9-21:5), and that he has assisted the Florida Department of Transportation ("FDOT") in addressing the state's substantial need for crushed stone and aggregates.  (Darragh Dep. 64:13-65:4).  He was eminently qualified to testify on rail capacity in Florida.

CSX rail lines leading to and within Florida are single track lines, which means that trains cannot pass each other unless one of the trains pulls off onto a passing siding to allow the other train to go by.  (Darragh Dep. 36, 115).  The rail lines leading into Florida from Alabama and Georgia are near full capacity.  (Darragh Aff. ¶ 11).  CSX currently hauls 3.5 to 5 million tons of crushed stone annually from the Lake Belt primarily to locations in Central Florida, but also to Jacksonville.  (Darragh Dep. 13; Darragh Aff. ¶ 3).

In order for CSX to haul any significant amount of rock, it must use unit trains that have been set up to quickly load, transport, and unload large amounts of crushed stone.  (Darragh Aff. ¶ 5; Darragh Dep. 17).  CSX uses unit trains each powered by two or three locomotives and pulling roughly 100 hopper cars to efficiently haul the limestone from the Lake Belt.  (Darragh Aff. ¶ 4).  CSX does not load or transport stone directly from any quarry in Florida outside of the Lake Belt (Darragh Dep. 57:5-9; 131:12-16; 132:8-12), and it is not feasible to try to load a unit train with crushed stone transported from a quarry to a train by truck (Darragh Dep. 21:17-22:8).  Thus, in order to transport any substantial amount of crushed stone, railroads like CSX and FEC are limited to transporting stone from quarries that have direct access to the railroad and unit train facilities.  However, the nearest quarries outside of the Lake Belt from which CSX loads and transports any crushed stone are in Georgia and Alabama, (Darragh Dep. 16:5-17:13; 22:23-23:17; 57:5-9; Darragh Aff. ¶ 10),[95] and like the quarries in Florida, are running at or near their capacity to transport aggregate by rail.  (Darragh Dep. 17:5-7; 23:13-17; 25:18-26:9).

Even if there was capacity in the quarries served by CSX, it currently lacks the rail and equipment capacity to transport substantial amounts of crushed stone into or throughout

---

[95] There are two quarries in central Alabama, two quarries near Junction City, Georgia, about 80 miles south of Atlanta, Georgia, and two quarries near Augusta, Georgia (id.).  These are also the nearest quarries outside of the Lake Belt presently served by CSX that have facilities to load unit trains.  (*Id.*).  CSX currently hauls approximately 1.4 million tons of crushed stone per year from Georgia, and approximately 250-300,000 tons of crushed stone per year from Alabama to locations in Central Florida.  (Darragh Dep. 108:6-110:1; 92:9-16; 93:10-94:5).  These quarries in Alabama and Georgia are running at or near their capacity to transport aggregate by rail. (Darragh Dep. 17:5-7; 23:13-17; 25:18-26:9).

Florida.[96]  Due to current high demand and competition for rail usage, increased distances and longer turn times that would result from transporting stone from quarries in Georgia or Alabama, a lack of capacity and necessary equipment, and the substantial investment and time it would take to add facilities or equipment to increase capacity, CSX would be unable to transport crushed stone into Florida from sources outside of the Lake Belt in quantities of more than 2 to 3 million additional tons per year during the next 36 months.  (Darragh Aff. ¶ 11; Darragh Dep. 111:19-112:1; 112:10-20).

<p style="text-align:center;">(b)      FEC Railroad.</p>

Mr. Charles Lynch testified that FEC Railroad is a single-track railroad that runs along the east coast of Florida between Jacksonville and Miami.  (Lynch Dep. 146:19-24; Plaintiffs' Ex. 1 to Lynch Dep.).[97]  FEC currently transports crushed stone for three companies in the Lake Belt:  Rinker Materials' FEC quarry, Titan (Tarmac) and White Rock.  (Lynch Dep. 21:20-21:25).  The FEC railroad has no line connections to any other quarry outside of the Lake Belt, and does not haul crushed stone from any Florida port or other source.  (Lynch Dep. 144:10-12; 156:23-157:14).  The only sources from which FEC could transport crushed stone to replace the

---

[96] In order to increase rail capacity, CSX would have to construct the facilities required to increase track capacity, such as passing sidings and double track sections.  Contrary to Professor Weisskoff's speculation, these are extremely expensive and take several years to complete. (Darragh Aff. ¶ 11; Darragh Dep. 58:12-62:11).  New facilities for loading and unloading unit trains take two to four years to construct and cost millions of dollars.  (Darragh Dep. 17:20-18:13).  CSX is not currently constructing any unit train loading facilities.  (Darragh Dep. 23:1-7).  CSX would also need to buy a substantial number of additional rail cars and locomotives to deal with the longer turn times.  (Darragh Dep. 95:10-96:6; 149:18-151:22; Darragh Aff. ¶ 10). Rail cars and locomotives are difficult to obtain because of high demand, the long lead times to obtain such cars, and competition with coal for any available cars.  (Id.; 24:7-16).

[97] Mr. Charles Lynch has worked in the railroad industry since 1975, including for railroads and consulting firms working on rail projects.  (Lynch Dep. at Ex. 1).  He has served as Vice-President of Transportation for FEC since 1999, and in that capacity, his duties include: - overseeing FEC's system-related functions and transportation network operations; overseeing dispatching, crew management and locomotive distribution; servicing the needs of FEC's customers; overseeing FEC's operating rules; supporting strategic planning (i.e., modeling FEC's network to project future demand given the existing infrastructure); assisting senior management to prepare capital budgets and plan for infrastructure improvements and capital needs; and supervising a logistical model analysis to determine required capital investments. (Lynch Dep. at 7:21-10:7).

limestone from the Lake Belt are quarries located at points north of Jacksonville, including in Alabama, Georgia or South Carolina, and only by way of interchange of such cargo from the CSX Railroad ("CSX") or the Norfolk Southern Railroad ("NS"), both of which have rail lines that connect with FEC in Jacksonville. (Lynch Dep. 157:15-158:10). CSX and NS are the only railroads that have lines that lead into Florida. (Lynch Dep. 79:13-81:5).

If mining in the Lake Belt production is shut down or substantially curtailed, Mr. Lynch testified that because of limited rail capacity on the CSX and NS lines,[98] no more than two unit trains from CSX and two unit trains from NS would be able to interchange with FEC per week within the next 36 months. Assuming each such unit train consisted of 100 cars, and could each carry 10,000 tons of crushed stone, Mr. Lynch testified that FEC could transport no more than 40,000 tons a week, or roughly 2 million tons of crushed stone per year during the next 18 to 36 months from quarries located outside of the state. (Lynch Dep. 141:21-142:11).

Based on the unrebutted testimony of Dr. Darragh and Mr. Lynch, no more than 3-5 million tons of aggregate could be transported annually by rail during the next 36 months.

### ii. Trucking is impracticable.

Trucking also would not be a practicable alternative for transportation of crushed stone from sources in northern Florida, Georgia or Alabama into central and southern Florida, even if those quarries had the available mining capacity. Trucking crushed stone from central or northern Florida (*e.g.*, from Tampa or Jacksonville) to southern Florida would cost

---

[98] The entire rail industry is facing capacity constraints. (Lynch Dep. 149:18-150:19). The CSX and NS rail lines leading into Florida are congested and lack the rail capacity and infrastructure necessary to substantially increase current shipments of aggregate to the FEC line. (Lynch Dep. 27:3-28:11; 32:15-33:8). Moreover, FEC has only 26 passing sidings, and therefore, increasing capacity on the FEC system would also require an increase in the amount of double track, passing sidings and additional signals. (Lynch Dep. 9:11-10:7; 29:5-22). At present, FEC transports roughly one train per week (approximately 500,000 tons of crushed stone annually) that originate from points north of Jacksonville to points within Florida. (Lynch Dep. 143:5-21). Even if there was available track capacity (*e.g.,* in comparison to passenger trains), bulk commodity trains are given the lowest priority on the tracks. (Lynch Dep. 161:24-163:14).

approximately $30.00 to $50.00 per ton (between four and six times the value of the material).[99] Trucking crushed stone from Georgia or Alabama would double even those per ton costs, adding approximately $6 billion annually to the cost of the material.  For comparison, the total annual employee payroll for all construction firms in the six-county south Florida area is only approximately $5 billion (Tr. 5959-61).

Transporting 50 million tons of limestone from a source outside the Lake Belt to south Florida by 25 ton dry bulk tractor trailers would take approximately 2 million truck trips per year.  To implement 2 million truck trips operating 24 hours per day 7 days per week would require between 5,000 and 6,000 25 ton dry bulk tractor trailers.  The most recent United States census information reflects that only about 1,300 dry bulk tractor trailers now operate on the Florida highways, and that 5,500 dry bulk tractor trailers would represent approximately nineteen percent (19%) of the entire inventory of such trucks in the United States.  To implement 2 million truck trips per year would double freight traffic in Florida, increasing highway waiting times, accidents and air pollution.  (Tr. 5961-62).

### iii.    Ports and ships are at capacity.

Florida ports do not have the capacity to import crushed stone in quantities sufficient to replace Lake Belt production.  Over the next 36 months, South Florida ports would have less than 1 million tons of annual capacity to import additional crushed stone into Florida.  (Tr. 5963-64).[100]

---

[99] Shipping crushed stone by truck adds between 10¢ and 15¢ per ton mile to its cost.  At between fifty and one-hundred miles, the cost of the trucking equals the price of crushed stone FOB the quarry.  Therefore, it is very unusual for crushed stone to be trucked more than one hundred miles.  (Tr. 5944-45).

[100] Shipping crushed limestone by ocean-going vessels adds approximately $10.00 per ton to its cost, and moving it from a Florida port to its ultimate destination by rail or truck adds still more cost.  (Tr. 5945-46).

The Court heard from Mr. Charles Towsley, an expert who has been in the port business since 1975.[101]   Mr. Towsley is intimately familiar with the 14 statutory deep water ports in Florida.  (Tr. 5601-02).  He has managed two of the largest of these ports, the Port of Tampa, and for 8 years, the Port of Miami.  (Tr. 5602).  For the last 5 years, Mr. Towsley has also served as Chairman of the Florida Seaport Transportation Economic Development Council – a group that provides oversight of the funding and grant programs provided to ports by the Florida Department of Transportation.  (Tr. 5601-02).

Mr. Towsley testified that approximately 5 million tons of crushed stone are imported annually into Florida through its deep water ports; an amount that Plaintiffs' economic witness did not contest.  (Tr. 5655).  Mr. Towsley opined further that even assuming that additional crushed stone existed and ships were available to transport it, only an additional 2.4 million tons of crushed stone, or roughly a 50% increase, could be imported annually into Florida within the next 36 months.[102]  (Tr. 5635).  Of this, less than 1 million tons could be imported through South Florida ports.[103]   Defendant Intervenors' Exhibit 142 reflects the analysis performed by Mr. Towsley.

---

[101] Mr. Towsley was admitted as an expert in port planning, design, access, and operations, and the use of Florida ports to import cargo, including aggregate and other dry bulk cargos.  (Tr. 5605).  He was the only port expert to provide evidence in this case, and his testimony is un-rebutted.

[102] Notably, the analysis, and the anticipated amount of terminal space the ports will make available for the import of aggregate, would change little even if the demand for imported crushed stone increased dramatically.  Ports allocate dockage based on factors that cannot be reduced to the short-run market value of the import.  Other factors include compatibility, environmental concerns, access issues, servicing issues, space issues, the pricing structure of the ports, and long term agreements.  (Tr. 5624).  As public entities, the ports have a formula for earning a return based upon their industrial land value.  The methods for structuring their leases for that return are not historically related to short-term fluctuations in the market value of commodities.  (Tr. 5624-25).

[103] Mr. Towsley also identified and considered other trends in the usage of Florida ports relevant to his analysis.  (Tr. 5635).  Ports are moving away from less desirable, dirty or unsightly bulk cargo to the more prestigious types such as cruise passengers.  (Tr. 5635-36l; Def. Int. Ex. 142).  A second significant trend impeding the expansion of port access for bulk cargo is that ports are becoming "land starved."  (Tr. 5638).  Port expansion competes with other higher and better valued urban land uses, and is further inhibited by environmental concerns.  (Tr. 5639).

Port availability is not the only constraint on importing crushed stone through the ports. Ships capable of carrying the limestone are in very limited supply.  Mr. Edward DeRoche is Senior Vice President of Canada Steamship Lines International ("CSL").  (DeRoche Dep. 4:20-5:4).  His job responsibilities include the negotiation of various transportation agreements and the marketing of CSL's pool of vessels.  (DeRoche Dep. 11:23-12:1; 38:16-39:20; (DeRoche Aff. ¶3).  Mr. DeRoche has been directly involved in the decisions to add vessel capacity, as well as the negotiations with shipyards on construction contracts.  (DeRoche Dep. 39:22-40:10; 98:15-100:3); DeRoche Aff. ¶3).  He has performed these duties for over 34 years.  (DeRoche Dep. 4:20-5:21); DeRoche Aff. ¶3).

Mr. DeRoche gave unrebutted testimony concerning the logistics of transportation of crushed stone via ships.  He described CSL's management of a pool of ships that transport a wide range of commodities including crushed stone.  (DeRoche Dep. 38:16-39:20).  He advised, as did Mr. Towsley, that the efficient shipment of bulk commodities such as crushed stone requires shipping large quantities and the ability to load and discharge those quantities quickly (DeRoche Dep. 107:8-108:8).  He advised that CSL utilizes large vessels (known as Panamax class) that are fitted with specialized unloading systems in order to handle bulk commodities such as crushed stone, (DeRoche Dep. 83:8-17; 84:12-18; 99:21-23; DeRoche Aff. ¶¶4-8). These ships are extremely expensive (upwards of $50 million) and take several years to build. Conversion of carriers' existing bulk to accommodate the self-unloading system is cost-prohibitive.  (DeRoche Dep. 101:8-103:20 104:8-105:2; DeRoche Aff. ¶10).

Due to increasing demand, there is a shortage of these ships, as there are only 14 self-unloading Panamax vessels worldwide.  (DeRoche Dep. 103:8-20; DeRoche Aff. ¶12).  While CSL is expecting four more of these ships within the next 16 months, these vessels would add no more than 2.5 million tons of shipping capacity – if solely dedicated to shipping crushed stone. (DeRoche Dep. 78:5-79:15; 92:17-93:14; 96:17-97:16; DeRoche Aff. ¶13).  However, these vessels will not be used to ship crushed stone only, and the capacity added by these ships may be

filled by existing contracts for other commodities.  (DeRoche Dep. 92:17-97:14; 99:20-100:16; DeRoche Aff. ¶12).

Exploring the constraints on importation of foreign limestone, Tarmac America's Mr. Townsend testified that Tarmac had investigated foreign imports and found that Tarmac could bring in only approximately 1 to 1.5 million tons of limestone from sources outside the United States during the next 18 to 36 months.  (Tr. 4974-75).  This level of imports could not come close to replacing the 11 million tons per year that Tarmac extracts from its Lake Belt quarry. (Tr. 4975).

Moreover, there are numerous problems with importing limestone from foreign sources. One is cost.[104]   Another is reliability.[105]   Last, there is quality.[106]   Many sources of foreign limestone contain chlorides which causes spalding of the steel reinforcing rods within concrete. (Tr. 4975).  Foreign limestone also must meet a gradation specification.  (Tr. 4975).  There are also other port, transportation, and cost issues.  Many foreign port facilities are simply unable to accommodate appropriate ships.  (Tr. 4975).  As explained by Mr. Townsend, there is also limited availability of suitable space at domestic ports for importation of crushed stone.  (Tr. 4975).[107]   The importation of foreign limestone is not a viable option to replace the Lake Belt production over the remand period.

---

[104] For example, the average weighted price of limestone at Tarmac America's Lake Belt quarry is approximately $6 to $12 per ton.  (Tr. 4976).  Assuming Tarmac found limestone in Honduras or Mexico, the transportation cost to bring the limestone to Port of Tampa or Port Canaveral would be about $19 a ton.  (Tr. 4976).  There is no rail transportation in Port Canaveral, and shipping the limestone from Tampa by rail would be physically impossible because of the size of the trains needed and the limited rail infrastructure at Port of Tampa.  (Tr. 4977-78).  The cost for trucking limestone from Tampa to South Florida is somewhere between $40-60 a ton.  (Tr. 4978).  Importing limestone would thereby increase Tarmac's cost of limestone six fold.  (Tr. 4978).

[105]   Mr. Glusac testified that foreign supplies of cement are unreliable and that shortages in foreign cement frequently cause disruption to the market.  (Tr. 5765-66).

[106] Limestone from Mexico and other parts of South America cannot be used to replace lost production in Lake Belt because it often does not meet FDOT specifications.  (Prasad Dep. 20-21).

