UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 03-23427-CIV-HOEVELER

SIERRA CLUB, NATURAL
RESOURCES DEFENSE COUNCIL
and NATIONAL PARKS
CONSERVATION ASSOCIATION,

      Plaintiffs,

v.

LT. GEN. CARL A. STROCK, Chief of
Engineers, United States Army Corps
of Engineers, and H. DALE HALL,
Director, United States Fish and Wildlife
Service

      Defendants,

and MIAMI-DADE LIMESTONE
PRODUCTS ASSOCIATION, INC., VECELLIO
& GROGAN, INC., TARMAC AMERICA LLC,
FLORIDA ROCK INDUSTRIES, INC., SAWGRASS
ROCK QUARRY, INC., APAC-FLORIDA, INC.,
RINKER MATERIALS OF FLORIDA, INC., KENDALL
PROPERTIES AND INVESTMENTS,

      Defendant-Intervenors.

_____/

## ORDER SUPPLEMENTING COURT'S ORDER OF MARCH 22, 2006

THE COURT has before it the question of what further relief, if any, should be

granted to Plaintiffs in light of the Court's conclusions that the Defendants had

committed multiple violations of the Administrative Procedures Act ("APA"), 5 U.S.C. §

706; the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq.; the Clean Water

Act ("CWA"), 33 U.S.C. § 1251 et seq.; and the National Environmental Policy Act

("NEPA"), 42 U.S.C. § 4321 et seq.[1]  These violations occurred in relation to the

issuance of CWA § 404(b) permits in April 2002 to nine private corporations[2] for the

destruction of approximately 5,400 acres of wetlands in order to remove the underlying

limestone for processing into cement, concrete blocks, and other products.  The Court's

Order granting summary judgment for Plaintiffs found that Defendants, the United

States Army Corps of Engineers ("Corps") and United States Fish and Wildlife Service

("FWS"), had made numerous decisions lacking a rational basis and had failed to

consider all relevant factors in their permitting decision; further, the Court found that the

record in this case prior to issuance of the permits compelled the conclusion "that the

permits should not have been issued."  Sierra Club v. Flowers, 423 F. Supp. 2d 1273,

1379 (S.D. Fla. 2006).  The Defendants were directed to prepare a legally sufficient

Environmental Impact Statement ("EIS"), i.e., a supplemental EIS ("SEIS"), and to

engage in formal consultation regarding the impact on protected species, at a

---

[1]Summary Judgment was granted on March 22, 2006, on behalf of Plaintiffs as to
each of the following claims (i.e., as to all claims which had not already been dismissed
voluntarily by Plaintiffs): Count I (Corps' issuance of the permits/Record of Decision
("ROD") in compliance with CWA and APA), Count III (Corps' compliance with ESA),
Count IV (FWS' compliance with APA), and Count V (Corps' preparation of
Environmental Impact Statement ("EIS"), and failure to issue SEIS pre-ROD, in
compliance with NEPA and APA).  See Docket No. 26, April 6, 2004 (Amended
Complaint); Sierra Club v. Flowers, 423 F. Supp. 2d 1273, 1380 (S.D. Fla. 2006).

[2]Eight of the nine corporations have intervened in this action (only Sunshine
Rock has not).  A tenth corporation, the Lowell Dunn Company, did not obtain its permit
until October 2004, i.e., more than two years after the date of the ROD and the
issuance of the other nine permits, and thus its permit has not been considered during
these proceedings.  Presumably, if the Corps based their decision to issue that permit
on the same process and data which has been found by this Court to compel an
opposite conclusion, i.e. denial of the permit application, then that permit would suffer
similar deficiencies if re-evaluated by the Corps.

minimum.  As will be further detailed below, the Court now has concluded – based upon the additional information presented by the parties – that not only should the permits not have been issued in April 2002, but also that these permits must be set aside today.  The following findings therefore supplement and affirm those in the Court's Order entered March 22, 2006, reported at <u>Sierra Club v. Flowers</u>, 423 F. Supp. 2d 1273 (S.D. Fla. 2006).

## I. INTRODUCTION

The Court's Order granting summary judgment for Plaintiffs requested briefing from the parties to assist the Court in determining an appropriate remedy in light of current developments in the case.[3]  Because the Intervenors (members of the limestone mining industry) alleged that they faced a significant disruption in their mining businesses if the Court were to determine that a prohibition against further mining was appropriate, the Court granted their request for an evidentiary hearing.  The Court also participated in a view of the area by helicopter, and visited representative sites on the ground to more thoroughly evaluate the scope and context of the mining

---

[3]The administrative record upon which the Court relied in granting summary judgment was limited to information before the agencies prior to issuance of the permits in April 2002.  Because the Court presumed that pertinent developments had occurred between April 2002 and the Court's Order in March 2006 (a four year period), and because the Supplemental Administrative Record ("SAR") which had been submitted prior to the summary judgment briefs extended only through April 2004, the Court requested briefing from the parties so that the Court's decision on remedies would be based on current information as to the status of the mining, the alleged impacts to the environment, and other issues related to the permits.

activities and their impacts.[4]  The Court witnessed mining activities proceeding at that

time (and already had learned that the Corps had taken no action to limit any of the

mining activities during the period of supplemental environmental analysis ordered by

this Court).[5]

 During a six-month period spanning from mid-June through December 2006,[6]

the Court heard extensive argument from the parties and received a total of 32 days of

---

[4]While the Court first raised the suggestion of a site visit, Plaintiffs had previously requested permission from Intervenors to access their mining sites and subsequently filed a motion asking this Court to schedule a Court-attended aerial inspection.  All parties cooperated in scheduling that site visit, and the Intervenors provided the helicopter transportation, which was appreciated by the Court.

[5]Despite the Court's ruling in March 2006 detailing the environmental risks of this permitted activity, the Corps elected to proceed without any disruption of the mining process during the approximately eighteen months anticipated, at a minimum, for completion of Defendants' supplemental review.  "[T]he Federal Defendants believe that the public interest is best served by leaving the permits in place and allowing mining to continue in accordance with the existing permits during the remand period."  Docket No. 119, filed May 5, 2006, p. 2.  The Defendants' eighteen-month estimate of time may be less than what will be required.  Intervenors' counsel noted in his opening statements that the remand period would be from 18 to 36 months, Tr. 53, 54, thus it would approach the scheduled end of the entire permitted period.  In any event, wetlands continue to be destroyed today, fifteen months after this Court's Order invalidating these permits was entered, despite this Court's extensive comments regarding the insufficiency of the environmental analysis upon which the Corps had relied in issuing these permits.

[6]Efforts to schedule the hearing dates more promptly were frustrated by the conflicting schedules of the numerous attorneys participating in the hearing, and occasionally by the Court's other scheduled hearings and trials.  Plaintiffs were represented by a total of six attorneys, Defendants by four attorneys, and Intervenors by twelve attorneys.  See Docket (listing counsel of record).  The number of attorneys actively participating in the hearing averaged at least eight each day, including a minimum of four attorneys for Intervenors.  In this Order, the Court occasionally has referenced statements made by counsel for the respective parties.  It is this Court's custom not to identify counsel by name; thus, "Intervenors' counsel" may refer to any of the twelve attorneys representing the Intervenors.

testimony[7] and approximately 440 exhibits. During the hearing, the Court frequently announced its intention to learn as much as possible about the facts of this case and to hear all of the evidence.[8] In addition, the Court permitted the parties to file post-hearing briefs, which total nearly 300 pages. The Court has carefully studied all of these materials. While the Defendants and Intervenors have urged this Court to accept that the Defendants' ongoing supplemental environmental review is proceeding properly, the Court has significant doubts in light of the evidence regarding continuing violations of governing regulations.

Shockingly, the Court learned for the first time during the evidentiary hearing, in June 2006, that benzene, a carcinogen,[9] had been detected as early as January 2005 in the water being pumped from the Biscayne Aquifer ("Aquifer"), "the primary source of drinking water for the Miami-Dade County area." AR1028,[10] p. 4. The contamination

---

[7]Thirty-two witnesses appeared in court, and the parties relied on the deposition testimony of another eleven witnesses.

[8]The Court also granted the Intervenors' extraordinary request to present sur-rebuttal testimony and, on several occasions, permitted Intervenors' witnesses to answer questions as to which sustainable objections were raised – in order to provide them with as great an opportunity as possible to represent their substantial financial interests. The Court has considered all of the testimony in this case and given appropriately less weight to that testimony which was beyond an expert's area of expertise or arguably was hearsay.

[9]"Benzene is a chemical that is known to cause cancer." Tr. 455 (Dr. Susan Markley)

[10]Document number 1028 of the Administrative Record ("AR").

was found in the area where limestone mining, which uses explosives[11] to remove the

limestone from the Aquifer, is proceeding pursuant to the challenged permits. The

contamination was so significant[12] that Miami-Dade County's Water and Sewer

Department ("WASD") (the agency responsible for the delivery of drinking water for the

County) shut down seven of the fifteen production wells which draw water from the

Aquifer in that area, known as the Northwest Wellfield ("Wellfield"), and pump it to

water treatment plants several miles away.[13]   More than two years after the initial

contamination incident,[14] Miami-Dade County's Department of Environmental

Resources Management ("DERM"), the agency responsible for protecting the Wellfield,

---

[11]The explosives being used by the permittees at the time the benzene was discovered included fuel oil which contained benzene.

[12]Benzene had never previously been detected in the vicinity of this wellfield at anywhere near the levels observed, one of the monitoring wells had levels of 14.9 to 50.9 parts per billion ("ppb"), which were "several times higher than had been previously detected anywhere in the vicinity of the [Wellfield]."  Docket No. 366, filed March 16, 2007 (Intervenors' Notice of Filing, Attachment 1, WASD Corrective Action Plan/Reactivation Plan, last revision date February 5, 2007 ("CAP"), p. 2).  According to state drinking water standards the maximum allowable concentration of benzene is 1.0 ppb.  Id. (citing Primary Drinking Water Standard, F.A.C. Chapter 62-550).

[13]"The Northwest Wellfield is Miami-Dade's largest single source of water supply, [authorized by state water regulators] to provide 155 million gallons per day to the northern half of Miami-Dade County, [it] is the water supply for approximately one million people.  The water from the Wellfield is pumped to the Hialeah-Preston Water Treatment Plant where it is treated and distributed."  Intervenors' Exh. 17 (Memo from William Brant, Director, WASD, to George Burgess, County Manager, June 14, 2004).

[14]DERM's report was published after the conclusion of the evidentiary hearing before this Court, but has been submitted by the Intervenors for consideration by the Court.  Docket No. 366, filed March 16, 2007.  The Court hereby GRANTS Intervenors' Motion to Admit Into Evidence Certain Recently Released Public Records (including DERM's report), Docket No. 374.

announced that it could not eliminate the mining-related blasting as a source of the

benzene.[15]  DERM's report concluded that the two reported contamination periods

(January 2005 to February 2006, and a second episode beginning in August 2006)

were not caused by several other potential sources.[16]

_____

[15]WASD already had initiated a comprehensive investigation into the benzene contamination, installing monitoring wells, participating in multiple sampling events, and incurring costs of more than one million dollars, before being redirected from the investigation by County management who determined that DERM was the proper agency to conduct the investigation. Tr. 2377-79 (Ana Caveda), Plaintiffs' Exh. 144. The personal opinions of senior WASD professional staff who conducted the investigation were that the mining-related blasting activities were the likely source of benzene. "In my [personal] opinion, [benzene] was probably caused by the blasting," Tr. 1300 (Pitt); "[Blasting] was the most likely of the sources that we identified," Tr. 2366 (Caveda). The Court found these two witness' testimony credible, and notes that the Deputy Director of WASD, Dr. Douglas Yoder, acknowledged Pitt's opinion, but asserted that WASD was relying on DERM's investigation and conclusion that there was "insufficient evidence" to know where the benzene was coming from. Tr. 4281-83 (Dr. Douglas Yoder). Recently, DERM reported to the County that "[b]ased on the frequency of blasting operations in the vicinity of [production well 1] as well as the volumes of diesel fuel utilized, the rock mining operations represent a potential source for the benzene contamination documented." Docket No. 366 (Executive Summary of Northwest Wellfield Benzene Investigation, prepared by DERM, February 2007 ("Executive Summary of Investigation"), p. 6. Despite WASD's investigation, and DERM's own hypotheses, Wilbur Mayorga, the Chief of DERM's Pollution Control Division and the person assigned to be the "liaison" to the mining companies during the benzene investigation, Tr. 4690 (Mayorga)), maintains that "to date the source of the contamination has not been found." Id.