[107] Confirming Mr. Towsley's testimony, Tarmac America investigated and found that there are no Florida ports available to accept the import of 11 million tons per year that Tarmac now

(continued . . .)

>    **e.** **The evidence demonstrates that halting Lake Belt mining would cause severe and irreparable harm to Florida's economy and Defendant Intervenors.**

If there were a halt to site preparation activities or production mining over the remand period, there would be direct employment effects on the mining industry. The Lake Belt mines subject to the permits at issue in this proceeding employ approximately 1,000 persons directly in mining operations. (Tr. 5946). In addition, there would be significant upstream and downstream effects. Upstream impacts would be effects on industries providing inputs to the Lake Belt mining industry. Downstream impacts would be the economic consequences for industries that rely heavily on limestone from the Lake Belt, sometimes known as the "multiplier effect." (Tr. 5967-70).

Employment within the six South Florida counties in critical downstream industries which rely heavily on Lake Belt limestone encompasses about 175,000 jobs. More broadly, employment across Florida in critical downstream industries which rely heavily on Lake Belt limestone approximates 619,000 jobs. (Tr. 5949-50).

>    **i.** **The irreparable harm to Florida's economy.**

Dr. David testified that ultimately, the direct, indirect, and induced, employment effects of the 46 million ton shortage in limestone due to a halt in mining would result in a loss of about 280,000 jobs in South Florida. (Tr. 5984-86). The loss of value added (*i.e.,* incomes) to the South Florida economy from that shortage would be approximately $17 billion per year. (Tr.

---

(. . . continued)
produces in the Lake Belt. (Tr. 4978-79). It would take 220 shiploads to import the 11 million tons, and 2000 truckloads per ship to move the stone from the port. (Tr. 4979-80, 4980). The ships necessary to carry this much limestone could not even be fabricated within an 18 to 36 month time frame. (Tr. 4980). Moreover, there simply are not enough trucks available to haul the limestone away from the Florida port. With 220 shiploads and 2000 truckloads per ship, there would be a total of 440,000 truck-trips per year just to replace Tarmac's Lake Belt volume. (Tr. 4980-81). Each truck costs approximately $120,000 and takes about 9-12 months to acquire. (Tr. 4981). All of the Defendant Intervenors face similar difficulties in attempting the importation of foreign limestone.

5986).  The loss of output to the South Florida economy would approach $33 billion per year. (Tr. 5986-87).

Dr. David carefully explained his methodology.  He based his testimony on his training as an economist and the testimony of the witnesses in this case, as well as "government documents, numerous studies of the transportation industries, many sources of data, government sources, and industry sources."  (Tr. 6036-37).  He concluded that if the Lake Belt mines were shut down, there would be a "direct loss" of about 1,000 jobs in just the quarries based on the payroll evidence provided by the company witnesses.  (Tr. 5946, 5982).  To determine the "downstream" reduction in employment, he first calculated the increase in the price of limestone in the Florida, Georgia, and Alabama market that would be caused by eliminating the Lake Belt supply.  (Tr. 5950-55, 5965-66, 5971, 5982-83).  Then he calculated the additional price increase resulting from the much greater transportation cost of moving the limestone a greater distance to South Florida.  He added these costs together to obtain the total increased cost for limestone in South Florida.  (Tr. 5950-55, 5971, 5982-83).

Dr. David then determined the fractional cost of limestone for each downstream industry that uses it as a component.  For example, limestone may be as much as 10% of the cost of the cement, but only 2% or less of the total cost of construction.  He then derived how much the total costs of each industry would rise by multiplying the previously determined increase in limestone market cost by its percentage of the total cost of the downstream industry.  For example, a 300% increase in the cost of limestone would produce a 6% increase in total construction costs because limestone represents only 2% of construction cost.  Dr. David then assumed a standard elasticity demand of 1, meaning that if construction costs rise 6%, then employment and output in that industry will fall 6%.  (Tr. 5966).

Dr. David next calculated the shortage of limestone likely to result during the remand period.  (Tr. 5966).  Based on the expert evidence as to transportation capacity and alternative Florida mine capacity, he concluded that 13 million additional tons per year could come into South Florida from outside sources, and that there are 10 million tons currently used in South

81

Florida supplied by other mines in the region.  He calculated that the shortage of 46 million would then be about 67% of the total amount needed annually during the remand period.  (Tr. 5960, 5975-76).

Finally, to reach the total "downstream" impact, Dr. David combined the results of these effects, price increase and supply shortage.  (Tr. 5982-83).  He then multiplied the relevant percentages for each particular industry by the total employment in each affected industry in the six county area to obtain total employment losses for "downstream" industries.  (Tr. 5984-85).

Dr. David also calculated "upstream" effects, i.e., the impact on employment in South Florida businesses that supply the mines and downstream industries as well as those that serve the households of workers in those industries.  Dr. David took the employment losses for the downstream industries and used them as inputs in the IMPLAN model to calculate the effect of the loss of the construction, mining, and concrete/cement manufacturing jobs in South Florida on supplier companies.   IMPLAN is a standard model designed for exactly such upstream calculations.   The total economic effect is a combination of the downstream and upstream factors.  (Tr. 5981-5991).

Dr. David gave detailed testimony on a likely scenario in which 13 million tons of alternative limestone supply yielded a net shortage of 46 million tons per year during the remand period.  The result would be 1,140 lost jobs in mining, 1,218 lost jobs for suppliers to the mines, 133,504 lost jobs in downstream industries like cement and concrete products and construction, and 146,623 lost jobs from suppliers to downstream industries and employees' households, such as retail and health care, for a total of 282,486 lost jobs.  (Tr. 5981, Def. Int. Ex. 169).  The income and output losses were derived using analogous techniques.  (Tr. 5986-5987).

Other economic effects caused by this shortage of limestone from the Lake Belt would include a substantial increase in prices of limestone-derivative products throughout the Southeastern region of the United States, a substantial increase in freight rates for rail, trucking and marine transportation, and significant adverse effects in sectors of the economy not directly dependent on limestone products.  (Tr. 5990-92).

82

The loss of employment, incomes and output to the South Florida economy caused by the 46 million ton shortage of limestone would lead to a severe recession in the South Florida economy.  (Tr. 5987).

### ii.    The irreparable harm to Defendant Intervenors.

To the extent that mining is halted, each of the Defendant Intervenors will be required to let go hundreds or thousands of employees, not only those employed directly at the quarries and related facilities in the Lake Belt, but also employees who work at the manufacturing, sale and distribution facilities that rely on aggregate from the Lake Belt to operate.

White Rock, for example, is a fourth generation family-owned business that engages in mining operations only in the Lake Belt at two principal locations.  These are White Rock Main, which is located north of U.S. 27, adjacent to the Miami-Dade/Broward County line and was grazing pastureland until mining activities commenced at the location approximately 20 years ago, and White Rock South, which is situated on leased property approximately ten miles to the south of its Main facility.  At Main, White Rock operates a limestone quarry and crushing facility.  White Rock operates a quarry and an asphalt plant at its South facility.

White Rock has 920 employees working at its quarries and at Ranger Construction, its affiliated facility.  (Tr. 5531).  These employees would have to be terminated approximately two weeks after closure of operations necessitated by the cessation or curtailing of mining.  (Tr. 5534-35).

Rinker Materials employs approximately 300 people at its Lake Belt quarries, and over 5,000 in the State of Florida.  (Tr. 5777-78).  If its Lake Belt quarries were shut down, the company would have to lay off a significant number of employees at the quarries and related facilities in the Lake Belt, and at the various manufacturing, sale and distribution facilities that rely on the aggregate from these Lake Belt quarries to operate.  (Tr. 5783).  The services of many third-party contractors would also no longer be needed.  (Tr. 5783-84).

Tarmac America's representative testified that if the Court were to halt site preparation or production mining in the Tarmac quarry, fewer than 50 of its 1,300 employees in the Lake Belt would keep their jobs. (Tr. 4981-82).[108] Florida Rock's Miami quarry employs 111 persons and has property, plant and equipment of approximately $52,451,000 of which $21,523,000 is land. (Plf. Ex. 118). Thus, Florida Rock would suffer serious losses if its Lake Belt mining were terminated.

Sawgrass Quarry ("Sawgrass") and Community Asphalt Corporation ("Community Asphalt") have engaged in mining operations in the Lake Belt for more than 20 years, on property owned by Sawgrass that is east of Okeechobee Road, east of U.S. 27, and immediately to the north of N.W. 186th Street. (Fernandez Dep. 10:24-25, 11:1-8). Community Asphalt employs approximately 20 workers to process limestone into road base, as well as 10-20 workers in the Sawgrass asphalt plant. (Fernandez Dep. 30:5-11). There are also more than 100 truck drivers who deliver the product to various projects, and a similar number of project-site operators who work the product into roads. (*Id.* at 30:11-14). In total, Community Asphalt has 633 employees, 369 of whom work in Miami-Dade County. (Fernandez Dep. 53:21, 54:5-18).

In addition to employment impacts, each of the Defendant Intervenors would suffer significant economic impacts from a substantial curtailment or halt to Lake Belt mining. First, each of the Defendant Intervenors would lose the use and value of the hundreds of millions of dollars spent to acquire, develop and operate the quarries and related facilities located in the Lake Belt. White Rock has spent more than $200 million on capital improvements at the White Rock Main quarry and $25 million at its White Rock South facility. (Tr. 5533).

---

[108] In addition, third parties – including but not limited to railroad employees, the 400 independent truckers that haul Tarmac limestone products, and suppliers – would be adversely affected. (Tr. 4982-83). Purchasers and users of Tarmac's limestone products, and those who depend upon them, also would be adversely affected – including engineers and architects that design projects, bankers that loan money, construction workers, electrical workers, plumbers, roofers, among others. (Tr. 4983).

Rinker Materials has three quarries that produce construction grade aggregate in the Lake Belt, (Tr. 5759), including those at SCL[109] and FEC,[110] which it owns, and Krome quarry, which it operates under an arrangement with the owner of the property.[111]   (Tr. 5759).   Its total investment in the land, equipment and facilities at the FEC, SCL, and Krome quarries is about $350 million.   If mining were curtailed substantially or halted at the FEC, SCL and Krome quarries, Rinker Materials would be unable to utilize these substantial facilities.   (Tr. 5787). Rinker Materials' Florida Materials Division operates as part of a team in implementing its Florida vertically integrated building products system.   (Tr. 5750).   This division of Rinker Materials operates 95 Florida ready-mix concrete and 26 Florida concrete block plants, as the majority of which rely on limestone from the Lake Belt to operate.[112]   (Tr. 5758).   The total investment in these manufacturing plants and related facilities and infrastructure is over $500 million. (Tr. 5787).   If mining in the Lake Belt was halted or substantially curtailed, Rinker Materials would also lose the use of its manufacturing plants and related facilities that rely on aggregate produced by FEC, SCL and Krome quarries – in short, any halt or substantial curtailment in production would significantly impact  the company.   (Tr. 5786-87).

In 1984, Tarmac purchased the assets of Lone Star Industries – including 6,000 acres in the Lake Belt, a cement mill, an aggregate production facility, and concrete and ready-mix plants throughout the state – with the expectation that it had permits and a 50-year supply of limestone. (Tr. 4983-84).

---

[109] The Rinker Materials' SCL quarry is located just to the north of Tamiami Trail, and produces approximately 2.5 million tons annually.  (Tr. 5772).  Between 18 to 22 acres are mined annually at SCL.  (Tr. 5773).  The wetlands at SCL, much like those at the FEC, are primarily dense melaleuca.  (Tr. 5771, 5774).  A significant portion of the limestone is used to supply Rinker's cement mill, which recently went through a $160 million renovation.  (Tr. 5774).

[110] The FEC quarry is located south of Okeechobee Road.  (Tr. 5768).  FEC annually produces about 13 million tons of aggregate.  (Tr. 5769).  Limestone from the FEC quarry is shopped through the FEC rail lines up the east coast as far as to Jacksonville.  (Tr. 5769).

[111]  The Krome quarry produces approximately 5 million tons of limestone annually.   This limestone is processed and distributed to Orlando and Tampa.  (Tr. 5775).

[112] Rinker has 71 ready-mix concrete plants and 17 concrete block plants that rely on limestone from either the FEC, SCL or Krome quarries to operate.  (Tr. 5779).

Much of the investment in the various Lake Belt quarries and related facilities has been made in reliance on the ability to conduct mining operations under the permits which are the subject of this action.  For example, since the permits were issued in 2002, Rinker Materials has built eight new ready-mix plants and four block plants.  (Tr. 5782).  It has also expanded its concrete truck fleet by more than one hundred trucks.  (*Id.*)  Rinker Materials has invested almost $150 million in the quarries themselves since the Corps issued the permits in 2002.  (Tr. 5782-83).  Similarly, since the issuance of the 2002 Corps permit, Tarmac has invested over $400 million in its Florida operations.  (Tr. 4984).  The investments include a new $249 million cement plant adjacent to the Tarmac Lake Belt quarry, several new block plants that supply concrete blocks all the way to Jacksonville, a new mobile equipment garage, and numerous other concrete facilities throughout the state.  (Tr. 4984-85).

Each of the Defendant Intervenors would lose hundreds of millions of dollars in annual revenues from the direct operation of the quarries in the Lake Belt.  For example, White Rock excavates approximately 160,000 tons of rock per acre.  (Tr. 5546).  In 2005, the company mined approximately 20 million tons of rock (Main and South combined); in 2006, it mined approximately 22 million tons.  (Tr. 5547-48).  Collectively, these operations (Main and South combined) generate revenues of approximately $240 million per year – with a net profit margin of approximately 18%.  (Tr. 5555-56).

These revenues and profits would be lost if mining in the Lake Belt is halted or significantly curtailed.  White Rock operates no facilities outside the Lake Belt and cannot obtain limestone from another source, having been unable to identify other reserves in Florida that have the same quality limestone as is found in the Lake Belt.  (Tr. 5481).

The combined annual aggregate production of Rinker Materials' quarries within the Lake Belt is approximately 20 million tons (Tr. 5777), and the total annual revenue for the crushed stone and aggregate portion of Rinker Materials' business originating in the Lake Belt exceeds

$200 million.  (Tr. 5778).  These revenues would be lost if Rinker Materials' Lake Belt quarries are forced to halt or substantially curtail, mining.  (Tr. 5787).[113]

From the Lake Belt operations, for the year ended September 30, 2005, Florida Rock's Miami quarry sold 4,227,000 tons of aggregates, generating $36,400,000 in revenues.  For the six months ended March 31, 2006, Florida Rock sold 1,973,000 tons of aggregates from the Miami quarry, generating $19,467,000 in revenues.  (Plf. Ex. 118).  A significant portion of this volume is shipped by rail to Central and Northeast Florida and used in Florida Rock's concrete production facilities in Southeastern Florida, Central Florida, Tampa and Jacksonville.  Florida Rock is a supplier of rock to the FDOT.  (Prasad Dep. 8:23-9:7, 10:20-23).

Moreover, for those companies that are vertically integrated, that is, they utilize the aggregate they mine to supply their own manufacturing facilities, hundreds of millions of dollars in additional revenues will also be lost.[114]

Even if mining or site preparation is not completely halted, or is halted for a short period of time, each of the Defendant Intervenors will be unable to commit to long-term supply contracts and will lose the customers and customer good will these companies have spent decades developing.  A curtailment or halt in Lake Belt production would also ultimately cause the mining companies not to be able to perform their contractual obligations to supply limestone-based products.  (Tr. 4973).  As Mr. Hurley testified, White Rock currently has more than $500 million in contractual commitments.  White Rock would lose its customer base because it would be unable to fulfill its commitment to lenders or its supply agreements with more than 200 customers.  White Rock would also not be in compliance with its long-term equipment contracts.

---

[113]   In addition, the redi-mix concrete, concrete pipe and concrete block manufacturing facilities of Rinker Materials that rely on Lake Belt aggregate to operate generate millions of dollars in additional revenue.  (Tr. 5778).

[114]   As explained by Mr. Glusac, Rinker Materials supplies its own raw materials and finished products.  Rinker Materials has infrastructure at each of its three quarries, such as direct access to rail, that allows it to be vertically integrated.  (Tr. 5766).  As Rinker Materials moves materials from its quarries north by rail, it is distributed to concrete plants that rely solely on that material.  (Tr. 5767).

This would result in a loss of $20 million of revenue each month for the time of my mining cessation. (Tr. 5531-34).

Rinker Materials' key customers include the Florida DOT, as well as other governmental agencies, and Rinker Materials also sells to general contractors and developers, and to individuals. (Tr. 5754-55). If Rinker Materials is unable to commit to long term provision of aggregate and related building materials to these customers, it will lose customers and substantial customer good will.[115]

If mining is halted for any period of time, and each of the Defendant Intervenors are forced to stop operations, lay off employees, and tell customers that they are no longer able to supply their aggregate and limestone product needs, it will take a very long time to once again ramp up operations. Crews will once again have to be recruited, hired and trained; equipment will have to be obtained; site preparation will have to be again initiated, and depending on the time of year and weather, this process could take from six to 18 months. (Tr. 5788).