[16]WASD already had initiated a comprehensive investigation into the benzene contamination – installing monitoring wells, participating in multiple sampling events, and incurring costs of more than one million dollars – before being redirected from the investigation by County management who determined that DERM was the proper agency to conduct the investigation. Tr. 2377-79 (Ana Caveda), Plaintiffs' Exh. 144. The personal opinions of senior WASD professional staff who conducted the investigation were that the mining-related blasting activities were the likely source of benzene. "In my [personal] opinion, [benzene] was probably caused by the blasting," Tr. 1300 (Pitt); "[blasting] was the most likely of the sources that we identified," Tr. 2366 (Caveda). The Court found these two witnesses to be very credible, and notes that the Deputy Director of WASD, Dr. Douglas Yoder, acknowledged Mr. Pitt's opinion, but

Despite protestations to the contrary, it appears likely that the Corps-permitted mining activities, specifically the blasting used to dislodge the limestone[17] from the Aquifer, are a source of the benzene.  A significant portion of the mining occurs in this same Wellfield where the contamination was discovered – some of the active mining operations are less than 3000 feet from the production wells.  The Court need not determine conclusively[18] whether the benzene originated from mining-related blasting as the contamination itself (and the Corps' failure to treat it as significant) is sufficient to expose the Corps' ongoing violations and dereliction of their duties under the CWA,

---

asserted that WASD was relying on DERM's investigation and conclusion that there was "insufficient evidence" to know where the benzene was coming from.  Tr. 4281-83 (Dr. Douglas Yoder).  Despite WASD's investigation, and DERM's own hypotheses, Wilbur Mayorga, the Chief of DERM's Pollution Control Division and the person assigned to be the "liaison" to the mining companies during the benzene investigation, Tr. 4690 (Mayorga), testified that "to date the source of the contamination has not been found."  Id.  Recently, DERM reported to the County that "[b]ased on the frequency of blasting operations in the vicinity of [the contamination] as well as the volumes of diesel fuel utilized, the rock mining operations represent a potential source for the benzene."  Executive Summary of Investigation, p. 6.

[17]It is "necessary to blast to fracture the stones so they can be mined." Tr. 4969 (Albert Townsend, testifying on behalf of permittee/Intervenor Tarmac America LLC ("Tarmac")).

[18]Making a conclusive determination that blasting is *the* source of the benzene contamination may have ramifications as to liability for remediation costs, etc. – therefore it is not surprising that the County pursues the investigation carefully. However, a failure by the Corps to take certain minimal steps, e.g., inspecting the blasting locations and materials used by the active mining operations, which might reduce the risk of further contamination from this potential source is surprising in light of conditions in the permits themselves relating to protection of the Wellfield from contamination, including the prohibition of mining within a certain distance from the production wells.

NEPA, and APA.[19]  When the Court questioned the Defendants' primary witness as to

why the benzene contamination had not been included in the report of the Corps'

"Three Year" review required by the permits,[20] his response was: "[W]e don't have any

clear indication from the County that it's a problem."  Tr. 2776 (John F. Studt).[21]

---

[19]"Congress has charged [the Corps and FWS] with acting in the public interest."
Tr. 7189-90.  The Corps' apparently unyielding determination to approve mining,
regardless of the demonstrated risks of adverse impacts, demonstrates that they did
not act in the public interest prior to issuance of these permits, nor during the time
when they should have been monitoring and enforcing the terms and conditions of the
permits.

[20]The report of the Corps' "Three Year" review was filed in April 2006, a full year
after it was due.  It also failed to provide the public – to the extent that this document
presumably was available to the public – with adequate information about this Court's
Order on Summary Judgment and the Court's finding of significant violations by the
Defendants.  "An Order on Motions for Summary Judgment dated March 22, 2006, was
received  . . . and is under review by the Corps for required actions."  Docket No. 103
(Memorandum for Record, dated April 19, 2006, p. 14 of Exh. B to Declaration of John
F. Studt, Chief, South Permits Branch, Regulatory Division, Jacksonville District, dated
April 24, 2006 ("'Three Year' review report")).  Indeed, despite the Court's findings
regarding the inadequacy of the Defendants' analysis of potential impacts on the wood
stork, the "Three Year" review report repeats the prior assessment (of consultants hired
by the permittees) that "the Lake Belt 10-Year Mine Plan is not likely to adversely affect
the wood stork."  This is a conclusion which the FWS now has admitted was incorrect;
the Biological Opinion, issued August 31, 2006, announces that there will be a "take" of
wood storks under the current mining plan.  Docket No. 241, filed September 1, 2006
(Defendants' Notice of Filing Biological Opinion ("BO")).

[21]Although the Corps' witness, John Studt, testified that the Corps didn't "have
any clear indication from the County that [the benzene was] a problem," Tr. 2776, Studt
himself was in written contact with the acting Director of DERM in late January 2006
and received a copy of a January 2006 County memorandum on potential
contamination of the Wellfield in general.  The memorandum noted that studies
conducted by the United States Geological Survey ("USGS") indicated that the
County's wellfield protection zones (on which the Corps' mining prohibition was based)
"might not be sufficient to minimize the risk to the public" and that a necessary
protective buffer around the production wells would be "substantially greater" than the
current zones.  Plaintiffs' Exh. 149.  The County's statements are clearly relevant to the
Corps' determination of adverse environmental impacts from the mining in this Wellfield

The Corps' shifting of responsibility to the County,[22] combined with a complete

failure to advise not just this Court (during the pendency of these proceedings) but also

the public as to the contamination of the Wellfield by benzene and the potential

connection to the mining activities,[23] eliminated the possibility of meaningful public

_____

and should have triggered, at a minimum, further investigation by the Corps – including, perhaps, consultation with the EPA about the water quality issues. ("I did not consult separately [with the EPA about benzene], no . . . . I know we did not coordinate [our 'Three Year' report with EPA] in writing."  Tr. 2684, 2699 (Studt).)  Moreover, Corps staff also received messages from DERM as early as February 2005 describing the benzene contamination as an "emergency" and an "immediate public health hazard." Plaintiffs' Exh. 150.  Regardless of the quantity of communication received by the Corps, it is undisputed that the Corps knew about the benzene incident almost immediately after it occurred, knew that it might be related to the mining, and still did nothing to limit the mining.  Defendants' counsel correctly noted that "just because the County has been silent [about the need to stop the mining because of the contamination risks] . . . that alone is not dispositive." Tr. 7170.

[22]See n21, *supra*.

[23]It bears observation that if the Corps had filed the "Three Year" review by December 31, 2005, as promised (see Docket No. 56, filed May 2, 2005, Notice to Court), and if the Corps had been candid about the benzene contamination which had already occurred, then this Court's Order in March 2006 should have vacated the permits.  The Court presumes that counsel for the Defendants did not have access to information concerning the benzene contamination at the time of filing their "Notice to Court" on May 2, 2005, nor when they filed their "Notice of Filing" on September 27, 2005, as they asserted in those submissions that the Corps' ongoing (and delayed) review of the permits at issue "[did] not materially affect any of the argument presented in the summary judgment briefs."  The "Three Year" review reports that the status update from the mining industry, dated March 15, 2005, indicates "excellent water quality in both the active and inactive mining lakes" and that neither cryptosporidium nor giardia, "the principal potential contaminants of concern regarding the Northwest Wellfield, have been found in any of the lake, . . . monitoring well, or production well samples through the end of 2004."  Docket No. 103. The foregoing statement is not incorrect, but may be viewed as somewhat misleading in light of the fact that the miners' report was written, and then adopted by the Corps, at a time when the County had shut down almost half the production wells in the Wellfield due to the highest level of benzene contamination ever seen in that Wellfield and which County regulators believed had been caused by blasting related to mining.  In light of the record as now

participation required by NEPA and the CWA.[24]  In summary, the Corps' lack of concern

about the benzene contamination represents a failure to fulfill its legal obligations to

conduct the agency's permitting activities with transparency.[25]  This is just one example

of the many errors made by the Corps in failing to provide accurate information for

public assessment and review throughout the permitting process.[26]

---

developed, i.e., that the Corps knew of the benzene contamination as early as
February 2005, and was present at a meeting in May 2005 at which the benzene issue
was discussed, Plaintiffs' Exh. 108, Intervenors' Exh. 15, it would have been a serious
mistake for counsel to have failed to advise the Court of this information if it was in
counsel's possession.  Clearly, the Corps should have informed this Court, through
counsel, that the benzene contamination had been discovered, that it was significant,
and that blasting related to activities authorized by the permits under review by the
Court was considered to be one of the sources.

[24]The Defendants' approach also leads to a corruption of the applicable federal
environmental regulatory tests for approving activities in wetlands.  Instead of
conducting an analysis which assesses risks and balances harms, the Defendants
imply that if Plaintiffs cannot specify "what levels of organisms may be present" in the
mining pits, Docket No. 350, p.15,  then the Corps is free to blithely rely on the County
management's assertions that the safety of the drinking water supply is adequately
protected – despite evidence to the contrary, such as the fact that the necessary
upgrades to the water treatment plants (to treat the contaminated water from the
Wellfield) will not be completed until at least four to five years from now.  Tr. 4291 (Dr.
Yoder).

[25]The regulations specifically state that "public scrutiny" is essential to
implementing NEPA.  40 C.F.R. 1500.1(b), see also Sierra Club v. Marsh, 976 F.2d
763, 770 (1st Cir. 1992) ("public disclosure is a central purpose of NEPA").  As
previously stated by the Court, "the deferential judicial review of an agency's actions
should oblige that agency to disclose fully the reasoning behind its decisions in order to
demonstrate clearly that such decisions were issued in compliance with governing laws
- such candor would ensure that our nation's environmental laws are respected."
Sierra Club, 423 F. Supp. 2d at 1285.

[26]The Court addresses in further detail below the Corps' continuing errors, e.g., a
failure to protect the Aquifer, the loss of endangered wood stork foraging habitat, the
destruction of archaeological sites by the mining operations, and a failure to establish
and enforce adequate mitigation requirements.

Defendants' lack of transparency and clarity in the permitting process also have made the "public interest" issues[27] difficult to grasp in this case.  It is impossible to discern precisely what is at issue under these permits with respect to the number of acres to be mined, the precise locations and types of mining impacts at any given point in time, and the total length of time during which the mining activities may proceed.[28] Defendants rely on the permittees to report the number of acres mined and wetlands impacted, but the permittees use different descriptive terms than those used by the Defendants – raising a question as to whether there is or could be any meaningful monitoring to ensure the accuracy of the reporting of impacts.[29]  The Defendants

---

[27]The Corps' public interest review of all permits is described in 33 C.F.R. 320.4(a).

[28]Despite the fact that the ROD references a total of 5,409 acres of impacts, AR1028, p. 5, and the Biological Opinion ("BO") states that the mining footprints now total 5,712.2 acres (of which reportedly only 4,521 acres are wetlands), BO, p. 2, the BO claims that "[n]o increase in the total area permitted for mining has resulted from [the permit modifications since 2002]."  BO, p. 4.

[29]For example, the ROD itself references three sources of estimates of the "acres of impact" of the proposed mining – each of which yields a different amount e.g., the estimated impacts for Sunshine Rock range from 38.04 acres to 70.1 acres, AR1028, p. 5, 7.  The permit issued to Sunshine Rock states that it relates to "the placement of fill material in waters of the United States, covering approximately 68.7 acres."  AR1055. The recently issued BO references "acres of fill/excavation" or "actual mined acreage" and "wetland impacts," e.g., for Sunshine Rock, a total of 45 acres of fill/excavation are permitted including 9 acres already mined as of early 2005, and an additional 42 acres, all of which have been cleared of vegetation (note that the sum of these two numbers exceeds the total amount permitted), BO, p. 13.  The Lake Belt 2005 Annual Report (the most recent Annual Report submitted to the Court) describes "lake" acreage, "disturbed" acreage, "mining," and "wetland impacts" as of February 2005; the reported acres of "lakes" and "disturbed" areas apparently include activities already completed before these permits were issued, e.g. Sunshine Rock is described as having a total of 113 acres of "lake" acreage, another 34 acres of "disturbed" acreage, and the company reportedly generated only 5 acres of "mining" and no "wetland impacts" between April

offered very little[30] to support their untenable position that the alleged benefits to the

economy outweigh risks of environmental harm from the continued mining.[31]   Nor is it

an easy task to test the Intervenors' arguments that there are insufficient alternative

sources of limestone to replace the rock being harvested under these permits, and that

any reduction in mining will be devastating to the mining companies,[32] their employees,

---

2004 and February 2005. Plaintiffs' Exh. 16, Table 2.  The figures for other permittees
are similarly discrepant.