In sum, the proof of the economic devastation that Defendant Intervenors will suffer in the event of a halt of mining in the Lake Belt is so clear and overwhelming, Plaintiffs utterly failed to rebut it with any credible evidence.[116]

> ### 2.    The evidence demonstrates that vacatur would disrupt crucial public infrastructure and environmental projects.

The devastating effects on the South Florida economy caused by a shortage of Lake Belt limestone, and the increased cost of limestone, would fall more heavily on some consumers of limestone-derivative products than others. These users would include public works with fixed

---

[115]  Even if mining were not immediately shut down, but rather, Rinker Materials could no longer engage in clearing or de-mucking, Rinker Materials could not commit to supply long term projects. (Tr. 5790). This would cause Rinker Materials to lose customers, jobs, and revenue. (Tr. 5790-91).

[116] Some of the companies would have grave difficulty absorbing the kinds of losses that would follow from such defaults. (See *e.g.*, Tr. 4973).

budgets, such as highways, bridges, schools, government buildings, and environmental projects of all kinds.  (Tr. 5992-93).

### a.       Public works projects would halt.

Company representatives testified that high-grade, Lake Belt limestone is used for transportation projects, such as the extension of the Palmetto Expressway, I-95 to the north, and improvement of the Sawgrass Expressway, (Tr. 4971-72, 5489), and for construction of schools, roads, residential housing, commercial buildings, and medical facilities.  (Tr. 4972).  For example, Tarmac is providing limestone products manufactured with Lake Belt rock for: expansion of the Northwest Regional Medical Center (near the Miami-Dade-Broward county line); the University of Miami School of Nursing; Broward General Hospital; the new Delray Beach Fire and Rescue headquarters; the Cocoa Launch simulator at Cape Canaveral; and the Pompano Beach city center.  (Tr. 4972).

Crucial public (and private) projects that Lake Belt mining supplies with limestone products would halt if these quarries were unable to produce the limestone aggregates, cement, concrete and asphalt used in such projects.  (Tr. 4973).  For example, 60% of White Rock's products are used in the public sector, and it supplies products to the Miami-Dade Expressway Authority for highway expansion and improvement, and to the Miami International Airport for runway upgrades and expansion of tarmacs and buildings.  (Tr. 5488-89).  Also Ranger Construction, a major White Rock customer, primarily performs heavy highway construction for FDOT, as well as Florida counties and municipalities.  (Tr. 5487-88).

Community Asphalt utilizes Sawgrass' entire mining output.  (Fernandez Dep. 5:16, 6:10).  Community Asphalt mines roughly 1 to 1.2 million tons of limestone per year, (Fernandez Dep. 16:22-24), and processes it from the quarry into FDOT lime rock base. (Fernandez Dep. 12:19-20).  Community Asphalt's primary business is heavy and highway construction – primarily, building roads, runways, and parking lots.  (Fernandez Dep. 22:15-16,

22:25-23:2).  Approximately 90% of Community Asphalt's contracts are with the Florida DOT or some other government agency.  (Fernandez Dep. 33:5-7).

APAC Southeast, Inc. ("APAC") is primarily a heavy highway contractor, which performs extensive work for FDOT, Florida counties and municipalities, and private developers.  (Parker Dep. 13:12-16).  APAC purchases between 1.7 and 2 million tons of aggregate annually from the Lake Belt region, purchasing from almost all mining operations in the Lake Belt.  (Parker Dep. 14:6-19, 14:25-15:1).  All of APAC's projects in Miami-Dade, Broward, Palm Beach and Monroe Counties rely entirely on Lake Belt aggregate, and its other projects in south Florida are between 50% and 75% dependent on Lake Belt products.  (*Id.* at 19:23-25, Ex. 4).  APAC's projects in Central Florida are also 50-75% dependent on Lake Belt materials.  (*Id.* at 22:18-23).  Curtailing mining activities in the Lake Belt would have a significant impact on APAC's public projects, including hurricane recovery, roads, schools, prisons, courthouses, airports, ports, and other facilities that are essential to international security, as well as tourism.  (Parker Dep. 29:18-23, 30:2-6).

Aranth Prasad, the Chief Engineer for the Florida Department of Transportation, testified that Lake Belt limestone meets the highest FDOT standards, and that approximately 50% of all of the aggregate used by FDOT comes from the Lake Belt.  (Prasad Dep. 10:20-23).  In describing the potential effect of any curtailing or eliminating of production from Lake Belt, he stated: "It's going to have a significant impact.  We depend on – as I mentioned before, 50 percent of the rock comes from this area, and that would severely curtail our ability to make the necessary improvements to the transportation system."  (Prasad Dep. 11:11-18).  The potential impact on projects to be let in 2007 is as follows:

a)  District 6 – Miami, Dade, Monroe Counties – $397 million, all projects would be affected.  (Prasad Dep. 12:13-20).

b)  District 4 –Broward, Palm Beach, Indian River, St. Lucie – $256 million, all projects would be affected.  (Prasad Dep. 13:1-8).

c)  District 1 – Naples to south of Tampa – $593 million – (60% of the projects would be affected) – $356 million. (Prasad Dep. 13:9-15; *see* Int. Defs.' Ex. 154).

The total dollar value of FDOT contracts to be let  through October 2006 was $3.1 billion, of which $1.8 billion will be put directly at risk.  (Prasad Dep. 13:22-14:9).  The effect of curtailment or elimination of Lake Belt production on currently authorized FDOT projects would be $1.2 billion.  (Prasad Dep. 14:17-23).  Stopping or reducing Lake Belt production would also adversely affect FDOT's repair and maintenance activities, (Prasad Dep. 15:5-9; 17:2-12), interfering with safety on the roads by preventing needed improvements and halting many ongoing significant projects.  (Prasad Dep. 17:13-23).

Finally, the FDOT estimated the effect of suspension of production in the Lake Belt would at least double, if not quadruple, the price of aggregate for its projects.  (Prasad Dep. 20:16-20).

### b.    Environmental projects will be stopped and eco-system service values will be impaired.

For each ton of limestone originating from the Lake Belt that is sold by the Defendant Intervenors, they pay a per-ton mitigation fee which is used by the State of Florida Lake Belt Mitigation Committee to acquire, restore and manage wetlands in the Pennsuco mitigation area. Through the end of 2005, the State of Florida had collected approximately $17.2 million in mitigation fees from Lake Belt mining.  This money is being used to acquire new land and to restore land in public ownership within the Pennsuco mitigation area.  Through the end of 2005, approximately 937 acres were acquired and restored, and an additional 3,375 acres already in public ownership were restored, within the Pennsuco mitigation area.  (Tr. 5993-94).  If mining were curtailed or halted, mitigation fees would not be collected, and funding for acquisition, restoration and management would end.

In 2006, the Florida Legislature enacted a second fee that will generate funds to pay for improved water treatment facilities to augment the protection of Miami-Dade's Northwest Wellfield.  Section 2, Chapter 2006-13, Laws of Florida.  As with the Pennsuco wetlands area, if Lake Belt mining is curtailed or halted, the financing source for this enhancement of the Miami-Dade water treatment facilities will be unavailable.

Plaintiffs claim that pristine wetlands perform ecosystem services values of approximately $16,000 per acre per year, while wetlands degraded with the infestation of melaleuca perform ecosystem services values of up to $8,000 per acre per year. Thus, restoration or removal of melaleuca-infestation from an acre of wetlands generates a "lift" or improvement in ecosystem services value for that acre of wetlands of approximately $8,000. (Tr. 5994-95). The approximately 4,312 acres that have been acquired and/or restored in the Pennsuco mitigation area with mitigation fees generated by Lake Belt mining during the term of the permits at issue in this proceeding, generate approximately $34.5 million per year in ecosystems services values. (Tr. 5994; Tr. 5995).

Mitigation is occurring in the Pennsuco mitigation area under the relevant permit conditions at a ratio of approximately 2.5 to 1 (for a "lift" in ecosystem services net value of approximately $8,000 per acre or total ecosystem services value of about $20,000 for every acre mined in the areas subject to the permits at issue in this proceeding). The lakes created by the mining likewise generate ecosystem services values of approximately $5,000 per acre. (Tr. 5996-98). As a result, ecosystem services value of over $25,000 is produced for every acre mined under the permits at issue in this proceeding. If there were a halt in site preparation or mining, the melaleuca-infested areas of the Pennsuco mitigation area would not be restored, and the degraded wetlands in the Pennsuco mitigation area would produce ecosystem services value of only about $8,000 per acre. As a result, there will be a net improvement in ecosystems services value exceeding $17,000 per acre mined, and if mining continues on the approximately 1,200 acres to be mined in the areas subject to the permits at issue in this proceeding during the next 36 months, the net increase in ecosystem services value would be approximately $20 million. (Tr. 6003-05; Int. Defs.' Ex. 171).

Scott Burch, Chief of the Cost Engineering Branch of the Corps, testified that many of the Corps' projects in South Florida are built with limestone and that they utilize significant quantities from the Lake Belt area. (Tr. 2913). Burch is responsible for overseeing and directing the preparation of all construction cost estimates prepared for all Corps projects within the

Jacksonville District, including CERP.  (Tr. 2923).  He explained that the Corps typically seeks the most economical source of material for its projects, and discussed how it bids out projects. (Tr. 2913).  He noted that increases in the costs of key components to Corps projects such as cement, concrete and concrete products have negative impacts on the Corps, such as forcing it to have to go back to Congress to get renewed authority to move forward with projects that become too expensive due to increases in material costs.  (Tr. 2928-41; Fed. Def. Ex. 22).  For example, the Tamiami Trail Modification Project, "considered a cornerstone project for Everglades restoration" and "critically important to CERP," was priced to be built from materials from the nearby Lake Belt quarries.  (Tr. 2931-45).  If the Court were to enjoin mining in the Lake Belt, or if production were severely limited, the increased costs could result in the project exceeding its congressionally authorized limits, or a delay in obtaining the materials could result in the project being postponed.  (Tr. 2945-47).  Hence, a shutdown or curtailment of mining in the Lake Belt "would significantly impact Everglades restoration."  (Tr. 2947).  Indeed, Mr. Burch testified that the Corps cannot plan other components of CERP until the Tamiami project is complete.  Col. Rice expressed similar concerns about the Tamiami Trail project.  (Tr. 4860).[117]

### 3.    Plaintiffs utterly failed to rebut Defendant Intervenors' economic evidence.

Plaintiffs failed to offer any witnesses, expert or otherwise, on the available additional capacity of Florida's ports, railroads, and trucking infrastructure, or availability of alternative limestone sources.  Instead, they presented at trial only the testimony of Dr. Richard Weisskoff, an economics professor at the University of Miami.  (Tr. 1592).  Professor Weisskoff testified on

---

[117]  Plaintiffs contend in their Proposed Findings that there were concerns by the Park and the FWS "that the proposed expansion of mining at Kendall Properties sites would interfere with longstanding and vital public efforts to restore water flows to the Park."  (Plf. Findings at 39). However, the evidence does not support their claim.  When Plaintiffs asked Col. Rice on cross-examination whether Kendall properties' mining operations would adversely affect "in potentially drastic ways" the CERP plans for relocation of the L-31N levee and canal, Col. Rice disagreed, pointing out that the remaining space between the mining operations and the Park would be "more than enough area" within which to put a water distribution system.  (Tr. 4903-04).

two separate occasions, first during Plaintiffs' case-in-chief (July 19-20 and 24, 2006), and second during Plaintiffs' rebuttal case (November 30 and December 1, 2006). Professor Weisskoff testified for approximately 23 total hours, (Tr. 1592-2226, 6652-6869), far longer than any other witness.

> **a.** **At the direction of Plaintiffs, Weisskoff initially failed to model the anticipated effect of the curtailment of Lake Belt mining while conceding his access to Dr. Tanner's model.**

Weisskoff's trial testimony began on July 19, 2006. As noted above, he testified that he did not "attempt to predict any future responses through econometric modeling at this stage" and that he was "unable to give a [precise,] quantitative estimate of the actual impact on the curtail [sic] of mining in the Lake Belt district" (Tr. 1644-45; *see also* Tr. 1958. 1959). Professor Weisskoff could not estimate the number of tons of limestone that could come into the state by rail, barge, and ocean-going ships or the tonnage that could come through Florida's deep-water ports, (Tr. 2109, 2117), and could not estimate the number of employees put out of work as a result of any shut down of Lake Belt mining. (Tr. 1723-24).

> **b.** **Weisskoff assumed without any expertise or factual basis, the availability of aggregate to replace the 50 million tons currently produced in the Lake Belt.**

Weisskoff's opinions were premised on the assumption of inexpensive availability of crushed stone from other areas to replace limestone currently produced from the Lake Belt. He simply ***assumed*** the availability of other stone to replace any lost production if the Lake Belt production is stopped or curtailed, and at no material increase in cost.

> **i.** **His lack of information as to other sources in Florida.**

Professor Weisskoff offered conjecture regarding limestone quarries in Florida and elsewhere that could potentially replace the quality limestone produced in the Lake Belt, even though he is not an expert on limestone quarries. He admitted he did not know the names or

94

locations of the quarries in Florida, the quality of the rock, the current level of production, the ability of the quarries to increase production, the amount of available reserves at each quarry, the length of time it will take particular quarries to obtain necessary permits, construct necessary production facilities, or acquire rail access - if ever - or any other information that a professed expert would be expected to know, before rendering an opinion regarding alternate sources of limestone in Florida.  Instead, he simply speculated that "maybe you could get rock from another source."  (Tr. 1732).

When commenting about the alleged availability of alternate sources of stone, Professor Weisskoff relied on a USGS document (Pls.' Ex. 115) that he testified contained a list of 76 limestone quarries in Florida that could potentially provide limestone to replace that now produced in the Lake Belt.  (Tr. 1811-12).  However, on cross-examination, he admitted many of the limestone quarries were in fact distribution facilities (sort of like a "Home Depot" for rock), that some were in fact located in the Lake Belt, and that others were in the Florida Panhandle with no available transportation to South Florida.  (Tr. 2065-68).

In offering his testimony, Professor Weisskoff failed to rebut, and in fact simply ignored, the testimony of Mr. Stuart Limb, and the testimony of the company representatives, all of whom were intimately familiar with the limestone mining business, and each of whom testified on personal knowledge that Florida quarries outside the Lake Belt that produce limestone products that are FDOT approved or that can be utilized in the manufacture of concrete are already operating at full capacity to meet existing high demand, and therefore, would be unable to produce crushed stone sufficient to replace that now produced in the Lake Belt.

One question that Mr. Weisskoff could not answer on cross-examination was; if there are currently available crushed stone sources in Central and North Florida, why are they not now supplying the needs of those areas – rather than paying the additional cost of transportation of limestone from the Lake Belt?  (*See* Tr. 1801-02).

ii.    **His lack of knowledge with respect to transportation to bring aggregate from outside into Florida.**

Professor Weisskoff acknowledged that he had no knowledge of the current rail capacity to bring crushed stone into Florida (Tr. 2109): whether additional rock could be brought in on current rail lines; the length of time required to acquire property, secure permits and construct additional rail lines or spurs.  (Tr. 2111-12).  "I have no idea."  (Tr. 2112).  Similarly, he had no knowledge as to how much additional rock could be brought in by truck, but acknowledged that "[t]here's a limit to the distance," (Tr. 2114); nor the amount to be brought in by barge or ship. (Tr. 2117-18).

In support of Professor Weisskoff's contention that there must be alternative sources of crushed stone available, Plaintiffs, in their Proposed Findings, cite to Florida Rock's Annual Report, (Plf. Ex. 118), for the finding that Florida Rock "has in place reserves and capacity in other Florida locations to replace volume lost from the Lake Belt."  (Doc. 347, Plf. Findings at 73).  That proposed finding is illustrative of Plaintiffs' myopic view of crushed stone supply because it ignores and fails to quote the key caveat in that section of the Report which states: "There is, however, inadequate transportation infrastructure to transport this replacement aggregate volume at reasonably affordable costs...."  (Plf. Ex. 118 at 17).

While Professor Weisskoff testified on direct that the "whole Caribbean is limestone," (Tr. 1930), he acknowledged on cross-examination that he had no knowledge as to the quantity or quality of these potential deposits, whether they contained deleterious materials, and specifically whether they were of the quality sufficient for use in commercial and highway construction.  (Tr. 2130-32).  Professor Weisskoff's testimony that there is a foreign world out there of limestone ignores the fact that it can take years to locate areas that have sufficient reserves of quality aggregate, acquire the land, obtain a local partner (often required by foreign jurisdictions), obtain foreign permission to conduct mining operations, construct the necessary facilities (which can include not only quarries, but also roads and port facilities in

96

environmentally sensitive areas) and that port and shipping capacity is far too limited to effectuate any meaningful substitution of foreign rock for Lake Belt limestone in the near-term.