[30]The Defendants presented only three witnesses (all of whom are employed by
Defendants and none of whom are responsible directly for the regular monitoring of the
activities pursuant to these permits nor were they able to testify specifically as to the
numbers of acres impacted to date or planned to be impacted in the future), and less
than thirty exhibits.  Indeed, the Defendants presented their own employees as
"experts" – which is emblematic of the often-observed problem presented when
testimony is offered by individuals who have been hired to give a specific "expert"
opinion, rather than an opinion that is unquestionably free of bias.  To be clear, the
Court is not suggesting that the employees who testified on behalf of their employer,
nor the other experts who testified in this case, were anything less than credible; the
entire record in this case, however, evinces a significantly flawed decision making
process – one that relied on a number of assumptions rather than on independent
verification and analysis of relevant claims – and which produced unlawful outcomes by
those federal agencies entrusted with protecting our national natural resources.  In
short, the pertinent public officials have failed to "make decisions that are based on
understanding of environmental consequences, and take actions that protect, restore,
and enhance the environment."  40 C.F.R. 1500.1(c).

[31]Defendants' argument that this mining results in benefits for Everglades
restoration is based on financial concerns.  The alleged benefits are that the mitigation
fee paid for each ton of rock provides funds to acquire wetlands for conservation and
that the mined limestone products provide a ready supply of materials for purchase and
use by the Corps in its construction projects related to Everglades restoration.  This
argument is of little persuasive effect in the context of the extensive adverse
environmental impact of this permitted mining.  Moreover, the Corps has not
demonstrated that it will be unable to meet the alleged additional costs if mining is
discontinued in these wetlands.

[32]Moreover, the multi-national nature of most of the corporations who are mining
under these challenged permits, and the recent purchase of permittees Florida Rock

and the population in general.[33]  Without an accurate baseline against which to measure the planned future mining impacts, and in light of the widely varying mining production levels of the different permittees, it is difficult to assess whether there might be alternative sources for some of the mining activities for at least some period of time.[34]

As noted in this Court's earlier Order, the Court's duty is to "immerse" itself in the evidence and determine whether the agency decision was rational and based on consideration of the appropriate factors.  The Court has endeavored to understand the full extent of the scientific evidence regarding the conditions of the Aquifer and its

_____

and Rinker by competitors (and non-permittees) Vulcan and CEMEX, respectively, see discussion, *infra*, render it rather difficult to measure the impacts of this Court's ruling on the specific permittees themselves.

[33]Throughout the hearing the parties' acrimony was generally subdued; in their briefs, however, Intervenors accuse the Plaintiffs of being "callous" regarding the "devastating economic impacts that will flow from vacation of the permits or an enjoining of mining," Docket No. 352, p. 2, and  Plaintiffs point to the "huge annual profits" accumulated by the Intervenors for several years' worth of business activity, i.e., the sale of mining products, despite the fact that "they have yet to, and may never, satisfy the stringent standards for destroying the wetlands at issue," Docket No. 356, p. 12.  While the Intervenors' predictions that any halt in mining by the Court would lead to "[m]assive unemployment" and a "recession throughout South Florida," Docket No. 352, p. 112, appear to be at least mildly inflated, it is also true that Plaintiffs must not fault corporations for proceeding to operate profitably when the Corps has improvidently authorized permits for these privately profitable activities.

[34]Because these permitted actions involved an industry which claims to be so vital to the regional and statewide economy, this Court granted the evidentiary hearing and has considered all of the evidence offered post-ROD. If such a vital industry was not involved, this Court would have ruled originally that the Corps and FWS had not done their job and that all permitted actions must cease immediately.

vulnerability to contamination.[35]  From a review of the evidence, the Court has

understood the primary message to be essentially undisputed:[36] the deep, vast quarry

pits left behind from the mining activity expose the Aquifer (and the drinking water

drawn therefrom by the pumps in the Wellfield) to a greater risk of contamination than if

the pits were not present.[37]  Regardless of whether the existing or planned municipal

---

[35]Hydrology and the other relevant sciences are obviously not the area of this Court's academic expertise. Many of the witnesses who testified have decades of experience in the pertinent fields and rely on data and analysis which, while commensurate with such experience, is somewhat impenetrable to those without formal training in the field.

[36]Intervenors' counsel made the following candid admission during his closing argument. "Obviously, the fact is that water is moving faster [in the Aquifer]. No one's disputing that the data that was used 20 years ago to develop the [setback distances] around the Wellfields, well, it's been superseded by more recent data." Tr. 7234. Unfortunately, counsel proceeded to (presumably inadvertently) misstate the facts regarding the history of benzene contamination in the Wellfield.

> So if it had been an issue, as [Plaintiffs] suggest, that the actual detonation of [blasting] emulsion was creating benzene, it would have come up somewhere. It would have come up somehow over the last 50 years.... It came up nowhere until January 2005, when they've been doing this [mining] out there for 50 years. So it's plainly something that is of concern, but there's just no logical connection why suddenly, suddenly, this particular activity could be the explanation."

Tr. 7240. William Brant, former Director of WASD, testified persuasively that, looking back at sampling over the years, "there were occasional hits of benzene.... [Y]ou would see it one time and then it would not be there for another year or so." Tr. 1494. "In the early years of [sampling], when you have very few samples [sampling occurred only once per year, generally] low levels of benzene were detected, not very high." Tr. 6552 (Dr. Hennet). The infrequency of the County's sampling in this area in the past ("the data is pretty sparse for 40 years of blasting," Tr. 6552 (Dr. Hennet)) has been suggested as an explanation for the sporadic nature of indications of benzene, Tr. 6551-52 (Dr. Hennet), as well as the relative lack of indications of pathogens such as cryptosporidium and giardia, Tr. 291-94 (Dr. Huffman).

[37]Although the Intervenors argue that there is an inherent risk of contamination of the Aquifer from the wetlands themselves and existing canals near the Wellfield (i.e.,

water treatment facilities will be able to treat those incidents of benzene contamination

which already have occurred, or any potential future contamination by benzene or

pathogens such as cryptosporidium or giardia, it nevertheless remains an exceedingly

significant occurrence that a previously pristine Aquifer has suffered these grave

problems.  The Court finds that the evidence clearly establishes that the CWA and ESA

compel denial of these mining permits, and also that the Corps' governing regulations,

as well as the intent and letter of NEPA and the APA have been violated by the Corps'

issuance of these permits.[38]  The principles governing judicial review of agency actions

direct that the Court approve an agency decision even if the Court disagrees with the

_____

from water bodies that are not mining pits), they have not provided evidence to
disprove the overwhelming evidence that the existence of the mining pits on top of the
Aquifer renders it more vulnerable to contamination, by facilitating more direct
interaction with the Aquifer, than if the pits were not present.

    [38]NEPA "ensures that important effects will not be overlooked or underestimated
only to be discovered after resources have been committed or the die otherwise cast."
Robertson v. Methow Valley, 490 U.S. 332, 349 (1989).  "The President, the federal
agencies, and the courts share responsibility for enforcing [NEPA] so as to achieve the
substantive requirements of section 101 [of NEPA]."  40 C.F.R. § 1500.1(a).  Section
101 of NEPA declares that

    [I]t is the continuing responsibility of the Federal Government to use all
    practicable means . . . [so] that the Nation may fulfill the responsibilities of each
    generation as trustee of the environment for succeeding generations; assure for
    all Americans safe, healthful, productive, and esthetically and culturally pleasing
    surroundings; attain the widest range of beneficial uses of the environment
    without degradation, risk to health or safety, or other undesirable and
    unintended consequences; . . . enhance the quality of renewable resources and
    approach the maximum attainable recycling of depletable resources.

42 U.S.C. § 4331(b).

agency,[39] as long as the agency's conduct is compliant with the law, i.e., is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or without observance of procedure required by law." 5 U.S.C. § 706 (2)(A).[40] However, "[t]he failure of an agency to comply with its own regulations constitutes arbitrary and capricious conduct," Simmons v. Block, 782 F.2d 1545, 1550 (11th Cir. 1986),[41] and subjects the agency action to reversal according to the APA. 5 U.S.C. § 706 (3)(a).

It appears that the primary issue in this case from the Defendants' perspective may be the question of whether there were other available sources of readily accessible

---

[39] As noted in this Court's March Order, Sierra Club, 423 F. Supp. 2d at 1310 n110, "[w]hether the Court would have reached the same conclusion is irrelevant, 'the agency must merely have reached a conclusion that rests on a rational basis.'" City of Oxford v. F. A. A., 428 F.3d 1346, 1352 (11th Cir. 2005)."

[40] This Court must not "substitute its judgment for that of the agency." Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Engineers, 87 F.3d 1242, 1246 (11th Cir. 1996), citing Citizens to Preserve Overton Park, Inc., v. Volpe, 401 U.S. 402, 416 (1971).  This Court also must not engage in "undue judicial interference." Norton v. Southern Utah Wilderness Alliance, 542 U.S. 55, 66 (2004) (court can only compel agency to act when the agency had an enforceable duty to do so).  The unique facts and procedural posture of this case suggest that – far from this Court's Orders being perceived as "undue judicial interference" – it appears that the Court's rulings may fall on deaf ears.

[41] The Department of the Army has acknowledged on a national level that the Corps has been deficient in ensuring compliance with mitigation required in permits pursuant to 33 C.F.R. § 325.4(a)(3).  Plaintiffs' Exh. 174, Government Accountability Office Report to the House Committee on Transporation and Infrastructure, "Wetlands Protection: Corps of Engineers Does Not Have an Effective Oversight Approach to Ensure that Compensatory Mitigation is Occurring," September 2005.  The Corps' record of admitted failures with respect to enforcing mitigation requirements may suggest that the Corps is an agency to which deference should be given only after a full investigation by the Court – specifically as to those actions regarding mitigation.

limestone outside the permitted area,[42] rather than a focus on the impacts on wetlands and the Aquifer.[43] This conflict in the Corps' approach exemplifies the concern expressed by Senator Muskie thirty-five years ago that the Corps, "a mission-oriented agency, is not equipped to evaluate the environmental impact of dredging activities

---

[42]The Corps has argued that the future of Everglades restoration depends on the Court's approval of this mining, reporting that there will be "likely harm to Everglades restoration projects that would result if the Court orders any relief that disrupts ongoing mining activities" and that "vacatur of the existing mining permits would . . . jeopardize the Corps' ability to complete "a dam restoration project that is designed to protect local communities from potentially disastrous flooding." Docket No. 350, pp. 11 (emphasis added), 28; Tr. 2944-47, 2954-58 (Scott Burch). The Corps suggests that any limit on mining imposed by this Court to protect the wetlands and Wellfield being destroyed by this mining might actually lead to a disaster of the scale of Hurricane Katrina in August 2005. "[W]e could, under a high water event, experience a failure [of the Hoover dike at Lake Okeechobee] similar to what happened in New Orleans." Tr. 2956 (Burch). This testimony is disturbing not only because it raises the terrible specter of the Hurricane Katrina tragedy but, most importantly, because it leaves the mistaken impression that limestone from the Lake Belt area is critical to the project to rehabilitate the Hoover Dike. In fact, the same witness making such damaging predictions (the Corps' own Chief of its Cost Engineering Branch) admitted that he did not know if the Hoover Dike project actually was using any material from the Lake Belt, Tr. 2986-88 (Burch); indeed, he admitted that the Hoover Dike project is using "gravel from all around the state . . . [and] material coming from quarries other than the Lake Belt." Tr. 2986-87 (Burch).