### iii.   Weisskoff's attempt to value ecosystem services lost to mining ignored resulting benefits from mining and manipulated values to arrive at an answer to serve Plaintiffs' conclusions.

Finally, in his initial appearance, Professor Weisskoff attempted to estimate the value of ecosystem services which would be lost if mining in the Lake Belt is continued during the remand period.  However, the Professor, either by design or inadvertence, failed to:

a)   include in his equation the "lift" or increase in ecological value that would result from transforming, through mitigation paid for by mining, the melaleuca-infested land in the Pennsuco to pristine wetlands on a 2.5 to 1 ratio;

b)   assign in his equation any ecological value whatsoever for the lakes that will be created and remain after mining operations are completed;

c)   consider the loss in ecological value to lands mined elsewhere, whether Georgia, Alabama, the Yucatan or the Caribbean, to replace aggregate now produced in the Lake Belt; and

d)   ignored value to the public of hospitals, schools, highways and residences built with aggregate from the Lake Belt.

(Tr. 2158-59, 2164-66, 2168).  As a result, Professor Weisskoff provided the Court with an unfair and deceptive opinion regarding the loss of overall ecological value from mining.

Equally important, Professor Weisskoff appears to have manipulated values to arrive at the answers he wanted.  When asked on cross-examination if he had ever before valued melaleuca-infested property on a per acre basis he said: "No, never did." (Tr. 2153).  However, when shown a copy of his book, he acknowledged having previously valued melaleuca acreage in his peer-reviewed book at *zero*.  (Tr. 2154).  Before this Court (after employment by Plaintiffs), on the other hand, he valued melaleuca-infested property in the Lake Belt at $8,000 per acre to arrive at an ecosystem services valuation.  (Tr. 2154).  He had no explanation for his convenient decision to assign a value to melaleuca-infested wetlands for the first time as part of

his testimony in this case.  Such a dramatic alteration in opinion, apparently to secure the results sought by Plaintiffs in this litigation, renders all of the Professor's testimony suspect.

### iv. Weisskoff's rebuttal attempt to suggest alternative sources likewise fails.

Professor Weisskoff was called again by Plaintiffs in their rebuttal case.  He testified as to several telephone calls he made (that were not revealed when asked during his deposition two weeks earlier), (*see* Tr. 6718-27), as to possible additional sources of limestone.  (Tr. 6670-73).  He testified that he had, through his phone calls, identified a new source of limestone in South Florida.  Cross-examination revealed that as to the one new source he was able to identify – a U.S. Sugar in Palm Beach County - he failed to obtain a copy of the permit which reflected on its face that the applicant had not complied with all conditions necessary for production mining of stone.  (Tr. 6848-54).  And the Professor was unable to opine as to whether the conditions allowing mining to begin at the site would ever be met, much less during the remand period. (*Id.*)

### v. Weisskoff's flawed REMI Model ignores constraints on availability and transportation, and replaces aggregate with products not suitable for construction purposes.

Ultimately, the best Professor Weisskoff could offer in support of his speculation that alternative sources of crushed stone must exist that could replace lost production in the Lake Belt, is a modeling theory that simply postulates that if there is demand, it will be met.  His testimony ignored completely all expert testimony presented during the remedies hearing as to limitations on availability and transport capacity, relying instead again on a couple of "telephone calls," unsupported by any documentation or other hard evidence.

The factual basis of Weisskoff's rebuttal opinions rest solely on the workings of a basic, inexpensive, commercially-available REMI Model that Plaintiffs acquired.   (Doc. 333,

Weisskoff Dep. 63-64).[118]   This limited modeling consisted of entering into the REMI Model scenarios suggested by Plaintiffs' counsel and a couple of inputs derived from part of Jesse David's testimony, such as the estimated costs for various transportation modes and the degree of shutdown of various sectors.  (*See, e.g.,* Doc. 333, Weisskoff Dep. 59-60, 61, 108).  Weisskoff merely plugged the inputs into the REMI Model and displayed the results.  He did not adjust the model to account for the testimony of witnesses in this case concerning transportation costs and constraints that would dramatically affect the outcome of the modeling.  (Doc. 333, Weisskoff Dep. 92-93 (no modeling adjustments to account for Mr. Darragh's testimony about CSX's single rail line and limited capacity; no adjustment for Mr. Lynch's testimony regarding the FEC Railroad; no adjustment based on Mr. Towsley's testimony regarding ports; no adjustment for Mr. DeRoche's testimony regarding shipping; no adjustment for Mr. Limb's testimony regarding availability of aggregate); *see also* Tr. 6831-34).  Weisskoff did not testify as to his opinion regarding which (if any) of his 15 different REMI runs accurately model the economic impact of a significant reduction or elimination of Lake Belt limestone mining.  (Doc. 333, Weisskoff Dep. 124).

Professor Weisskoff was unable to cull from his modeling efforts key information that would allow the Court to assess its accuracy.  For example, Weisskoff could not extract from the REMI Model the effect of each run on the price of limestone.  (Doc. 333, Weisskoff Dep. 78-79, 101 (cannot testify to incremental price change); *see also* Tr. 6779-80).  He also could not testify to the model's calculation of transportation cost increase for any run.  (Doc. 333, Weisskoff Dep. 86).  He could not say from where the model suggests replacement limestone is coming or what the cost would be to transport the limestone into South Florida.  (Doc. 333, Weisskoff Dep. 88-

---

[118]   Despite his prior contention that the modeling was too expensive and too time consuming for Plaintiffs to present in their case-in-chief, Weisskoff testified in rebuttal that the control for his modeling took about five hours to configure and the actual modeling runs took less than sixty seconds each.  (Tr. 6731).  He also testified that a one-month license for unlimited use of the model cost just $3,000.  (Tr. 6729).

89, 90-91, 112; *see also* Tr. 6780, 6785).  Nor could  he offer information on what distance that replacement stone would have to travel.  (Doc. 333, Weisskoff Dep. 90-91).

Further, Weisskoff's modeling results were not based on the testimony presented by witnesses in this case, including evidence as to the effect of the exclusion of Lake Belt limestone on downstream industries, such as cement and construction, that depend heavily on limestone as a key input.  Despite significant evidence to the contrary, Weisskoff's modeling suggested insignificant downstream effects on the construction industry even from a 99.5% shutdown. (Doc. 333, Weisskoff Dep. 87).  Weisskoff also could not testify as to how the model treats the significant transportation constraints, regulatory requirements, capital costs, and other barriers to entry into the market testified to in this case.  (Doc. 333, Weisskoff Dep. 97-98).  At best, Weisskoff speculated that REMI assumes a fluid, national economy full of competitive firms. (*Id*.).  In order to simulate the barriers to entry present in this case, a modeler would need to "close ... up" the model to account for the constraints, which Weisskoff failed to do.  (Doc. 333, Weisskoff Dep. 98).

The central fallacy of the Professor's REMI Model, as even he acknowledged on cross-examination when he was confronted with the REMI User Guide, (Tr. 6744; Int. Defs' Ex. 181), is that because the "Mining Sector" is so broad in the 23-sector REMI Model he used, limestone aggregate (in his model) can be replaced *by any mined product*, like phosphate, coal, kaolin, or even oil and natural gas.  (Tr. 6746-48, 6752, 6785-86, 6788).  Additionally, the model utilized by Professor Weisskoff recognizes no capacity limitation on particular mines.  *Thus, the Model assumes that Lake Belt limestone could be easily replaced from nearby phosphate or kaolin mines.  These products, of course, have no utility in the construction of roads, houses, schools and hospitals.*  That an expert, and Plaintiffs' counsel, would present a model so obviously flawed as to be utterly useless in gauging the economic effect of a shut down of Lake Belt mining is troubling at best, and deceptive at worst.

Professor Weisskoff also challenged Dr. Jesse David's opinion claiming David assumed no crushed stone would be brought in as replacement, but that was Weisskoff's assumption, not

David's, who estimated 13 million replacement tons coming into South Florida.  (Tr. 5976, 5980-81).  The bottom line is that Professor Weisskoff is unable to provide any meaningful estimate, and his model provides none, to establish that any more than 13 million of the 59 million tons of limestone estimated to be produced by 2008, could be replaced by *ANY* source outside the Lake Belt.

> **vi.     Even under Weisskoff's model, the curtailment of mining in the Lake Belt will result in Miami-Dade County suffering a severe recession.**

Using his own REMI Model, which can replace limestone with phosphate and coal (among other products), in his direct examination, Professor Weisskoff estimated a Lake Belt shutdown would cause the loss of 4,000 jobs related to mining in Miami-Dade County.  (Tr. 6701).  But he acknowledged that in those model runs that he programmed to recognize the additional cost of transporting rock into South Florida, this estimate would swell to almost 50,000 jobs lost in Miami-Dade County alone.  (Tr. 6701).  He then sought, to reduce his estimate to 20,000 construction-related jobs lost without any basis or rationale whatsoever.  (Tr. 6705).  The bottom line is that even under the Professor's fundamentally flawed REMI Model, he estimates that granting Plaintiffs' vacatur demand would create a substantial recession in the Miami-Dade County economy.

## III.    THE COURT SHOULD NEITHER ENJOIN CONTINUED MINING UNDER THE DEFENDANT INTERVENORS' EXISTING PERMITS NOR VACATE THOSE PERMITS PENDING THE REMAND.

Plaintiffs have at various times during the case requested different forms of equitable relief.  Initially, Plaintiffs requested an injunction, then eschewed an injunction and requested vacatur.  Plaintiffs included in their Proposed Findings an evaluation of both the vacatur standard and the injunction standard, although in both cases, Plaintiffs failed to set forth the correct legal

standards for relief.  Plf. Findings at 9-10, 14, 79-81.[119]  To assist the Court in its evaluation of the evidence, the appropriate legal standards for injunctive relief and vacatur are set out and discussed below.

### A.    Plaintiffs Have Failed to Meet the Standard for Injunctive Relief.

The Court may only grant Plaintiffs' request for injunctive relief if Plaintiffs prove that they will be irreparably harmed absent an injunction, that the balance of harms favors injunction, and that an injunction is in the public interest.  The evidence at the hearing, however, established that none of those standards for injunctive relief have been met.  Plaintiffs' witnesses failed to prove any irreparable environmental harm from mining during the remand period.  In fact, most agreed that any impacts of mining on the environment could be repaired or mitigated.  And the speculative harm (typically unrelated to mining *during the remand period*) that Plaintiffs' witnesses did testify about is vastly outweighed by the tremendous economic and environmental dislocation that the evidence demonstrates would be caused by any injunction against mining.  Under these circumstances, Plaintiffs have not come close to carrying their burden to prove the standard for injunctive relief has been met.

### 1.    The general requirements for injunctive relief.

Injunctive relief is an "extraordinary remedy" that "should issue only where the intervention of a court of equity 'is essential in order effectually to protect … against injuries otherwise irremediable.'"  *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312 (1982) (citations omitted).  It "is not a remedy which issues as a matter of course" and "has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the Plaintiff."  *Id.* at 311-12.  An injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997).

---

[119]  Plaintiffs suggest, for example, that to avoid the issuance of an injunction, the Federal Defendants or Defendant Intevenors must demonstrate that they would be irreparably harmed by injunction.  Plf. Findings at 80.  That suggestion turns on its head the burden of proof for equitable relief, which always rests with the movant.

To obtain permanent injunctive relief, a Plaintiff must demonstrate: (i) actual success on the merits; (ii) a substantial threat of irreparable injury if an injunction is not granted; (iii) that such injury outweighs harm that injunctive relief would inflict on the defendants; and (iv) that an injunction will serve the public interest. *Klay v. United Healthgroup, Inc.,* 376 F.3d 1092, 1097 (11th Cir. 2004); *Fla. Keys Citizens Coalition, Inc. v. U.S. Army Corps of Eng'rs,* 374 F. Supp. 2d 1116, 1127 (S.D. Fla. 2005). In balancing the equities, the courts must keep in mind that the "sole function of an action for injunction is to forestall future violations," *Ala. v. U.S. Army Corps of Eng'rs,* 424 F.3d 1117, 1133 (11th Cir. 2005) (citations omitted), and that injunctive relief must be "limited in scope," *i.e.,* any such relief "should be tailored to restrain no more than what is reasonably required to accomplish its ends." *Keener v. Convergys Corp.,* 342 F.3d 1264, 1269 (11th Cir. 2003) (citation omitted).

### 2. Injunctive relief in environmental cases.

"Environmental litigation [does] not exempt" a Plaintiff from proving irreparable harm, and a showing of success on the merits "does not obviate the necessity to show irreparable harm." *United States v. Lambert,* 695 F.2d 536, 540 (11th Cir. 1983); *accord, e.g., Sierra Club v. U.S. Army Corps of Eng'rs,* 935 F. Supp. 1556, 1584 (S.D. Ala. 1996). And, in striking the appropriate balances, the Court should pay particular regard to the public consequences of injunctive relief. *Romero-Barcelo,* 456 U.S. at 312. That consideration includes effects on the Defendant Intervenors, their employees, and the local economy. *E.g., Louisiana ex. rel. Guste v. Lee,* 635 F. Supp. 1107, 1126-28 (E.D. La. 1986) (refusing to enjoin local shell-dredging industry, despite Corps' failure to file environmental impact statement in connection with extending dredging permits; defendants "represent[ed] the public's interest in preventing the demise of the shell dredging industry, the loss of jobs, [and] the loss of capital investments"); *Fla. Wildlife Fed. v. Goldschmidt,* 506 F. Supp. 350, 353 (S.D. Fla. 1981) (Hoeveler, J.) (refusing to enjoin highway project because injunction would both inflict harm on companies that had made substantial investments and reliance on permits and deprive "residents and

taxpayers not only their tax dollars but also of their access to safe, efficient means of both routine local travel and emergency evacuation").[120]

### a.   Injunctive relief under the Clean Water Act and the National Environmental Policy Act.

The traditional injunction test applies to claims asserted under the Clean Water Act. *Romero-Barcelo,* 456 U.S. at 311-12; *Miccosukee Tribe of Indians v. South Fla. Water Mgmt. Dist.,* 280 F.3d 1364, 1371 (11th Cir. 2002), *vacated on other grounds,* 541 U.S. 95 (2004).  The same test also applies to alleged violations of the National Environmental Policy Act, *i.e.,* there is no automatic issuance of an injunction upon finding a NEPA violation.  *Fla. Keys Citizens Coalition*, 374 F. Supp. 2d at 1127; *accord, Nat'l Audubon Soc'y v. Dep't of the Navy,* 422 F.3d 174, 202 (4th Cir. 2005) ("a court should not automatically enjoin agency action whenever it finds a NEPA violation" "[a]s in all injunction cases, a court must balance the harms particular to each case in assessing whether an injunction is justified and how far it should reach").

### b.   The Endangered Species Act.

Earlier in this litigation, Plaintiffs relied on *TVA v. Hill*, 437 U.S. 153 (1978), to argue that the Endangered Species Act requires injunctive relief as a matter of right upon finding a violation.  Plaintiffs' Memorandum on Remedies and in Support of Plaintiffs' Emergency Motion for Interim Relief (D.E. 99) ("Plaintiffs' Memorandum") at 12-13.  In that decision, the Supreme Court noted that, in enacting the ESA, Congress had struck the balance "in favor of affording endangered species the highest of priorities," and held that the district court in that case was required to enjoin construction of a dam to avoid the certain eradication of a protected species.  *Id.* at 162, 171, 194.

---

[120]   In *Goldschmidt,* the court rejected the Plaintiffs' assertion that "their burden is lessened because this is an environmental case and that a showing of violations of the National Environmental Policy Act" entitle them to an automatic injunction.  *Id.* at 353.  Further, in rejecting as "specious at best," the Plaintiffs' argument that "even substantial additional costs caused by court-ordered delay are entitled to little weight," the court concluded that increased costs that would ultimately be borne by the taxpayers and citizens constituted irreparable harm. *Id.* at 371.

*Hill* does not apply here at all; the Corps and the FWS have addressed the deficiencies noted in the Court's March 22, 2006 summary judgment order.   The FWS completed its Biological Opinion on August 31, 2006, finding that "the Corps and the permittees have incorporated all reasonable and prudent measures necessary and appropriate to minimize impacts of incidental take of wood storks into the design of the proposed action," and have made several valuable suggestions that the Corps will implement.   Biological Opinion at 61-63.