[43]Although a senior staff member for the Corps testified that one of the Corps' goals is to "provide strong protection of the nation's aquatic environment, including wetlands, as a primary goal of the [regulatory] program," Tr. 2467-68 (Studt), and Defendants reference Congress' intent to protect the aquatic environment at the time it passed the CWA and established the Corps' regulatory program, Docket No. 350, p. 2, the Corps' actions suggest otherwise. For example, the mandatory regulatory presumption, which the Corps failed to apply, is that there are other environmentally preferable alternatives which must be considered, 40 C.F.R. 230.10(a)(3), prior to permitting the destruction of wetlands. In issuing these permits, however, the Corps chose to focus instead on "economic hardship on the mining industry" and the "legal issues" that would arise if the permits were not issued, Docket No. 42, filed July 15, 2004, p. 4, and therefore failed to test carefully the permit applicants' claims that this Wellfield was the only location available for this limestone mining.

[and, indeed] would do a disservice to their mission if they would try to act as environmental protectors."[44]  Sierra Club, 423 F. Supp. 2d at 1351 n219 (citing 117 Cong. Rec. 38854 (1971) (statement of Senator Muskie, during Senate Consideration and Passage of S. 2770, debating whether the Corps or EPA should have regulatory authority under the CWA).

The Court's impression, gleaned from the record prior to issuance of these permits, and subsequently confirmed by review of the supplemental administrative record and evidence before the Court, is that the Corps was driven by a sense of predetermination[45] and an urgency[46] which compromised the environmental analysis

---

[44]For example, Congress and members of the public clearly expect the Corps to perform its duties, such as constructing a new dike or improving bridges, in the most cost-effective manner; the Corps, therefore, may properly consider any cost increases in materials, e.g., limestone and its related products, to be of serious concern.  Since the Corps relies on the limestone mined from the Lake Belt area to provide a convenient source of construction materials for its own purchase and use, the Corps faces an inherent conflict when attempting to regulate mining in these wetlands, since any reduction in this mining may increase the costs of these materials.

[45]The Corps refused to limit the mining despite receiving significant objections after the ROD was issued.  Then-Congressman Peter Deutsch reported his personal "great concern," and a widespread public "concern that these mining activities grossly conflict with our efforts to restore America's Everglades."  SAR 1198 (letter from Congressman Deutsch to Corps, dated October 18, 2002). As the Court noted previously,

> [T]here is an underlying theme of pre-determination evident in the frequent reference by the Corps' staff to the historical presence of mining in the area, the Corps' swift rejection of suggestions that mining be stopped or limited, and the omnipresence of mining representatives and their reminders that the Florida legislature's creation of a Lake Belt Committee indicated the state's support for mining . . . . [A] sense of inevitability permeated the agencies' decision-making processes [such that there was] a high likelihood that procedural safeguards, such as those enshrined in NEPA and the CWA, were overlooked or viewed as unimportant in light of the expected approval of the mining.

Defendants are required to perform.  It has been evident throughout this process that the Corps has every intention of continuing to approve mining in this area, and that the Intervenors (permittees) are eager for such approval.[47]  The Corps' persistence provides further support for this Court's prior findings that the Corps violated NEPA by failing to consider fully the "no mining" or "curtail future mining" alternatives[48]  when it approved this mining plan. The Corps also violated the CWA when it failed to presume that

_____

Sierra Club, 423 F. Supp. 2d at 1287.  Nothing presented to the Court since the entry of that Order suggests that this Court's conclusion was wrong; instead, additional evidence supports that conclusion.

[46]The Corps was in such a hurry to issue these permits that it did so before establishing an accurate baseline of prior impacts on wetlands (from mining pursuant to previously-issued permits) against which to measure the impacts of these permits.  Nor were the annual impacts of this permitted mining monitored in the first two years.  In early 2004, the Corps still had no accurate information as to the permitted mining's annual impacts on hundreds of acres of wetlands. (The permits required annual reports from the permittees regarding the number of acres impacted, but the Lake Belt 2003 Annual Report, published in early 2004, reported that it had no information about the acres impacted because the County's aerial photos of the mining area had not yet been released from the previous spring (2003). SAR1321 (letter from permittees' consultant to Corps, dated March 11, 2004, explaining that they were relying on aerial photos to assess impacts).

[47]The permits themselves suggest that they will be extended.  "[T]he intent of the Permittee and [the Corps] is that the currently authorized unmined areas [from prior permits] will be permitted through future extensions of this permit [subject to studies provided by the permittee, applicable law, monitoring reports, etc.]." See, e.g., AR1055, p. 3 (permit issued to Sunshine Rock, Inc.).  "Prior to the expiration date [of the permit], the Corps will decide if the permit will be renewed and extended to cover the projected '50 year' life of mining activities, or some lesser period, as may be appropriate." Id.  This raises, again, the question of whether these permits are for ten years, as claimed by Defendants, or whether they are "bridging permits" designed to allow mining to continue without interruption while the Corps plans for the full fifty years of mining envisioned in the EIS (and criticized by other federal agencies, local agencies, organizations, and individuals). Sierra Club, 423 F. Supp. 2d at 1279.

[48]40 C.F.R. § 6.203(b)(1), (c); 40 C.F.R. § 1502.14(d).

practicable, *environmentally preferable* alternatives exist, as required by the CWA,[49] and instead readily approved the comprehensive mining plan.

The theme of predetermination also is evident in recent submissions from the Defendants; in their post-hearing brief, the Defendants state that any "adverse impact to the public interest [caused by vacating these permits] is *unnecessary*, since the Corps needs only a limited time (nine months) to complete its supplemental NEPA analysis." Docket No. 350, p. 32 (emphasis added).[50] This implies that the Corps has no intention of stopping these environmentally damaging activities, despite this Court's sweeping condemnation of the basis for these permits and the mounting evidence that the Aquifer has been irreversibly contaminated.[51]

---

[49]40 C.F.R. § 230.10(a)(3).

[50]The Defendants also state that "[i]t is in the public interest that the Court should remand the permits to the Corps without vacatur." Docket No. 350, p. 5. The Court already did remand the permits without setting them aside in March 2006, but it appears that may have been a mistake since in the intervening period Defendants continued to ignore their duty to protect the municipal water supply and the wood stork.

[51]The Defendants announced to this Court that "the Corps . . . [already has] concluded that continued mining over the short term (i.e., the 18-month remand period) will result in only minor environmental impacts." Docket No. 92, filed April 26, 2006, p. 9. In light of the Corps' earlier conclusions that there would be no "significant impact" on the quality of the human environment when they issued the permits in 2002, only to later discover that benzene contamination and destruction of wood stork foraging habitat were occurring, this Court has little confidence in the Corps' present assertions that there will be "only minor environmental impacts." Moreover, nothing in the permits prohibits the mining companies from mining the area more rapidly than in the past (and completing all of the mining projected to have continued until 2012 and beyond), Tr. 2620-21 (Studt); this lack of control over the rate of mining effectively renders meaningless the Defendants' assumptions, based on the estimates of annual rates of mining, as to the magnitude of potential impacts in the "relatively short period of time of 18 months." Tr. 2581-82 (Studt). The permits themselves are based upon an anticipated 331.5 acres of wetlands impacts per year; an eighteen-month period

In three decades of federal judicial service, this Court has never seen a federal agency respond so indifferently to clear evidence of significant environmental risks related to the agency's proposed action.[52] It may be that the power of "economics" (i.e. financial profit to be gained from further production of building materials) unduly influenced the Corps. The events preceding the issuance of the EIS and the Record of Decision ("ROD"), specifically when the Corps seemed to wilt in the presence of pressure for approval of the permits, suggest such a conclusion. 423 F. Supp. 2d at 1287-88.[53] It now appears that even the local governmental agencies have yielded,

---

reasonably could be predicted to result in the destruction of five hundred acres of wetlands (331.5 acres per year times 1.5 years). Tr. 2537 (Studt). This is in addition to the acres of wetlands already destroyed pursuant to these permits. "[E]stimated wetland impacts to date [August 2006, nearly one year ago] should be approximately 1,500 acres." Plaintiffs' Exh. 159; Docket. No. 240, filed August 28, 2006 (Defendants' Notice of Filing Biological Assessment ("BA")).

[52]In thirty years of trying cases nor have I ever felt the weight of a decision so heavily on me; this burden is the result of Intervenors' claims that any limits imposed on this mining by the Court will lead swiftly to a catastrophic effect in the lives of so many mining company employees and others. Yet, as I reflect on that burden I am faced with more compelling evidence that the source of drinking water for the current population of Miami-Dade County, as well as future generations, i.e. millions of people, is at risk because of this mining. Also, the evidence regarding the profits enjoyed by these private companies – most of which are very large or multinational enterprises (Rinker/CEMEX, Florida Rock/VULCAN, Tarmac-TITAN, White Rock/Continental) – throughout the multiple years of mining under these invalid permits suggests to the Court that today's ruling, when viewed in context, imposes a remedy which is less punitive on the Intervenors than what it might at first seem and, also what might otherwise have been imposed.

[53]The Corps even ignored the County's request for a public hearing and instead issued these permits despite widespread concerns that the mining and remnant pits would contaminate the Aquifer. AR654 (letter from Merritt Stierheim, County Manager, to Corps, dated July 19, 2000).

22

perhaps as a result of increasing pressure from the mining companies or others.[54]

Recently, the County restarted some of the production wells which had been shut down

more than two years ago due to benzene-related contamination issues.[55]  CAP, p. 5.

Under the presumption that benzene will continue to be found, the County appears to

have conceded that upgrades to the water treatment plant which handles the majority of

the County's drinking water are necessary[56] in order to prepare for the perhaps

_____

[54]Despite the County's prior clearly stated objections to these mining permits specifically noting the risk of Wellfield contamination, AR485, AR608, AR646, AR655, AR656, AR791B, AR813, it appears that DERM may now have abandoned attempts to establish a more accurate mining setback line, instead opting to proceed with expensive upgrades or the replacement of water treatment plants.

[55] It is troubling to the Court that William Brant, who had worked for the County for 27 years, may have been forced to resign as Director of WASD soon after he had advocated, in candid memoranda, for a full investigation of the source of the benzene – an investigation which might have exposed mining activities as the source.  Tr. 1479-81, 1552-53.  The County Manager (George Burgess) asked for Brant's resignation, Tr. 1552 (Brant), soon after a meeting at which Brant was instructed by Assistant County Manager Joe Ruiz "not to write any more memos" relating to rock mining as a potential source of the benzene contamination, and to allow DERM to take control over the investigation.  Tr. 1479. According to Brant's testimony, he had urged the County management to contact the mining industry to ask "if there were any alternative explosives that they could be using to see if it had any impact on the benzene concentrations."  Tr. 1478.  Whatever the County's reasons for removing Brant as Director of WASD may be, the evidence does not suggest that the new leadership will result in any greater protection of the Wellfield or better communication with the Corps.  The Court notes that while John Renfrow (the new Director of WASD) was Director of DERM, he rejected Brant's suggestion in May 2005 that the Corps be notified of the benzene contamination as "inappropriate and premature," Plaintiffs' Exh. 106 (Memorandum from John Renfrow to William Brant, May 18, 2005); Tr. 1484 (Brant).  At least some of the DERM staff did not agree with Renfrow – DERM staff had notified the Corps promptly, in February 2005, regarding the benzene contamination.

[56]William Brant, former head of WASD, testified that these upgrades to the water treatment plants would not be necessary but for the mining lakes in the vicinity of the Wellfield. Tr. 1575.  The Court found Mr. Brant to be a very credible witness.

23

inevitable reclassification of the Wellfield from "groundwater" to "groundwater under the direct influence of surface water" ("GWUDI")[57] by federal and state authorities. Even if the water treatment plants are able to treat the raw water for the anticipated amounts of benzene, it is nevertheless of grave concern that benzene will now regularly affect a previously pristine Aquifer.[58] The ability to cure a problem does not justify its creation. It is improper for these risks to be imposed solely on the public, including the risk that the public will have to pay a substantial sum to upgrade the water treatment facilities, particularly when the private sector earns enviable profits on the harvesting of these non-renewable natural resources.

---

[57]"The surface water treatment rule promulgated by the EPA in 1989 requires that public water supplies derived from 'groundwater under the direct influence of surface water' (GWUDI) receive the same treatment as water supplies derived directly from surface water." AR1175 (Northwest Wellfield Watershed Protection Plan, prepared for the SFWMD by DERM, dated August 16, 2000). Treating surface water to reach acceptable drinking water standards is much more costly than treating groundwater.