The completion of the Biological Opinion satisfies the agencies' consultation obligations under the ESA and fully corrects the ESA deficiency identified by the Court.   *Sierra Club*, 423 F. Supp. 2d at 1377; *see also* 50 C.F.R. § 402.14 (*l*)(1) ("[f]ormal consultation is terminated with the issuance of the biological opinion"); *id.* at § 403.02 ("[f]ormal consultation … concludes with the Service's issuance of the Biological Opinion").   Thus, because no further relief is available to Plaintiffs in satisfaction of their ESA claims, those ESA claims are entirely moot, and *Hill* would not apply under any circumstances.[121]

---

[121]   Both the Federal Defendants and the Defendant Intervenors have moved to dismiss Plaintiffs' ESA claims as moot.   Those motions are still pending.   Plaintiffs assert in their Proposed Findings that the Court should still consider the Endangered Species Act counts in determining the appropriate remedy in this case.   Plf. Findings at 61, n.51.   First, Plaintiffs assert that "it makes no legal or logical sense for the Court to 'dismiss' a claim as to which it has already entered summary judgment for Plaintiffs."   Plf. Findings at 61, n.51.   Plaintiffs ignore, however, that mootness is a threshold jurisdictional inquiry and jurisdiction must be satisfied at all stages of the proceedings.   *Brooks v. Ga. State Bd. of Elections*, 59 F.3d 1114, 1119 (11th Cir. 1995).   As the Eleventh Circuit has noted, "it is not sufficient that the controversy was live only at its inception."   *C. & C. Products, Inc. v. Messick*, 700 F.2d 635, 636 (11th Cir. 1983).   The Court has no jurisdiction to consider or impose a remedy based on a claim that is moot.   Plaintiffs' appeal to common sense notwithstanding, cases dismissed as moot after a judgment on the merits are legion.   *See*, *e.g.*, *County of Los Angeles v. Davis*, 440 U.S. 625, 632-33 (vacating injunction requiring the County to abide by certain hiring practices where there was no "reason to believe . . . [the County] would significantly alter [its] hiring practices if the injunction were dissolved."); *Sannon v. United States*, 631 F.2d 1247, 1249-50, 1251-52 (5th Cir. 1980) (federal government's concession that immigrant Plaintiffs were entitled to hearings mooted an injunction to that effect, and the old Fifth Circuit vacated the district court's attempt to bootstrap the mooting event into grounds for a new injunction); *accord*, *e.g.*, *Johnson v. Horn*, 150 F.3d 276, 288 (3d Cir. 1998) (vacating an injunction based on the government's concession at oral argument in the court of appeals that it would henceforth provide the requested relief voluntarily), *overruled on other grounds by Dehart v. Horn*, 227 F.3d 47 (3d Cir. 2000).

Second, Plaintiffs argue that their Endangered Species Act claim is not moot because "the formal consultation process does not conclude until the federal agency makes a final decision as to how it will proceed in light of the BiOp."   Plf. Findings at n. 51.   Plaintiffs' argument simply

(continued . . .)

Moreover, even if that were not so, *Hill*'s application is limited to *substantive* violations of the ESA, *i.e.,* the rare and serious circumstances when injunctive relief is required to prevent extinction of a species. *Romero-Barcelo,* 456 U.S. at 314; *Water Keeper Alliance v. POD,* 271 F.3d 21, 34 (1st Cir. 2001); *Ala. v. U.S. Army Corps of Eng'rs,* 441 F. Supp. 2d 1123, 1131-32 (N.D. Ala. 2006). Here, this Court found only a procedural ESA violation. *Flowers*, 423 F. Supp. 2d at 1377-78 ("[t]o be clear, the Court is not announcing a conclusion that the proposed mining will be so damaging to the wood stork's habitat that it must not be approved; rather, the Court is finding that the Corps (and FWS) should have conducted the formal consultation process required by the ESA and 50 C.F.R. 402.14(a)").[122]   *Hill* does not eliminate equitable balancing in ESA cases where the only violation found is a readily correctable deviation from ESA's procedures, and no endangered species risks eradication in the absence of an injunction.

_____

(. . . continued)

is incorrect as a matter of law. The Endangered Species Act's implementing regulations state unequivocally: "***Formal consultation is terminated with the issuance of the biological opinion***." 50 C.F.R. § 402.14(*l*)(1) (emphasis added); *accord id.* § 402.02 ("Formal consultation . . . concludes with the Service's issuance of the biological opinion"). Plaintiffs themselves previously admitted as much, in practically the same words, when it suited them to do so: "The formal consultation process concludes . . . with the FWS's issuance of a BO . . . ." Plaintiffs' Mem. in Opp. to Defendant Intervenors' Motion to Dismiss at 6-7 (June 21, 2006). That is why Plaintiffs previously relied on the "voluntary cessation" exception to the mootness doctrine and suggested that the Federal Defendants might call off the consultation. *See id.* at 5-8. Now that the Federal Defendants have completed consultation and Plaintiffs' unfounded prediction has come to naught, Plaintiffs put forward the new but equally meritless contention that formal consultation between the Corps and FWS continues even after FWS delivers its completed Biological Opinion. That argument is entirely irreconcilable with 50 C.F.R. §§ 402.14(*l*)(1) and 402.02, which Plaintiffs do not cite. Indeed, during its rulemaking to develop applicable regulations, FWS considered and *rejected* the notion that "consultation [should] terminate[] with ... the Federal agency's decision" on how to respond to the Biological Opinion. *See* Interagency Cooperation – Endangered Species Act of 1973, as amended, 51 Fed. Reg. 19926, 19956 (June 3, 1986). Although the regulation that Plaintiffs cite, 50 C.F.R. § 402.15(a), notes the obvious point that the Corps will decide after it receives the Biological Opinion how to proceed "in light of" the Biological Opinion, that provision has nothing to do with the formal consultation that is the subject of Plaintiffs' ESA claims; § 402.15 "describes the steps that the Federal agency should take ***after consultation is concluded***." 51 Fed. Reg. at 19956 (emphasis added). Plainly the steps listed in § 402.15 are not part of the formal consultation process, and formal consultation is now complete.

[122]   This holding belies Plaintiffs' suggestion that the Court should have "grave 'doubts whether the agencies chose correctly' in approving and issuing the permits" and *substantively* pre-determined that the "permits should not have been issued." *See, e.g.,* Proposed Findings at 10 (citation omitted).

*E.g., Ala. v. U.S. Army Corps,* 441 F. Supp. 2d at 1131-32; *Am. Rivers v. U.S. Army Corps of Eng'rs,* 271 F. Supp. 2d 230, 248-49 (D.D.C.), *app. dismissed,* 2003 WL 22890061 (D.C. Cir. Dec. 4, 2003).

> **3.      Plaintiffs have failed to establish that continued mining during the remand period would result in irreparable harm.**

The evidence presented by Plaintiffs at the hearing does not establish that they will suffer irreparable harm if mining continues during the brief remand period.  Absent a showing by Plaintiffs of irreparable harm, as noted above, injunctive relief cannot issue.  *Lambert*, 695 F.2d at 540.

Plaintiffs failed to establish an irreparable risk of cryptosporidium or giardia contamination in the Northwest Wellfield from continued mining operations during the remand. First, Plaintiffs failed to establish that cryptosporidium or giardia currently are a risk to the Northwest Wellfield; despite mining taking place in the Lake Belt for decades, cryptosporidium or giardia have never been found in the wellfield.  Second, Plaintiffs failed to establish that mining during the remand will increase any risk of cryptosporidium or giardia contamination; the evidence showed that to the extent any risk of cryptosporidium or giardia exists, the risk from canals and wetlands in the area are at least as great, if not greater, than any risk posed by the mining areas.   Third, Plaintiffs have failed to show that any pathogens, even if hypothetically present in the mining lakes – which the evidence demonstrates they are not, would even reach the wellfield; the evidence demonstrated that Plaintiffs' "limit of capture" for the Northwest Wellfield was expansively overexaggerated, yet most of the mining operations that would be conducted during the remand still were outside the limit of capture.  Fourth, Plaintiffs utterly failed to establish that any pathogens hypothetically present in the mining lakes could harm any water consumer; the evidence demonstrated that, between the natural processes of filtration, dilution and die off and the lime softening technology already employed at the water treatment plants, any pathogens found in the water would be reduced by more than 99.9999% before they reached any consumer, far more than required by EPA to eliminate any realistic risk of illness.

Plaintiffs failed to establish an irreparable risk of benzene contamination in the Northwest Wellfield from continued mining operations during the remand.  None of the agencies charged with investigation of the benzene contamination in the Northwest Wellfield has identified mining as the source.  Plaintiffs failed to prove that their theory of incomplete detonation of blasting emulsion could account for the benzene in the wellfield; the evidence demonstrated that the non-benzene components of blasting emulsion were not found in the wellfield and it would require an unrealistic amount of blasting emulsion to generate the benzene found.  Even more telling, Plaintiffs failed to show how the release of undetonated mineral oil (the fuel component of the emulsion all of the companies now use) could cause benzene contamination; each of the witnesses testifying at the hearing agreed that a release of mineral oil emulsion would not result in benzene contamination.  Plaintiffs also failed to prove the scientific viability of their "benzene generated by detonation" theory; their only witness ascribing to that theory failed to account in any way for the pressure, temperature, and chemical reaction differences between combustion and detonation, and conceded on cross examination that it would take *billions* of gallons of blasting emulsion under his theory to generate the benzene found.  Plaintiffs again failed to show that the release of benzene at most of the areas to be mined during the remand period would even reach the Northwest Wellfield; as with the evidence regarding pathogens, the evidence regarding the wellfield's capture zone does not establish that benzene from most of the lakes would ever reach the production wells.  Finally, as with the issue of pathogens, Plaintiffs completely failed to establish that benzene in the wellfield poses a risk of harm to anyone; the evidence demonstrated that there is no benzene in the water being delivered to consumers, and the most advanced treatment equipment already exists at the treatment plants to strip any benzene out of the water.

Plaintiffs have failed to establish an irreparable risk of seepage from continued mining during the remand period.  Plaintiffs did not establish that seepage from mining during the remand would be significant; the evidence demonstrated that the amount of incremental seepage expected from mining during the remand is extraordinarily small.  Plaintiffs failed to establish

108

that mining north of the Tamiami Trail would impact Everglades National Park at all, and failed to establish that mining south of the Tamiami Trail would have any more than "fractions of inches" impact in the park.  The evidence demonstrated that the amount of seepage from continued mining during the remand period was negligible when compared to the seepage naturally occurring and occurring as a result of the canals, wellfields, and water structures in the area.  Finally, Plaintiffs did not establish that any seepage from continued mining during remand is irreparable; all of the witnesses that testified agreed that seepage readily can be managed and mitigated.

Plaintiffs failed to establish an irreparable harm to wetlands from continued mining during the remand period.  The evidence demonstrated that the areas to be mined were largely melaleuca-infested, isolated wetlands and pasturelands, with relatively low value when compared to wetlands like the Pennsuco in which mining is not permitted.  Plaintiffs failed to establish that mining irreparably harmed the wetlands; the evidence demonstrated that devegetation, demucking, and even excavation were all repairable.  Plaintiffs did not establish that the wetlands in the areas to be mined were in any way irreplaceable; each of the witnesses at the hearing, including Plaintiffs' witnesses, agreed that mitigation could replace any functions and values of wetlands lost to mining.

Plaintiffs did not establish that continued mining during the remand period would result in irreparable harm to wood storks.  Plaintiffs failed to establish that any of the areas to be mined during the remand period contained valuable wood stork habitat; the evidence demonstrated that the areas to be mined were either melaleuca-infested or already impacted by mining preparation activities, and were isolated and degraded, and did not support the prey size and density necessary for wood storks.  Even the evidence presented by Plaintiffs' witness was only that there were three areas in the entire Lake Belt that he would "suspect" might "potentially" be good wood stork foraging habitat, but Plaintiffs presented no evidence that mining during the remand period would occur in any of those areas.  None of Plaintiffs' witnesses offered any opinion on the effect of mining *during the remand period* on the wood stork, and all conceded

109

that mining during the remand would not result in the death or injury to any wood stork.  Finally, even if some wood stork foraging habitat was lost in the Lake Belt due to mining during the remand period, that loss would not be irreparable; the evidence demonstrated that the mitigation of any wetlands lost in the Lake Belt with improvements to the Pennsuco wetlands would provide a net benefit for the wood stork.

In sum, Plaintiffs utterly have failed to demonstrate that continued mining during the remand period would result in irreparable harm.  The evidence at the hearing established that any harm from each of the alleged environmental effects of mining was speculative at best, and any harm that actually came about could be repaired or compensated for after the remand is completed.  This evidence precludes issuance of an injunction. *United States v. Lambert*, 695 F.2d at 540  ("[T]he only evidence relevant to the irreparable nature of the harm cited was Dr. Banner's testimony that continued filling would make restoration 'more difficult, more expensive, and more uncertain.' Such evidence is insufficient in and of itself to require a finding of irreparable harm that overcomes the equities against an injunction.").

> **4.    Plaintiffs have failed to establish that the balance of harms favors injunction or that the public interest would be served by enjoining mining during the remand period.**

Even if Plaintiffs were able to establish irreparable harm, which they are not, they would still have to demonstrate that the balance of harm favors injunction and that an injunction against mining would be in the public interest.  The evidence presented at the hearing demonstrates, however, that the massive harm of an injunction vastly outweighs the speculative harm to the environment alleged by Plaintiffs' witnesses, and that the public interest would not be served by an injunction against mining during the remand period.

Limestone literally constitutes the foundation and building blocks of Florida's economy and infrastructure.  Limestone is the essential ingredient of cement, concrete, concrete block, asphalt, and road base.  Limestone is needed to build Florida's roads (which, of course, include hurricane evacuation routes), bridges, schools, hospitals, courthouses, prisons, government

buildings, commercial high-rise buildings, factories, shopping centers, residential communities, and even the Everglades restoration projects.

Florida has an enormous appetite for limestone, consuming millions and millions of tons each year, because of the State's extraordinary increase in population. Expansion of the populace has fueled virtually unparalleled job growth. Concomitant with this growth has been a boom in the construction industry. Florida must build the infrastructure, residential neighborhoods, and commercial/industrial sites necessary to keep pace. To do so, Florida needs high quality limestone because most limestone aggregate does not meet the mandatory government standards for use in roads and construction.

Nearly half of the quality limestone annually used in Florida, more than 50 million tons, is extracted from mines in the Lake Belt region in Miami-Dade County. Limestone has a very low value to weight ratio. Because it is so heavy and bulky, it must be used as close to the source as possible. As distance from the mines increases the transportation costs, the price of limestone rises by multiples of its cost FOB the quarry. Thus, Lake Belt limestone is a crucial component of the South Florida economy, and vital to its infrastructural needs.

Lake Belt limestone is essentially irreplaceable, at least during the 36-month remand period, for other fundamental reasons. First, deposits of such quality are very limited relative to pre-existing demand in Florida; indeed, the evidence shows there really are no replacement sources not operating at or near capacity within the state of Florida. Second, sources outside of Florida are not only limited in capacity, and by the quality of their stone, the cost and relative unavailability of transportation conduits render them infeasible as substitute sources of limestone aggregates.

The unrebutted testimony of the experts demonstrates that Florida ports lack any appreciable capacity to receive additional limestone rock; that the ships for such massive loads are unavailable; that Florida's single track railroads are already operating at very close to capacity; and that trucking huge quantities of limestone aggregates into the state simply would not be an ecologically or economically viable alternative to mining in the Lake Belt. In short, if

the mining of limestone in the Lake Belt stopped, the aggregate production could not be replaced in any reasonable time, at any reasonable price, and at any reasonable level of output.

The expert witnesses and company representatives testified that there would be three major economic effects if this Court were to halt mining under the permits.  First, the mining operations in the Lake Belt would shut down, leaving thousands of workers unemployed.  Second, there would be substantial "upstream" effects caused by the fact that the mining companies and their employees would no longer be able to buy goods and services.  Finally, there would be massive "downstream" effects as the industries that need limestone for construction and road building face shortages, or prices so high that either they could no longer purchase limestone, or would have to radically reduce their output.  Contracts for many important private and public work projects would be breached, delayed, or abandoned; customers lost, and businesses shutdown.  Massive unemployment would follow, billions of dollars of losses, and a recession throughout South Florida.  Ironically, important environmental interests would be compromised because the Everglades restoration project would be adversely affected, the funding source for acquiring and restoring the Pennsuco wetlands eliminated, and the fees for augmenting county water treatment facilities would be lost.