[58]Note that the benzene concentration detected at production well 1 ("PW-1"), the southernmost of the fifteen pumping wells in the Wellfield, reached as high as 15 ppb in February 2005 and 9 ppb in November 2006. Even though the water treatment plant can reportedly process and clean this quantity of benzene from the finished water, it is unclear what might happen to anyone operating a private well near a mining lake. The testimony and evidence suggests that are no private wells functioning in the Wellfield itself, but this evidence does not include data on private wells near other mining locations which continue to mine under these permits. For example, the northernmost and southernmost locations where mining is taking place pursuant to these challenged permits "are not in the region of the Northwest Wellfield protection areas." ROD, AR1028, at 75-76. While the Corps previously, and perhaps erroneously, concluded that those projects "would be of no risk to the drinking water resource," it is unclear what the level of risks are to the neighboring residential communities which may use private wells to tap into the Aquifer for drinking water or other purposes. The ROD states that there are 1,800 private landowners in the Lake Belt area and that their corresponding land uses include, *inter alia*, "rural residences," AR1028, p. 5, i.e., which may be the type of residence which relies on a private well.

Having fully considered all of the evidence, as well as the administrative record before the Court – including the Supplemental Administrative Record ("SAR"),[59] the Court concludes that there is no reason to disturb the Court's earlier findings regarding the failure of the Defendants to comply with their duties to the public.  It also appears that the basis for each of the Court's previously expressed concerns has been validated[60] and these permits must be set aside until completion of the SEIS.  In sum, the Court concludes that the Corps failed to give appropriate weight to the public's need for reliable freshwater as compared to the private need to continue mining this specific limestone and any larger public need for this limestone (instead of limestone from other sources). The Court's decision to set aside these permits is compelled by Defendants' failure to fulfill their legal duties to protect our natural aquatic resources and habitats.

## II. DETERMINATION OF AN APPROPRIATE REMEDY

For more than sixty years the APA has directed the courts regarding the presumed remedy for unlawful conduct by federal agencies: "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or

---

[59]Since the facts in this matter which were in the administrative record prior to issuance of the challenged permits in April 2002 were already addressed in this Court's March 2006 Order (which is incorporated herein) they will not be restated here.

[60]The implications of the current evidence as to two of the Court's primary concerns announced in the March 2006 Order, e.g., the contamination of the municipal water supply and the threats to the endangered wood stork, are discouragingly bleak.

without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (2)(D).[61]  This

standard of review also has been specifically applied to each of the environmental

statutes at issue herein, <u>Sierra Club</u>, 423 F. Supp. 2d at 1284, including both of the

substantive environmental statutes, the CWA and ESA, along with NEPA.[62]

Agency decisions are guided by statutes as well as by regulations.  Agency

regulations may be viewed:

> as an attempt to solve various problems of "market failure" identified by
> economists . . . . [R]egulation is frequently justified by the need to compensate for
> the fact that the price of a product does not reflect costs that its production and
> use impose on society.  For example, in an unregulated market the price of steel
> will not reflect the "externalities" (sometimes referred to as "spillover costs") that
> its manufacture imposes in the form of air pollution.  Neither the manufacturer nor
> the consumer of its products bears these costs.  As a result, the demand for steel
> will be greater than it should be, because it is higher than it would be if buyers
> had to pay for the cost of its adverse side effects.

Stephen G. Breyer, Richard B. Stewart, Cass R. Sunstein, Matthew L. Spitzer,

Administrative Law and Regulatory Policy: Problems, Text, and Cases, Fifth Ed. (2002)

---

[61]The clear language of the APA provides that "courts [shall] . . . set aside
federal agency action that is 'not in accordance with law.'" <u>FCC v. NextWave Personal
Communications</u>, 537 U.S. 293, 300 (2003).  If a party prevails on its APA claim, "it is
entitled to relief under that statute, which normally will be vacatur." <u>Am. Bioscience,
Inc. v. Thompson</u>, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (citations omitted).
"[A]gency actions should be reversed if they are found to be 'arbitrary and capricious,
an abuse of discretion, or otherwise not in accordance with law'." <u>Sierra Club v. Martin</u>,
168 F.3d 1, 3 (11th Cir. 1999).

[62]It is undisputed that vacating, or "vacatur" of (the term derives from the APA's
command that a Court "shall set aside" an agency's illegal action), improper agency
actions was the presumptive remedy until the early 1990s, see discussion, *supra*, and
remains so today.

("Administrative Law"), pp. 5 - 8.[63]

A prime goal of the APA was to strengthen judicial review of agency decisions –

to ensure that agencies were considering all the relevant facts, listening to diverse

viewpoints from affected interests, consistently obeying their own regulations, and

explaining their decisions as a "reasoned exercise of [the agency's] discretion in a given

case." Administrative Law, p. 416.[64]  These concerns are the foundation of the "hard

look" doctrine, discussed in Marsh v. Oregon Natural Resources Council, 490 U.S. 360,

374 (1989), and applied in this Court's March 2006 Order.[65]

The growth of the regulatory role of the national government has provided a

multitude of reported decisions addressing the conduct of federal agencies in

rulemaking and other contexts.  Despite this body of precedent, the Court has not found

specific guidance addressing the precise question in this case.  The most favorable

---

[63]Environmental harms present a particularly vivid example of "externalities," also described as "transactions costs," Administrative Law, p. 420, because people who produce those harms, e.g., contamination of the Aquifer, cannot easily bargain with those who suffer from those harms, e.g., consumers of municipal drinking water who face higher costs for clean water.  Several factors render it difficult for courts to remedy through private litigation those market failures which manifest as environmental harms, e.g., the possibility of a remedy may be unavailable until after a significant harm already has occurred, and direct proof of causation is difficult to establish.  Testimony suggests in this case, for example, that the Miami-Dade County Attorney's office reportedly concluded that there was not a legally sufficient basis for DERM to file a claim against the miners to recover the costs of the benzene investigation.  Tr. 2379-80 (Caveda).

[64]This Court must exercise its "narrowly defined duty of holding agencies to certain minimal standards of rationality," Ethyl Corp. v. E.P.A., 541 F.2d 1, 36 (D.C. Cir. 1976).

[65]Sierra Club, 423 F. Supp. 2d at 1346 n199, 1378.

reading of the precedent presented by the Defendants and Intervenors to support their arguments against setting aside these permits is that this Court has discretion to decline to do so. Defendants and Intervenors do not cite any precedent compelling this Court to authorize the continuation of activities under permits the Court believes should never have been issued due to a failure to properly consider adverse environmental impacts.

In its March 2006 Order, this Court remanded these permits without immediately vacating them.[66] Defendants and Intervenors urge this Court to maintain that status – despite evidence that Defendants' violations, and consequent environmental harms from the improperly permitted mining activities, are continuing. Intervenors specifically promote the relatively new concept labeled "remand without vacatur" ("RWV"),[67] and

---

[66] The Court decided not to set the permits aside at that time because it was unknown whether the record of Defendants' activities in the four years between issuance of the permits and the Court's Order would require that remedy. For example, the Court was uninformed at that time (March 2006) as to the results of the Corps' "Three Year" review, etc.

[67] The concept of "remand without vacatur" ("RWV") is founded upon the Supreme Court's reasoning in Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208 (1988) ("[A] statutory grant of legislative rulemaking authority [to an agency] will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms."). Proponents of this concept advocate RWV to fill the gap often created when a court vacates an important rule. See Ronald M. Levin, "Vacation at Sea: Judicial Remedies and Equitable Discretion in Administrative Law," 53 Duke L.J. 291 (2003). Professor Levin argues that RWV in such circumstances would permit the agency's rule to remain in effect while the legislature or regulatory agency corrects the deficiencies; however, he concedes that "at least some Justices [of the Supreme Court] might have ... doubts about the highly discretionary device of remand without vacation," due to their preference for formalism and bright-line rules. Levin, supra, at 346. Defendants and Intervenors nevertheless petition this Court to follow the United States Court of Appeals for the D.C. Circuit D.C. Circuit Court of Appeals in adopting RWV. Docket No. 352. While the D.C. Circuit has embraced the use of RVW, see Checkosky v. S.E.C., 23 F.3d 452 (D.C. Cir. 1994), certain judges in that Circuit disfavor its use. See Milk Train,

suggest that courts should apply RWV whenever possible.[68]  Several reported decisions

of the United States Court of Appeals for the D.C. Circuit employ RWV – none of which

involve an environmental permitting issue.[69]  More importantly, the Eleventh Circuit has

not adopted RWV.  Intervenors rely upon, and extensively cite, a law review article

advocating the adoption of the following recommendations issued by the American Bar

Association ten years ago:

> The Administrative Procedure Act should be construed, or if necessary
> amended, to permit [the courts to exercise discretion and order RWV] . . .
> In exercising this discretion, a reviewing court should normally strike the balance
> in favor of vacating the agency's action, unless special circumstances exist . . .

---

Inc. v. Veneman, 310 F.3d 747, 758 (D.C. Cir. 2002) (Sentelle, J., dissenting)
("Therefore, when we hold that the conclusion heretofore improperly reached should
remain in effect, we are substituting our decision of an appropriate resolution for that of
the agency to whom the proposition was legislatively entrusted. I therefore cannot
concur."); Checkosky, 23 F.3d at 490 (Randolph, J., dissenting) ("The remand-only
disposition ... is contrary to law. It rests on thin air.").  Judge Wald, a former judge of
the D.C. Circuit, "believes that there are inherent powers in a reviewing court to
postpone vacation until the agency has a chance to make things right," Patricia M.
Wald, "Judicial Review in Midpassage: The Uneasy Partnership Between Courts and
Agencies Plays On," 32 Tulsa L.J. 221, 236 (1996); however, even she expressed
doubt over the legitimacy of RWV, in American Medical Ass'n v. Reno, 57 F.3d 1129,
1136 N.4 (D.C. Cir. 1995), Judge Wald remarked, "we do not reach the question raised
and left undecided in Checkosky as to the validity of this precedent [authorizing RWV
as an appropriate remedy." Id. (citations omitted).

[68] Professor Levin suggests that § 706 of the APA "should not be read too
literally, where such a reading would confine the court's equitable remedial authority."
Levin, supra n67, at 322.

[69] Most of the decisions applying RWV involve rulemaking or other similar agency
functions. "The D.C. Circuit started applying RWV in the 1970s . . . [m]ost cases
involved defects in the agency's substantive explanation for its policy choice . . . the
court focused on cases where costs of vacating the rules were high, while the benefits
were likely to be minor or nonexistent."  Kristina Daugirdas, Note: "Evaluating Remand
without Vacatur: A New Judicial Remedy for Defective Agency Rulemaking," 80 N.Y.U.
L. Rev. 278, 290 - 91 (2005).

> [such as] where, in the context of the proceeding as a whole: (a) the agency's error <u>did not preclude fair public consideration of a central issue</u> in a rulemaking <u>or a fair hearing on the necessary findings</u> in an adjudication or other agency proceeding; (b) the court finds a substantial likelihood that the agency, after further consideration, <u>will be able to remedy its error and reach a similar overall result on a valid basis</u>; and (c) the [Plaintiffs'] interest in obtaining relief from the agency's decision <u>is clearly outweighed</u> by the substantial and adverse impact that vacation of the agency's action would have on [Intervenors] who over time have reasonably relied on the agency action being remanded . . . [a]nd such <u>impact cannot be remedied after such interim period</u>.

Levin, *supra* n67, at 387 (citing American Bar Association Recommendation No. 107B (August 1997)) (emphasis added).  The ABA's recommendation, therefore, supports, in principle, the Court's decision to set aside these permits.  The ABA's recommendations reveal a presumption of vacation ("a reviewing court should normally strike the balance <u>in favor of vacating the agency's action</u>"), and none of the special exceptions to this presumption apply — the Corps' actions precluded the public's "fair consideration" of the permitting decision; the Court does not believe the Corps can remedy its error; and the Plaintiffs' (and the public's) interest in obtaining relief from the effect of these permits is not "clearly outweighed" by the impact on Intervenors (or the public) of setting aside these permits.  It appears that this Court's consideration of irreparable harm under the ABA's recommended guidelines should weigh heavily against the continuation of activities currently resulting in substantial environmental damages that "cannot be remedied after such interim period" (e.g., contamination of the Aquifer, the death of wood stork due to the destruction of their foraging habitat, and the continued devastation of wetlands).[70]

---

[70]<u>Miccosukee Tribe of Indians v. S. Fla. Water Mgmt. Dist.</u>, 280 F.3d 1364 (11th Cir. 2002) (vacating injunction prohibiting operation of a pump station without a permit,

In essence, Defendants and Intervenors urge this Court to engage in an
"equitable" balancing and to take the extraordinary step of not setting aside, or vacating,
the very permits which this Court long ago concluded should not have been issued.
Sierra Club, 423 F. Supp. 2d at 1380.[71]  The balancing test proffered by Defendants and
Intervenors requires the Court to evaluate both the seriousness of the agency's
deficiencies and the disruptive consequences of an interim change (by the Court) that
may later be changed (by the agency).  Chamber of Commerce of the United States v.
SEC, 443 F.3d 890, 908 (D.C. Cir. 2006).  Since this Court's prior Order already found
serious deficiencies in the Defendants' actions,[72] the first part of the test cannot be
satisfied and, because the test includes two parts (note the use of the conjunction
"and"), the Defendants' and Intervenors' arguments must fail.[73]  In summary, the Court

---

since without the pumping there would be flooding; the court noted that the plaintiffs
only wanted the state agency defendant to obtain the appropriate federal permits – not
to stop the pumping).