Plaintiffs presented no rebuttal expert witnesses regarding transportation constraints, the unavailability of alternative sources of limestone, or the consequences for public contracts.  Instead, they offered an economist who foolishly disregarded the sworn testimony on these issues, and instead used a "model" that simply "assumed away" the problem of replacing Lake Belt limestone by regarding all mined products as fungible and recognizing no limitations on the capacity of these substitutable mines.  Thus, under the blind equations of the $3,000 REMI Model maldeployed, the 50 million tons of Lake Belt limestone would be replaced at very little cost or consequence to employment and output by drawing from small nearby phosphorus or kaolin mines, even though, of course, those substances cannot be used for cement, concrete, concrete block, road base, or any other construction.  Yet even so, Plaintiffs' economist opined

112

that thousands of jobs would be lost in Miami-Dade County alone by halting the Lake Belt mining.

There can be no question that the overwhelming evidence presented during this remedies proceeding demonstrates that stopping the Lake Belt limestone mining would have severe and irreparable adverse economic consequences for South Florida, and a vast number of public works projects of the first importance to the people of South Florida. The evidence summarized in the immediately preceding section on the lack of irreparable environmental harm, combined with the economic harm evidence just recounted, demonstrates that the balance of equities and the public interest would not support vacatur or an injunction.

### B.    Plaintiffs Have Failed to Meet the Standard for Vacatur.

Vacatur is not automatic; the Court must weigh the likelihood that the Corps can correct the deficiencies in its decisionmaking on remand, the disruption that would be caused by an interim change in the permits that itself may be changed after remand, and the public interest. In this case, there is no question that the Corps can correct the deficiencies identified by the Court – in fact, the Corps already has addressed the Court's concerns about formal consultation under the ESA. The evidence demonstrated that the disruption that would be caused by any vacatur would be extraordinary – even under Plaintiffs' questionable economic scenarios, vacatur would cost thousands to tens of thousands of Florida jobs. In fact, the evidence was clear that far more than jobs would be lost; vacatur would cost the Defendant Intervenors hundreds of millions of dollars, would cost the Florida economy billions in lost productivity, would halt vital public works projects and, ironically, would halt or delay environmental projects from Pennsuco restoration to the Water Deliveries Project intended to protect and restore the Everglades. Balanced against this tremendous disruption and incontrovertible environmental harm is the rank speculation of Plaintiffs that mining during the remand period may potentially cause some unmeasurable increment of environmental impact. Consideration of the public interest, like consideration of seriousness and disruption, weighs very heavily against vacatur.

113

**1.      There is no right to "automatic" or "near automatic" vacatur.**

Remand without vacatur has long been regarded as being well within the remedial discretion of the federal courts reviewing administrative action under the APA.[123]  This is so, in part, because of the long-established rule, first announced in *S.E.C v. Chenery Corp.,* 318 U.S. 80, 94 (1943), that agency action can be upheld only on the basis actually stated by the agency. That is, "reviewing courts will often and quite properly pause before exercising full judicial review and remand to the agency for a more complete explanation of a troubling aspect of the agency's decision."  *Checkosky v. S.E.C.,* 23 F.3d 452, 463 (D.C. Cir. 1994) (Silberman, J.) (citations omitted).  Although vacatur is a sanction ordinarily available to the reviewing court, vacatur is *not* automatic when agency action is found wanting under the APA.  *Sugar Cane Growers Co-op. of Fla. v. Veneman,* 289 F.3d 89, 98 (D.C. Cir. 2002) (rejecting, as "simply not the law," argument that reviewing court must vacate agency action that violates APA); *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.,* 429 F.3d 1136, 1151 (D.C. Cir. 2005) (citation omitted).  Instead, remand without vacatur is the usual remedy where the consequences of vacatur are disruptive and the administrative error is procedural or is likely to be remedied on remand.

Although Plaintiffs suggest that courts "occasionally" decline to vacate agency actions as an "exception" to the ordinary rule, Plf. Findings at 8-10, even a cursory review of the relevant caselaw indicates otherwise.  The D.C. Circuit, which hears the great bulk of cases arising from challenges to agency action, routinely orders remand without vacatur.  *See, e.g., Milk Train, Inc. v. Veneman,* 310 F.3d 747, 755-56 (D.C. Cir. 2002); *Sugar Cane Growers,* 289 F.3d at 98; *Radio-Television News Directors Ass'n v. Fed. Commc'ns Comm'n,* 184 F.3d 872, 888 (D.C. Cir. 1999); *United Distrib. Comm'n. v. Fed. Energy Reg. Comm'n,* 88 F.3d 1105, 1191 (D.C.

---

[123]   "Remand without vacatur is a mechanism by which courts remand back to an agency a decision in circumstances in which the court believes the agency rationale is flawed, yet declines to vacate the agency decision.... The court retains all the power it has to vacate the rule eventually; however, it holds its fire while the agency goes back to the drawing board." *Remands Without Vacatur, supra* at 600 (footnote omitted).

Cir. 1996); *A.L. Pharma, Inc. v. Shalala,* 62 F.3d 1484, 1492 (D.C. Cir. 1995); *Am. Water Works Ass'n v. Envtl. Prot. Agency*, 40 F.3d 1266, 1275 (D.C. Cir. 1994); *Checkosky,* 23 F.3d at 454*; Allied-Signal,* 988 F.2d at 150-51; *Int'l Union United Mine Workers of Am. v. Fed. Mine Safety and Health Admin.,* 920 F.2d 960, 967 (D.C. Cir. 1990); *City of Brookings Mun. Tel. Co. v. Fed. Commc'ns Comm'n*, 822 F.2d 1153, 1171-72 (D.C. Cir. 1987); *Rodway v. U.S. Dep't of Agric.,* 514 F.2d 809, 824 (D.C. Cir. 1975).[124]

So too have other courts. *E.g., Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs*, 260 F.3d 1365, 1380-81 (Fed. Cir. 2001); *Cent. Me. Power Co. v. Fed. Energy Reg. Comm'n,* 252 F.3d 34, 48 (1st Cir. 2001); *Cent. & S.W. Servs., Inc. v. U.S. Envtl. Prot. Agency,* 220 F.3d 683, 692 (5th Cir. 2000), *cert. denied,* 532 U.S. 1065 (2001); *Idaho Farm Bureau Fed. v. Babbitt,* 58 F.3d 1392, 1405-06 (9th Cir. 1995); *Md. Native Plant Soc'y v. U.S.*

---

[124]  Plaintiffs are apparently of two minds about the D.C. Circuit's precedents.  On the one hand, their Proposed Findings state that, because "there is little Eleventh Circuit precedent on point," the Court should look to the D.C. Circuit, "which all parties agree has developed expertise in interpreting and applying the APA."  Proposed Findings at 4.  On the other hand, the Proposed Findings look askance at the D.C. Circuit's precedents on this point, suggesting that "it is most 'appropriate' to look to recent Supreme Court precedent which … states that the APA 'requires federal courts to set aside federal agency that is not in accordance with law.'"  *Id.* at 7 n.4 (internal quotations omitted).  Of course, the Supreme Court precedent cited by Plaintiffs does not hold that vacatur is required for any violation of the APA.  Plaintiffs repeatedly cite *American Bioscience, Inc. v. Thompson,* 269 F.3d 1077 (D.C. Cir. 2001), as emblematic of vacatur's primacy.  Plaintiffs' Memorandum at 6; Proposed Findings at 5.  That decision – which interestingly was authored by Judge Silberman, the author of the oft-cited separate opinion advocating remand without vacatur in *Checkosky* – arose from the Food and Drug Administration's approval of a generic cancer drug, which was challenged on a claim that the original pharmaceutical company's patent barred the approval.  269 F.3d at 1078-83.  The case was before the court for the second time, following a remand without vacatur "for the agency to produce a record."  *Id.* at 1084.  Although the court recited the proposition that a Plaintiff who "prevails on its APA claim … is entitled to relief under that statute, which normally will be a vacatur of the agency's order," *id.* (citations omitted), the opinion concludes:

> Which brings us to the remedy.  We have already directed the district court to remand this case once to compile a record.  That is consistent with our practice of remanding without vacating when we are unsure of the grounds the agency asserts the defendant's action (and, perhaps, where we perceive that a ground poorly articulated be sufficient to sustain the action).  But at this point we think the only appropriate course is to vacate the action appellant challenges….

*Id.* at 1086 (citations omitted; emphasis added).  *American Bioscience* is hardly authority for the proposition that the D.C. Circuit's remand-without-vacatur rule has somehow been discarded or cast aside.

*Army Corps of Eng'rs,* 332 F. Supp. 2d 845, 863 (D. Md. 2004); *Nat'l Ass'n of Home Builders v. Norton,* 2004 WL 3740765 at *3 (D. Ariz. June 28, 2004); *Natural Resources Defense Council v. U.S. Dep't of Interior,* 275 F. Supp. 2d 1136, 114 (C.D. Cal. 2002); *see also* 3 RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE, § 7.13 (4th ed. 2002) (endorsing remand without vacatur under APA).

And these courts have it exactly right. A federal court's exercise of its equitable discretion may be "displaced only by a 'clear and valid legislative command.'" *U.S. v. Oakland Cannabis Buyers' Co-op.,* 532 U.S. 483, 496 (2001) (citation omitted).[125] But far from mandating vacatur as an automatic (or nearly automatic) remedy, the text of the APA expressly contemplates that courts will exercise equitable discretion in determining the appropriate remedy for unlawful agency action. Section 702 of the APA, for example, expressly provides that "[n]othing herein[] affects ... the power or duty of the court to dismiss any action *or deny relief on any other appropriate legal or equitable ground."* 5 U.S.C. § 702 (emphasis added). Further, Section 705 empowers reviewing courts, "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury," to "issue all necessary and appropriate process … to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. "If the APA is read to mean that every action that fails the review standards of section 706 must be 'set aside,' these provisions become difficult to explain." Ronald M. Levin, *"Vacation" At Sea: Judicial Remedies & Equitable Discretion in Administrative Law,* 53 DUKE L.J. 291, 313 (2003) (hereinafter *"Vacation" At Sea).*

Under fundamental statutory construction principles, Section 706 therefore cannot be read to require a federal court to vacate agency action – even action that might be found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *e.g., Cooper Indus., Inc. v. Aviall Servs., Inc.,* 543 U.S. 157, 167 (2004) (court must

---

[125]   In *Hecht Co. v. Bowles,* 321 U.S. 321 (1944), the United States Supreme Court established the statutory construction canon that only an "unequivocal statement" by the Congress can override the courts' inherent authority to exercise equitable remedial discretion. *Id.* at 329-30.

construe statute to "give every word some operative effect") (citation omitted); *TRW Inc. v. Andrews,* 534 U.S. 19, 31 (2001) ("a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant") (citation omitted).  And nothing in the APA's legislative history suggests a Congressional intent to require automatic vacatur.  *"Vacation" At Sea, supra* at 313.

Plaintiffs invite this Court to cast aside the settled rule that remand without vacatur is a perfectly appropriate remedy and claim that such a departure is justified by "recent Supreme Court precedent."  Proposed Findings at 7 n.4.  In support of that contention, Plaintiffs muster only a lone, out-of-context quotation from *FCC v. NextWave Personal Communications,* 537 U.S. 293 (2003).  But *NextWave* has nothing to do with administrative-law remedies; the Court there merely held that the FCC had violated the Bankruptcy Code.  *Id.* at 299-303.  In the sentence invoked by Plaintiffs, the court was simply quoting language from the APA requiring "federal courts to set aside federal agency action that is 'not in accordance with law,' 5 U.S.C. § 706(2)(A) – which means, of course, *any* law, and not merely those laws that the agency itself is charged with administering."  *Id.* at 300.  The Court was making the point that it could hold unlawful the FCC's action even though the provision of law the FCC had violated was contained in the Bankruptcy Code as opposed to the Communications Act.  It was not *sua sponte* revolutionizing the law of administrative remedies.  Not surprisingly, as Plaintiffs recognize, Proposed Findings at 4-11, no court has read *NextWave* to overrule *sub silentio* decades of precedent establishing and using the power to remand without vacatur.  The D.C. Circuit certainly has not found that *NextWave* requires a change in its extensive jurisprudence regarding remand and vacatur.  *See, e.g., Chamber of Commerce of U.S. v. S.E.C.,* 443 F.3d 890, 908 (D.C. Cir. 2006).  As commentators have recognized, because a remand *without* an accompanying vacatur "is consistent with the courts' use of ... broad remedial powers," the device "can be

utilized by the courts consistently with APA section 706." *Remands Without Vacatur, supra* at

627; *accord*, *"Vacation" At Sea, supra* at 314-15.[126]

Thus, Section 706 must be read to confer upon the federal courts the *authority* to set aside

agency action, but also the obligation, in making the determination whether to vacate agency

action, to weigh the competing equities. There is, simply stated, no "automatic" vacatur under

the APA. *Cent. Me. Power Co.,* 252 F.3d at 48 ("reviewing court that perceives flaws in an

---

[126] Plaintiffs are also mistaken in suggesting that *Nevada v. Department of Energy,* 457 F.3d 78 (D.C. Cir. 2006), overrules decades of D.C. Circuit precedent permitting remands without vacatur. Proposed Findings at 5. The question in that case was whether a state's claim that the Energy Department had failed to prepare an SEIS was reviewable under Section 706(2)(A) or, as the court ultimately held, whether judicial review was premature at the point. *Id.* at 85. And Plaintiffs' further implication that the Eleventh Circuit has rejected the D.C. Circuit's remand-without-vacatur jurisprudence, Plf. Findings at 5, is even more misleading: the decision in *Sierra Club v. Martin,* 168 F.3d 1 (11th Cir. 1999), does not address the issue at all. *Id.* at 3-8 (court of appeals reversed district court's summary judgment for government and intervening defendants upon holding that Forest Service had violated governing statutes, ordering "further proceedings consistent herewith"). The decisions that Plaintiffs string-cite, Plf. Findings at 7 nn.3, 4, do not support departing from the D.C. Circuit precedent upon which defendants have relied. *E.g., CropLife Am. v. Envtl. Prot. Agency,* 329 F.3d 876, 884 (D.C. Cir. 2003) (vacating rule on challenge that "presents a purely legal question that does not 'depend upon consideration of … particularized facts'") (citation omitted); *Humane Soc'y v. Dep't of Commerce,* 433 F. Supp. 2d 4, 23-25 (D.D.C. 2006) (vacating contested permits for research on threatened and endangered populations of sea lions on the basis of a biological opinion that the agency itself "later characterized as both opaque and internally inconsistent"); *Fund for Animals v. Norton,* 294 F. Supp. 2d 104-15 (D.D.C. 2003) (vacating change in rules allowing snowmobiles in national parks because, "[w]hen, as here, an agency reverses an earlier decision by revoking or staying an existing regulation, the agency is 'obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance'") (citation and italics omitted); *Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs,* 109 F. Supp. 2d 30, 43-44 (D.D.C. 2000) (vacating permits for as-yet unbuilt casinos for failure to prepare an EIS). Plaintiffs place particular reliance on *Florida Wildlife Federation v. U.S. Army Corps of Eng'rs,* 404 F. Supp. 2d 1352 (S.D. Fla. 2005). Plf. Findings at 5-6. But the Court in that case was addressing the *future* construction, *not,* as in the present case, businesses that have been operating for many decades in reliance on existing permits. 404 F. Supp. 2d at 1355-57. The Court ruled that the Corps had violated NEPA "by issuing the permit without adequate environmental review." *Id.* at 1356. The successful plaintiffs sought vacatur and defendants "ask[ed] the Court to remand the matter to the Corps for further consideration." *Id.* at 1357-58. The Court set aside the permit because it had "found the Corps' environmental assessment not to be in accordance with the law, and its finding of no significant impact to be arbitrary and capricious." *Id.* at 1358. And, after balancing all of the factors that govern injunctive relief, the court *granted an injunction* against the project. *Id.* at 1360-66. Thus, the court in *Florida Wildlife* essentially followed the D.C. Circuit's model in substance if not in so many words – because its decision that the standards for injunctive relief were met would also have led to a balancing in favor of vacatur.

agency's explanation is not required automatically to set aside the inadequately explained order")

(citation omitted).[127]

### 2.    The test for determining whether to vacate agency action.

Although the difference between a fatally flawed agency decision and one that may be

salvaged on remand is often "a matter of degree," *Checkosky,* 23 F.3d at 464, it is not one that is

either unreasoned or intuitive.   Rather, "[t]he decision whether to vacate depends on 'the

seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose

correctly) and the disruptive consequences of an interim change that may itself be changed.'"