[71]Defendants and Intervenors repeatedly argued against an "injunction" and
focused a large proportion of their presentation on the impact that would be caused by
a permanent injunction against limestone mining in the Lake Belt area.  The Court is
not issuing an injunction; indeed, Plaintiffs have not pressed for a permanent injunction
against all mining in this area.  Rather, the Court makes this decision based upon the
evidence presented to the Court to date: not only should these permits never have
been issued in the first place, but they lack sufficient support for their issuance today.

[72]The Court's interpretation of the agency's deficiencies is that they were
serious.

[73]Even if the Court had not found serious deficiencies, it bears mention that
judicial review would be meaningless if the mere claim of disruptive consequences to
an industry or private actor was sufficient to avoid the setting aside of improper agency
conduct.  "Potential disruption, alone, however is insufficient to justify the application of
RWV . . . . The possibility of long delays could create incentives for parties to act
strategically by prolonging the final disposition of the case." Daugirdas, *supra* n69, at

finds the Intervenors' arguments unpersuasive and the cases they cite inapposite. This Court is not inclined to suggest a new standard for administrative agency review in this Circuit, particularly when the theory rests on such a slender reed, and when application to the facts of this case would merely result in the expansion of benefits already enjoyed by the private actors, including years of profits to which they might not otherwise have been entitled.[74]

As noted above, there is little guidance specifically addressing these issues; the parties have not cited any, and it is likely that no factually similar cases exist. The Court's cursory review could not identify another community in the United States in which the Corps permits rock mining and blasting activities on top of a major municipal water source, and the parties have not presented such an example. Further, this Court's search reveals a lack of reported cases sharing a similar posture to this case: where the Court's ruling on remedies is occurring after five years of mining (i.e., half of the "10 year" term of these permits) and more than a year after summary judgment was awarded to Plaintiffs – with a delay due to extensive evidentiary hearings on potential remedies. Therefore, the Court will briefly review the fundamental principles of judicial review, specifically focusing on how they apply to the regulatory violations at issue.

---

298, 310. The focus of disruption must be on a significant public interest - in particular, a federal objective. While "Everglades restoration" is a public interest and, arguably, a federal objective, it is not so directly connected to this mining that it could provide the sole justification for the otherwise improperly permitted activity.

[74]To be clear, the Court passes no judgment on the Intervenors nor their representatives for the aggressive pursuit of maximal profits, but it is this Court's duty to follow this nation's environmental laws and to insist that federal agencies do the same – regardless of pressures which may temporarily have led them astray.

To answer the question of what relief is appropriate to award Plaintiffs today, July 2007, in light of their success on summary judgment last year, the Court first must consider the question in light of the earlier determination that these permits should never have been issued in April 2002. The Court must consider, within limits,[75] current information in making a decision about remedies. In essence, this consideration requires the Court to determine whether a re-issuance or after-the-fact validation of those permits is supported by the record today. Rather than merely looking back to April 2002, when the permits were originally issued, the arguments offered by the parties instead take into account the intervening five years' worth of developments – including modifications to the permits.[76] All parties have asked this Court to rule based

_____

[75]Judicial review is guided by the principle of deference to a legitimate, i.e., regulations-abiding, exercise of agency discretion. In light of that principle, this Court is extremely reluctant to make its own determinations based upon the current scientific evidence which the Corps itself is reviewing; not only because the Court is not trained in hydrology or any of the fields of science at issue, but primarily because of the "final action" threshold question for a court's review of an agency's action. Here, the only "final action" clearly established as of this date is the issuance of the ROD and the permits which followed; therefore, this Court has focused on that "final action" – albeit with the benefit of new information – in determining what remedy should be imposed. Perhaps the Corps' questionable decision in April 2006 to allow the mining to occur despite the substantial problems in the permits which had been identified by this Court (and the known incidence of benzene contamination) could be construed as a final action – this may be an alternative theory to support this Court's current review. In any event, Defendants agreed with Intervenors' request for the evidentiary hearing, Docket No. 78, and did not object to the majority of the evidence offered by Plaintiffs and Intervenors.

[76]For example, a 2005 amendment to the Tarmac permit allowed mining to proceed in an area  that was not authorized in the 2002 permits, but rather was within the "50 year" planned area of mining initially evaluated in the EIS issued in June 2000 (the subject of overwhelming criticism, see Sierra Club, 423 F. Supp. 2d at 1305). This permit amendment, or modification, was done without public notice or consultation with

upon that updated information.  During the hearing, counsel for Defendants stated that "the Corps is waiting for any guidance from the Court.  If the Court ruled right now that mining should not continue, then the Corps would not persist in allowing the mining to continue." Tr. 2648.[77]  The Court is mindful not to be tempted by the Defendant's invitation, for this Court's role is not to force a specific substantive result from an agency.  This Court does, however, strongly recommend that the Corps take note of what this Court has described, in many pages, as an inevitable conclusion of the evidence presented: these permits must be set aside, at least until the SEIS is completed.

A court's blind adherence to the principles of agency deference, particularly when faced with the agency's own acknowledgment of serious deficiencies,[78] is contrary to the

---

FWS.

[77]The Corps' position before my colleague, Judge Middlebrooks, as a result of his opinion in <u>Florida Wildlife Fed'n v. United States Army Corps of Eng'rs</u>, 404 F. Supp. 2d 1352 (S.D. Fla. 2005) (rejecting permits issued for construction of a biotech research complex), was that the permitted activity should stop immediately after the Court announced its ruling.  The difference between the Corps' position in this case and their position in <u>Florida Wildlife Federation</u> may exemplify the inherent conflict of interest in the Corps' enforcement of environmental laws which conflict with the agency's own construction projects.  The permits at issue in <u>Florida Wildlife Federation</u> related to the construction of a facility largely intended for private enterprises only indirectly connected to the Corps' mission.  In the present case, the Corps is a direct consumer of the limestone produced pursuant to these invalidated mining permits - purchasing aggregates, concrete, and other materials for public construction projects. Notably, if the Corps simply had taken the same position before this Court that it had taken before Judge Middlebrooks (to stay any further action under the invalidated permits), an extraordinary amount of judicial resources, as well as those of the parties, would have been conserved.

[78]The Corps' tacit admissions that it failed to recognize the impact of mining on wood storks, failed to hold a public hearing, and repeatedly violated governing

doctrine of separation of powers.[79]  To be clear, this Court is not dictating what the

agency's future decision should be; rather this Court has determined that the agency

has failed to perform its important duties.[80]  The principles of agency deference, as

_____

regulations are enough to raise concern about the results of any future deference in
this case. Reviewing the Corps' errors in this case alongside its previously admitted
failures to mitigate potential impacts in other CWA projects, see Plaintiff s' Exh. 174,
Government Accountability Office Report to the House Committee on Transportation
and Infrastructure, "Wetlands Protection: Corps of Engineers Does Not Have an
Effective Oversight Approach to Ensure that Compensatory Mitigation is Occurring,"
September 2005, suggests that the Corps is an agency with serious performance
deficiencies. Another example comes from the Corps' own admission, in testimony
before  a House Subcommittee, that flooding damage from Hurricane Katrina would
have been worse if the Corps' original protection plan had been adopted (the plan was
rejected by a Federal Court (see SOWL, Inc. v. Rush, No. 76 Civ. 3998 (E.D.La. Dec.
30, 1977)). See U.S. Gen. Accounting Office, GAO-05-1050T, Testimony Before the
Subcommittee on Energy and Water Development, Committee on Appropriations,
House of Representatives, "Army Corps of Engineers: Lake Pontchartrain and Vicinity
Hurricane Protection Project," (2005)).  In sum, it may be determined one day that the
Corps' past failings should result in their sacrifice of the cloak provided by judicial
deference as to their actions impacting environmental protection.  This Court does not
issue such a broad ruling at this time, but is compelled to note that the agency's
conduct has been somewhat below an appropriate standard.

   [79]Obviously, Article III of the United States Constitution must not be read in
isolation; our constitutional system is structured to provide certain checks and balances
on the authority of each of the three branches of government.  For example, the courts
and the Executive review the constitutionality of challenged legislation, and Congress
has the power to impeach the President or a judge under appropriate circumstances.

   [80]The Court's prior Order found that Defendants violated statutory and regulatory
guidance, and subsequent evidence suggests that some of those violations persist
today.  The CWA specifically notes that "an unacceptable adverse effect on municipal
water supplies" may be grounds for denial of a 404 permit, and that permits should only
issue if they are consistent with the 404(b) guidelines, found at 40 C.F.R. § 230; 33
U.S.C. § 1344.  Those guidelines, and other governing regulations, unambiguously
prohibit the approval of permits which cause municipal water supply contamination
unless it was "clearly demonstrated" that the presumed practicable alternatives were
not available or would have "other significant adverse environmental consequences."
40 C.F.R. § 230.10(a), (a)(3); see also Id. § 230.10(4)(c) ("[N]o discharge of dredged or
fill material shall be permitted which will cause or contribute to 'significant degradation'

stated in <u>Chevron U.S.A., Inc. v. NRDC.</u>, 467 U.S. 837, 862 (1984), require courts to

accord substantial deference to the federal agencies in interpreting their regulations.

However,

> courts are not obliged to stand aside and rubber-stamp their affirmance of
> administrative decisions that they deem inconsistent with a statutory mandate or
> that frustrate the congressional policy underlying a statute.  Such review is
> always properly within the judicial province, and courts would abdicate their
> responsibility if they did not fully review such administrative decisions.

<u>NLRB v. Brown</u>, 380 U.S. 278, 291-92 (1965)[81].  "[C]ourts must overturn agency actions

which do not scrupulously follow the regulations and procedures promulgated by the

agency itself." <u>Sierra Club v. Martin</u>, 168 F.3d 1, 8 (11th Cir. 1999)[82] (quoting <u>Simmons v.</u>

---

of the waters of the United States.")
    The evaluation of whether an activity will lead to "significant degradation"
requires an assessment of the persistence and permanence of the effects, the first
example of the type of effects to be considered is "effects on municipal water supplies."
40 C.F.R. § 230.10(5)(c)(1).  The Corps is required to make a factual determination
regarding "the degree to which the material proposed for discharge will introduce,
relocate, or increase contaminants."  40 C.F.R. § 230.11(d).  While the predicted
source of the benzene is not the "material proposed for discharge," i.e., presumably the
muck and other remnants of the limestone mining process, the 404(b) Guidelines
clearly require the Corps to consider secondary effects of the proposed activity, 40
C.F.R. § 230.11(h), and the effects of the blasting process used to extract the rock from
the Aquifer must be considered as some of these secondary effects.

    [81]"The judiciary is the final authority on issues of statutory construction and must
reject administrative constructions which are contrary to clear congressional intent."
<u>Chevron, U.S.A., Inc. v. NRDC</u>, 467 U.S. 837, 843 (1984) (citing <u>NLRB v. Brown</u>, and
others).