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n,* 988 F.2d 146, 150-51 (D.C.Cir.1993) (citation

omitted); *accord, e.g., Chamber of Commerce,* 443 F.3d at 908; *Advocates for Highway & Auto*

*Safety,* 429 F.3d at 1151; *Sugar Cane Growers,* 289 F.3d at 98; *Checkosky,* 23 F.3d at 464.[128]

---

[127]   In actuality, Plaintiffs have taken inconsistent positions on this issue.  At the hearing on April 19, 2006, Plaintiffs' counsel announced that they "strongly disagree[d]" with the Defendant Intervenors' argument that the Court should conduct an evidentiary hearing on remedies, once having granted summary judgment.  Transcript 4/19/06 (D.E. 105) at 10.  Plaintiffs urged the Court to decide the remedies issue based on a written record.  *Id.* at 33.  And they argued that, under the ESA, "the normal, almost automatic relief that a court issues is to enjoin all activities in the endangered species habitat" upon finding a violation of the ESA.  *Id.* at 38.  But Plaintiffs also conceded, albeit begrudgingly, that Section 706 does not *require* vacatur in all cases upon a finding of improper agency action.  *Id.* at 43.  After the Court ordered the evidentiary hearing on remedies, *id.* at 52, 58, Plaintiffs argued in their remedies submission that the Court was *required* to set aside the permits and, as "an interim measure," requested the court to "*immediately* enjoin any *new* wetlands dredging pursuant to the permits."  Plaintiffs' Memorandum at 1 (emphasis added).  And they argued that vacatur was required based upon "a serious APA violation," without taking into consideration the impact of vacatur.  *Id.* at 6-8.  Following the evidentiary hearing, Plaintiffs incorporated much of their remedies memorandum into their proposed "findings."  Plf. Findings at 1-13.  That is, Plaintiffs proposed that the Court should "find" that "the presumptive remedy in an APA case is vacatur *and* remand," that the Court should not take into consideration the disruptive effect, that the precedent authorizing remand without vacatur should be disregarded and, alternatively that vacatur should be ordered under the D.C. Circuit's long-established framework.  *Id.* at 4-12.  Plaintiffs' attempt to dismiss the established body of precedent upon which Defendant Intervenors have relied is unavailing.

[128]   These factors are balanced together; courts have declined to vacate, even in the face of tremendously serious violations of administrative law, where disruption is particularly significant.  *See, e.g., Sugar Cane Growers,* 289 F.3d at 98 (court refuses to vacate despite total failure to engage in required rulemaking where vacatur would cause significant disruption).  Similarly, courts have refused to vacate where evidence of disruption is minimal, but the deficiencies in the agency's decisionmaking are not serious.  *See, e.g.*, *Fox Television Stations, Inc. v. F.C.C.*, 280 F.3d 1027, 1049 (D.C. Cir. 2002) (court refuses to vacate where the

(continued . . .)

Stated otherwise, the question is whether the agency can fix any deficiencies in the challenged action on remand – which the Court obviously determined is feasible here, because it remanded for just that purpose in the summary judgment order.

The courts exercise their discretion in imposing an appropriate remedy in recognition of the reality that vacatur "can upset a legal regime on which many citizens depend." *Remands Without Vacatur, supra* at 618 n.109 (citation omitted). And "[p]rotecting the legitimate expectations of those subject to administrative rules and, therefore, those most vulnerable to the perturbations of judicial processes, is a sound justification for designing pragmatic administrative law techniques." *Id.* at 623.

In determining whether to remand with vacatur, those courts that have addressed the issue generally look to three factors: (i) the likelihood that the agency can mend the errors in its decision and substantiate its ruling; (ii) the disruptive effects of vacatur of agency action when that action may ultimately be upheld following a remand; and (iii) public interest considerations. *E.g., Chamber of Commerce,* 443 F.3d at 908; *Sugar Cane Growers,* 289 F.3d at 98; *Cent. Me.,* 220 F.3d at 692; *Allied-Signal,* 988 F.2d at 150-51. Where there is "a serious possibility" that the agency can substantiate its decision following a remand and "the disruptive consequences of an interim change that may itself be changed" are shown, remand without vacatur is ordinarily appropriate, *Milk Train*, 310 F.3d at 755-56, particularly where vacatur "would have a serious economic impact." *Md. Native Plant Soc'y v. U.S. Army Corp of Eng'rs,* 332 F. Supp. 2d 845, 863 (D.Md. 2004).

This analysis is not all that different from the injunctive relief framework, as the D.C. Circuit has recognized. *Int'l Union, United Mine Workers v. Fed. Mine Safety & Health Admin.,* 920 F.2d 960, 967 (D.C. Cir. 1990) (both vacatur and injunctive relief turn on "analogous factors"). As one court has explained, relying on *Romero-Barcelo*'s holding on injunctive relief:

---

(. . . continued)
disruptive consequences of vacatur may not be great, but it is probable that the agency can justify its decision on remand).

> In determining whether an agency's action should be vacated or not pending rectification of a procedural flaw, the Court must consider (1) the purposes of the substantive statute under which the agency was acting, (2) the consequences of invalidating or enjoining the agency action, and (3) … potential prejudice to those who will be affected by maintaining the status quo.  In addition, the Court must consider the magnitude of the administrative error and how extensive and substantive it was.

*Endangered Species Comm. of Bldg. Indus. Ass'n of S. Cal. v. Babbitt,* 852 F. Supp. 32, 41 (D.D.C. 1994) (footnote omitted); *accord, "Vacation" At Sea, supra* at 334, 341-42 (courts' discretion to withhold equitable relief is "probably the closest analog to remand without vacation"; Supreme Court's rejection of no automatic entitlement to injunctive relief "carries strong implications concerning the proper dimensions of remand without vacation").  A factor that is perhaps unique to the administrative context also requires the court to consider the "protection of reliance interests," *i.e.,* parties' reliance on established administrative rulings. *"Vacation" at Sea, supra.* at 300.

Here, the permits the Plaintiffs would have the Court vacate were issued in 2002, and have been relied upon by the Defendant Intervenors not only in the ordinary conduct of their businesses, but also with respect to Defendant Intervenors' expenditure of huge sums on capital improvements to their physical plants and ancillary facilities.  The Court cannot weigh the equities without giving serious consideration to Defendant Intervenors' reliance on the permits.[129]

The analysis is no different when a plaintiff claims that administrative action has been insufficiently protective of the environment.  In *Natural Resources Defense Council v. United States Dep't of Interior,* 275 F. Supp. 2d 1136 (C.D. Cal. 2002), for example, the NRDC

---

[129]   In fact, many of the mining areas covered by the 2002 permits were covered by valid, unchallenged permits issued before 2002.  For example, all of the property covered by the permits for White Rock Main (Ex. 128-30), as well as an additional 1,000 acres owned by White Rock in the same vicinity, were covered by valid, ongoing and unchallenged mining permits issued before April 2002.  (Tr. 5527; Ex. 137-138).  These permits were rolled into the April 2002 permits issued by the Corps.  (*Id.*)  Tarmac also had prior permits that were consolidated into its 2002 permits.  (Tr. 4958-59).

challenged the FWS's designation of critical habitat for the California gnatcatcher, and developers also challenged that designation. *Id.* at 1138-39. Evidence submitted to the court showed that protecting the gnatcatcher critical habitat would adversely affect both job growth and housing growth over a 20-year period, resulting in a significant economic loss to the area. *Id.* at 1140. The government sought a voluntary remand to consider the economic impact of the rules. *Id.* at 1141.

The court agreed to order the voluntary remand, but directed that the existing rule remain in place, citing D.C. Circuit precedent and the Ninth Circuit's *Idaho Farm Bureau* decision. *NRDC*, 275 F. Supp. 2d at 1143. And the court did so despite determining that the government's error was properly considered to be substantive:

> The consequence of a substantive rather than procedural error on the equitable balancing derives from a potentially greater likelihood of significant change to the existing rule during remand. The substantive character of a rule making deficiency suggests in general that an agency will revise the rule during reconsideration. Where the existing rule is more likely to fall during remand, the courts are more reluctant to enforce that rule in the intervening remand period however, as illustrated by this case the fact dependent inquiry into the foreseeable consequences of the agency error prevents a *per se* rule of vacatur for substantive error.

*Id.* at 1144-45. The court placed particular emphasis on the fact that "[t]he remand will last a limited period." *Id.* at 1147.

Plaintiffs contend, however, that this Court should cast aside all of these settled principles governing whether to remand without vacating the permits, and in the process warp the established test almost beyond recognition. They argue that the test's "seriousness" prong focuses on whether "the legal violations found by the Court" in the summary judgment order "*continue* to pose serious risks to the environment and to public health and safety." Proposed Findings at 14 (original emphasis).[130] But "seriousness," under the remand-without-vacatur

---

[130] Plaintiffs' suggestion that the "seriousness" prong for vacatur requires an evaluation of how "serious" the implications of the agency's decision are to the environment appears to be entirely unfettered by support in any relevant caselaw. Plf. Findings at 11-12.

analysis, speaks to "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)," *i.e.,* it addresses whether the agency "may be able to explain" its decision. *Allied-Signal,* 988 F.2d at 150-51.[131]  That is, "[t]he proper focus is on the probability that the agency can rehabilitate its prior action." *"Vacation" At Sea, supra* at 378-79. "Remand without vacatur is especially appropriate where the agency is likely to be able to substantiate its decision.:" *Md. Native Plant Soc'y,* 332 F. Supp. 2d at 863 (citation omitted). Environmental harm is relevant not to how "serious" the Corps' errors were, but instead to how "disruptive" it would be to leave the permits in place during a remand. *See Allied-Signal,* 988 F.2d at 150-51; *Endangered Species,* 852 F. Supp. at 41.[132]

Plaintiffs further skew the remand-without-vacatur standard when they suggest that the "disruption" standard address only the question whether a "*federal* objective or activity that Congress sought to promote" is "significantly" disrupted.   Proposed Findings at 11-12. Plaintiffs, of course, are correct that in the case of rulemaking challenges, courts have at times evaluated those concerns because the disruptive impact of vacating a rule often can be judged by using that yardstick, as, for example, in *Natural Resources Defense Council,* 275 F. Supp. 2d at 1144-45.   But that is only one sort of "equitable" factor that courts consider; whether the consequences of vacatur are "disruptive" depends on "the balance of equities and public interest considerations" – all of them, not simply those that concern "federal statutory objectives." *Cent.*

---

[131]   Plaintiffs suggest that the "extent of doubt whether the agency chose correctly" language from *Allied-Signal* authorizes a Court to delve into the substance of an agency's decision to determine whether the Court would have reached the same conclusions.  Plf. Findings at 10.  The vacatur standard requires no such thing, and for the Court to do so would conflict with innumerable decisions regarding the proper role for a reviewing court in an APA case.  It is basic that a reviewing court "is not empowered to substitute its judgment for that of the agency," *Vt. Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 555 (1978), but merely to examine "whether the decision was based on a consideration of the relevant factors." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971).

[132]   As noted earlier, Plaintiffs have utterly abandoned any effort to satisfy the traditional injunction standard, under which they also would be required to address – and satisfy – the question whether the public interest warrants an injunction.

*Me. Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001).[133]  And harm to a regulated industry, as a direct result of eliminating a regulation that benefits it, is a classic example of the sort of "disruptive" consequence this Court should consider in its remedial calculus.

For example, in *American Water Works Association v. EPA*, 40 F.3d 1266 (D.C. Cir. 1994), the D.C. Circuit remanded a regulation that exempted "transient" water systems from lead-pollution drinking water standards, but expressly refused to vacate the exemption during the remand, on the ground that "vacatur would be unnecessarily disruptive to the exempted industries." *Id.* at 1273.  Similarly, in *Maryland Native Plant Society*, the court declined to vacate an unlawfully granted permit because it recognized that "the uncertainty of vacatur" would cost the permittee "hundreds of thousands of dollars, if not more."  332 F. Supp. 2d at 863.  And in *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484 (D.C. Cir. 1995), the D.C. Circuit remanded the FDA's decision to approve a drug without vacating it, because the court concluded that vacating "would prove disruptive to [the drug company], which has relied on [the approval] in good faith for over thirteen years." *Id.* at 1492.  And as discussed above, Plaintiffs have identified *nothing* in the APA – much less anything with the "express" language required to displace this Court's equitable discretion to consider all relevant remedial factors – that would artificially limit the equitable factors this Court can consider in deciding whether to vacate the permits.  The Court should therefore reject Plaintiffs' attempt to lead it into an erroneous application of the governing standards.

### 3.    There is no question that the Corps can substantiate its decision to issue the permits.

As noted above, the touchstone for the "seriousness" prong of the remand without vacatur test is whether there is "at least a serious possibility" that on remand, the Corps can substantiate its decision to issue the 2002 permits.  The Court never has suggested that there are no set of

---

[133]  In any event, Plaintiffs do not explain why considering harm to the mining industry would be contrary to "federal statutory objectives" advanced by the statutes at issue here.  Congress surely did not intend the Clean Water Act, NEPA, and the APA to protect the environment at any cost.

circumstances under which the Corps can justify issuance of these permits. And the evidence demonstrates that the Corps is complying with the Court's remand order and engaging in the analysis the Court required.

The deficiencies this Court identified in the Corps' permitting decision are exactly the kind of violations that courts have generally held should be remanded without vacating. The Court explicitly contemplated that the Corps may be able to address its concerns on remand. *See, e.g.*, *id.* 1336 ("If these permits had been issued as fifty year permits, the Court would have invalidated the permits and directed the Corps to deny the permits (rather than simply remanding the case for further study)."); *id.* 1357 ("The mining industry applicants have thus far failed to carry that burden - perhaps on remand they will be able to demonstrate conclusively that there are no practicable alternatives for any of the intended mining activity."). The voluminous record the Corps compiled for over a decade to support its permitting decision implies that "[g]iven the extensive record involved in this case and the obviously considerable review that has been accomplished by local, state, and federal agencies, the Army Corps may very well be able to justify its decision on remand." *Md. Native Plant Soc'y*, 332 F. Supp. 2d at 862-63. Even more importantly, many of the concerns that Court expressed in regard to insufficient analysis of the availability of replacement source of rock and the adequacy of the Wellfield protections currently in place have been addressed during the remedies hearing.

In fact, the agencies have already begun to correct the putative deficiencies the Court identified and will rectify the remaining concerns on remand. For example, in finding the Corps and FWS violated the ESA, the Court explained that it was "not announcing a conclusion that the proposed mining will be so damaging to the wood stork's habitat that it must not be approved; rather, the Court [found] that the Corps (and the FWS) should have conducted the formal consultation process," *Flowers*, 423 F. Supp. 2d at 1377. On August 31, 2006, the agencies completed this consultation process when the FWS completed its Biological Opinion, explaining that "[t]he Service believes the Corps and the permittees have incorporated all reasonable and prudent measures necessary and appropriate to minimize impacts of incidental take of wood

125

storks into the design of the proposed action," and made several valuable suggestions that the Corps will implement. *Id.* at 61-63. This satisfies the agencies' consultation obligation under the ESA. *See* 50 C.F.R. § 402.14(*l*)(1) ("*Formal consultation is terminated with the issuance of the biological opinion*.") (emphasis added); *accord id.* § 402.02 ("Formal consultation . . . concludes with the Service's issuance of the biological opinion"). Furthermore, the Corps has begun the process of creating a Supplemented Environmental Impact Statement ("SEIS") to address the other issues raised by the Court's final order. (Tr. 2551-52 (Studt)). As part of this process, the public will have ample opportunity to comment both on the draft and proposed final versions of the SEIS. (Tr. 2560-61 (Studt) (the Corps will provide a 60-day comment period on the draft SEIS and a 30-day comment period on the proposed final version)).

### 4. The evidence demonstrates that vacating the permits would be incredibly disruptive and would not be in the public interest.

As noted above, in deciding whether to vacate the 2002 permits, the Court must consider "the disruptive consequences of an interim change that may itself be changed." *Allied-Signal*, 988 F.2d at 150-51. The Court must also consider the harm to the public interest in deciding whether to vacate the permits. *Cent. Me. Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001).

The evidence regarding disruption and the public interest is no different when evaluating it in terms of vacatur than when evaluating harm in terms of injunctive relief. As demonstrated above, the evidence presented at the hearing conclusively demonstrates that vacating the permits would lead to immense damage to the Florida economy, including the loss of thousands of jobs, undeniable harm to the Defendant Intevernors, and a tremendous negative impact on public works and environmental projects. The evidence demonstrates that any alleged environmental harm from allowing the permits to remain in place during the remand period is so speculative and unsubstantiated by evidence that the public interest in protecting the environment cannot begin to justify vacatur. Further, when those speculative harms are balanced against the immediate impacts to the Florida economy, the loss of thousands of Florida jobs, and the halt or

delay of public works and environmental projects, there is no reasonable argument that vacatur is in the public interest.