    [82]The opinion in <u>Sierra Club v. Martin,</u> 168 F.3d. 1 (11th Cir. 1999), held that the
Forest Service did not follow its own directive, therefore, its decisions regarding several
forest management plans were not entitled to deference.  The court found that the
agency's decision not to maintain population data on certain sensitive species when it
had previously said that it would do so, was "contrary to the clear language of [its own
forest plans] and the [National Forest Management Act]" and therefore not entitled to
deference.  <u>Id.</u> at 11-12.  The court made this decision despite the fact that none of the

Block, 782 F.2d 1545, 1550 (11ᵗʰ Cir. 1986)).  When the terms of a regulation are

unambiguous, no deference is given to agency action which contradicts the regulation's

plain language.  Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) ("[W]e

must defer to the [agency's] interpretation unless an 'alternative reading is compelled by

the regulation's plain language . . . .'") (citations omitted).  Clearly, deference is not

absolute but rather admits of exceptions for those rare occasions when agencies fail to

abide by their own regulations or statutory directives, as they do here.[83]  This is not to

suggest that agencies must execute their duties flawlessly – although it is a worthy

aspiration, nor that agencies should be discouraged from acknowledging past errors in

judgment, i.e., such admissions need not subject the agency to a total lack of trust; but it

must be that our system of government permits the courts, on those rare occasions

---

agency's governing regulations specifically imposed such a population data
requirement.  In response to the court's decision, the Forest Service adopted
amendments to the plans which attempted to give the Forest Service its own discretion
to do what the appellate court previously had criticized it for doing, i.e., rely upon
habitat information instead of maintaining actual population inventories on proposed,
endangered, threatened, or sensitive species.  The Eleventh Circuit rejected this
attempt to limit its earlier ruling, and directed that the agency must follow NEPA and the
governing directives of its prior plans which required it to keep actual population data
on such species, not simply habitat information.  Ouachita Watch League v. Jacobs,
463 F.3d. 1163 (11ᵗʰ Cir. 2006).  Thus, the appellate court confirmed its willingness to
enforce an agency's own directives even if they are not specifically included in the
agency's governing statutes or implementing regulations.

[83]For the Court to ignore the failures of an agency (governed by the executive
branch) in implementing federal laws (passed by Congress) would result in an
"abdicat[ion]" of the Court's responsibility, NLRB v. Brown, 380 U.S. at 290-91,  and a
deviation from the principles of our government.  Thus, while this court's review must
be performed with "conscientious awareness of its limited nature." Ethyl Corp. v.
E.P.A., 541 F.2d 1, 36 (D.C. Cir. 1976) (affirming EPA decision regulating emissions
from gasoline additives), it is not done without some authority to take action –
regulatory violations are evidence that deference does not apply.

when judges are faced with evidence that an agency's orientation or conduct is contrary to its Congressional mandate, to peek carefully behind the curtain of deference and set aside certain agency actions. Courts are justifiably reluctant to approve environmental permitting decisions when the record demonstrates that those decisions were based upon assumptions rather than upon an independent study of the issues.  When the Corps planned to renew shell dredging permits in Louisiana's Lake Pontchartrain which would have "affect[ed] over two million acres of ecologically fragile water and wetland . . . [and might have] also interfere[d] with the process of delta-building . . . and with the health of living reefs and the formation of new reefs," a federal appellate court criticized the Corps for arguing that "damage to the [bottom dwelling life in Lake Pontchartrain already] was completed in the 1950's and so the effects of further [shell] dredging cannot be considered significant."  Louisiana v. Lee, 758 F.2d 1081, 1085-86 (5th Cir. 1985) (vacating dismissal of action challenging failure to file EIS and noting that while agency can rely on mitigating effects of permit conditions when deciding whether EIS is required, significant environmental effects were at issue).[84] Twenty years later the Corps' arguments are strikingly similar.  Noting that the wetlands to be mined in the next year and a half had "largely been impacted already by some part of that sequence of mining or have a significant amount of Melaleuca," Tr. 3073 (Paul Souza), Souza

---

[84]"The renewal of [the permits] will not maintain a status quo, but rather will continue a course of environmental disruption begun years ago," Lee, 758 F.2d at 1085-86.  The court remanded the case back to the district court to "compare the projected ecological status of the affected areas if the [project] is continued for another five years with their projected condition if the dredging is halted now." Id. at 1086.

testified that there would not be any adverse effects from the mining in the near future.[85]

Defendants fail to recognize that their own actions – the permitting of additional clearing

of vegetation and continued destruction of wetlands – are the basis for the argument

that the area is suitable only for mining, an argument which this Court already has

rejected. Sierra Club, 423 F. Supp. 2d at 1295 n49, 1330, 1373 n275 (rejecting "already

degraded wetlands" arguments). Such self-generating justification for further

destruction is simply improper in the context of the facts of this case, and in light of the

Defendant's neglect to administer their important regulatory duties. The Corps' failure to

perform an adequate environmental analysis before it issued these permits caused the

present situation; acres of wetlands – perhaps what would have been suitable foraging

habitat – are now denied protection by the Corps because they have "been impacted

already." Tr. 3073 (Souza).

The Court previously found that the Corps violated multiple provisions of NEPA –

e.g., failing to adequately evaluate the adverse impacts of the proposed mining on

Wellfield contamination, on wood stork habitat, and on seepage – largely due to a

reliance on insufficient data and outdated analyses. The Corps also failed to properly

consider mitigation, and was deficient in planning for littoral shelf construction. They

failed to ensure that the targeted area for mitigation and restoration would be acquired,

and they improperly balanced the applicant mining companies' needs against the long

---

[85]The Corps also apparently has relied on the existence of mitigation in
rendering its decision not to disturb mining during the current period of supplemental
environmental analysis. "The principal factors [for our decision not to stop the mining
at this point] are that there would be a small amount of additional [mining] and, second,
that the mitigation was, in fact, ahead of schedule." Tr. 2651 (Studt).

term productivity of the environment.  Sierra Club, 423 F. Supp. 2d. 1273.  Similarly, the

Court identified numerous violations of the CWA by the Corps, including a failure to

properly define the project purpose – a deficiency which resulted in their failure to apply

the proper presumption against locating activities in wetlands.[86]  That improper definition

rendered the Corps' analysis of practicable alternatives incomplete.  This compounding

of errors, in part due to the Corps' favorable view toward proposals from the permit

applicants,[87] consistently permeated the permitting process.

   To date, Defendants have done little to demonstrate their consideration of the

public's viewpoint, in violation of the CWA, 33 U.S.C. § 1344(a), and the Corps'

regulations implementing the CWA, see 33 C.F.R. § 327.4. "NEPA procedures must

insure that environmental information is available to public officials and citizens before

decisions are made and before actions are taken.  The information must be of high

quality.  Accurate scientific analysis, expert agency comments, and public scrutiny are

essential to implementing NEPA."  40 C.F.R. § 1500.1(b).[88]

---

[86]As discussed in the Court's prior Order, the CWA 404(b)(1) Guidelines prohibit
the destruction of wetlands "if there is a practicable alternative to the proposed [action]
which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. §
230.10(a). This provision should guide the mining industry to "first seek project sites
that will have the least damaging effects on wetlands and their ecosystems." Sierra
Club, 423 F. Supp. 2d at 1351. The test of alternatives requires measurement of
alternatives at the time when the specific property was acquired by the applicant, not at
the time when the permit application is submitted.

[87]If the Corps accepts a permit applicants' claims as true, without conducting
sufficient independent study, there is a significant risk that permitting decisions will be
based upon a set of assumptions which lack a proper foundation.

[88]Interestingly, when the Court last visited the Corps' website and searched for
the terms "lake belt" nothing current was found. At the hearing, the Court was advised

"NEPA ensures that the agency will not act on incomplete information, only to

regret its decision after it is too late to correct." <u>Marsh v. Oregon Natural Resources</u>

<u>Council</u>, 490 U.S. 360, 371 (1989).

> Prior to the passage of [NEPA], environmental considerations were systematically underrepresented in the federal agency decision making process. Consistent with traditional notions of natural resource allocation, the benefits of development were overstressed and less environmentally damaging alternatives for meeting program objectives were often given limited consideration. NEPA declares a broad national commitment to protecting and promoting environmental quality. This commitment is implemented by focusing government and public attention on the environmental effects of proposed agency action; the Act ensures that important environmental consequences will not be 'overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast.' In short, NEPA requires that the evaluation of a project's environmental consequences take place early in the project's planning process.

<u>North Buckhead Civic Ass'n v. Skinner</u>, 903 F.2d 1533, 1539-40 (11th Cir. 1990)

(footnotes omitted).[89]  The contamination of the Aquifer, the death of wood storks, and

---

that a special website, www.lakebeltseis.com, had been established by the Corps to advise the public regarding the SEIS process.  While the information on that website is more current, it does not indicate why the draft SEIS is not available yet (July 2007), despite the claim that it would be available as of May 2007.  On the Evergladesplan.org website (the "official site of the Comprehensive Everglades Restoration Plan (CERP)") there are "Q&As" which appear to be out of date.  For example, Q&A number 12, regarding the wood stork, reports that "[FWS] ... notified the Corps in December 2001 that it would not seek higher-level review of the project.  The wood stork issues have been adequately resolved."  So you Want to Know More About . . . USACE Lake Belt Permits, http://www.evergladesplan.org/facts_info/sywtkma_lakebelt.aspx (last visited July 10, 2007).  It therefore appears that Q&A number 12 has not been updated, or the Corps is ignoring both the Court's Order and the FWS' Biological Opinion.  It also appears that one of the permittees' consultants may not be aware of the mandatory public disclosure required by NEPA. "The Lake Belt looks pretty lonely on the Jacksonville Corps 'Hot Topics' web page.  We were hoping that it was 'old news' by now."  SAR1188 (message sent July 8, 2002, to Corps staff member).  The comment reveals a desire to have the mining plan proceed without further public scrutiny.

[89]As described by then Judge, now Justice, Breyer writing for the Court of Appeals for the First Circuit twenty years ago:

the destruction of hundreds of acres of wetlands by devegetation and demucking appear to be the regrettable outcomes of the Corps' failure to gather complete information before issuing these mining permits in 2002; these permits must be set aside before further harm is done.

Having previously found "substantial procedural or substantive reasons," Skinner, 903 F.2d at 1539, to grant summary judgment for Plaintiffs, and failing to find anything but support for that conclusion in the record amassed since that Order, including evidence of ongoing violations, this Court is compelled to set aside these permits until completion of the SEIS.  However, this Court is very mindful of the Intervenors' arguments regarding the potentially catastrophic effects of limiting their ability to retrieve limestone, a non-renewable natural resource, from below the surface of their private property.  Indeed, this Court extensively weighed the Intervenors' claim, particularly with respect to the employees of permittees' companies who may be facing unemployment

---

[T]he harm at stake [in a NEPA violation] is a harm to the _environment_, but the harm consists of the added _risk_ to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment.  NEPA's object is to minimize that risk, the risk of uninformed choice, a risk that arises in part from the practical fact that bureaucratic decisionmakers (when the law permits) are less likely to tear down a nearly completed project than a barely started project . . . .  [T]he risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation.

Sierra v. Marsh,  872 F.2d 497, 500-501, 504 (1st Cir. 1989) (vacating denial of preliminary injunction while noting that additional development as result of marine terminal and connecting causeway must be considered when weighing injunctive relief claims and that the economic need for the project was exaggerated) (emphasis in original).

and who have not enjoyed the past profits to the same extent as the corporations [90]

themselves.[91]  For that sole reason, and with the explicit statement that this decision

should not carry precedential value because it is driven by unique circumstances,[92] the

Court has crafted a partial stay of this Order, described in more detail below, which will

allow all of the permittees to continue to mine under these permits until the SEIS is

completed, with certain restrictions on three of the mining operations.[93]  The Defendants

_____

[90]It is interesting to note that three of the corporations mining under these permits have been sold in the past three years.  Permittee CSR Rinker Materials Corp. (now known as (Intervenor) Rinker Materials of Florida, Inc.) is in the process of being acquired by a Mexican corporation, Cemex S.A.B. de C.V.  (In addition, permittee/Intervenor Kendall Properties & Investments' property currently is mined by Rinker.)  Permittee/Intervenor Florida Rock Industries, Inc., was recently sold for $4.6 billion to Vulcan Materials Co.  Permittee Pan American Construction (now known as (Intervenor) APAC-Florida, Inc.) bought permittee Continental Florida Materials, Inc., for $5 million in Dec. 2004. See discussion, *infra*.