## IV.   THE COURT SHOULD REJECT PLAINTIFFS' PROPOSED FINDINGS.

### A.   The Form of Plaintiffs' Findings Is Inappropriate.

As set forth in Point II, *supra,* Plaintiffs' recitation of the evidence adduced at the remedies hearing is both inaccurate and misleading.  But there is a yet more fundamental flaw in Plaintiffs' submission of Proposed Findings of fact and conclusions of law:  Plaintiffs are improperly attempting to usurp this Court's most essential judicial function – the adjudication of a dispute.[134]

The Eleventh Circuit has spoken directly to the disfavored practice of submitting extensive proposed "findings" to a district court, as well as to the equally disfavored practice of a district judge adopting wholesale such "findings."  *In re Colony Square Co.,* 819 F.2d 272 (11th Cir. 1987).  As the court noted in that decision, "[t]he cases admonishing trial courts for the verbatim adoption of proposed orders drafted by litigants are legion," *id.* at 274-75, including the United States Supreme Court's warning in *Anderson v. City of Bessemer City, North Carolina,* 470 U.S. 464 (1985):

---

[134] At the conclusion of the remand hearing, it was clear that this Court had in mind receiving briefs or memoranda from the parties, not Proposed Findings of fact.

> THE COURT: All right, sir, thank you. And thus, the case is over with, except that you want to file memoranda. And I will be happy to see the memoranda in this – in connection with the closing.  (Tr. 7316)

> THE COURT: . . . I'm just asking for a brief that's setting forth your closing argument, your closing argument. It doesn't matter what they say. I want to know what you think about your positions. (Tr. 7321).

> THE COURT: Here's what we're going to do. I'm going to give you all whatever you need. You can have 20 days to file your brief, you can have 30 days to respond, and that's it.  (Tr. 7326).

> THE COURT: I'm going to borrow Mr. Nachwalter's statement to me. We should do this case the way we have done it in the past. First brief yours, second brief yours, reply yours.  (Tr. 7329).

Plaintiffs apparently took it on themselves to submit and suggest this Court adopt the Proposed Findings prepared by Plaintiffs.

> We … have criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by citation to the record. We are also aware of the potential for overreaching and exaggeration on the part of attorneys preparing findings of fact when they have already been informed that the judge has decided in their favor….

*Id.* at 572 (citations omitted).

In *Colony Square,* the Eleventh Circuit restated its disdain for "the ghostwriting of judicial orders by litigants."  819 F.2d at 274 (citations omitted).  The court catalogued the many reasons for condemning the practice, among which is that "[t]he quality of judicial decisionmaking suffers when a judge delegates the drafting of orders to a party; the writing process requires a judge to wrestle with the difficult issues before him and thereby leads to stronger, sounder judicial rulings.  *Id.* at 275 (citations omitted); *accord, e.g., Barclays-Am./Bus. Credit, Inc. v. Radio WBHP, Inc.,* 871 F.2d 1023, 1030 (11th Cir. 1989).  "The adversarial zeal of counsel for the prevailing party too often infects what should be disinterested findings to entrust their preparation to the successful attorney."  *Cuthbertson v. Biggers Bros., Inc.,* 702 F.2d 454, 459 (4th Cir. 1983).[135]

"'[T]he appellate court can feel slightly more confident in concluding that important evidence has been overlooked or inadequately considered' when factual findings were not the product of personal analysis and determination by the trial judge."  *Id.* at 275 n.9 (citation omitted).  "The reviewing court deserves the assurance that the trial court has come to grips with apparently irreconcilable conflicts in the evidence ... and has distilled therefrom true facts in the crucible of [the court's] conscience."  *Id.* at 275 n.10 (citation omitted).  "[F]indings of fact

---

[135] Even when a district court requests the parties to prepare proposed orders without announcing a decision from the bench, "we cannot discount the possibility that the district court may not have agreed in totality with the findings of fact or legal conclusions in either of the proposals, but chose one simply because it came closest to its own view," which approach "offends our belief that a judge's findings and conclusions should represent that judge's view, no more and no less" *Pa. Envtl. Defense Found. (P.E.D.F.) v. Canon-McMillan School Dist.,* 152 F.3d 228, 233 (3d Cir. 1998) (footnote omitted).

adopted by the court must be the result of the trial judge's independent judgment." *Bright v.*

*Westmoreland County,* 380 F.3d 729, 731-32 (3d Cir. 2004) (citations omitted).

A district court's adoption of a party's entire proposed order – both findings of fact and

conclusions of law, such as Plaintiffs have presented here – is yet more disfavored. *Bright,* 380

F.3d at 732. That is:

> There is authority for the submission to the court of Proposed Findings of fact and
> conclusions of law by the attorneys for the opposing parties in a case, and the
> adoption of such of the proposed findings and conclusions as the judge may find
> to be proper.... But there is no authority in the federal courts that countenances
> the preparation of the opinion by the attorney for either side. *That practice
> involves the failure of the trial judge to perform his judicial function.*

*Id.* (citation omitted; emphasis by the court). This is so because the verbatim adoption of a

party's proposed order strikes at the very heart of the judicial function:

> Judicial opinions are the core work-product of judges. They are much more than
> findings of fact and conclusions of law; they constitute the logical and analytical
> explanations of why a judge arrived at a specific decision. They are tangible
> proof to the litigants that the judge actively wrestled with their claims and
> arguments and made a scholarly decision based on his or her own reason and
> logic. When a court adopts a party's proposed opinion as its own, *the court
> vitiates the vital purposes served by judicial opinions.*

*Id.* (emphasis added).

**B.       Plaintiffs' Findings Violate the Summary Judgment Standard.**

This case is before the Court on Plaintiffs' Motion for Summary Judgment. On April 22,

2006, this Court granted, in part, Plaintiffs' Motion for Summary Judgment – finding for

Plaintiffs on the merits of their claim and withholding ruling on the appropriate remedy during

remand to the Corps. *Sierra Club v. Flowers*, 423 F. Supp. 2d at 1380 (retaining jurisdiction to

determine "an appropriate remedy in this case . . . *i.e.,* the nature of the injunction, if any, which

should issue . . ."). *Cf. Maryland Native Plant Soc'y*, 332 F. Supp. 2d at 863 (granting the

Plaintiffs' summary judgment motion "insofar as it REMANDS the case to the Army Corps of

Engineers" and denying the summary judgment motion "insofar as it seeks vacatur of the Corps' decision or an injunction against further construction at this time.")

As this Court has already articulated and Plaintiffs are already well aware, on motions for summary judgment:

> [t]he burden on the moving party is a high one: the weight of all the evidence, considered in a light most favorable to the non-moving party, must demonstrate the lack of a genuine, triable issue of material fact [and] the record evidence [must] show[] that the moving party is entitled to judgment as a matter of law.

*Sierra Club v. Flowers*, 423 F. Supp. 2d at 1283 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) and Fed. R. Civ. P. 56(c)).  Notwithstanding this legal standard, Plaintiffs' Findings of Fact are skewed heavily in favor of Plaintiffs and give practically no weight to evidence adverse to their position and absolutely no deference to the Federal Defendants in the exercise of their administrative duties.  This failure to apply the proper standard of review further renders Plaintiffs' Findings unacceptable.

### C.     Plaintiffs Fail to Individuate Their Challenges to Each Defendant Intervenors' Permit.

Any equitable relief fashioned by the Court must be "limited in scope" to the extent necessary to protect the interests of the parties and "should be tailored to restrain no more than what is reasonably required to accomplish its ends."  *Keener v. Convergys Corp.,* 342 F.3d 1264, 1269 (11th Cir. 2003) (citing *Gibson v. Firestone,* 741 F.2d 1268, 1273 (11th Cir. 1984)); *Klay v. United Healthgroup, Inc.,* 376 F.3d 1092, 1096 (11th Cir. 2004) ("an abuse of discretion occurs if the district court imposes some harm, disadvantage, or restriction upon someone that is unnecessarily broad or does not result in any offsetting gain to any one else or society at large"); *see also Soc'y for Good Will to Retarded Children, Inc. v. Cuomo,* 737 F.2d 1239, 1251 (2d Cir. 1984) ("Injunctive relief should be narrowly tailored to fit the specific legal violations adjudged."); *Consolidation Coal Co. v. Disabled  Miners of S. W.Va.,* 442 F.2d 1261, 1267 (4th Cir. 1971).

Consistent with this mandate, the Court must consider whether Plaintiffs have met their burden to show that all of the necessary elements for enjoining mining have been satisfied for each individual permit.  *See Fla. Keys Citizens Coalition, Inc. v. United States Army Corps of Eng'rs*, 374 F. Supp. 2d 1116, 1127 (S.D. Fla. 2005).  If Plaintiffs cannot satisfy the requisite standard for injunction based on mining during the remand period under a particular permit, an injunction nonetheless prohibiting mining under that permit would be impermissibly overbroad.

The same requirement applies to vacatur.  The Court must determine the propriety of vacatur on a permit-by-permit basis.  *See, e.g. Davis County Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1455-56 (D.C. Cir. 1997) (vacating EPA standards for small emissions units and cement kilns, but remanding without vacatur the portion of the same rule applying to large units based on differing evaluation of disruption).[136]

Plaintiffs concede that mining at the various quarries during remand requires individualized assessment, acknowledging that even if the permits were vacated wholesale, the Corps properly could reissue some of the challenged permits during the remand period: "…with regard to sites where mining operations have already been occurring, or the wetlands and other natural resources [have been] irretrievably damaged, and that are relatively far removed from Miami-Dade drinking water supplies and the Everglades, the Corps could reasonably find that permits could be issued while the agency is evaluating the Lake Belt plan as a whole."  (Plf. Findings at 9, n. 5.).  Plaintiffs, however, mistake the import of the distinctions among quarries:

---

[136]   In requires little argument to establish that vacating "Permit A: based on evidence relevant only to "Permit B" would be improper.  In the present case, it is incontrovertible that each of the permits at issue, and each of the quarries in the Lake Belt covered by those permits, are different. Among other things, the land use surrounding the permitted mining footprint, the condition of any existing wetlands, the geographical location, and the prior permit status differ from quarry to quarry.  Similarly, the size of each quarry, amounts invested in each quarry in reliance on the 2002 permits, the operations at each quarry, and the number of employees that would be affected by the shutdown of any particular quarry differ.  Plaintiffs, however, make no effort whatsoever to evaluate the alleged harm associated with mining during the remand period at any particular quarry.  Rather, they attempt to paint with a broad, overgeneralized brush, and as noted below, none of the evidence they presented establishes any harm associated with continued mining at any particular quarry during the remand period, nor do they consider the degree to which mining could go forward on already prepared land at each permitted site..

if, as Plaintiffs clearly contemplate, some of the quarries do not present significant environmental impacts, such permits – individually considered – should not be subject to injunction or vacatur in the first instance.[137]

**V.    IF THE COURT DECIDES TO ENJOIN CONTINUED MINING UNDER THE DEFENDANT INTERVENORS' EXISTING PERMITS OR VACATE THOSE PERMITS, IT SHOULD DO SO IN A WAY THAT AVOIDS ECONOMIC AND ENVIRONMENTAL DISRUPTION.**

If, despite all of the evidence presented at the hearing, the Court determines that an injunction against mining under some or all of the permits or vacatur of some or all of the permits is appropriate, the Court should structure its order in a way to avoid as much as possible the disruption such an order would cause.  The Court should stay the effectiveness of any such order until the Corps can act on requests by Defendant Intervenors for replacement permits during the remand period.[138]  Plaintiffs suggest that Defendant Intervenors would be able to secure such permits expeditiously, and rely on that fact to assert that economic disruption from vacatur or injunction would not be particularly severe.  Plf. Findings at 9 n.5, and 78.  If the Court stayed effectiveness of any vacatur or injunction order until Defendant Intervenors' requests for replacement permits were either approved or rejected by the Corps, it would avoid at least some of the economic and environmental disruption that would be caused by immediate interruption of operations in the area.

Alternatively, if the Court believes that Plaintiffs have asked for and have established adequate grounds for an injunction, which they plainly have not, the Court could craft an order that minimized the disruptive impact of any injunctive relief.  In fact, the Court would be

---

[137] Vacatur of particular permits with the expectation that they would be reinstated because of their lack of environmental impact not only would constitute a plainly improper exercise of the Court's equitable power, it also would constitute a unwarranted distraction of agency attention and waste of agency resources that are better conserved to complete the supplemental environmental impact statement.

[138]   In the alternative, the Court should stay the effectiveness of any such order pending appeal, and to the extent required should certify for appeal the issues raised in its order.  Given the impact of such an order on Defendant Intevenors, doing so would avoid the disruption of an immediate shutdown while the Defendant Intevenors pursued their rights to review.

obligated to do so. *Keener,* 342 F.3d at 1269; *Klay,* 376 F.3d at 1096 (11th Cir. 2004); *Soc'y for Good Will to Retarded Children,* 737 F.2d at 1251. For example, if the Court believes that Plaintiffs have established irreparable harm and the other equitable factors with regard to wetlands impacts, which again they have not, the Court could require a mitigation bond to be posted, or could allow mining to continue during the remand period in those permitted areas of the Lake Belt that already have been impacted by devegetation or demucking.

## CONCLUSION

Based on the foregoing, Defendant Intervenors request that the Court deny Plaintiffs' motion to vacate Defendant Intervenors permits and allow the Corps to proceed under the previously ordered remand while all permits remain as otherwise in effect; or, in the alternative, should the Court rule that any vacatur may be appropriate, to order that any such vacatur be stayed until the Corps acts on applications for replacement permits during the remand period. Should the Court determine, over Defendant Intervenors' objections, that vacatur of any permit(s) may be ordered, Defendant Intervenors' request the Court to address the propriety of vacatur on an individual permit-by-permit basis.

<div style="margin-left: 50%;">Respectfully submitted,</div>

Michael Nachwalter
Elizabeth B. Honkonen
Kenny Nachwalter, P.A.
201 South Biscayne Boulevard
1100 Miami Center
Miami, FL 33131
Tel: (305) 373-1000
Fax: (305) 372-1861
E-mail: mnachwalter@kennynachwalter.com
*Counsel for Miami-Dade Limestone Products Association, Inc.*

Douglas M. Halsey
T. Neal McAliley
White & Case LLP
Wachovia Financial Center, Suite 4900
200 South Biscayne Boulevard
Miami, FL 33131-2352
Tel: (305) 371-2700
Fax: (305) 358-5744
E-mail: dhalsey@whitecase.com
E-mail: nmcaliley@whitecase.com
*Counsel for Miami-Dade Limestone Products Association, Inc., et al.*

Franklin G. Burt
Richard J. Ovelmen
Jorden Burt LLP
777 Brickell Avenue
Suite 500
Miami, FL 33131
Tel:  (305) 371-2600
Fax: (305) 372-9928
E-mail:  fgb@jordenusa.com
E-mail:  rjo@jordenusa.com
*Counsel for Tarmac America LLC*

Martin J. Alexander
Holland & Knight LLP
222 Lakeview Drive
Suite 1000
West Palm Beach, FL 33401
Tel:  (561) 833-2000
Fax: (561) 650-8399
E-mail:  marty.alexander@hklaw.com
*Counsel for Rinker Materials of Florida, Inc.*

Gabriel H. Nieto
Berger Singerman
200 S. Biscayne Blvd.
Suite 1000
Miami, FL 33131
Tel: (305) 755-9500
Fax: (305) 714-4340
E-mail: gnieto@bergersingerman.com
*Counsel for Kendall Properties and Investments*

Daniel H. Thompson
Berger Singerman
315 South Calhoun Street
Suite 712
Tallahassee, FL 32301
Tel: (850) 561-3010
Fax: (850) 561-3013
E-mail: dthompson@bergersingerman.com
*Counsel for Kendall Properties and Investments*

Lawrence R. Liebesman
Holland & Knight, LLP
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, D.C. 20006-1816
Tel:  (202) 955-3000
Fax: (202) 955-5564
E-mail:  lawrence.liesbesman@hklaw.com
*Counsel for Rinker Materials of Florida, Inc*

John A. DeVault, III
Bedell, Dittmar, DeVault, Pillans & Coxe, P.A.
The Bedell Building
101 East Adams Street
Jacksonville, FL 32202
Tel:  (904) 353-0211
Fax: (904) 353-9307
E-mail: jad@bedell.firm.com
*Counsel for Florida Rock Industries, Inc.*

Marlene K. Silverman
Kerri Barsh
Elliot H. Scherker
Edward G. Guedes
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, FL 33131
Tel:  (305) 579-0500
Fax:  (305) 579-0717
E-mail:  silvermanm@gtlaw.com
E-mail:  barshk@gtlaw.com
E-mail:  scherkere@gtlaw.com
E-mail:  guedese@gtlaw.com
*Counsel for Vecellio & Grogan, Inc.,d/b/a White Rock Quarries and Sawgrass Rock Quarry, Inc.*

By:_____/s/__Michael Nachwalter_____
        Michael Nachwalter

134

## CERTIFICATE OF SERVICE

I certify that on January 22, 2007, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this date on all counsel of record identified on the attached Service List, via transmission of notice of Electronic Filing generated by CM/ECF or in some other authorized manner on January 23, 2007, for those counsel or parties who are not authorized to receive electronically Notice of Electronic Filing.


                                               /s/ Michael Nachwalter
                                                  Michael Nachwalter