[91]The Court is primarily relying upon the arguments of Intervenors' counsel as to the question of devastating economic harm specifically to the corporations themselves – as the limited corporate information provided as evidence is somewhat impenetrable. In any event, it is not clear that corporate financial health necessarily is a factor under any of the governing statutes or corresponding regulations at issue here.  Plaintiffs' expert economist, whom this Court found credible, testified that market conditions are likely to adjust and respond to shortfalls by strategic positioning and substitution.  Tr. 1832-33 (Dr. Richard Weisskoff).  (Indeed, perhaps Florida Rock's recent sale to Vulcan demonstrates these principles.  See discussion, *infra*.)  Intervenors' own economist testified that a gradual decrease in the supply obviously of limestone would result in lesser impacts on the economy (and Intervenors) in the interim.  Tr. 5990 (Dr. Jesse David).

[92]The Court's concern for both the permittees' and the greater public's need for access to the limestone, in light of the Defendants' conduct in improperly approving these activities, have compelled this court to adopt an unusual partial stay of this Order.

[93]Only three of the corporations mining under these permits, Tarmac (owned by Titan, a Greek multinational corporation), Florida Rock (recently purchased by Vulcan Materials), and APAC (whose property is mined by White Rock, which also bought

also claim that the impact of vacatur during the remand period will have a "severe" effect on the Florida economy, causing a "major economic disruption" and "disruption to critical Everglades restoration projects." Docket No. 350, pp. 5, 27. It appears that at least some of the Defendants' broad predictions rest on debatable grounds.[94] More pointedly, the project to reinforce the Hoover Dike at Lake Okeechobee will use limestone that is not likely to come primarily from the area mined pursuant to these

---

fellow-permittee Continental), will be limited from mining in certain areas of their existing operations, as described in further detail below, until the SEIS is completed.

[94]The Defendants' witness was unable to make a specific estimate as to the increase in costs if these permitted mining companies were unable to supply the resource from these specific mines, nor did the witness testify about the ability of any of the permittees to access rock from other locations – even from their own company's other mines or sources. He noted that even though he had the ability to do so by running a computer program, Tr. 2966-67, he had "not done a study or analysis of [the cost impact to the Corps of an increase in crushed rock cost if Lake Belt production was shut down]," Tr. 2921, 2981 (Burch). Despite his failure to present the Court with a specific estimate of cost increases, the Corps' witness testified that an injunction against mining would cause 15-25% "across-the-board increases in Corps projects." Tr. 2953-54 (Burch). This figure, however, seems somewhat exaggerated in light of the witness' testimony that the limestone-related resources for an endeavor such as the Tamiami Trail project, which is emphasized as critical to CERP, do not constitute the majority of project's cost. Tr. 2968. See also n29, supra. According to a former Corps official, Dr. Terry Rice, the cost for the Tamiami Trail project is estimated at $156 million. The construction costs are $125 million and materials are approximately half of that cost, so the total cost for all materials would be approximately $55 million. Tr. 4863-64 (Dr. Rice). Applying the maximum cost increase estimated by the Corps, i.e. a 25% increase indicates that if mining is shut down, the increased costs for this project would be $13,750,000. In contrast to other cost increases in the Corps' Everglades restoration projects the amount of this increase, which has been estimated using the maximum estimates testified to by the Corps – despite the fact that no data to support those estimates was presented to the Court, this figure seems relatively low. For example, "when the contract was signed in 1994 [for the Modified Water Deliveries Project, which includes the Tamiami Trail project], the price of this project was $84.5 million. Right now, given all the changes that have been made, it's up to $400 million." Tr. 4863-64 (Dr. Rice).

invalidated permits.

The Court maintains hope that the corporations and their employees will make
appropriate adjustments, and that Everglades restoration work will not be significantly
delayed because of the Court's determination that this mining must be stopped.  In fact,
the Court has structured the remedy in an effort to provide the "gradual shift" noted in
the "Strategic Aggregates Study," prepared by consultants for the Florida Department of
Transportation earlier this year:

> Therefore, if there are to be closures, a gradual shift may allow time for the
> development of comparable new supplies and help mitigate the negative
> economic consequences that would otherwise burden the state, especially if the
> alternatives come from in state sources.

Strategic Aggregates Study, Part II, dated March 12, 2007, pp. 2-3.  It must not be
forgotten that limestone is a non-renewable resource,[95] and at some point under a future
mining scenario, the rock reserves would be exhausted; each day that this mining
proceeds under these invalidated permits fosters the expectation that mining will
continue to be permitted in wetlands,[96] an expectation which cannot be fulfilled.[97]

_____

[95]As noted in this Court's prior opinion, the Corps itself believed that mining of
the 5,000 acres subject to permits in existence before those issued in 2002 would last
only fifteen years, at which time rock would have to be brought in from elsewhere in any
event.  423 F. Supp. 2d at 1334.

[96]"Given the realities, the farther along the initially chosen path the agency has
trod, the more likely it becomes that any later effort to bring about a new choice, simply
by asking the agency administrator to read some new document, will prove an exercise
in futility."  Sierra Club v. Marsh, 872 F.2d 497, 503-504 (1st Cir. 1989) ("The district
court explicitly found that any 'harm' would prove reparable (not 'irreparable') on the
ground that removal of the [island causeway proposed to be permitted] would
'substantially restore the environmental status quo,' and 'removal' was 'practicable.'  To
rest the determination solely on this ground is to overlook the increased likelihood that
residents, workers, businesses, as well as government agencies, may, for example, all

In summary, the Court has determined that these permits must be set aside until the Corps completes the SEIS. A partial stay of this Order is granted, solely on the basis of the Intervenors' claims of a catastrophic result from a total prohibition of this mining; the stay will allow those mining operations to continue which are either taking place in non-wetlands or are located at a sufficient distance from the Wellfield that they pose a slightly lower risk of contamination of the production wells and municipal water supply.[98]

---

become ever more attached to the causeway and to the island development as the project nears completion. They may prove ever more willing to put up with any concomitant environmental harm.")

[97]For example, White Rock has $225 million in capital investments in its Main and South (Continental) quarries operating under these permits, Tr. 5533 (Hurley), and would be forced to default on millions of dollars of construction contracts if mining under these permits is limited in any substantial manner. Docket N. 94, p. 9. Recently, Tarmac invested $249 million in a new concrete block plant adjacent to the Lake Belt mining operations. Tr. 4984 (Townsend). When these permits were issued, mining companies owned less than half of the entire Lake Belt area, but since the permits were issued, at least some of the permittees have been acquiring additional property. White Rock, for example, has been purchasing property for as much as $160,000 per acre – the purchased property is outside the ten year permit, but within the EIS, and was bought for the purpose of mining. Tr. 5560-61 (James Hurley). The Corps' actions to date may have created an impression that permits would be available in the future. Corporations acting on that impression would have made investments in the area and certainly expected a return on those investments.

[98]The evidence before the Court is inconclusive as to the location of private wells near these areas, i.e., outside the Wellfield but near the mining operations on the periphery of the project area, but it is clear that mining activities, including blasting and the remnant quarry pits, pose risks to the Aquifer generally. To the extent that private wells draw from the Aquifer, they also may be exposed to the same risk.

## III. THE PERMITS MUST BE SET ASIDE DUE TO THE CORPS' FAILURE TO CONSIDER SIGNIFICANT ADVERSE ENVIRONMENTAL IMPACTS OF THIS MINING

The Biscayne Aquifer "is the source of the most important water supplies developed in southeastern Florida,"[99] and its characteristics, including the fact that it is "highly transmissive,"[100] render it particularly vulnerable to the mining activities which the Corps has approved.  Mining requires the complete removal of the surface, even if it is a protected wetland, to allow access to the limestone in the Aquifer which lies beneath the surface.  The limestone is then extracted to depths of as much as 80 feet,[101] and sometimes more, below the surface – creating large quarry pits.  The newly created quarry pits fill with water and become "lakes" which directly interact with the Aquifer.  This direct interaction between the mining activities and the Aquifer may have been a significant factor in allowing the Aquifer to become contaminated with benzene, as discussed in further detail below.

The County operates fifteen public wells in the Northwest Wellfield which are

---

[99]Johnnie E. Fish and Mark Stewart, "Hydrogeology of the Surficial Aquifer System, Dade County, Florida," USGS Water Resources Investigations Report 90-4108, published 1991, p. 13 (quotations omitted).  The Court hereby GRANTS Plaintiffs' request to admit this USGS Report, which was attached as Exhibit A to Docket No. 266, filed September 26, 2006.

[100]In other words groundwater moves through it in a relatively free manner. See Plaintiffs' Exh. 9, R. A. Renken, K. J. Cunningham, M.R. Zygnerski, M.A. Wacker, A. M. Shapiro, R. W. Harvey, D. W. Metge, C. L. Osborn, and J. N. Ryan, "Assessing the Vulnerability of a Municipal *Supra* to Contamination in a Karst Aquifer, Environmental & Engineering Geoscience, Vol. XI, No. 4, November 2005, p. 329.

[101]White Rock, for example, mines to a depth of approximately 80 feet at their main mining location.  Tr. 5547 (James Hurley).

located in the center of the area where the mining activities are occurring.[102]  The

Wellfield was originally conceived to be a "pristine" Wellfield.  William Pitt, Chief of the

Planning Section at WASD, testified that it "was envisioned that it would always be out

at the western reaches of the county and that it would never experience any potential

pollution from development, from different uses above the land surface and that type of

thing."  Tr. 1206 (Pitt).[103]  The Wellfield has been in service since the early 1980s and

serves as the main raw water source for the John E. Preston Water Treatment Plant.

CAP.[104]  The wells in the Wellfield collectively draw water up from the Aquifer (drawing

up to the current permitted maximum of 150 million gallons per day ("MGD")) to supply

40% of the County's drinking water.[105]  AR617, p. 5, AR1028, p. 5.  The wells in the

---

[102]As noted in the Court's March 2006 Order, another County Wellfield, the West Wellfield, is located to the east of the mining by Rinker which is occurring south of Tamiami Trail (on the site owned by Kendall Properties).

[103]To the east of the Wellfield is a protective canal; the water level in this canal is kept at a high level in order to prevent runoff from industrial and residential areas in the east (the canal is east of the Turnpike) from entering the Wellfield area.  Tr. 5137 (Carlos Espinosa).

[104]Miami-Dade County operates both the Hialeah and John E. Preston water treatment plants, which process water from the Northwest Wellfield and deliver it to residents in the northern part of the County.  As the plants are adjacent to each other, they often are referred to jointly as the Hialeah-Preston water treatment plant.  The Court's use of the term "water treatment plant" in this Order indicates the Hialeah and Preston water treatment plants collectively.

[105]"The Northwest Wellfield is a major uncontaminated source of municipal drinking water for Miami-Dade County, Florida.  The Wellfield consists of fifteen wells that supply a current demand of 150 million gallons per day (MGD) and a planned future capacity of  225 MGD....  The South Florida Rockmining Coalition is proposing to mine 8,400 additional acres, totaling almost 20,000 acres eventually mined out in the Lake Belt area.  This would leave most of the Northwest Wellfield occupied by open water."  AR1175 (Northwest Wellfield Watershed Protection Plan, prepared by DERM,

Northwest Wellfield are not screened, i.e., not enclosed in a protective casing, but

rather are open to the raw groundwater in the Aquifer at a depth of approximately 40 to

70 feet.  While the wells draw water from that depth primarily because that is the "most

permeable" interval, they also draw in water from above the 40 foot depth.  Tr. 1407

(Pitt).  Once the wells draw up the water, the water is then delivered to a treatment plant

several miles away.  One of the County's most important concerns is that the Aquifer not

be subject to reclassification as "groundwater under the direct influence" of surface

water ("GWUDI") – such a reclassification (from the present classification as

"groundwater") would require a costly modification of the County's water treatment

facilities.  AR1175 (Northwest Wellfield Watershed Protection Plan, prepared for the

SFWMD by DERM, dated August 16, 2000).[106]


## A. Risks affecting the municipal water supply

Prior to issuance of the mining permits by the Corps, the County expressed its

concern that continued limestone mining in the area of the Wellfield would trigger a

GWUDI classification.[107]  Despite this earlier position, and despite the recent incidents

_____

dated August 16, 2000).

[106]See, e.g., Intervenors' Exh. 96, Intervenors' Exh. 16, Plaintiffs' Exhs. 175, 176, Tr. 110 (Dr. Stavros Papadopulos) 4254, 4266-71 (Dr. Yoder).

[107]For example, WASD clearly was concerned about the adverse impacts of limestone mining.

In 1997, the State of Florida determined that well #10 in the Northwest Wellfield was GWUDI, based on the results of microparticulate analysis (MPA) conducted by the State.  Following this determination, the MDWASD conducted an